UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| ERIC CERVINI, WENDY DAVIS, DAVID GINS, and TIMOTHY HOLLOWAY,<br><br>Plaintiffs,<br><br>v.<br><br>ELIAZAR CISNEROS, HANNAH CEH, JOEYLYNN MESAROS, ROBERT MESAROS, DOLORES PARK, and JOHN and JANE DOES,<br><br>Defendants. | Civil Action No. 1:21-cv-00565-RP<br><br>Hon. Robert Pitman |

## PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND......................................................................................................2

STANDARD OF REVIEW ........................................................................................................5

ARGUMENT .............................................................................................................................6

I.      THE COURT HAS JURISDICTION UNDER 28 U.S.C. §§ 1331, 1343(A)(1)..............6

II.     PLAINTIFFS STATE A VALID CLAIM FOR A VIOLATION OF THE KLAN
        ACT'S SUPPORT-OR-ADVOCACY CLAUSES. ..........................................................7

        A.      Congress designed the support-or-advocacy clauses to protect the integrity
                of federal elections and intentionally omitted statutory language that narrows
                other provisions of the Klan Act. ...........................................................................9

        B.      The support-or-advocacy clauses are valid exercises of Congress's Article I
                powers under, among other things, the Elections Clause and the Necessary
                and Proper Clause...............................................................................................13

        C.      The Complaint plausibly alleges all elements of a support-or-advocacy claim
                required by the statutory text of the support-or-advocacy clauses. ......................18

        D.      This Court should reject Defendants' attempts to shoehorn additional
                elements into the support-or-advocacy clauses that are not found in or
                required by the statutory text. ..............................................................................21

                1.      Plaintiffs need not allege class-based animus. .........................................21

                2.      Plaintiffs need not allege state action. ....................................................26

                3.      Emotional injuries are sufficient to give rise to Klan Act liability. .........26

III.    PLAINTIFFS STATE A VALID CLAIM FOR CIVIL CONSPIRACY UNDER
        TEXAS LAW. ...............................................................................................................29

IV.     PLAINTIFFS STATE A VALID CLAIM FOR CIVIL ASSAULT UNDER TEXAS
        LAW. ............................................................................................................................31

CONCLUSION.......................................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
570 U.S. 1 (2013) ................................................................................................. 14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................ 6

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .............................................................................................. 19

*Bourland v. State,*
528 S.W.2d 350 (Tex. App. 1975) ....................................................................... 30

*Bray v. Alexandria Women's Health Center,*
506 U.S. 263 (1993) ............................................................................... 16, 22, 23

*Brown v. Reardon,*
770 F.2d 896 (10th Cir. 1985) ............................................................................. 24

*Bryan v. City of Madison,*
213 F.3d 267 (5th Cir. 2000) ............................................................................... 23

*Bryant v. Military Dep't of Miss.,*
597 F.3d 678 (5th Cir. 2010) ............................................................................... 23

*Burroughs v. United States,*
290 U.S. 534 (1934) ............................................................................................. 14

*Cantu v. Moody,*
933 F.3d 414 (5th Cir. 2019) ............................................................................... 23

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ............................................................................................. 17

*City of Tyler v. Likes,*
962 S.W.2d 489 (Tex. 1997) .......................................................................... 28, 31

*Colautti v. Franklin,*
439 U.S. 379 (1979) ............................................................................................. 25

*Creighton v. State,*
No. 08-9-00022-CR, 2011 WL 743073 (Tex. App. Mar. 2, 2011) ...................... 33

*Daigle v. Gulf State Utils. Co., Local Union No. 2286,*
   794 F.2d 974 (5th Cir. 1986) ........................................................23, 24

*Deubert v. Gulf Fed. Sav. Bank,*
   820 F.2d 754 (5th Cir. 1987) ................................................................23

*Drichas v. State,*
   175 S.W.3d 795 (Tex. Crim. App. 2005)........................................30, 33

*Duncan v. Walker,*
   533 U.S. 167 (2001)..............................................................................25

*Evergreen Partnering Grp. v. Pactiv Corp.,*
   720 F.3d 33 (1st Cir. 2013)..................................................................19

*Farber v. City of Paterson,*
   440 F.3d 131 (3d Cir. 2006).................................................................24

*Galloway v. State of La.,*
   817 F.2d 1154 (5th Cir. 1987) ............................................................24

*In re Glenn,*
   900 F.3d 187 (5th Cir. 2018) ..............................................................25

*Griffin v. Breckenridge,*
   403 U.S. 88 (1972)....................................................................12, 23, 25

*Grimes v. Smith,*
   776 F.2d 1359 (7th Cir. 1985) ............................................................24

*Haddle v. Garrison,*
   525 U.S. 121 (1998)..................................................................27, 28, 29

*Halberstam v. Welch,*
   705 F.2d 472 (D.C. Cir. 1983) ......................................................20, 33

*Hardin v. Obstetrical & Gynecological Assocs. P.A.,*
   527 S.W.3d 424 (Tex. App. 2017)..................................................28, 31

*Harrison v. KVAT Food Mgmt., Inc.,*
   766 F.2d 155 (4th Cir. 1985) ..............................................................24

*Home Builders Ass'n of Miss., Inc. v. City of Madison,*
   143 F.3d 1006 (5th Cir. 1998) ..............................................................5

*Horaist v. Doctor's Hosp. of Opelousas,*
   255 F.3d 261 (5th Cir. 2001) ..............................................................24

*Int'l Bankers Life Ins. Co. v. Holloway,*
    368 S.W.2d 567 (Tex. 1963)................................................................30

*United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan,*
    250 F. Supp. 330 (E.D. La. 1965) ............................................14, 15, 17

*Kimble v. D.J. McDuffy, Inc.,*
    648 F.2d 340 (5th Cir. 1981) (en banc) ..............................................22

*Kinney v. Weaver,*
    367 F.3d 337 (5th Cir. 2004) (en banc) ........................................ *passim*

*Kush v. Rutledge,*
    460 U.S. 719 (1983)................................................................ *passim*

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub.
    Interest Legal Found.,*
    No. 18-423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018)........................... *passim*

*Leal v. McHugh,*
    731 F.3d 405 (5th Cir. 2013) ..............................................................6

*Libertad v. Welch,*
    53 F.3d 428 (1st Cir. 1995)................................................................20

*McCord v. Bailey,*
    636 F.2d 606 (D.C. Cir. 1980) ........................................................12, 24

*Menchaca v. Chrysler Credit Corp.,*
    613 F.2d 507 (5th Cir. 1980) ............................................................5

*Milliken v. Skepnek,*
    No. 14-96-01522-CV, 1999 WL 496505 (Tex. App. July 15, 1999) ....................33

*MVS Int'l Corp. v. Int'l Advert. Sols., LLC,*
    545 S.W.3d 180 (Tex. App. 2017)........................................................29

*Nat'l Coal. on Black Civic Participation v. Wohl,*
    498 F. Supp. 3d 457 (S.D.N.Y. 2020)............................................ *passim*

*Newberry v. E. Tex. State Univ.,*
    161 F.3d 276 (5th Cir. 1998) ............................................................23

*NFIB v. Sebelius,*
    567 U.S. 519 (2012)......................................................................17

*Novak v. World Bank,*
    703 F.2d 1305 (D.C. Cir. 1983)............................................................6

*Parkway Co. v. Woodruff,*
  857 S.W.2d 903 (Tex. App. 1993), *writ granted* (Apr. 20, 1994), *aff'd as modified*, 901 S.W.2d 434 (Tex. 1995) ..................................................................28

*Paynes v. Lee,*
  377 F.2d 61 (5th Cir. 1967) ...................................................................6, 15, 25, 26

*Perez-Sanchez v. Pub. Bldg. Auth.,*
  531 F.3d 104 (1st Cir. 2008) .................................................................................24

*Prescott v. Jefferson,*
  No. 17-13584-A, 2018 WL 3937045 (11th Cir. May 31, 2018) ............................24

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
  547 U.S. 47 (2006) .................................................................................................25

*Sanchez v. Striever,*
  614 S.W.3d 233 (Tex. App. 2020) .........................................................................32

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
  801 F.3d 412 (4th Cir. 2015) .................................................................................19

*Smiley v. Holm,*
  285 U.S. 355 (1932) ...............................................................................................14

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ...................................................................................................7

*Stem v. Gomez,*
  813 F.3d 205 (5th Cir. 2016) ...................................................................................7

*Trevino v. Johnson,*
  168 F.3d 173 (5th Cir. 1999) ....................................................................18, 20, 31

*True v. Robles,*
  571 F.3d 412 (5th Cir. 2009) ................................................................................4, 5

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,*
  463 U.S. 825 (1983) ...............................................................................................23

*United States v. Bowman,*
  636 F.2d 1003 (5th Cir. Unit A Feb. 1981) ...........................................................14

*United States v. Butler,*
  25 F. Cas. 213 (C.C.D.S.C. 1877) (No. 14,700) ...................................................20

*United States v. Crosby,*
  25 F. Cas. 701 (C.C.D.S.C. 1871) (No. 14,983) ...................................................17

*United States v. Goldman,*
   25 F. Cas. 1350 (C.C.D. La. 1878) (No. 15,225)...........................................14, 18

*United States v. Harris,*
   106 U.S. 629 (1883)...........................................................................15, 16

*United States v. Malmay,*
   671 F.2d 869 (5th Cir. 1982) ...............................................................14

*United States v. Morrison,*
   529 U.S. 598 (2000)...........................................................................17

*United States v. Shoemaker,*
   746 F.3d 614 (5th Cir. 2014) ...............................................................19

*United States v. Simms,*
   508 F. Supp. 1179 (W.D. La. 1979) .......................................................15

*Ex parte Yarbrough,*
   110 U.S. 651 (1884)......................................................................... *passim*

*Yohey v. Collins,*
   985 F.2d 222 (5th Cir. 1993) ...............................................................18, 20, 31

**Statutes**

28 U.S.C. § 1331...........................................................................................6

28 U.S.C. § 1343(a)(1)...................................................................................6

42 U.S.C. § 1985..................................................................................... *passim*

42 U.S.C. § 1985(1)........................................................................................9

42 U.S.C. § 1985(2)........................................................................................10

42 U.S.C. § 1985(3)................................................................................ *passim*

70 Rev. Stat. § 5519 (1878) ............................................................................16

Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13 ...........................9, 14, 17, 26

Tex. Penal Code § 22.01(a)(2)...............................................................32, 34

**Constitutions**

U.S. Const. art. I, § 4.......................................................................................14

U.S. Const. art. I, § 8, cl. 18............................................................................14

**Congressional Material**

Cong. Globe, 42d Cong., 1st Sess. 704 (1871) ..............................................................12

**Treatises**

Restatement (Second) of Torts § 924 (1979) ..............................................................28

**Law Reviews**

Note, *The Support or Advocacy Clause of § 1985(3)*,
  133 Harv. L. Rev. 1382 (2020) ..............................................................24

Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*,
  89 Fordham L. Rev. 145 (2020) ..............................................................15, 17, 26

## INTRODUCTION

Less than a week before the 2020 presidential election, Defendants Eliazar Cisneros, Hannah Ceh, Joeylynn Mesaros, Robert Mesaros, and Dolores Park ("Defendants")—acting in concert with dozens of other supporters of then-presidential candidate Donald Trump (the Jane and John Doe defendants)—used their vehicles to assault, intimidate, and threaten voters who were exercising their constitutional rights while campaigning for the election of President Joseph Biden and Vice President Kamala Harris. Defendants, apparently dissatisfied with the myriad of methods by which to express their political viewpoints protected by the U.S. Constitution, decided to terrorize supporters of the Biden-Harris ticket to prevent them from peacefully advocating for the candidates of their choice. For more than an hour, the self-described "Trump Train" surrounded a Biden-Harris Campaign bus and held its passengers hostage on the busy highway, in order to frighten those passengers and prevent them from engaging in constitutionally protected speech. Compl. ¶¶ 73, 87, 89, 103. In doing so, Defendants acted unlawfully, and this lawsuit seeks accountability for Defendants' successful efforts to traumatize and silence the targets of their conspiracy, Plaintiffs Eric Cervini, Wendy Davis, David Gins, and Timothy Holloway. *Id.* ¶¶ 2, 10, 96, 112, 116, 135.

Defendants do not seriously dispute that Plaintiffs' allegations satisfy the elements of their claims pursuant to the Ku Klux Klan Act of 1871 ("Klan Act") and Texas law. Instead, Defendants rely on jurisdictional arguments that are wrong as a matter of law (*infra* Argument § I); invent pleading requirements that are untethered from the text of the Klan Act, its statutory history, and the case law interpreting it (*infra* Argument § II); and fail to seriously address Plaintiffs' detailed allegations satisfying each of the elements of their civil conspiracy (*infra* Argument § III) and civil assault (*infra* Argument § IV) claims. Plaintiffs respectfully submit that this Court should deny the Defendants' motions to dismiss.

## FACTUAL BACKGROUND

On October 30, 2020, supporters of the Biden-Harris Campaign intended to campaign at various political events across central Texas—the last of a three-day "Soul of the Nation" bus tour through the state. Compl. ¶¶ 2, 45. Plaintiffs Eric Cervini, Wendy Davis, David Gins, and Timothy Holloway—respectively, a volunteer, surrogate, staffer, and contractor for the Biden-Harris Campaign—were among those supporters who intended to spend that day campaigning. *Id*. ¶ 5. As originally planned, the day's bus tour involved various campaign events in San Antonio, San Marcos, and Austin, mostly by navigating north on Interstate 35 ("I-35"). *Id*. ¶ 66. Defendants, along with dozens of other Trump supporters, deliberately thwarted those plans by subjecting Plaintiffs to a violent and traumatizing coordinated vehicular assault.

Upon learning of the Biden-Harris Campaign's Texas bus tour, Trump supporters began planning to intercept and assault the bus tour using a caravan of dozens of vehicles, which they dubbed a "Trump Train." *Id*. ¶¶ 46–48, 59–65. Much of this coordination occurred over the social media accounts of two local Trump-supporter groups, the Alamo City Trump Train and New Braunfels Trump Train. *Id*. For example, on the morning of Wednesday, October 28, 2020, one Alamo City Trump Train member posted that the group should "be on standby for Friday [the 30th]," and that the group should "flood the hell out of" the Biden-Harris Campaign bus. *Id*. ¶ 46. The Complaint details additional efforts to recruit for and coordinate a so-called "#OperationBlockTheBus" in the days leading up to the assault. *Id*. ¶¶ 46 & n.3, 47–48, 55–57, 63.

Planners of the Trump Train continued to coordinate on the day of the assault itself. *Id*. ¶ 59. On the morning of October 30, a leader of the New Braunfels Trump Train encouraged his friends and followers to "go get that Biden bus[.]" *Id*. ¶ 60. That day, planners also used social media to share logistical information and to track the bus's location in real time. *Id*. ¶¶ 61–65, 68.

As the Biden-Harris Campaign bus departed San Antonio, Defendants and other members of the Trump Train commenced their 90-minute vehicular assault on Plaintiffs. *Id.* ¶ 7. Over the course of the assault, Defendants, along with the Jane and John Doe defendants and dozens of other vehicles, surrounded the bus at dangerously close proximity—sometimes within inches— and deliberately forced it to slow down to just 15-25 miles per hour on an interstate with a speed limit of 70 miles per hour. *Id.* ¶¶ 7, 24, 84, 89. Defendants repeatedly swerved and braked in front of the bus to block its path, forcing the 25-ton bus to take evasive maneuvers to avoid a collision. *Id.* ¶¶ 84–90. Plaintiffs feared for their lives. *Id.* ¶ 129.

The Complaint details how each Defendant participated in the coordinated assault on Plaintiffs. Defendant Hannah Ceh—along with at least two John Does—menaced the bus aboard a pickup truck driving within inches of the bus to box it in. *Id.* ¶¶ 81, 89. Defendants Robert and Joeylynn Mesaros (the "Mesaros Defendants") lay in wait on the shoulder for the bus to arrive, and then used their pickup truck to "dangerously and abruptly cut[] right in front of the bus," *id.* ¶ 87, to box the bus in, *id.* ¶ 150. They then deployed a breaking maneuver to rapidly slow the bus to a crawl. *Id.* ¶ 87 & images, 150. Defendant Joeylynn Mesaros then bragged online about how she and her husband, Defendant Robert Mesaros, "escort[ed]" the Biden bus "out of town." *Id.* ¶ 82 & image. Defendant Park assisted other vehicles in boxing the bus in. Video footage shows her vehicle driving slowly in front of and to the left of the bus to block its escape on the left. *Id.* ¶ 86 & images. She also livestreamed some of the harassment online from her SUV and bragged about how she and the rest of the Trump Train deployed dangerous driving tactics. *Id.* ¶ 92. "This Biden bus is surrounded! Like seriously surrounded by Trump flags!" she said. "If my husband sees me like this he's going to kill me for driving like this!" *Id.* She explained on video how she and others maneuvered to slow down traffic near the bus and box out non-Trump-Train vehicles

to keep the bus surrounded. *Id.* Defendant Eliazar Cisneros also used his pickup truck to assault the bus with a rapid breaking maneuver. *Id.* ¶ 85 & images. At one especially dangerous point, Defendant Cisneros collided with the SUV of a Biden-Harris Campaign staffer who was escorting the bus—an act Defendant Cisneros later described as "slamming that fucker . . . Hell yea" and "serv[ing] . . . 35 in[ch] tires."[1] *Id.* ¶¶ 8, 102–106, 121. Even after the crash on the highway, Defendant Cisneros continued to harass Plaintiffs, first in person in Austin and then later online— for example, by posting the message, "How did you like Texas?" on Plaintiff Cervini's Facebook page. *Id.* ¶¶ 113–115, 127.

---

[1] Defendant Park asserts that "it seems Plaintiffs' claims are untruthful as police believe that it was the Plaintiff in the white truck, and not Defendant Cisneros, who was the aggressor in the accident." Park MTD at 6. This comment is inaccurate, incredible, and irrelevant. *First*, the campaign staffer involved in the collision is not a Plaintiff in this action. *Second*, Defendant Park raises a factual dispute—but at the motion-to-dismiss stage, Plaintiffs' well-pleaded facts must be accepted as true. *E.g.*, *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009). *Third*, the credibility of the San Marcos police's statement that "[t]he at-fault vehicle may be the white SUV and the victim appears to be the black truck" is at issue. Mairead McArdle, *Local Police Say Biden Staffer May Have Been 'At Fault' in 'Trump Train' Highway Incident*, Nat'l Rev. (Nov. 2, 2020), https://yhoo.it/3h0x8pw. The San Marcos police were not present at the incident, nor did they interview either party to the collision. *See id.* (Plaintiffs are separately suing members of San Marcos law enforcement for refusing or failing to come to the bus's aid, in spite of advance notice and repeated calls for a police escort. *See generally* Compl., *Cervini v. Stapp*, 1:21-cv-00568-RP (W.D. Tex. June 24, 2021), Dkt. 1.). Further, online footage (including the footage Defendant Park cites) shows Defendant Cisneros accelerating and swerving twice into the Biden staffer's SUV, *see* Storyful Rights Mgmt., *Trump Supporter's Car Collides with Vehicle Crossing Into Lane During Biden Bus Trail Incident*, YouTube (Nov. 2, 2020), at 1:54–2:01, https://youtu.be/k4XgDO5cxgM (cited in Park MTD at 6); Yellow Rose Drones, *Operation Biden Bus Escort Duty - Part 2 with Additional footage*, YouTube (Nov. 5, 2020), at 1:58–2:04, https://bit.ly/3kYdgF4; melissa "cancel student debt" byrne (@mcbyrne), Twitter (Oct. 31, 2020, 11:50 AM), at 0:13–0:21, https://bit.ly/3gWR78I, and Cisneros admitted on Facebook after the incident that it was he who "slamm[ed]" into the staffer's vehicle. Compl. ¶ 121. *Finally*, who was at fault in the collision has no bearing on the Complaint's allegations that Defendants targeted, assaulted, and intimidated the bus by boxing it in, abruptly slowing down in front of it, forcing it to a crawl, and creating a dangerous situation for the bus participants and others on the highway. *Id.* ¶¶ 73, 87, 89, 103.

#OperationBlockTheBus succeeded. Plaintiffs were ultimately able to escape the Trump Train, but not unscathed. As a result of the incident, the Biden-Harris Campaign canceled the remaining campaign events in Texas to protect the safety of campaign staff and attendees. *Id.* ¶¶ 116, 135. All Plaintiffs suffered significant psychological harm, and all were prevented from exercising their First Amendment rights to advocate for their chosen candidates. *Id.* ¶¶ 129–134. Plaintiffs brought suit to hold Defendants accountable for their unlawful conduct and to seek redress for these damages under both the Klan Act and Texas law.

In response, all Defendants have moved to dismiss, three arguing that this Court lacks subject-matter jurisdiction and all arguing that Plaintiffs have failed to state a claim. *See* Dkt. 22 ("Ceh MTD"), Dkt. 24 ("Mesaros MTD"), Dkt. 25 ("Cisneros MTD"), Dkt. 33 ("Park MTD") (collectively, the "Motions to Dismiss"). Plaintiffs now file this consolidated brief in opposition to Defendants' motions.

## STANDARD OF REVIEW

Defendants Ceh and Cisneros move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, and all Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. At the motion to dismiss phase, a Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (cleaned up).

"A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). The party asserting jurisdiction bears the burden to prove that jurisdiction exists under Rule 12(b)(1). *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

Dismissal under Rule 12(b)(6) is appropriate only if a complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable . . . ." *Id.* at 678. Motions to dismiss under Rule 12(b)(6) are generally "viewed with disfavor and [are] rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

## ARGUMENT

### I.   THE COURT HAS JURISDICTION UNDER 28 U.S.C. §§ 1331, 1343(A)(1).

This Court has federal question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, as well as original jurisdiction over "any civil action authorized by law to be commenced by any person to recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in [42 U.S.C. § 1985.]" 28 U.S.C. § 1343(a)(1). Plaintiffs allege a violation of the Klan Act, 42 U.S.C. § 1985, a federal law. Compl. ¶¶ 136–141. Plaintiffs have subject-matter jurisdiction under both 28 U.S.C. §§ 1331 and 1343(a)(1). *See, e.g.*, *Paynes v. Lee*, 377 F.2d 61, 64–65 (5th Cir. 1967) ("Federal jurisdiction" is "clearly conferred by 42 U.S.C.A. § 1985(3)"); *Novak v. World Bank*, 703 F.2d 1305, 1307 nn.2, 3 (D.C. Cir. 1983) (28 U.S.C. §§ 1331 and 1343(a)(1) provide federal jurisdiction over Section 1985 claims).

Nonetheless, Defendants Ceh and Cisneros assert the legal conclusion that there is no federal jurisdiction because the Klan Act "cannot apply under the facts pled." Ceh MTD at 1–2; Cisneros MTD at 1–2. And Defendant Park argues that the state law claims should be dismissed "for want of jurisdiction" because the Klan Act claim is "frivolous." Park MTD at 16–17.

Defendants fundamentally misstate this Court's high bar for overcoming subject-matter jurisdiction by conflating jurisdiction with purported frivolity. Jurisdiction "is not defeated by the possibility that the averments might fail to state a cause of action." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (cleaned up).

The only exceptions to a federal court's subject-matter jurisdiction are if a federal claim is either (i) "immaterial and made solely for the purpose of obtaining jurisdiction" or (ii) "is wholly insubstantial and frivolous." *Id*. Neither of these rare exceptions applies here. To the extent that Defendants mean to argue that Plaintiffs' claims are so "wholly insubstantial and frivolous" as to render jurisdiction inoperable, *id*., Defendants' nonsensical and unsubstantiated claims of "frivolous[ness]" cannot meet this exacting standard. Plaintiffs' interpretation of their support-or-advocacy claim under the Klan Act has been accepted by multiple federal courts. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486–87 (S.D.N.Y. 2020) ("*Nat'l Coal.*"); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 18-423, 2018 WL 3848404, at *5–6 (E.D. Va. Aug. 13, 2018) ("*LULAC*").

Defendants cannot avoid the merits of this case by merely crying frivolity: more is required to overcome this Court's clear grant of subject-matter jurisdiction. *See Stem v. Gomez*, 813 F.3d 205, 210 (5th Cir. 2016) ("So long as a complaint is drafted 'to seek recovery directly under the Constitution or laws of the United States,' a 'failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction.'") (citing *Bell v. Hood*, 327 U.S. 678, 681–82 (1946)).

## II. PLAINTIFFS STATE A VALID CLAIM FOR A VIOLATION OF THE KLAN ACT'S SUPPORT-OR-ADVOCACY CLAUSES.

As the Complaint recounts, Defendants (i) engaged in a prohibited conspiracy to intimidate or injure lawful voters (Plaintiffs) for providing support or advocacy for the Biden-Harris

presidential campaign; and (ii) acted on the conspiracy by participating in a coordinated effort to obstruct, threaten, and intimidate the occupants of the Biden bus by engaging in dangerous driving tactics; (iii) which injured Plaintiffs in their person or property and/or deprived them of exercising a right or privilege as citizens of the United States. *See* Compl. ¶¶ 136–141.

That course of conduct violated the support-or-advocacy clauses of the Klan Act. The support-or-advocacy clauses make it unlawful for "two or more persons" to "conspire" either to (i) "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" in a federal election, or to (ii) "injure any citizen in person or property on account of such support or advocacy." 42 U.S.C. § 1985(3).

In their Motions to Dismiss, Defendants do not deny that they engaged in a coordinated effort to obstruct, threaten, and intimidate the occupants of the Biden bus on I-35. Nor do they attempt to engage at all with the relevant statutory language of the support-or-advocacy clauses of Section 1985(3). Instead, in a fruitless effort to dodge the plain text of the support-or-advocacy clauses and the well-pleaded allegations of the Complaint, Defendants spend most of their Motions to Dismiss engaged in an analysis that runs directly contrary to Supreme Court precedent (which, like the relevant statutory text, they neither cite nor discuss).

The Court can and should reject the arguments advanced in the Motions to Dismiss. Contrary to Defendants' arguments: (i) the support-or-advocacy clauses are a valid exercise of Congress's Article I powers to protect the integrity of federal elections, not an exercise of Congress's powers under the Reconstruction Amendments (the Thirteenth, Fourteenth, and Fifteenth Amendments), Park MTD at 8–11; *see infra* Argument § II.B; (ii) Plaintiffs are not required to allege class-based animus to bring a support-or-advocacy claim, Mesaros MTD at 6–9; Park MTD at 11–14, 15–16; Ceh MTD at 2; Cisneros MTD at 2; *see infra* Argument § II.D.1;

(iii) Plaintiffs need not allege state action when pleading a violation of the support-or-advocacy clauses, Park MTD at 14–15; *infra* Argument § II.D.2; and (iv) emotional injuries do, in fact, count as injuries under the Klan Act, Ceh MTD at 2; Cisneros MTD at 2; *infra* Argument § II.D.3.

Because the Complaint plausibly alleges all the statutory elements of a support-or-advocacy claim required by the text of the relevant statutory text, *see infra* Argument § II.C, and Defendants' arguments all run contrary to Supreme Court precedent, the Motions to Dismiss Plaintiffs' Klan Act support-or-advocacy claim for failing to state a claim should be denied.[2]

### A.   Congress designed the support-or-advocacy clauses to protect the integrity of federal elections and intentionally omitted statutory language that narrows other provisions of the Klan Act.

The support-or-advocacy clauses at issue in this case were passed as part of Section 2 of the Ku Klux Klan Act of 1871 (and not, as the Mesaros Defendants suggest, "the Civil Rights Act of 1964," Mesaros MTD at 6). *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 14. Section 2 of the Klan Act prohibits a laundry-list of private conspiracies to interfere with civil rights. *See id.*[3] At present, five separate provisions of Section 2 of the Klan Act are codified at 42 U.S.C. § 1985, which creates a cause of action for victims of five textually distinct conspiracies:

- Section 1985(1) makes it unlawful to engage in conspiracies that interfere with the

  performance of official duties by federal officeholders, specifically to

  conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any

---

[2] Because Plaintiffs have stated a claim for a Klan Act violation, the Court need not address the arguments raised by the Mesaros Defendants and Defendant Park that Plaintiffs' state-law claims should be dismissed upon dismissal of the federal claims.

[3] Defendant Park is wrong when she asserts that Congress left Klan Act plaintiffs to "enforcement in the state courts" when the Act was passed. Park MTD at 8. The Klan Act created substantive causes of action in federal court for its violations (now found at, among other places, 42 U.S.C. §§ 1983, 1985–1986) as well as a specific grant of federal jurisdiction for its enforcement (now found at 28 U.S.C. §§ 1343(a)(1)–(3)). *See* § 2, 17 Stat. at 13–14.

State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties.

- The first part of Section 1985(2) makes it unlawful to engage in conspiracies that interfere with administration of justice in federal courts, specifically to

  conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror.

- The second part of Section 1985(2) makes it unlawful to engage in conspiracies that obstruct justice in state courts *with the intent to deny persons the equal protection of the laws*, specifically to

  conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws . . . .

- The first part of Section 1985(3) makes it unlawful to engage in conspiracies to deny the private enjoyment of *equal protection of the laws* and *equal privileges and immunities* under the laws, specifically to

  conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . .

- The second part of Section 1985(3)—on which Plaintiffs base their claim—make it unlawful to conspire to deny the right to support or advocate for candidates in federal elections, specifically to

  conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy . . . .

As the Supreme Court has emphasized when interpreting the Klan Act, some of the Klan Act's provisions regulate *federal interests* and some regulate *traditionally state interests*. *Kush v. Rutledge*, 460 U.S. 719, 724–25 (1983). Specifically, of Section 1985's five provisions, three protect the "institutions and processes of the federal government": 1985(1) bans interfering with federal officeholders, the first part of 1985(2) bans interfering with federal judicial proceedings, and the second part of 1985(3) (the provision at issue here) bans interfering with support or advocacy in federal elections. *Id.* In contrast, two provisions of the Klan Act deal with issues "not institutionally linked to federal interests and . . . usually of primary state concern": the second part of 1985(2) bans obstructing justice in state courts with the intent to deny the equal protection of the laws, and the first part of 1985(3) bans denying the private enjoyment of the equal protection of the laws or equal privileges and immunities under the law. *Id.* at 725. The support-or-advocacy clauses fall into the former category: they regulate federal interests. *Id.* at 726.

Moreover, as the Supreme Court has also emphasized, Congress also drafted the provisions of the Klan Act that regulate *federal interests* differently from the provisions that regulate *traditionally state interests.* Most materially, only the provisions of the Klan Act that regulate traditionally state interests require proof that the defendant had a motive to deny equal protection or equal privileges and immunities. That difference of statutory text was intentional: Congress had constitutional doubts about its ability to "vastly extend[] federal authority and displace[] state

control" over those areas, which addressed traditional state interests. *Id*. at 726. As a result, Congress added "language requiring that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws" to the clauses intruding on traditional areas of state authority. *Id*. at 725; *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (equal protection language added "solely to allay" constitutional "doubts"). Accordingly, when interpreting the statutory "language requiring [an] intent to deprive of equal protection or equal privileges and immunities" that Congress added to avoid potential constitutional problems, the Supreme Court gives meaning to that language by requiring plaintiffs bringing claims under those portions of the Act to show that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1972).

But no such language appears in Klan Act provisions protecting against interference with traditionally federal interests. Again, this was intentional. The constitutional distinction between the Klan Act provisions that protect uniquely federal interests and those aimed at more traditional spheres of state authority was just as obvious in 1871 as it is today. Neither Congress nor the courts have ever doubted Congress's power under Article I to enact legislation designed to protect its officeholders, its courts, and its elections from interference. *See Kush*, 460 U.S. at 726 (constitutional concerns did "not apply to the portions of the statute that prohibit interference with federal officers, federal courts, or federal elections"); *see also* Cong. Globe, 42d Cong., 1st Sess. 704 (1871) (statement of Sen. Trumbull) (noting, when the support-or-advocacy clauses were introduced, "There ought not to be any objection to that, I think"). For that reason, Congress drafted the provisions of the Klan Act protecting against interference with federal interests—including the support-or-advocacy clauses—more broadly, and the equal protection language imposing a class-

based animus requirement "simply does not appear in the portion[s] of the statute" that protect against interference with federal interests. *Kush*, 460 U.S. at 726. And, as explained below, those intentional textual, purposive, and constitutional differences between the Klan Act's support-or-advocacy clauses and its equal protection clauses are ultimately fatal to Defendants' contentions: cases interpreting the constitutionality of the latter clauses and setting out their elements are irrelevant when interpreting the former, even though—due to the subsequent process of codification—both clauses later found themselves occupying the same statutory subdivision. *See id.* at 724 (codification was "not intended to change the substantive meaning of the 1871 Act").

**B.**     **The support-or-advocacy clauses are valid exercises of Congress's Article I powers under, among other things, the Elections Clause and the Necessary and Proper Clause.**

As a threshold matter, Defendant Park erroneously contends that Congress lacked a "constitutional basis" to create "a federal tort claim against a private actor," such as herself, in the Klan Act. Park MTD at 8–11. Defendant Park bases her argument on a series of cases, which she contends establish that Congress lacks the power under the Commerce Clause and the Thirteenth, Fourteenth, and Fifteenth Amendments to penalize tortious conduct by private parties. *Id*. In turn, Defendant Park argues that holding her liable here as a private party under the Klan Act would be unconstitutional as applied because it would exceed the powers of Congress. *Id*.

That argument is meritless—it fails to recognize or address the fact that the support-or-advocacy clauses were passed pursuant to Congress's powers under Article I to regulate federal elections. Therefore, Defendant Park's discussion of the supposed limits of Congress's powers under the Reconstruction Amendments is ultimately irrelevant to any question before this Court.

The Supreme Court has already upheld the support-or-advocacy clauses—specifically, the support-or-advocacy clauses' since-repealed criminal enforcement provision (Section 5520 of the

13

Revised Statutes)[4]—as a valid exercise of Congress's Article I authority under the Elections Clause and the Necessary and Proper Clause. *See* U.S. Const. art. I, § 4; U.S. Const. art. I, § 8, cl. 18; *Ex parte Yarbrough*, 110 U.S. 651, 658–62 (1884). And rightly so. Congress's Article I powers provide a complete basis for the support-or-advocacy clauses. The Elections Clause's "substantive scope is broad." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013). It gives Congress the power to issue a "complete code for congressional elections," including laws relating to the "protection of voters" and the "prevention of fraud and corrupt practices." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982). Thus, Article I gives Congress the power to "erect[] . . . barriers to a potential threat to the federal electoral process" as doing so is "a proper exercise of the Congressional power to regulate federal elections." *United States v. Bowman*, 636 F.2d 1003, 1011–12 (5th Cir. Unit A Feb. 1981); *see also Burroughs v. United States*, 290 U.S. 534, 544–48 (1934) (Congress has similar powers in presidential elections). That includes the authority to regulate "private interference before the voting stage . . . whenever it is reasonably related to protection of the integrity of the federal electoral process." *United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 352 (E.D. La. 1965) (Wisdom, J.) (cleaned up). Accordingly, Article I allows Congress to protect citizens that are engaged in providing support or advocacy in federal elections. *See Yarbrough*, 110 U.S. at 658–62; *see also United States v. Goldman*, 25 F. Cas. 1350, 1354–55

---

[4] *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 13–14 (creating criminal penalties for violations of Section 2 of the Klan Act of 1871, which included the support-or-advocacy clauses), *codified at* 70 Rev. Stat. § 5520 (1878) ("If two or more persons . . . conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy, in a legal matter, towards or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of the Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; each of such persons shall be punished by a fine . . . or by imprisonment . . . or by both such fine and imprisonment."), *repealed by* Act of Feb. 8, 1894, ch. 25, § 1, 28 Stat. 36, 37.

(C.C.D. La. 1878) (No. 15,225) (Article I permits Congress to prohibit injuring or intimidating people engaged in support or advocacy before election day); Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 166–67 & n.119 (2020); *cf. LULAC*, 2018 WL 3848404, at *3 (Section 11(b) of the Voting Rights Act of 1965's anti-intimidation provision, 52 U.S.C. § 10307(b), was a valid exercise of Article I authority); *United States v. Simms*, 508 F. Supp. 1179, 1184–87 (W.D. La. 1979) (same regarding anti-vote-buying provisions of the Voting Rights Act of 1965, then codified at 42 U.S.C. § 1973i(c), now codified at 52 U.S.C. § 10307(c)); *Katzenbach*, 250 F. Supp. at 352 (same regarding Section 131(b) of the Civil Rights Act of 1957's anti-intimidation provision, then codified at 42 U.S.C. 1971(b), now codified at 52 U.S.C. § 10101(a)(2)(B)).

That is why the Fifth Circuit and other district courts have recognized that the support-or-advocacy clauses give "rise to an independent substantive right" enforceable against private parties without identifying "a violation of a separate constitutional right" (which would not be possible if the constitutionality of the support-or-advocacy clauses was based on the Reconstruction Amendments). *Nat'l Coal.*, 498 F. Supp. 3d at 486 n.30; *see, e.g.*, *Paynes*, 377 F.2d at 63–64; *LULAC*, 2018 WL 3848404, at *6. Thus, the support-or-advocacy clauses were a valid exercise of Congress's Article I powers to protect federal elections that can be validly enforced against private parties. *Cf. Paynes*, 377 F.2d at 64 (support-or-advocacy clauses provide a "specific remedy for interference by private individuals").

Park's cases are all inapposite. Park argues first that *United States v. Harris*, 106 U.S. 629 (1883), "struck down the [Klan Act] in its entirety for the next ninety years." Park MTD at 8–9. That is incorrect. *Harris* struck down only one provision of the Klan Act: Section 5519 of the

Revised Statutes, which did not contain the support-or-advocacy clauses.[5] *See Harris*, 106 U.S. at 644 (1883). As a result, the holding of *Harris*—that Section 5519's ban on private conspiracies to deny equal protections exceeded Congress's constitutional powers under the Privileges and Immunities Clause of Article IV, Section 2 and the Reconstruction Amendments, *see id.* at 636–44—has nothing to do with the constitutionality of the support-or-advocacy clauses because it did not examine whether the support-or-advocacy clauses were valid exercises of Congressional authority under Article I.[6] That is why the Supreme Court was able to unanimously uphold the constitutionality of the support-or-advocacy clauses just over one year later in *Yarbrough*. *See* 110 U.S. at 658–62.

*Griffin* and *Bray v. Alexandria Women's Health Center*, 506 U.S. 263 (1993), do no better. Defendant Park argues that *Griffin* and *Bray* limit Congress's authority to address only harms related to "slavery or involuntary servitude" through legislation under the Thirteenth Amendment. Park MTD at 9. Again, however, *Griffin* and *Bray* say nothing about the support-or-advocacy clauses and whether they were valid exercises of Congress's powers under the Elections Clause or the Necessary and Proper Clauses; rather, like *Harris*, these cases analyze the distinct statutory language of the Klan Act's equal protection clauses (this time their civil enforcement counterparts).[7]

---

[5] Section 5519 contained the criminal enforcement provision for another Klan Act provision (not based on Article I) that made it unlawful to conspire "for the purpose of depriving . . . persons . . . the equal protection of the laws . . . or of equal privileges and immunities under the laws." 70 Rev. Stat. § 5519 (1878).

[6] Neither the Elections Clause nor the Necessary and Proper Clause were at issue in *Harris*. *See* 106 U.S. at 636–37 ("There are only four paragraphs in the constitution which can, in the remotest degree, have any reference to the question in hand. These are section 2 of article 4 of the original constitution, and the thirteenth, fourteenth, and fifteenth amendments" (lowercase in original).).

[7] It is true that the civil enforcement provisions for the Klan Act's equal protection clauses are currently codified along with the support-or-advocacy clauses at 42 U.S.C. § 1985(3). Defendants might argue that what is true of the constitutional grounding for one portion of Section 1985(3)

Finally, Park argues that *United States v. Morrison*, 529 U.S. 598 (2000), and *City of Boerne v. Flores*, 521 U.S. 507 (1997), limit Congress's power to enact legislation to remedy discriminatory private conduct via the interstate commerce clause and the Fourteenth Amendment. Park MTD at 10–11. But again, those cases are irrelevant here because the support-or-advocacy clauses are not based on the Reconstruction Amendments. *See, e.g.*, *United States v. Crosby*, 25 F. Cas. 701, 704 (C.C.D.S.C. 1871) (No. 14,893) ("We have no doubt of the power of [C]ongress to interfere in the protection of voters at federal elections, and that that power existed before the adoption of [the Reconstruction Amendments].").

In sum, when acting under the Elections Clause and the Necessary and Proper Clause, Congress can create new substantive rights enforceable against private parties. *See, e.g.*, *Katzenbach*, 250 F. Supp. at 352; Primus & Kistler, 89 Fordham L. Rev. at 168. Congress permissibly exercised that power when it passed the support-or-advocacy clauses, *Yarbrough*, 110 U.S. at 658–62; *see also NFIB v. Sebelius*, 567 U.S. 519, 570 (2012) (the "question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise." (cleaned up)). It was therefore was entirely constitutional for the support-or-advocacy clauses to create "an independent substantive right" enforceable against private parties. *Nat'l Coal.*, 498 F. Supp. 3d at 486 n.30. [8]

---

must also be true for the other. But the Supreme Court has already rejected that argument: because the provisions of the Klan Act now codified in Section 1985 were all passed as part of an undifferentiated single statutory section, *see* § 2, 17 Stat. at 13–14, the later acts by the codifiers to group Klan Act provisions in different parts of the code should not be used as aids to understanding the Klan Act because codification "was not intended to change the substantive meaning of the 1871 Act," *Kush*, 460 U.S. at 724.

[8] Defendant Park protests that she did not violate Plaintiffs' right to engage in interstate travel. Park MTD at 13-14. That argument is irrelevant because, as discussed, the support-or-advocacy clauses create a new substantive right that is not reliant on pre-existing constitutional rights. She also urges that she could not have "obstructed the election" because she participated in the Trump Train attack on October 30 rather than November 3, 2020. *Id.* at 14. But the support-or-advocacy

C.   **The Complaint plausibly alleges all elements of a support-or-advocacy claim required by the statutory text of the support-or-advocacy clauses.**

The Complaint pleads a violation of the support-or-advocacy clauses of the Klan Act by alleging that: (i) Defendants engaged in a prohibited conspiracy to intimidate or injure lawful voters (Plaintiffs) for providing support or advocacy for the Biden-Harris presidential campaign; and (ii) Defendants acted on the conspiracy by participating in the Trump Train; (iii) which injured Plaintiffs in their person or property and/or deprived them of exercising a right or privilege as citizens of the United States. *See* 42 U.S.C § 1985(3); *see also Nat'l Coal.*, 498 F. Supp. 3d at 487–88 (examining elements of claim under support-or-advocacy clauses); Compl. ¶¶ 136–141.

Defendants do not seriously dispute that, accepting the allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Complaint pleads each of these required elements to state a support-or-advocacy claim. Defendants Ceh, Cisneros, and Park nevertheless make scattered assertions to the contrary.[9] Their half-baked attacks are unavailing.

***Unlawful conspiracy***. Defendant Park argues in a single sentence that "[t]he Complaint does not even show Mrs. Park entered into a conspiracy," presumably disputing that Plaintiffs have satisfied the first element of their Klan Act claim. Park MTD at 13. Contrary to Defendant Park's glancing assertions, Plaintiffs more than sufficiently plead facts sufficient to show the formation of a conspiracy that each Defendant then engaged in. Plaintiffs allege how—in the days and minutes leading up to the attack—self-entitled "Trump Train" groups recruited for, planned, and coordinated "#OperationBlockTheBus" online. *See* Compl. ¶¶ 46 & n.3, 47–65. The Complaint

---

clauses include no requirement that any part of a prohibited conspiracy take place on election day. *See* 42 U.S.C. § 1985(3); *see also Goldman*, 25 F. Cas. at 1354-55 (Article I empowers Congress to prohibit injuring or intimidating people engaged in support or advocacy before election day).

[9] As Defendants Joeylynn and Robert Mesaros did not in any way raise any argument as to the sufficiency of Plaintiffs' Klan Act allegations, they are waived. *See Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999); *Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993).

further details how Defendants joined the Trump Train and, acting in concert with dozens of other Trump supporters, intentionally slowed down to a crawl in a coordinated manner and then deployed other dangerous driving tactics that were plainly calculated to, and succeeded in, intimidating and threatening Plaintiffs. *See id.* ¶¶ 1–8, 12, 59–65, 73–74, 79–80, 84–92, 97, 102, 138–140; *see also infra* Argument § III (detailing Plaintiffs' allegations that Defendant Park reached at least a tacit understanding with co-conspirators as to the object of the conspiracy).[10] Viewed in the light most favorable to Plaintiffs, and drawing all reasonable inferences therefrom, these allegations plausibly show a "concert of action" from which this Court can infer that Defendants, including Defendant Park, conspired to intimidate Plaintiffs. *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014) (cleaned up); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (requiring only "enough factual matter (taken as true) to [plausibly] suggest that an agreement was made").[11]

Defendants Ceh and Cisneros do not dispute that they entered into a conspiracy. Rather, they suggest that "it would be a stretch" to conclude that their conspiracy was an *unlawful* one because they acted in support of a political candidate. Ceh MTD at 2; Cisneros MTD at 2. But that suggestion runs contrary to black-letter conspiracy law: the mere presence of a broader, otherwise lawful objective does not immunize the participants from conspiracy liability. An agreement to perform a "lawful act in an unlawful manner" is just as illegal as agreeing "to participate in an

---

[10] Defendant Park also protests in the background section of her brief that she did not participate in advance planning of attack and did not communicate explicitly with others on the highway. Park MTD at 2-3. This factual issue, premature at the motion-to-dismiss stage, is also immaterial on the merits. Her reckless driving and contemporaneous admissions, both captured on video, show her coordinating with other drivers to create a dangerous situation for the Biden-Harris Campaign bus. *See infra* Argument § III.

[11] *See also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015); *Evergreen Partnering Grp. v. Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013) (requirement is to show "the general contours of when an agreement was made").

unlawful act." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). That is why bank robbers cannot defend against conspiracy charges on the ground that their broader objective was to make money. *See Libertad v. Welch*, 53 F.3d 428, 446 (1st Cir. 1995). That Defendants acted in support of Donald Trump is irrelevant: what matters is not whether Defendants had a "broader objective" of supporting their preferred candidate, but rather, "whether, in effectuating that goal," Defendants "purposely employed tactics" that violated the Klan Act. *Id*. The Complaint plausibly alleges just that: Defendants conspired to obstruct, threaten, and intimidate the occupants of the Biden-Harris Campaign bus by forming a vehicular posse that engaged in coordinated dangerous driving maneuvers. Compl. ¶¶ 1–8, 12, 59–65, 73–74, 79–80, 84–92, 97, 102, 138–140.[12]

*Overt Acts*. No Defendant disputes that he or she took overt acts in furtherance of that prohibited conspiracy. Therefore, the Defendants' arguments are waived. *See Trevino v. Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999); *Yohey v. Collins*, 985 F.2d 222, 224–25 (5th Cir. 1993). Nor could they. The Complaint recounts in minute-by-minute detail how—for over an hour—Defendants subjected Plaintiffs to a dangerous vehicular assault to prevent the Plaintiffs from engaging in political advocacy in support of the Biden-Harris Campaign. Compl. ¶¶ 1–8, 12, 59–65, 73–74, 79–80, 84–92, 97, 102, 138–140; *see also supra* Factual Background; *infra* Argument § IV (detailing overt acts committed by each Defendant in furtherance of the conspiracy). The Complaint further describes how, through their dangerous conduct, Defendants succeeded in their ultimate goal: Defendants' conduct caused Plaintiffs to "fear[] for their lives" during the attack,

---

[12] In addition, many of the early instances of Ku Klux Klan terrorism and mayhem were taken specifically to bolster the electoral prospects of the Democratic Party. *See, e.g.*, *United States v. Butler*, 25 F. Cas. 213, 220 (C.C.D.S.C. 1877) (No. 14,700) (describing one early Klan Act conspiracy). Accordingly, it is illogical to believe, as Defendants suggest, that the Reconstruction Congress would have meant to grant immunity to the Klan for its conduct so long as the Klan's unlawful acts also sought to further certain political goals.

*id.* ¶ 129, resulting in the cancelation of further campaign activity and denying Plaintiffs their ability to engage with other eligible voters and to exercise their First Amendment freedoms, *id.* ¶¶ 96, 135. Such allegations satisfy the overt act requirement. *See, e.g.*, *Nat'l Coal.*, 498 F. Supp. 3d at 487 (intimidating robocalls satisfied overt act requirement for Klan Act conspiracy).

**Injury or Deprivation**. Finally, though Defendants Ceh and Cisneros argue that emotional injuries are not actionable under the Klan Act, they are wrong for the reasons described below in Argument § II.D.3. Plaintiffs suffered injuries as a result of the unlawful conspiracy, including significant emotional injuries, the loss of job opportunities, and the deprivation of their First Amendment rights. Compl. ¶¶ 10–11, 14, 129–134.

Because Plaintiffs have plausibly alleged these three elements, they have stated a claim under the Klan Act's support-or-advocacy clauses. *See Nat'l Coal.*, 498 F. Supp. 3d at 487–88.

**D.      This Court should reject Defendants' attempts to shoehorn additional elements into the support-or-advocacy clauses that are not found in or required by the statutory text.**

Defendants' remaining arguments for dismissing Plaintiffs' support-or-advocacy claim— namely, that Plaintiffs should be required to allege class-based animus, state action, or additional non-emotional harm—all share a common flaw: those elements are not found anywhere in the text of the support-or-advocacy clauses themselves, though some are found in other provisions of the Klan Act. Accordingly, it would be clear error for this Court to add them as a prerequisite for alleging a support-or-advocacy claim. *See Kinney v. Weaver*, 367 F.3d 337, 352 n.14 (5th Cir. 2004) (en banc) (following Supreme Court precedent to recognize that "non-textual limiting construction[s]" of the Klan Act are "erroneous[]").

### 1.      Plaintiffs need not allege class-based animus.

The Motions to Dismiss argue that Plaintiffs' claim under the support-or-advocacy clauses of Section 1985(3) requires them to plead racial or class-based animus. Mesaros MTD at 6–9; Park

MTD at 15–16; Ceh MTD at 2; Cisneros MTD at 2. But Defendants' arguments are not grounded in nor do they rely upon the statutory language of the support-or-advocacy clauses. Instead, Defendants attempt to graft this extra-textual element onto Plaintiffs' support-or-advocacy claim by applying case law interpreting a *different* provision of Section 1985. To the extent that approach may have prevailed in this circuit in the early 1980s after *Kimble v. D.J. McDuffy, Inc.*, 648 F.2d 340, 347 (5th Cir. 1981) (en banc); *see also* Park MTD at 15 (relying on *Kimble*), that approach was firmly rejected by the Supreme Court in *Kush* only two years later. It has been clearly erroneous since then.

In *Kush*, the Supreme Court interpreted the plain meaning of the text of the Klan Act, from which *Kimble* (and now, Defendant Park) departed in favor of extra-textual limiting constructions, and expressly held that the Klan Act requires a showing of class-based animus *only* when a particular provision makes it unlawful to engage in a conspiracy to deny individuals the equal protection of the laws. *Kush*, 460 U.S. at 725. There is, per *Kush*, "no suggestion" that the equal protection language should apply to "any other portion[s] of § 1985." *Id.* at 726. *Kush* thus rejects any class-based animus requirement for claims brought under the portions of Section 1985 that did not have "the critical language" requiring a denial of equal protection. *Id.* at 720; *see also Bray*, 506 U.S. at 281 n.13 (reaffirming that the presence (or absence) of equal protection language was of the "greatest importance" when determining whether a Klan Act plaintiff needs to show class-based animus); *LULAC*, 2018 WL 3848404, at *5 (*Bray* "confirm[s]" that the class-based animus requirement from *Griffin* applies only to the first clauses of Section 1985(3) containing the key equal protection language).

As it should, the en banc Fifth Circuit recognized that *Kimble*'s non-textual interpretive approach did not survive *Kush*. *See, e.g.*, *Kinney*, 367 F.3d at 352 n.14 ("*Kush* is notable because

it rejected a non-textual limiting construction that certain circuits, including this one, had erroneously embraced."). Instead, following *Kush*, the Fifth Circuit now looks to the statutory text and applies a class-based animus requirement only where a provision's language requires a denial of the equal protection or equal privileges and immunities. *See, e.g.*, *Daigle v. Gulf State Utils. Co., Local Union No. 2286*, 794 F.2d 974, 978–80 (5th Cir. 1986) (requiring a showing of class-based animus *only* for the Klan Act claim brought under the second part of Section 1985(2) and for Section 1985(3)'s equal protection clauses because only those sections had the "equal protection language" giving rise to the requirement); *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 687–88 (5th Cir. 2010) (applying a class-based animus requirement to the plaintiff's claims under the second clause of Section 1985(2) and the first clause of Section 1985(3), which both contain the key equal protection language, but not the claim under Section 1985(1)); *see also id.* at 687 ("[t]he language requiring intent to deprive of equal protection . . . means that there must be some racial, or class-based, invidiously discriminatory animus behind the conspirator's action.") (cleaned up).[13]

---

[13] With the lone exception of *Kimble* (which, as discussed, is no longer good law in relevant part), every single case Defendants cite is plainly referring only to the equal protection clauses of Section 1985(3), despite using the shorthand, "§ 1985(3)." Not one of those cases adjudicates a dispute relating to a federal election or purports to interpret the support-or-advocacy clauses. *See* Mesaros MTD at 6–9; *Griffin*, 403 U.S. at 102–03 (quoting from the equal protection clauses—with no mention of the support-or-advocacy clauses—to list the elements of a Klan Act equal protection claim in a dispute involving an attack on Black Americans mistaken for civil rights activists on the highway); *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 827–29 (1983) (purporting to interpret equal protection clauses in a dispute involving a union attack on a construction site); *id.* at 827 (equal protection clauses are statutory language "[t]his case concerns"); *id.* at 840 n.1 (Blackmun, J., dissenting) (observing that the "first clause" of "Section 1985(3)" was "at issue here," and not support-or-advocacy clauses); *Bray*, 506 U.S. at 266–70 (interpreting "first clause" of Section 1985(3) in a dispute over access to abortion clinics); *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) (interpreting "relevant text" of Section 1985(3)'s equal protection clauses in a dispute over a drug bust); *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754, 757 & n.2 (5th Cir. 1987) (quoting equal protection clauses of Section 1985(3) in a dispute relating to whistleblowing bank employees); *Bryan v. City of Madison*, 213 F.3d 267, 269, 276 (5th Cir. 2000) (dispute involving a building permit); *Newberry v. E. Tex. State Univ.*, 161 F.3d

Based on *Kush* and its progeny, it is clear that claims arising under the support-or-advocacy clauses do not require a showing of class-based animus because those clauses do not contain the key "equal protection" language that triggers such a showing. *Kush*, 460 U.S. at 724; *McCord*, 636 F.2d at 614 & n.12 (courts should not impose an animus requirement where the text "does not demand a denial of 'equal protection of the laws.'") (cleaned up). Multiple courts have so held. *See, e.g.*, *LULAC*, 2018 WL 3848404, at *6; *Nat'l Coal.*, 498 F. Supp. 3d at 487–88; *see also* Note,

---

276, 277–79, 281 & n.2 (5th Cir. 1998) (employment and disability dispute relating to termination of a professor); *Galloway v. State of La.*, 817 F.2d 1154, 1158–59 (5th Cir. 1987) (dispute concerning termination of a prison guard); *Daigle*, 794 F.2d at 978–79 (quoting equal protection clauses of Section 1985(3) as the "pertinent" part of Section 1985(3) in an employment dispute, and moreover declining to apply class-based animus requirement in portions of Klan Act at issue that did not contain language relating to equal protection, *see supra* Argument § II.D.1); *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 270–71 & n.12 (5th Cir. 2001) (reciting elements of a claim for violation of Section 1985(3)'s equal protection clauses in an employment dispute concerning unwelcome sexual advances); *Perez-Sanchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107–09 (1st Cir. 2008) (quoting Section 1985(3)'s equal protection clauses in an employment discrimination dispute); *Farber v. City of Paterson*, 440 F.3d 131, 134, 140 (3d Cir. 2006) (quoting equal protection clauses in a political patronage dispute over termination of former city employees for supporting the prior mayor which cannot be within the ambit of the support-or-advocacy clauses because they cover only support-or-advocacy in federal elections); *Grimes v. Smith*, 776 F.2d 1359, 1360–63 (7th Cir. 1985) (quoting elements of a claim brought under Section 1985(3)'s equal protection clauses in case involving dispute in city primary election relating to spoiler candidate, which, again, cannot be within the ambit of the support-or-advocacy clauses because they cover only support-or-advocacy in federal elections); *Brown v. Reardon*, 770 F.2d 896, 898–99, 902 n.2, 906 (10th Cir. 1985) (quoting Section 1985(3)'s equal protection clauses in a termination dispute brought by city employees that their dismissal was based on their refusal to contribute to a political fund that was used to promote reelection of commissioner and "other city officials"); *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 156, 161 (4th Cir. 1985) (quoting equal protection clauses of Section 1985(3) as "relevant part" of statute in dispute concerning whether plaintiff was unlawfully terminated for running for *county* office as a Republican); *Prescott v. Jefferson*, No. 17-13584-A, 2018 WL 3937045, at *2 (11th Cir. May 31, 2018) (quoting language from portions of Section 1985(2) and Section 1985(3) that include equal protection elements in a dispute over whether court-appointed appellate counsel conspired to undermine the *pro se* incarcerated plaintiff's appeal of his conviction). The occasional lack of perfect linguistic precision does not require a nonsensical reading of the support-or-advocacy clauses that would require concluding that *Kush* is no longer good law. Nor does it require a non-textual limiting construction in violation of *Kinney*'s rule that "non-textual limiting construction[s]" are no longer appropriate following *Kush*. 367 F.3d at 352 n.14.

*The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382, 1396–97 (2020). This Court should follow the Fifth Circuit's instruction to avoid "erroneous[]" "[n]on-textual limiting construction[s]" of the Klan Act, *Kinney*, 367 F.3d at 352 n.14, and do the same.

Precedent binds this Court to reject Defendants' request to add extra-textual requirements to the statutory text Congress enacted. *See Kush*, 460 U.S. at 724-26; *see also In re Glenn*, 900 F.3d 187, 190 (5th Cir. 2018) (statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous" (cleaned up)). The inquiry can end here. But even were this not the case, Defendants' proposed interpretation of the support-or-advocacy clauses would violate additional rules of statutory construction. Interpreting those clauses to merely regurgitate the equal protection clauses would violate the "cardinal rule . . . that effect shall be given to every clause" of a statute, *id.* (cleaned up), by making the support-or-advocacy clauses redundant with the equal protection clauses. *See, e.g.*, *Griffin*, 403 U.S. at 99 (Klan Act provisions should not be interpreted to be "deprived . . . of all independent effect."); *see also Paynes*, 377 F.2d at 63–64 (treating support-or-advocacy clauses differently from equal protection clauses). Under Defendants' interpretation of the support-or-advocacy clauses, every cognizable claim under that subsection could plainly be brought as a claim under the equal protection clauses, because *Defendants literally claim the support-or-advocacy clauses have the exact same elements as the equal protection clauses*, *see* Mesaros MTD at 6; Park MTD at 12, rendering the former subsection utterly superfluous in Congress's statutory scheme. Courts consistently reject statutory interpretations that yield such outcomes. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (cleaned up); *Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (rejecting interpretation that "would make either the first or the second condition redundant or largely superfluous"); *cf. Rumsfeld v. F. for Acad. &*

*Institutional Rts., Inc.*, 547 U.S. 47, 57–58 (2006) (Congress should not be presumed to have engaged in "a largely meaningless exercise."). There is no reason to reach a different result here.[14]

### 2. Plaintiffs need not allege state action.

Defendant Park also argues that Plaintiffs' support-or-advocacy claim must be dismissed because the Complaint does not allege state action. Park MTD at 14–15. Again, Defendant Park misunderstands the support-or-advocacy clauses.

Defendant Park's argument is presumably based on her theory that the support-or-advocacy clauses address only violations of pre-existing constitutional rights. That is incorrect. As discussed, when Congress passed the support-or-advocacy clauses under its Article I powers to protect federal elections, it created a new substantive right that is enforceable against private parties. *See supra* Argument § II.B. Unsurprisingly then, both the Supreme Court and the Fifth Circuit have previously permitted support-or-advocacy claims to be brought with no requirement that a defendant be a state actor. *See Yarbrough*, 110 U.S. at 657–62; *Paynes*, 377 F.2d at 64 (explaining that the support-or-advocacy clauses provide a "remedy" for "interference by private individuals").

### 3. Emotional injuries are sufficient to give rise to Klan Act liability.

Finally, Defendants Ceh and Cisneros argue that Plaintiffs' claims should be dismissed because "[u]nder Texas Law, one does not recover for mental and emotional anguish damages." Cisneros MTD at 2; Ceh MTD at 2. That claim is doubly wrong.

---

[14] Interpreting the support-or-advocacy clauses to have the same elements as the equal protection clauses because both are found in Section 1985(3) would also improperly assign statutory meaning to the codification of the 1871 Klan Act. The provisions of the Klan Act now codified in Section 1985 were passed as part of an undifferentiated single statutory section, *see* § 2, 17 Stat. at 13–14, but were later codified together at Section 1985. The Klan Act's codification "was not intended to change the substantive meaning of the 1871 Act," *Kush*, 460 U.S. at 724, so the fact that the support-or-advocacy clauses and the equal protection clauses are both found in Section 1985(3) says nothing about whether a plaintiff alleging a support-or-advocacy clauses claim needs to allege class-based animus, *see* Primus & Kistler, 89 Fordham L. Rev. at 151–57.

*First*, Defendants Ceh and Cisneros mistakenly presume that Texas law, rather than federal law, determines what amounts to an injury under the Klan Act. It is true that to sue under the support-or-advocacy clauses, a plaintiff must suffer a requisite "injury." *See* 42 U.S.C. § 1985(3) (creating a cause of action for a party "injured in his person or property" by a step taken to advance a prohibited conspiracy under the support-or-advocacy clauses). But the Supreme Court has already recognized that harm that constitutes an injury under traditional common-law principles of tort law was "ample support for our holding" that the plaintiff had suffered injury under Section 1985. *Haddle v. Garrison*, 525 U.S. 121, 127 (1998);[15] *see also Kinney*, 367 F.3d at 353 (following *Haddle* to conclude that economic injury due to interference with employment is cognizable under § 1985). Further, *Haddle* specifically denied that a plaintiff can only state a Section 1985 claim upon successfully stating a claim in tort under the particular law of the forum jurisdiction. 525 U.S. at 127 n.4 (noting that the plaintiff's ability *vel non* to bring a successful state-law tort claim "has no bearing on whether he can state a claim for damages under § 1985(2)"). Instead, the Court asked whether the injury is of a sort generally recognizable under "principles of tort law," not whether any particular jurisdiction recognizes a specific tort. *Id.* at 127 & n.4. Were it otherwise, states resisting Reconstruction could have nullified Section 1985 by making exceptions to their tort law. Thus, in conducting its injury analysis, the Court emphasized not cognate state law, but various tort treatises, the Second Restatement of Torts, and the Supreme Court's own decision in *Truax v. Raich*, 239 U.S. 33 (1915). *Id.* at 126–27.

---

[15] *Haddle* was decided under Section 1985(2), not Section 1985(3). But that distinction makes no difference to the meaning of injury in the statute, because all portions of Section 1985 are covered by the same injury language, which appears at the end of Section 1985(3). *See* 525 U.S. at 125 n.2 (recognizing that "the remedial provision granting a cause of action for damages" for conspiracies described in Section 1985(2) is actually found in the text of Section 1985(3)).

Applying *Haddle* here, Plaintiffs' injuries are well-established under "principles of tort law." *Id.* at 127. They are therefore sufficient to state a claim under the Klan Act. The very same authorities on which the *Haddle* Court relied make clear that individuals who suffer personal injury are "entitled to recover damages for . . . emotional distress." Restatement (Second) of Torts § 924 (1979). Moreover, for intentional torts including "assault," "harm is not essential to a cause of action and if none is suffered, nominal damages at least are awarded." *Id.* cmt. a.

*Second*, even looking specifically to the law of the forum jurisdiction in this instance, Defendants Ceh and Cisneros incorrectly state Texas law, which applies the same well-established principle that emotional injuries are recoverable in tort. In Texas, "mental anguish is recognized as a real and serious harm" that is normally available for "torts involving intentional or malicious conduct [libel, battery, etc.] . . . [because] such conduct entails a high level of culpability"; "personal injury actions"; and "injuries of such a shocking and disturbing nature that mental anguish is a highly foreseeable result." *Hardin v. Obstetrical & Gynecological Assocs. P.A.*, 527 S.W.3d 424, 436 (Tex. App. 2017). Even the cases Defendants cite agree. *See City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997) ("Texas has authorized recovery of mental anguish damages in virtually all personal injury actions.") (cleaned up); *Parkway Co. v. Woodruff*, 857 S.W.2d 903, 914 (Tex. App. 1993) ("Mental anguish damages are recoverable under the [Deceptive Trade Practices Act] upon proof of a knowing violation of the act."), *writ granted* (Apr. 20, 1994), *aff'd as modified*, 901 S.W.2d 434 (Tex. 1995); Ceh MTD at 2–3; Cisneros MTD at 2–3. Thus, Plaintiffs' emotional injuries as alleged are sufficient to support their claims under the Klan Act (and Texas law, too).

*      *      *

In sum, Defendants' arguments that Plaintiffs' support-or-advocacy claim should be dismissed all fail. The support-or-advocacy clauses were valid exercises of Congress's Article I powers, *Yarbrough*, 110 U.S. at 658–62, which empower Congress to regulate conduct by state and non-state actors alike. The clauses are properly interpreted to give "rise to an independent substantive right" enforceable against private parties, *Nat'l Coal.*, 498 F. Supp. 3d at 486 n.30, and that congressionally created right should not be artificially limited by "erroneous[]" "non-textual limiting construction[s]," *Kinney*, 367 F.3d at 352 n.14, such as a requirement to allege class-based animus or state action when not required by the text of the statute, *see Kush*, 460 U.S. at 724–26; *LULAC*, 2018 WL 3848404, at *6, or a prohibition on emotional damages, *see Haddle*, 525 U.S. at 127. The Complaint plausibly alleges the elements required by the text of the statute, *see supra* Argument § II.C, and that is all that is required. The Motions to Dismiss Plaintiffs' Klan Act support-or-advocacy claim should be denied.

## III.   PLAINTIFFS STATE A VALID CLAIM FOR CIVIL CONSPIRACY UNDER TEXAS LAW.

Defendant Park asserts, without substantial argument, that the Complaint's allegations "do not plausibly establish" the elements of civil conspiracy under Texas law. Park MTD at 16–17. Not so. Under Texas law, civil conspiracy occurs when: "(1) a combination of two or more persons; (2) . . . seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result." *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 196 (Tex. App. 2017) (citing *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)). "The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy."

29

*Bourland v. State*, 528 S.W.2d 350, 354 (Tex. App. 1975). A civil conspiracy can be established by circumstantial evidence. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581–82 (Tex. 1963).

As explained, *supra* Argument § II.C, the Complaint establishes these elements as to all Defendants. As to the first four elements, the Complaint alleges that Defendants worked together under a common plan to turn their vehicles into weapons to surround and assault the Biden bus on the highway, in order to intimidate those on the bus out of campaigning. Compl. ¶¶ 1–8, 12, 59–65, 73–74, 79–80, 84–92, 97, 102, 138–140, 144–147. As to Defendant Park in particular, the Complaint points to ample evidence that she had reached at minimum a tacit understanding with her co-conspirators to slow down traffic in order to assault and intimidate the bus. She drove at a dangerously slow speed and dangerously close to the bus in order to assist other vehicles in boxing the bus in by blocking its escape to the left. *Id.* ¶ 86 & images. Further, she explained on video how she and others willfully maneuvered their vehicles to prevent the bus from exercising free movement on the highway—in other words, she admitted that her objective (which was successful) was to slow down traffic near the bus to keep it surrounded by Trump Train vehicles, which is illegal. Compl. ¶ 92; *cf. Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005) ("the manner in which appellant drove his truck" on highway while fleeing from law enforcement was criminal, making the truck "capable of causing death or serious bodily injury" to law enforcement and others on the road). These allegations at least plausibly establish "a meeting of the minds on the object or course of action" of the conspiracy: to intimidate the passengers on the Biden bus by denying the bus's ability to move freely on the highway as all persons are entitled to do, and to "escort" it "out of town." Compl. ¶ 83.

As to the fifth element, injury, the Complaint enumerates the injuries Plaintiffs have suffered as a result of Defendants' conduct. These include enduring imminent threats of bodily harm and death, emotional distress, and frustration of their plan of engaging in political advocacy in a federal election. *Id.* ¶¶ 130–135. And to the extent Defendants argue that emotional injuries are not injuries under Texas law, that argument is wrong. As discussed *supra* Argument § II.D.3, Texas common law recognizes "mental anguish" as "a real and serious harm," *Hardin*, 527 S.W.3d at 436, and has thus "authorized recovery of mental anguish damages in virtually all personal injury actions," *Likes*, 962 S.W.2d at 495.

Meanwhile, Defendants Cisneros and Ceh argue that Plaintiffs fail to plead a claim for civil conspiracy because they "have not pled an underlying Tort." Cisneros MTD at 3; Ceh MTD at 3. But the Complaint clearly alleges that "Defendants planned with each other and others to knowingly intimidate constitutionally eligible voters by physically assaulting, threatening, and harassing Plaintiffs." Compl. ¶ 145. Plaintiffs also bring a claim for civil assault, *id.* ¶¶ 148–152, an "underlying tort" that they allege was one of the objects of the unlawful conspiracy, *id.* ¶ 145.

## IV. PLAINTIFFS STATE A VALID CLAIM FOR CIVIL ASSAULT UNDER TEXAS LAW.

Defendants Ceh and Cisneros barely address the civil assault claim, except, perhaps, by saying, without reasoning or citing authorities, that "[t]here is no claim of any contact between the Plaintiffs and the Defendants . . . ." Ceh MTD at 2; Cisneros MTD at 2. Defendant Park asserts, also without argument, that as to her, "none of the elements [of civil assault] were pled in the complaint."[16] Park MTD at 17. As Defendants did not adequately raise these arguments, they are waived. *See Trevino*, 168 F.3d at 181 n.3; *Yohey*, 985 F.2d at 224–25.

---

[16] Defendant Park professes confusion as to whether the Complaint brings a civil assault claim against her, citing paragraphs alleging principal liability for assault as to other Defendants. Park MTD at 17. (She also notes, irrelevantly, that she was not "involved in the collision between the

But even if these arguments were properly raised, they would fail. As to Defendants Ceh and Cisneros's objection, physical contact is not a necessary element of an assault claim. In Texas, the elements of civil assault "mirror those of a criminal assault." *Sanchez v. Striever*, 614 S.W.3d 233, 239 (Tex. App. 2020) (citing *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012)). A defendant can commit assault by "intentionally or knowingly threaten[ing] another with imminent bodily injury," without the need for physical contact. Tex. Penal Code § 22.01(a)(2).

Contrary to Defendants Ceh, Cisneros, and Park's arguments, the Complaint plausibly alleges civil assault against all Defendants, under theories of either direct or accomplice liability depending on the individual Defendant. Defendants Cisneros and Robert Mesaros and others were "captured on video abruptly and rapidly slowing down the bus, boxing the bus in, and driving in front of or to the side of the bus at a dangerously low speed, and dangerously close to the bus, in an apparent effort to rapidly slow down the bus, to box the bus in, and/or to inhibit its movement on I-35." Compl. ¶ 150. Defendant Cisneros was captured on video cutting the bus off, moving in front of it, and rapidly braking on the busy highway to force the bus to slow down to a crawl. *Id.* ¶ 85. Moreover, Defendant Cisneros displayed his own willingness to use violence on the highway by tailgating the bus and boxing it in from behind, before—in his own words—"slamming" into a staffer's car with his "35 in[ch] tires." *Id.* ¶¶ 8, 151. Defendant Robert Mesaros waited in his truck on the shoulder for the bus to arrive, and then "dangerously and abruptly cut[] right in front of it" to box it in. *Id.* ¶ 87. As a direct result of this assaultive conduct, Plaintiffs feared imminent bodily injury or death. *Id.* ¶ 129. They feared a car crash on the highway, and feared what their assailants might do if they had succeeded in stopping the bus or forcing it off the road. *Id.* ¶ 8. These actions

---

white truck and Defendant Cisneros." *Id.*) But as paragraph 152 states, at this time, Plaintiffs allege only that she aided and abetted assault.

sufficiently allege civil assault against Defendants Cisneros and Robert Mesaros. *Cf. Creighton v. State*, No. 08-9-00022-CR, 2011 WL 743073, at *3 (Tex. App. Mar. 2, 2011) (upholding verdict of aggravated assault where defendant drove aggressively near pedestrian but did not make physical contact); *Drichas*, 175 S.W.3d at 798 (reckless driving in high-speed chase made truck "capable of causing death or serious bodily injury").

The Complaint also contains sufficient allegations showing that all Defendants aided and abetted civil assault under Texas law. In Texas, "[w]here one person assists another in making an assault, both are principals and liable in damages for any injury inflicted." *Milliken v. Skepnek*, No. 14-96-01522-CV, 1999 WL 496505, at *6 (Tex. App. July 15, 1999) (citing *Stein v. Meachum*, 748 S.W.2d 516, 518–19 (Tex. App 1988, no writ)). *See also Halberstam*, 705 F.2d at 477–78 ("Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation."). The Complaint details how Defendants, acting in concert and with intent to promote or assist the vehicular assault, solicited, directed, aided, encouraged, and/or attempted to aid in the assault. Compl. ¶¶ 82, 86, 89, 92, 152.

For example, Defendant Joeylynn Mesaros was a passenger in the vehicle Robert Mesaros was driving, and, one can reasonably infer, supported and encouraged his assaultive driving, as evidenced by her later bragging on social media about "escorting" the bus "out of town." *Id*. ¶ 82. Defendant Ceh was a passenger in a vehicle (driven by a John Doe defendant) that boxed the bus in on the front right corner through much of the drive, with a John Doe backseat passenger hanging out of the window, screaming. *Id*. ¶ 88. At some points, Defendant Ceh's truck moved to the front

left corner of the bus and drove dangerously close to it. *Id.* ¶ 89. And like Defendant Joeylynn Mesaros, Defendant Ceh boasted about that assaultive conduct online: footage Ceh posted on social media shows her vehicle driving within inches of the bus. *Id.* And, as discussed, *supra* Factual Background; Argument § III, Defendant Park's vehicle was also captured in footage assisting other vehicles in boxing the bus in by driving dangerously slowly in front of and to the left of it and blocking its escape on the left. *Id.* ¶ 86. The other vehicles would not have been nearly as successful at harassing the bus for as long as they did if the bus could have driven left into the middle lane and sped away.

In sum, Plaintiffs have plausibly alleged that Defendants Cisneros and Robert Mesaros, as well as certain Jane and John Does, committed civil assault by "intentionally or knowingly threaten[ing]" Plaintiffs with "imminent bodily injury" on the highway, Tex. Penal Code § 22.01(a)(2), and that all Defendants, including Defendants Ceh, Joeylynn Mesaros, and Park, aided and abetted that tortious conduct, Compl. ¶¶ 150–152.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss in their entirety.

DATED:  September 13, 2021                    Respectfully Submitted,

*/s/ John Paredes*

**TEXAS CIVIL RIGHTS PROJECT**
Mimi Marziani (TX Bar No. 24091906)
Emma Hilbert (TX Bar No. 24107808)
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741
Telephone: (512) 474-5073
Facsimile: (512) 474-0726
Email: mimi@texascivilrightsproject.org
emma@texascivilrightsproject.org


**THE PROTECT DEMOCRACY PROJECT, INC.**
John Paredes (NY Bar No. 5225412) (*pro hac vice*)
The Protect Democracy Project, Inc.
115 Broadway, 5th Floor
New York, NY 10006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
john.paredes@protectdemocracy.org

Cameron O. Kistler (DC Bar No. 1008922) (*pro hac vice*)
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
cameron.kistler@protectdemocracy.org

Benjamin L. Berwick (MA Bar No. 679207) (*pro hac vice*)
The Protect Democracy Project, Inc.
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
ben.berwick@protectdemocracy.org

Jared Fletcher Davidson (LA Bar No. 37093)
(*pro hac vice forthcoming*)
The Protect Democracy Project, Inc.
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
jared.davidson@protectdemocracy.org


**WILLKIE FARR & GALLAGHER LLP**
Michael Gottlieb (DC Bar No. 974960) (*pro hac vice*)
Robert Meyer (DC Bar No. 405632) (*pro hac vice*)
Samuel Hall (DC Bar No. 242110) (*pro hac vice*)
Meryl Conant Governski (DC Bar No. 1023549) (*pro hac vice*)
JoAnna Suriani (DC Bar No. 1645212) (*pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1000
Facsimile: (202) 303-2000
Email: rmeyer@willkie.com
mgottlieb@willkie.com
shall@willkie.com
mgovernski@willkie.com
jsuriani@willkie.com

Madeleine Tayer (NY Bar No. 5683545)
(*pro hac vice*)
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mtayer@willkie.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2021, a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case File System of the Western District of Texas in compliance with the Federal Rules of Civil Procedure. I further certify that on September 13, 2021, a true and correct copy of the foregoing was forwarded via Federal Express to Defendant Ceh at the following address: 2039 Wind Chime Way, New Braunfels, TX 78130.

*/s/ JoAnna Suriani*
JoAnna Suriani