## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

ERIC CERVINI, WENDY DAVIS, DAVID
GINS, and TIMOTHY HOLLOWAY,

                Plaintiffs,

    v.

ELIAZAR CISNEROS, HANNAH CEH,
JOEYLYNN MESAROS, ROBERT
MESAROS, DOLORES PARK, and JOHN
and JANE DOES,

                Defendants.

Civil Action No. 1:21-cv-565-RP
Judge Robert Pitman

## BRIEF OF *AMICUS CURIAE* CAMPAIGN LEGAL CENTER ACTION
## IN SUPPORT OF PLAINTIFFS' BRIEF IN OPPOSITION
## <u>TO DEFENDANTS' MOTIONS TO DISMISS</u>

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................ii

INTRODUCTION ...........................................................................................................................1

STATEMENT OF INTEREST ........................................................................................................1

ARGUMENT ..................................................................................................................................2

    I.   Section 1985(3) is deliberately broad and must be interpreted accordingly .......................3

        A. Section 1985(3)'s broad text creates robust substantive rights to protect voters and
           campaign workers engaged in the democratic process...................................................5

        B. Historical and statutory context reinforces that the support-or-advocacy clauses are
           broad ...............................................................................................................................9

        C. Legislative history favors reading the support-or-advocacy clauses broadly ..............11

    II. Section 1985(3) applies to the conspiracy conduct alleged in the Complaint ...................12

        A.  The Section 1985(3) support-or-advocacy clauses provide their own substantive
           rights, including to be free from intimidation .............................................................13

        B.  Support-or-advocacy claims do not require state action ..............................................17

        C.  Support-or-advocacy claims do not examine class-based discrimination...................20

    III. The First Amendment does not shield Defendants from liability ....................................24

CONCLUSION ..............................................................................................................................26

# TABLE OF AUTHORITIES

**Cases:**                                                                                  Page

*Allen v. City of Graham*, No. 1:20-CV-997 (M.D.N.C. June 2, 2021)............................................9

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013).............................................19

*Arizona Democratic Party v. Arizona Republican Party*,
    No. 16-cv-03752 (D. Ariz. Nov. 4, 2016) .....................................................................9, 23

*Blassingame v. Trump*, No. 2:21-cv-858 (D.D.C. 2021)..............................................................2

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020) .....................................................4

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ..............................6, 8, 21, 23

*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021)..........................................2

*Bryan v. City of Madison, Miss.*, 130 F. Supp. 2d 798 (S.D. Miss. 1999) ..................................22

*Cameron v. Johnson*, 390 U.S. 611 (1968) ...............................................................................25

*Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711 (9th Cir. 1981)........................24

*Cantu v. Moody*, 933 F.3d 414 (5th Cir. 2019) .........................................................................22

*Cockrum v. Donald J. Trump for President, Inc.*, No. 3:18-cv-00484 (E.D. Va. 2018) ................2

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ..................................................................................2

*Daigle v. Gulf State Utilities Co., Local Union No. 2286*,
    794 F.2d 974 (5th Cir. 1986) .............................................................................................22

*Duncan v. McCall*, 139 U.S. 449 (1891) ...................................................................................20

*Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) ................................................................................2

*Federer v. Gephardt*, 363 F.3d 754 (8th Cir. 2004) ...................................................................23

*Food and Drug Administration v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..........................................................................................................11

*Galloway v. State of Louisiana*, 817 F.2d 1154 (5th Cir. 1987).................................................22

*Gill v. Whitford*, 138 S. Ct. 1916 (2018) ....................................................................................2

*Great American Federal Savings & Loan Association et al., v. Novotny*,
    442 U.S. 366 (1979) ........................................................................................................6, 7

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) ........................................4, 6, 7, 10, 19, 21, 23

*Halprin v. Prairie Single Family Homes of Dearborn Park Association*,
    388 F.3d 327 (7th Cir. 2004) .............................................................................................16

*Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261 (5th Cir. 2001) ....................................22

*Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018) ..................................................2

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) ..................................................................19

*Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020)....................................................................2

*King v. Burwell*, 576 U.S. 473 (2015) ......................................................................................10

*Kush v. Rutledge*, 460 U.S. 719 (1983) ...............................................................5, 6, 8, 21, 23, 24

*Loughrin v. United States*, 573 U.S. 351 (2014) .......................................................................... 19

*LULAC v. Public Interest Legal Foundation*,
    No. 1:18-cv-00423 (E.D. Va. 2018) ................................................................ 2, 9, 13, 14

*McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031 (11th Cir. 2000) ...................................... 15

*McCord v. Bailey*, 636 F.2d 606 (D.C. Cir. 1980) .............................................................. 1, 4, 24

*McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919 (5th Cir. 1977) ........................... 21, 22

*Milner v. Department of Navy*, 562 U.S. 562 (2011) .................................................................... 11

*Mitchell v. Johnson*, No. 07-40996, 2008 WL 3244283 (5th Cir. Aug. 8, 2008) .................. 10, 22

*National Coalition on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) ............................................................................ 9, 14

*Newberry v. East Texas State University*, 161 F.3d 276 (5th Cir. 1998) .................................... 22

*Oregon v. Mitchell*, 400 U.S. 112 (1970) .................................................................................... 10

*Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967) ................................................................... 7, 8, 13, 22

*People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725 (E.D. Va. 1992) ............................ 16

*Ross v. Blake*, 136 S. Ct. 1850 (2016) ......................................................................................... 11

*Shelby County v. Holder*, 570 U.S. 529 (2013) ............................................................................. 2

*Silverman v. Newspaper & Mail Deliverers' Union of N.Y. and Vicinity*, No. 97-cv-
    040, 1999 WL 893398 (S.D.N.Y. Oct. 18, 1999) ............................................................ 15

*Smiley v. Holm*, 285 U.S. 355 (1932) .......................................................................................... 19

*Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977) ................................................... 4, 24

*Swalwell v. Trump*, No. 2:21-cv-586 (D.D.C. 2021) ...................................................................... 2

*Texas v. White*, 74 U.S. 700, 721 (1868) ..................................................................................... 20

*The Ku Klux Cases*, 110 U.S. 651 (1884) ...................................................................................... 8

*Thompson v. Trump*, No. 2.21-cv-400 (D.D.C. 2021) ..................................................................... 2

*United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO, et al., v. Scott*,
    463 U.S. 825 (1983) ............................................................................................................. 7

*United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961) .................................................................. 16

*United States v. Bird*, 124 F.3d 667 (5th Cir. 1997)) ................................................................... 25

*United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965) .................................................................. 16

*United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965) ......................................................... 16

*United States v. Goldman*, 25 F. Cas. 1350 (C.C.D. La. 1878) .................................................... 19

*United States v. Hicks*, 980 F.2d 963 (5th Cir. 1992) .................................................................. 15

*United States v. McCleod*, 385 F.2d 734 (5th Cir. 1967) ............................................................ 13

*United States v. Stevens*, 559 U.S. 460 (2010) ............................................................................ 24

*United States v. Wise*, 370 U.S. 405 (1962) .................................................................................. 9

*U.S. by Katzenbach v. Original Knights of Ku Klux Klan*,
  250 F. Supp. 330 (E.D. La. 1965) ................................................................16

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) ....................................................2

*Virginia v. Black*, 538 U.S. 343 (2003) ................................................................24

*Whitman v. American Trucking Associations*, 531 U.S. 457 (2001)..........................9

**Statutes:**

28 U.S.C. § 1331 ....................................................................................................3

42 U.S.C. § 1983 ..............................................................................................10, 17

42 U.S.C. § 1985(1)..........................................................................................1, 24

42 U.S.C. § 1985(2)........................................................................................15, 24

42 U.S.C. § 1985(3).....................................................................................*passim*

42 U.S.C. § 3617 ..................................................................................................16

52 U.S.C. § 10101(b) ...........................................................................................16

Civil Rights Act of 1866........................................................................................11

Civil Rights Act of 1957...................................................................................13, 16

KKK Act of Apr. 20, 1871, Ch. 22, § 1, 17 Stat. 13 ............................................10

KKK Act of Apr. 20, 1871, Ch. 22, § 2, 17 Stat. at 13-14 ....................................10

KKK Act of Apr. 20, 1871, Ch. 22, § 3, 17 Stat. at 14 ..........................................11

KKK Act of Apr. 20, 1871, Ch. 22, § 4, 17 Stat. at 14-15 ....................................11

KKK Act of Apr. 20, 1871, Ch. 22, § 5, 17 Stat. at 15 ..........................................11

**Other Materials:**

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*,
  39 N.Y.U. REV. L. & SOC. CHANGE 173 (2015) ......................................6, 14, 15

Craig C. Donsanto & Nancy L. Simmons, Public Integrity Section, U.S. Dep't of
  Justice, *Federal Prosecution of Election Offenses* (2007), available at
  https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbo
  ok-0507.pdf ...............................................................................................17

Eric Foner, Reconstruction: America's Unfinished Revolution
  (2d ed. 2014)................................................................1, 10, 11, 18, 23

Gabriel J. Chin, *Justifying A Revised Voting Rights Act: The Guarantee Clause and
  the Problem of Minority Rule*, 94 B.U. L. REV. 1551 (2014)............................20

Kate McGee, Jeremy Schwartz, and Abby Livingston, "Biden camp cancels multiple Texas
  events after a 'Trump Train' surrounded a campaign bus," TEXAS TRIBUNE (Oct. 31,
  2020), https://www.texastribune.org/2020/10/31/biden-trump-texas-bus/
  (last accessed Sept. 9, 2021)................................................................8

Mark Fockele, *A Construction of Section 1985(c) in Light of Its Original Purpose*,
  46 U. CHI. L. REV. 402 (1979)..............................................................12

Nicholas Stephanopoulos, *The Sweep of the Electoral Power*,
  36 Const. Comment (2021) ...................................................................... 18, 20

Noah Webster, *An American Dictionary of the English Language* 555 (1867) (Ex. D) .............. 14

Note, *The Support or Advocacy Clause of § 1985(3)*,
  133 HARV. L. REV. 1382 (2020) ................................................................ 6, 12

Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*,
  89 FORDHAM L. REV. 145 (2020) ........................................................... 6, 7, 20

## INTRODUCTION

Congress enacted the Ku Klux Klan ("KKK") Act in 1871 to address the "wave of counterrevolutionary terror" that swept over the Reconstruction Era.[1] At the behest of elected officials and prominent political figures in the postbellum South, violent white mobs banded together to target their political opponents—newly empowered Black voters, their allies, and the candidates they supported—with oppressive fury. The KKK's attacks were as widespread as they were vicious. Southern state governments either acquiesced to this chaos or were too overwhelmed to counteract it, and the federal government lacked the tools to ensure free political advocacy and protect the proper functioning of the democratic process in the aftermath of the Civil War. The KKK Act, codified in part at 42 U.S.C. § 1985, was the answer.

The KKK Act remains the answer for addressing political violence today. On October 30, 2020, Defendants engaged in a highway ambush by surrounding and then terrorizing and slamming into the vehicles of supporters of an opposing federal political candidate. Using this coordinated "Trump Train" intimidation tactic and riding under the banner of Confederate battle flags, advocates of one presidential campaign attempted to overcome their political adversaries not through robust debate but with raw violence. This use of threats and physical force in an effort to cow the supporters of an opposing political campaign shakes the foundation of our democratic process. And it amounts to a modern-day iteration of precisely the political violence that Congress sought to prevent with the KKK Act. The statute's protections of supporters and advocates of federal candidates apply just as forcefully here as they did in their original context 150 years ago.

## STATEMENT OF INTEREST

*Amicus curiae* Campaign Legal Center Action ("CLC Action") and its affiliate Campaign

---

[1] Eric Foner, Reconstruction: America's Unfinished Revolution 425 (2d ed. 2014); *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (summarizing history).

Legal Center (CLC) are nonpartisan, nonprofit organizations that have, collectively, been working for more than fifteen years to advance democracy through law. *Amicus* CLC Action and its affiliate have litigated numerous voting rights cases in federal courts, including as arguing counsel for the plaintiffs in the United States Supreme Court in *Gill v. Whitford*, 138 S. Ct. 1916 (2018) and *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018), and as counsel for plaintiffs in *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) (challenging Texas's photo ID law), and *Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020) (en banc) (challenging Florida's felony disenfranchisement law). CLC has filed *amicus curiae* briefs in every major voting rights case before the Supreme Court in recent years, including *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021), *Cooper v. Harris*, 137 S. Ct. 1455 (2017), *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), and *Shelby County v. Holder*, 570 U.S. 529 (2013).

CLC also submitted *amicus curiae* briefs in recent district court cases involving claims under 42 U.S.C. § 1985(1)[2] and 42 U.S.C. § 1985(3).[3] *Amicus* CLC Action has a demonstrated interest and expertise in the interpretation of laws, such as Section 1985(3), that protect voting rights, voters and campaign workers, and the proper functioning of the democratic process.

## ARGUMENT

*Amicus* CLC submits this brief to clarify several issues related to the interpretation and application of the support-or-advocacy clauses of 42 U.S.C. § 1985(3). Specifically, CLC Action seeks to explain why—based on the plain meaning of the text, relevant precedent, legislative history, and other sources—Defendants' alleged violent conspiracy to attack and intimidate supporters of a presidential campaign fits squarely within those clauses. Defendants' attempts to

---

[2] *Blassingame v. Trump*, No. 2:21-cv-858 (D.D.C. 2021); *Thompson v. Trump*, No. 2.21-cv-400 (D.D.C. 2021); *Swalwell v. Trump*, No. 2:21-cv-586 (D.D.C. 2021).
[3] *Cockrum v. Donald J. Trump for President, Inc.*, No. 3:18-cv-00484 (E.D. Va. 2018); *LULAC v. Public Interest Legal Foundation*, No. 1:18-cv-00423 (E.D. Va. 2018).

muddy the plain application of the support-or-advocacy clauses by improperly narrowing their scope and conflating case law related to other clauses of the KKK Act must be rejected.

The Court should reject Defendants' arguments for multiple reasons. First, Congress deliberately designed Section 1985(3) to broadly address political violence in all its forms. Defendants' cramped reading of the statute that erroneously conflates two distinct sets of provisions should be rejected.[4] Second, Plaintiffs' allegations are sufficient to state a cause of action under Section 1985(3) because they properly assert a factual basis for the substantive rights that the support-or-advocacy clauses create, including the right to be free from political intimidation, and they are not required to establish state action nor racial animus. Third, Congress had ample authority to enact Section 1985(3) under the Thirteenth and Fourteenth Amendments, as well as the Elections Clause, Necessary and Proper Clause, and Guarantee Clause; Defendant Park's strained arguments challenging Congress's authority are unfounded. Finally, the First Amendment does not immunize Defendants from liability for their involvement in the conspiracy.

## I.   Section 1985(3) is deliberately broad and must be interpreted accordingly.

Congress broadly designed the KKK Act to address the dire threat that anti-democratic, white supremacist groups posed to the proper functioning of the democratic process after the Civil War. In 1871, President Ulysses S. Grant explicitly appealed to Congress to pass legislation that would equip the federal government to address the severe "condition of affairs [that] now exists" in the postbellum South that "render[ed] life and property insecure" in the country. *Cong. Globe*, 42d Cong., 1st Sess. 236, 244 (1871) (all legislative history included in Ex. B). Congress compiled an extensive record detailing the rampant terror and intimidation that swept the country during the

---

[4] Defendant Cisneros's argument that a claim under Section 1985(3) is outside the Court's subject matter jurisdiction, Cisneros MTD at 1-2, is a non-starter; claims brought under the KKK Act—a federal statute—are clearly within this Court's federal question jurisdiction. *See* 28 U.S.C. § 1331.

Reconstruction Era, *see, e.g.*, *id.* 245-48, 320-21, 369, 374, 428, 436, with one leading lawmaker summarizing that "lawless bands of men, amounting to hundreds, . . . have been roaming over the country independent and unchallenged, committing these atrocities, without fear of punishment, cheered by their neighbors, and despising your laws and your authority;" and concluding that "[w]e are called upon to legislate in regard to these matters," *see id.* at 820 (Sen. Sherman). Congress answered this call by enacting the KKK Act, "creat[ing] a broad remedy to address [its] broad concerns" of attacks on American democracy, *see McCord*, 636 F.2d at 615.

This broad remedy vindicates violations of the KKK Act in a range of modern contexts that are distinct from the statute's historical origin. *See, e.g.*, *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1335 (7th Cir. 1977) (construing the KKK Act in a new context and concluding that "Congress surely may use the lesson of a particular historical period as the catalyst for a law of more general application" for the future). But here, the mob violence and intimidation targeted at political supporters that drove Congress to pass the KKK Act are legally indistinguishable from Defendants' coordinated attack on the Biden campaign on October 30, 2020. Indeed, the picture of that day is remarkably reminiscent of historical political violence, and it is just as unlawful for renegade groups brandishing Confederate battle flags to take to a public highway to ambush the supporters of an opposing political candidate in 2020 as it was in 1871. Congress's sweeping statutory design thus applies with equal force to address the injuries that Defendants caused. The text, structure, and legislative history of Section 1985(3) confirm this application, and as with all "Reconstruction civil rights statutes," the Court should "accord [the statute] a sweep as broad as [its] language." *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971) (citation omitted); *accord Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1747 (2020) (instructing "courts [to] apply the broad rule" when the text so dictates).

**A.      Section 1985(3)'s broad text creates robust substantive rights to protect voters and campaign workers engaged in the democratic process.**

Congress's broad intent is manifest in the plain text of Section 1985(3), which represents a comprehensive federal protection against political violence. Although "[t]he length and style" of the statute "make[s] it somewhat difficult to parse[,]" "its meaning becomes clear" if "its several components are carefully identified," *Kush v. Rutledge*, 460 U.S. 719, 724 (1983), and broken down by each clause separated by a semi-colon:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the *equal protection of the laws*, or of equal privileges and immunities under the laws;
>
> or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the *equal protection of the laws*;
>
> or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his *support or advocacy* in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States;
>
> or to injure any citizen in person or property on account of such *support or advocacy*;
>
> in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (emphases added).

Reviewing Section 1985(3)'s clauses this way clarifies that the first four clauses set out separate substantive protections, and the fifth provides the cause of action and remedy for violations of each of those separate protections. The first two clauses include a common phrase: "equal protection of the laws." These Section 1985(3) equal protection clauses prohibit conspiracies to deprive persons of equal protection of the laws (clause one) and to hinder state

authorities from securing equal protection (clause two). Clauses three and four, by contrast, include the phrase "support or advocacy" but say nothing of equal protection. These so-termed support-or-advocacy clauses of the statute prohibit conspiracies to use violence or intimidation to prevent any citizen from supporting or advocating for federal candidates (clause three) or to injure any citizen on account of their support or advocacy (clause four). As noted, clause five provides the cause of action for any parties injured "in person or property" by the prohibited conspiracy to recover damages from any of the co-conspirators.

The Supreme Court has recognized that Section 1985(3)'s equal protection clauses diverge from other parts of the statute and has declined to apply interpretations limiting the coverage of the first two clauses to the KKK Act more generally. *See Kush*, 460 U.S. at 724-26; *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993) (specifying that the *Griffin* analysis concerns "the first clause of § 1985(3)"); *see also Griffin*, 403 U.S. at 102 n.9 (carefully noting that its reasoning applied to claims "under the portion of § 1985(3) before" the Court—the equal protection clauses).[5] This distinction also applies to differentiate the support-or-advocacy clauses, which are designed to protect "the right to support candidates in federal elections" rather than to safeguard equal protection of rights derived from a separate source. *Kush*, 460 U.S. at 726.

The equal protection clauses are distinct because they require examining the conspirators' purpose and endorse equality in a plaintiff's existing rights. These clauses "provide[] no substantive rights [them]sel[ves]," *Great American Fed. S. & L. Ass'n v. Novotny*, 442 U.S. 366,

---

[5] *See also* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. L. & Soc. Change 173, 203-04 (2015) (summarizing differences between the Section 1985(3) clauses); Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 154 (2020) (same); Note, *The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382, 1387 (2020) (same).

372 (1979), but simply vindicate the deprivation of either "equal privileges and immunities" or "equal protection of the laws" that have their substantive basis "found elsewhere," *United Bhd. of Carpenters Local 610 v. Scott*, 463 U.S. 825, 833 (1983). Given that many relevant constitutional rights that could underlie an equal protection clauses claim require state action,[6] plaintiffs often (but not always) must "prove that the State was somehow involved in or affected by the conspiracy." *Carpenters*, 463 U.S. at 833. Additionally, because equality is the touchstone of claims under Section 1985(3)'s first and second clauses, plaintiffs must establish "class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 96-97. Thus, under the test established in *Griffin* and its progeny, plaintiffs pursuing a Section 1985(3) *equal protection clauses* claim must allege: (1) a violation of an independent right, such as First Amendment rights to free speech or association; (2) a "racial, or perhaps otherwise class-based" deprivation of that right; and (3) often state action. *Id.* at 102; *Carpenters*, 463 U.S. at 834-35.[7]

The *Griffin* test does not apply to a claim under Section 1985(3)'s support-or-advocacy clauses. Rather, the Section 1985(3) support-or-advocacy clauses provide far broader protections that are "something more and something different" because they effectuate "the specific attention of Congress which has provided a specific remedy for interference by private individuals" of the rights of voters to give their support or advocacy for federal candidates. *Paynes v. Lee*, 377 F.2d

---

[6] Some exceptions exist, such as a claim of conspiracy to deprive individuals of their Thirteenth Amendment rights, which does not require a showing of state action. *Griffin*, 403 U.S. at 104-05.

[7] Although the *Novotny* decision imprecisely described this *Griffin* test as the "criteria for measuring whether a complaint states a cause of action under § 1985(3)," *id.* at 372, it did not at all discuss the support-or-advocacy clauses, *see id.* at 370-72. Neither did the dissent, which discussed only the meaning of the "equal privileges and immunities under the laws" portions of Section 1985(3). *See id.* at 388-90 (White, J., dissenting). Indeed, much of the confusion concerning the jurisprudence involving Section 1985(3) stems from courts referencing the general section number as a shorthand for a particular provision because Congress's arcane drafting conventions from 1871 breaks down the statute's distinct provisions into separate clauses rather than citable subsections. *See* Primus & Kistler, *supra* n.5, at 184-89.

61, 64 (5th Cir. 1967). The support-or-advocacy clauses "relate[] to institutions and processes of the Federal Government" and broadly protect its electoral system, lacking the textual limits applicable to claims under the equal protection clauses. *See Kush*, 460 U.S. at 724. Instead of speaking in terms of "purpose" to deprive "equal protection of the laws, or of equal privileges and immunities under the laws," the support-or-advocacy clauses expansively protect "any citizen" from any conspiracy that uses "force, intimidation, or threat" to prevent the citizens' "support or advocacy" of a federal candidate or injure them on account of that support or advocacy. 42 U.S.C. § 1985(3). Because of these textual differences, "there is no suggestion" that the equal protection clauses' limiting requirements to prove discrimination involving a separate substantive right that potentially demands state action would apply to "any other portion of § 1985," including the support-or-advocacy clauses. *Kush*, 460 U.S. at 726; *see also Bray*, 506 U.S. at 267.

The support-or-advocacy clauses instead offer far-reaching substantive protections that enforce Congress's extensive "power to protect the elections on which its existence depends from violence[.]" *Ex Parte Yarbrough (The Ku Klux Cases)*, 110 U.S. 651, 658 (1884). As discussed in further detail *infra* Part II, the support-or-advocacy clauses establish their own statutory rights that do not compel proof of state action or class-based animus. Their elements, instead, require plaintiffs to establish (1) the Defendants participated in a conspiracy;[8] (2) to use intimidation, force, or threats against citizens; (3) to obstruct their support or advocacy of a federal candidate. Binding precedent supports this reading of the support-or-advocacy clauses, *see Paynes*, 377 F.2d

---

[8] Accepting the pleaded facts as true, *amicus* CLC Action examines the Section 1985(3) framework without discussing the elements of a conspiracy. However, we note that the records of the events in question and communications leading up to those events speak for themselves. *See, e.g.*, Kate McGee, Jeremy Schwartz, and Abby Livingston, "Biden camp cancels multiple Texas events after a 'Trump Train' surrounded a campaign bus," TEXAS TRIBUNE (Oct. 31, 2020), https://www.texastribune.org/2020/10/31/biden-trump-texas-bus/ (last accessed Sept. 9, 2021).

at 63-64, and the Court should follow the established path of recent district courts interpreting the statute in this manner. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486 & n.30 (S.D.N.Y. 2020); *LULAC v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *5 (E.D. Va. Aug. 13, 2018); *Ariz. Democratic Party v. Ariz. Republican Party*, No. 16-cv-03752, 2016 WL 8669978, at *5 n.4 (D. Ariz. Nov. 4, 2016); *accord Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *8 (M.D.N.C. June 2, 2021).

> **B.     Historical and statutory context reinforces that the support-or-advocacy clauses are broad.**

The historical backdrop in 1871, the statutory context of the KKK Act as a whole, and the history of prior failed legislation to protect voters and campaign workers from attack all further reinforce the expansive application of the Section 1985(3) support-or-advocacy clauses.

The historical backdrop of the KKK Act confirms that the purpose of Section 1985(3) was to fully protect citizens from attacks on their political support or advocacy. "[S]tatutes are construed by the courts with reference to the circumstances existing at the time of the passage." *United States v. Wise*, 370 U.S. 405, 411 (1962); *see also Whitman v. Am. Trucking Associations*, 531 U.S. 457, 471 (2001) (ruling that a statute must be "interpreted in its statutory *and historical context*" (emphasis added)). Immediately following the Civil War, the federal government undertook a broad effort to bring Black voters into the political process and safeguard that participation from attack. By 1870, Congress had passed the Thirteenth, Fourteenth, and Fifteenth Amendments to abolish slavery and its badges and incidents; guarantee due process, equal protection of the laws, and punish voting deprivations with reduced congressional representation; and outlaw race discrimination in voting. These Reconstruction Amendments, along with local organizing efforts by groups including the Union League and the Republican Party, led to a period of widespread electoral success for newly enfranchised Black voters, their allies in the South, and

their desired Republican candidates. Foner, *supra* n.1, at 291-307. This coalition briefly enjoyed electoral success in nearly all Southern governorships and legislatures while also electing Black representatives to Congress for the first time. *Id.* at 353. But the KKK and similar militant groups responded to these electoral victories with a sustained campaign of violence, threats, and intimidation. *See, e.g.*, *id.* at 425-44. The Klan's violence was politically motivated—designed to overcome Black Republicans and their white Republican allies with force when they could not defeat them at the ballot box. The KKK and like groups effectively functioned as "a military force serving the interests of the Democratic party, the planter class, and all those who desired the restoration of white supremacy." *Id*. at 425. To address this pervasive political violence problem and fulfill Congress's "idealistic determination that the gains of the Civil War not be surrendered," *Oregon v. Mitchell*, 400 U.S. 112, 254 (1970) (Brennan, J., dissenting in part and concurring in part), Congress devised the support-or-advocacy clauses to be a broad solution.

The expansive reach of the KKK Act's other provisions also establishes that Congress sought to fully safeguard participants in the political process from mob violence and intimidation in all forms. *See King v. Burwell*, 576 U.S. 473, 492 (2015) (provisions "must be read in their context and with a view to their place in the overall statutory scheme" (citation omitted)); *see also Griffin*, 403 U.S. at 98 (stating that the Court's "construction of Section 1985(3) is reinforced when examination is broadened to take in its companion statutory provisions"). For example, the KKK Act established a then-unprecedented private right of action for violations of constitutional rights (now codified, as amended, at 42 U.S.C. § 1983), and dramatically expanded protections for federal government officials performing their federal duties. *See* KKK Act of Apr. 20, 1871, Ch. 22, § 1, 17 Stat. 13 (Ex. C) (private right of action), § 2, 17 Stat. at 13-14 (federal official protections). The 1871 Congress also reached even further by authorizing President Grant to

10

engage the military to confront the massive private lawlessness in the South, permitting the temporary suspension of the writ of habeas corpus, and empowering courts to remove potential jurors because of their perceived support of the KKK. *See id.* § 3, 17 Stat. at 14 (military authorization), § 4, 17 Stat. at 14-15 (habeas suspension), § 5, 17 Stat. at 15 (juror qualification). This wide-ranging statutory scheme confirms that, in drafting Section 1985(3), Congress legislated at the height of its power to release the KKK's stranglehold on the South and protect voters and candidates' ability to freely engage in the democratic process. *See* Foner, *supra* n.1, at 455. Section 1985(3)'s comprehensive support-or-advocacy provisions played a key role in pursuing this goal.

Moreover, the history of Congress's prior enactments to protect against extremist groups also "underscores the . . . nature of" Section 1985(3)'s expansive coverage. *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (reaffirming "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination" (citation omitted)). The KKK Act was the third in a series of increasingly stringent Enforcement Acts designed to stop the severe threats to the Nation's democracy that prior legislation failed to address or left gaps, such as in the Civil Rights Act of 1866. *See* Foner, *supra* n.1, at 454-55. These prior laws fell short in protecting voters and campaign workers, an increasingly important objective in 1871 that was necessary to achieve the ultimate goal of restoring democratic order in the South. *See id.* at 455-59. Congress designed Section 1985(3) to correct these shortcomings in existing law. Accordingly, the support-or-advocacy clauses should be interpreted to have the expansive reach that their language requires.

### C.     Legislative history favors reading the support-or-advocacy clauses broadly.

The Section 1985(3) legislative history also provides "clear evidence of congressional intent" to enact a broad statute that would fully protect supporters of federal candidates from violent conspiracies. *See Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011). This legislative

history of the support-or-advocacy clauses reveals Congress's clear concern that stopping the KKK's politically motivated violence was urgently needed to preserve American democracy. *See* Mark Fockele, *A Construction of Section 1985(c) in Light of Its Original Purpose*, 46 U. Chi. L. Rev. 402, 407-11 (1979) (detailing legislative history).[9] The leading Committee Report for the bill puts this core objective beyond doubt, concluding that "[i]t is clearly established . . . [t]hat the Ku-Klux organization does exist, has a political purpose, is comprised of members of the democratic or conservative party, [and] has sought to carry out its purpose by murders, whippings, intimidations, and violence." *Id.* at 408 (quoting H.R. Rep. No. 1, 42d Cong., 1st Sess. xxx-xxxi). Congress understood that the KKK's goal was "to reestablish Democratic hegemony in the South" through political violence rather than fair electoral success, and knew that a narrow statutory prohibition would fail to ward off this dire threat to democracy. *See id.* As one member put it, "[i]f political opponents can be marked for slaughter by secret bands of cowardly assassins who ride forth with impunity to execute the decrees upon the unarmed and defenseless, it will be fatal alike to the Republican party and civil liberty." *Cong. Globe*, at 321 (Rep. Stoughton).

In sum, Section 1985(3)'s language is vast, and its statutory context, history, and purpose confirm its expansive application. To read it fairly is to read it broadly, and the Court should interpret the Section 1985(3) support-or-advocacy clauses in accordance with the statute's wide sweep and Congress's firm intent to protect the proper functioning of the democratic process against political violence and intimidation.

## II.     Section 1985(3) applies to the conspiracy conduct alleged in the Complaint.

The Section 1985(3) support-or-advocacy clauses prohibit Defendants' alleged conspiracy. First, the clauses provide substantive rights to protect citizens from conspiracies to obstruct,

---

[9] For more on the KKK Act legislative history, *see* Note, *The Support or Advocacy Clause of § 1985(3)*, *supra* n.5, at 1389-92.

through intimidation or other means, their support or advocacy for federal candidates. Second, Plaintiffs need not establish state action to state their claim because the support-or-advocacy clauses prohibit private conspiracies and that prohibition is firmly grounded within Congress's constitutional authority. Third, Plaintiffs have no obligation to allege discrimination because the Section 1985(3) support-or-advocacy clauses, unlike the statute's equal protection clauses, do not require Plaintiffs to prove that racial or other class-based animus motivated the conspiracy.

### A. The Section 1985(3) support-or-advocacy clauses provide their own substantive rights, including to be free from intimidation.

As explained above, the Section 1985(3) support-or-advocacy clauses establish their own substantive protections against conspiracies to prevent any citizens from supporting or advocating for federal candidates, or to injure citizens in person or property on account of such support or advocacy. Unlike the statute's equal protection clauses, claims under the support-or-advocacy clauses do not ask plaintiffs to identify a discriminatory violation of a separate constitutional or statutory right. These parts of Section 1985(3) *themselves* give Plaintiffs substantive rights to be free from conspiracies using violence or intimidation to hinder their support for a federal candidate. *See Paynes*, 377 F.2d at 63-64 (holding that Section 1985(3)'s support-or-advocacy clauses provide their own substantive rights); *LULAC*, 2018 WL 3848404, at *4-6 (same). Thus, as Judge Wisdom concluded in analyzing the analogous voter intimidation protections in the Civil Rights Act of 1957, "[t]he inquiry . . . is not whether the defendants have transgressed the Constitution. It is whether they have violated the statute" that here provides its own substantive rights against intimidation. *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967).

Plaintiffs have properly invoked their statutory rights and allege sufficient facts to establish that the "Trump Train" conspiracy and its effects on Plaintiffs amount to "intimidation" as that term is used in the support-or-advocacy clauses. *See* Compl. ¶¶ 129-35, 141. Although the methods

13

of political intimidation may change over time and require adapting the KKK Act to new contexts, *see, e.g.*, *LULAC*, 2018 WL 3848404, at *4, the conduct here requires no such adaption because this case is a modern mirror image of the political violence Congress sought to address in 1871. "Today, almost 150 years later, the forces and conflicts that animated Congress's adoption of the Ku Klux Klan Act . . . are playing out again." *Nat'l Coal. on Black Civic Participation*, 498 F. Supp. 3d at 464. And these attacks—reminiscent of the tactics and even symbolism that marked the Reconstruction-era political violence—amount to "contemporary means of" the same "voter intimidation [that] may be more detrimental to free elections than the approaches taken for that purpose in past eras, and hence call for swift and effective judicial relief." *Id.*

At least three sources confirm that the meaning of "intimidation" in Section 1985(3) covers Defendants' alleged conspiracy: contemporaneous dictionary definitions of the term at the time of the statute's enactment; the interpretation of "intimidation" in other federal civil rights statutes; and the U.S. Department of Justice's guidance on the meaning of the term. Using these and other sources, courts have broadly interpreted "intimidation" to encompass a wide range of conduct, from physical violence to emotional distress to other forms of coercion, that places the targeted person(s) in fear. Plaintiffs' allegations fit this accepted broad understanding of intimidation in Section 1985(3). *See* Compl. ¶¶ 2, 4, 8-10, 96, 116-18, 129-35, 141.

To begin, dictionary definitions support that the alleged conspiracy amounts to intimidation. The 1867 Webster's Dictionary defined "intimidate" as "[t]o make fearful; to inspire with fear.—S[yn]. [t]o dishearten; dispirit; abash; deter; frighten; terrify," Noah Webster, *An American Dictionary of the English Language* 555 (1867) (Ex. D), and numerous additional Reconstruction Era dictionaries attributed similar meaning to the word. *See, e.g.*, Cady & Glazer, *supra* n.5, at 196 (detailing definitions). Critically, this definition of "intimidate" does not address

14

the methods of intimidation, whether physical violence, psychological injury, or otherwise. The term instead focuses on the reaction that the conspirators' conduct induces in the targeted person(s), which adheres to "the most commonly understood 'dictionary' definition of 'intimidate'" meaning "to place a person in fear." *See United States v. Hicks*, 980 F.2d 963, 973 (5th Cir. 1992). This can be done through conduct that is "without . . . a direct or even veiled threat." *Id.* Thus, the meaning of "intimidate" as it has been understood from the Reconstruction Era to today focuses on the state of mind that the perpetrator implants in the victim(s), and Plaintiffs sufficiently allege they were intimidated under this accepted definition.

The use of "intimidation" in related federal statutes also supports this meaning. The term is identically used in 42 U.S.C. § 1985(2), a KKK Act provision that bars conspiracies to intimidate parties or witnesses in connection with legal proceedings. In interpreting that section, courts have held that the conspiracy victim's emotional harm, not merely physical injury or distress, gives rise to a claim for witness intimidation. *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034 (11th Cir. 2000); *Silverman v. Newspaper & Mail Deliverers' Union of N.Y. and Vicinity*, No. 97-cv-040, 1999 WL 893398, at *4 (S.D.N.Y. Oct. 18, 1999). The *Silverman* court, for example, explained that although the KKK Act sought "to address physical intimidation," this "was not the only goal of the statute." *Id*. Section 1985(2)'s use of "intimidation" meant the provision was "also designed to address improper interference with the judicial process" apart from physical attacks, and plaintiffs could bring a claim alleging other types of interference "with the witness' ability to give 'free, full and truthful testimony' in federal court." *Id*. This expansive definition of intimidation informs the meaning of its identical usage in the support-or-advocacy clauses.

"Intimidation" used in related civil rights statutes likewise favors this reading. *See* Cady & Glazer, *supra* n.5, at 193-202 (summarizing civil rights cases interpreting "intimidate" or

"intimidation"). Courts in this Circuit have construed "intimidation" in the analogous Civil Rights Act of 1957 to encompass emotional harassment and other types of coercion beyond threats or actual physical violence.[10] Similarly, 42 U.S.C. § 3617 makes it unlawful to "intimidate, threaten, or interfere with" a person's enjoyment or exercise of fair housing rights, which numerous courts have held covers intimidation that does not involve direct physical violence or threats.[11] And Section 131(b) of the Civil Rights Act prohibits intimidation that interferes with the right to vote in federal elections, 52 U.S.C. § 10101(b), which courts have held includes intimidation through emotional distress and non-physical coercion.[12] These interpretations reveal that the term "intimidation" used in civil rights statutes reaches a wide range of conduct to protect people from violations of their rights, and the Section 1985(3) support-or-advocacy clauses are no exception.

Finally, the Court may look to the Department of Justice's definition of voter intimidation to understand its meaning in the support-or-advocacy clauses. According to 2007 guidance, intimidation is conduct designed to "deter or influence voting activity through threats to deprive voters of something they already have, such as jobs, government benefits, or, in extreme cases, their personal safety." Craig C. Donsanto & Nancy L. Simmons, Public Integrity Section, U.S.

---

[10] *See, e.g.*, *McCleod*, 385 F.2d at 740-41 (finding baseless arrests and unjustified prosecutions were intimidation); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (same); *U.S. by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 341, 355 (E.D. La. 1965) (finding that Klansmen purposefully going to locations where they expected Black Americans to be exercising their civil rights was unlawful intimidation).

[11] *See, e.g.*, *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (scrawling a racial slur on plaintiffs' property); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725, 733 (E.D. Va. 1992) (excessive investigations of a rental property).

[12] *See United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (white landowners evicted and refused to deal in good faith with Black tenant farmers for the purpose of interfering with their voting rights, giving rise to a voter intimidation claim); *United States v. Bruce*, 353 F.2d 474 (5th Cir. 1965) (white landowners ordered Black defendant who was active in promoting voter registration to stay off their property, preventing him from reaching business clients); *United States v. Deal*, 6 Race Rel. L. Rep. 474 (W.D. La. 1961) (white business owners refused to engage in business transactions with Black farmers who attempted to register to vote).

Dep't of Justice, *Federal Prosecution of Election Offenses* 54 (2007).[13] Plaintiffs' allegations make clear that Defendants conspired to deter them from advocating for their candidate by depriving them of their sense of personal safety—a clear case of intimidation under this accepted meaning.

These authorities resolve any doubt that the facts alleged here amount to intimidation under any conceivable definition of that term, and indeed are reminiscent of the precise factual context in which Congress designed this particular statute to operate to prevent political violence.

### B.    Support-or-advocacy claims do not require state action.

Plaintiffs correctly state their Section 1985(3) claims against the private individuals involved in the "Trump Train" conspiracy, and nothing in the support-or-advocacy clauses requires proof of state involvement. Defendants' contrary arguments are detached from Section 1985(3)'s text and history. The suggestion that the statute could be unconstitutional if it does not require state action is also meritless because Congress has ample constitutional authority to protect against private conspiracies that undermine their own elections and the proper functioning of government.

Nothing in the Section 1985(3) support-or-advocacy clauses text requires state action. Unlike other KKK Act provisions, which ask plaintiffs to sue a "person [acting] under color of [law] of any State," 42 U.S.C. § 1983, or identify a deprivation of "the equal protection of the laws" that may separately require state action, 42 U.S.C. § 1985(3) (equal protection clauses), the support-or-advocacy clauses are not so limited. The text only requires plaintiffs to establish that "two or more *persons*" (not acting under color of any law), "conspire[d] to prevent by force, intimidation, or threat, *any citizen* . . . from giving his *support or advocacy*" (not requiring a separate substantive right). 42 U.S.C. § 1985(3) (emphases added). The language that compels state action in other KKK Act provisions is absent from the support-or-advocacy clauses.

---

[13] Available at https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-0507.pdf (last accessed September 9, 2021).

The legislative history also reveals that Congress designed Section 1985(3) without a state action requirement because the problem it sought to address centered on the violence of private vigilante groups who were not overtly acting on behalf of the government. *Cf.* Foner, *supra* n.1, at 432-44 (describing close relationship between KKK and government officials). As a secretive and ostensibly non-governmental group, Congress knew that the KKK sought to "encourage crimes of the most frightful nature to carry elections," and believed it had to wholly "suppress them" to "restore order, fair-dealing, equality, and peace, to secure free elections." *Id.* State action was not part of that calculation. Indeed, Congress was concerned that these outside forces were undermining the government, not part of it. *Cong. Globe*, at 486 (Rep. Cook) ("Any combination of men who shall conspire to prevent me from advocating the election of any qualified person to any office under the Government of the United States . . . is an offense against the Government of the United States."). Nothing in the text or history of the support-or-advocacy clauses supports the atextual suggestion that Congress sought to require state actors to be involved in the conspiracy.

Congress's sweeping constitutional authority over its elections empowers it to enact the support-or-advocacy clauses without a state action limit. *See* Nicholas Stephanopoulos, *The Sweep of the Electoral Power*, 36 Const. Comment 1, 35 (2021). Defendant Park's contrary arguments, *see* Park MTD at 8-14, overlook that, in addition to the Fourteenth Amendment, the support-or-advocacy clauses are anchored in the Thirteenth Amendment, the Elections Clause, the Necessary and Proper Clause, and the Guarantee Clause. Indeed, The KKK Act's text forecloses Defendants' effort to limit the statute because it states the bill was "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, *and for other purposes*." 17 Stat. at 13 (emphasis added). Defendants erroneously understate Congress's extensive authority over its elections and impermissibly read the words "for other purposes" out of the statute.

18

These "for other purposes" are not empty words. *See Loughrin v. United States*, 573 U.S. 351, 358 (2014) (courts must "give effect" to "every clause and word of a statute" (citation omitted)). They provide that Congress enacted the KKK Act using additional constitutional bases that do not require enforcement statutes to contain state action elements. First, the Thirteenth Amendment warrants reading the support-or-advocacy clauses without a state action requirement because it empowers Congress to enact legislation targeting private actions that preserve "the badges and the incidents of slavery." *Griffin*, 403 U.S. at 105. "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation," as it did in the KKK Act. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 440 (1968). The Elections Clause and the Necessary and Proper Clause in Article I also provide independent constitutional grounding for Congress to enact the KKK Act under its extensive "power to protect the elections on which its existence depends[] from violence[.]" *Ex Parte Yarbrough*, 110 U.S at 658; *accord United States v. Goldman*, 25 F. Cas. 1350, 1354 (C.C.D. La. 1878) (holding that the KKK Act is rooted in the Elections Clause). The Elections "Clause's substantive scope is broad" and Congress's power under it is "paramount." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013) (citation omitted). These clauses authorize Congress to prevent private attacks and "protect . . . the man who votes from personal violence or intimidation, and the election itself from corruption[.]" *Ex Parte Yarbrough*, 110 U.S. at 661; *see also Smiley v. Holm*, 285 U.S. 355, 366 (1932) (the Elections Clause authority includes the "protection of voters," unconditioned by state action).

The Guarantee Clause is likewise a "plenary" and "bountiful source of power [for Congress], which cannot be called into question." *Cong. Globe*, 40th Cong., 3d. Sess. 903 (1869) (Sen. Sumner). It authorizes Congress to protect the "right of the people to choose their own officers for governmental administration," *Duncan v. McCall*, 139 U.S. 449, 461 (1891), and there is no

requirement that state officials be responsible for the deprivation of that right. *See Texas v. White*, 74 U.S. 700, 721, 727 (1868) (specifying that "[t]he government *and the citizens of the State*, refusing to recognize their constitutional obligations, assumed the character of enemies" and had infringed the right to a republican form of government, which Congress has the authority to guarantee for the "people or political community" of the state "as distinguished from a government" (emphasis added)).[14] Thus, Congress has extensive authority to enact the support-or-advocacy clauses without requiring proof of state action. Because the text and history of the KKK Act contain no indications that state action is required, Plaintiffs need not plead it.

### C. Support-or-advocacy claims do not examine class-based discrimination.

Claims under Section 1985(3)'s support-or-advocacy clauses also do not require proof that racial or other class-based animus motivated the prohibited conspiracy. Defendants' contrary arguments—relying on inapposite cases concerning the statute's distinct equal protection clauses—run headlong into the provisions' plain text, binding precedent on the proper interpretation of Section 1985, the weight of recent persuasive authority, legislative history, and interpretations of similar provisions of the KKK Act.

First, the support-or-advocacy clauses' plain text establishes that proof of discrimination is not an element of Section 1985(3) claims enforcing those provisions.[15] Although the Section 1985(3) equal protection clauses speak in terms of protecting "equal" rights and evaluating the "purpose" driving the conspiracy, 42 U.S.C. § 1985(3), the support-or-advocacy clauses lack this "critical language," *see Kush*, 460 U.S. at 720. As the *en banc* Fifth Circuit concluded, it was these

---

[14] *See also* Gabriel J. Chin, *Justifying A Revised Voting Rights Act: The Guarantee Clause and the Problem of Minority Rule*, 94 B.U. L. REV. 1551, 1565-70 & n.115 (2014).

[15] The lack of an animus requirement also does not take the support-or-advocacy clauses outside the bounds of Congress's constitutional authority because the Elections Clause, Necessary and Proper Clause, and the Guarantee Clause do not limit Congress to preventing discrimination. *See supra* Part II.B.; *see also* Stephanopoulos, *supra*, at 7-11; Primus & Kistler, *supra* n.5, at 164-70.

provisions' purpose-centered text and "the presence of the word 'equal' which allowed the Court" in *Griffin* "to limit the application of the" Section 1985(3) equal protection clauses; "[b]y focusing on that word, the justices discerned that the purpose to deprive another of the equal protection of the laws must be class-based." *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 924 (5th Cir. 1977) (en banc); *see also Griffin*, 403 U.S. at 102 (repeatedly emphasizing the word "equal" to require proof of discrimination)*. Thus, "*Griffin*'s animus requirement rested on 'the "equal protection" language' of § 1985(3)," *Bray*, 506 U.S. at 281 n.13, which the support-or-advocacy clauses text omits. Instead, the support-or-advocacy clauses simply prohibit any conspiracy, irrespective of its motivation, that uses "force, intimidation, or threat" to prevent "any citizen . . . from giving his support or advocacy" to a federal candidate or "to injure any citizen in person or property on account of such support or advocacy." 42 U.S.C. § 1985(3). Because the support-or-advocacy clauses "contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws," there is no textual basis to interpret those provisions to require discrimination. *Kush*, 460 U.S. at 725.

Second, binding precedent also compels interpreting the support-or-advocacy clauses to exclude a class-based animus element. As noted above, the Supreme Court has repeatedly emphasized that the animus requirement applies to Section 1985(3) equal protection clauses claims but does not extend to other parts of the statute absent a textual basis to do so. *Kush*, 460 U.S. at 724-26; *see also Bray*, 506 U.S. at 267, 281 n.13;[16] *Griffin*, 403 U.S. at 102 & n.9. Even preceding these decisions, the Fifth Circuit in *Paynes* distinguished the support-or-advocacy clauses from the equal protection clauses, holding that plaintiffs must only show that the conspiracy hindered their

---

[16] Defendant Park's reliance on *Bray* for support, Park MTD at 9-10, is misplaced. The Court explicitly stated that the racial animus analysis it conducted was for an alleged "violation of the *first clause* of § 1985(3)," which is not at issue here. *Bray*, 506 U.S. at 267-68 (emphasis added).

"right to be free from threatened harm" while engaging in the political process "and the right to be protected from violence for an attempted exercise of a voting right[.]" 377 F.2d at 64. Although the factual summary in *Paynes* noted that the conspirators were "two unknown white men" and the plaintiffs were Black, *id.* at 63, the court made no use of those facts in resolving the case and did not discuss discrimination as a component of the analysis, *see id.* at 64-65. Moreover, all of the purportedly contrary Fifth Circuit authority Defendants cite either concern the distinct *equal protection clauses* of Section 1985(3)[17] or have been subsequently overruled,[18] and are therefore irrelevant to resolving the meaning of the support-or-advocacy clauses.

Third, persuasive authority supports that Section 1985(3) support-or-advocacy claims do not require proof of discrimination. Numerous district courts have recently construed the statute and reached precisely this conclusion. *See, e.g.*, *Nat'l Coal. on Black Civic Participation*, 498 F. Supp. 3d at 486 & n.30; *LULAC*, 2018 WL 3848404, at *5; *Ariz. Democratic Party*, 2016 WL 8669978, at *5 n.4. In *LULAC*, for example, the district court analyzed the Supreme Court's combined reasoning in *Kush v. Rutledge*, *Griffin v. Breckenridge*, and *Bray v. Alexandria Women's*

---

[17] *See, e.g.*, *Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) ("The *relevant text* of § 1985(3) criminalizes only conspiracies that involve depriving someone of 'equal protection of the laws' or 'equal privileges and immunities under the laws.' . . . *This kind of conspiracy* requires some form of class-based discrimination." (citations omitted) (emphases added)); *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 271 (5th Cir. 2001) (citing only equal protection clauses cases); *Bryan v. City of Madison, Miss.*, 130 F. Supp. 2d 798, 813 (S.D. Miss. 1999) ("[T]he conspiracy must have as its purpose not only the deprivation of equal protection of the laws, but also a racial or other class-based discriminatory motivation."), *aff'd* 213 F.3d 267 (5th Cir. 2000); *Galloway v. State of La.*, 817 F.2d 1154, 1158 (5th Cir. 1987) (defendants "conspired to deprive . . . equal protection of the laws"); *Daigle v. Gulf State Utils. Co., Local Union No. 2286*, 794 F.2d 974, 978 & n.2 (5th Cir. 1986) (noting the "pertinent part" of Section 1985(3) "prohibits private conspiracies to deprive persons of equal protection of the laws"); *McLellan*, 545 F.2d at 933 (concerning "*equal protection* of the laws within the meaning of [§ 1985(3)]" (emphasis added)).

[18] *See Mitchell v. Johnson*, No. 07-40996, 2008 WL 3244283, at *3 (5th Cir. Aug. 8, 2008) (noting that *Kimble v. D.J. McDuffy, Inc.*, 648 F.2d 340 (5th Cir. 1981), and *Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754 (5th Cir. 1987) were overruled); *Newberry v. East Texas State University*, 161 F.3d 276, 281 n.2 (5th Cir. 1998) (involving equal protection claim and relying on overruled cases).

*Health Clinic* to conclude that the support-or-advocacy clauses "do[] not require allegations of a race or class-based, invidiously discriminatory animus." 2018 WL 3848404, at *6.[19] The same legal framework governs Plaintiffs' claims and requires the same conclusion here.

The legislative history and historical context of the statute likewise reinforce that Congress intended the support-or-advocacy clauses to not require race discrimination. Although the statute in its original context had the effect of preventing the KKK's attacks mostly targeting recently enfranchised Black citizens, Congress designed its protections to extend to "all the thirty-eight millions of the citizens of this nation" at that time. *Cong. Globe*, at 484 (Rep. Wilson). Race was not the focus of the support-or-advocacy clauses because, as Representative Coburn summarized, the KKK's "reign of terror" is "exactly, as they say, political." *Id.* at 460. Allied white voters who supported Black citizens and sought to elect Republicans—pejoratively called "scalawags" by Southern racists—did not "escape the violence" of the KKK's intimidation campaigns. *See* Foner, *supra* n.1, at 427-28. As Representative Roberts summarized: "These acts of violence are not directed against colored citizens only . . . . [T]he victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans. They may be black or white . . . but only Republicans." *Cong. Globe*, at 412-13. Thus, Congress wrote the KKK Act to protect supporters of political candidates apart from their race because "[b]e they white or black, they must have free speech, a free ballot, and a safe home." *Id.* at 414.

Moreover, other KKK Act provisions that are more textually aligned with the support-or-advocacy clauses similarly diverge from the Section 1985(3) equal protection clauses by not

---

[19] Even courts that have erroneously limited other aspects of the support-or-advocacy clauses, such as by requiring state action (at odds with the statute's text and history), have agreed that plaintiffs are not "required to show class-based animus as part of [their] support and advocacy claim." *See, e.g.*, *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004) (applying *Kush*, 460 U.S. at 725).

requiring proof of discrimination. For instance, Section 1985(1), concerning conspiracies to threaten federal officials, and Section 1985(2), prohibiting conspiracies against witnesses and jurors in a judicial proceeding, do not have equality or purpose-focused language. 42 U.S.C. §§ 1985(1); 1985(2). As such, courts have routinely interpreted those provisions to not contain a discrimination element. *See Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717 (9th Cir. 1981) (Section 1985(1) claim); *Stern*, 547 F.2d at 1339 (same); *Kush*, 460 U.S. at 724-27 (Section 1985(2) claim); *McCord*, 636 F.2d at 614 & n.12 (same). Thus, the Section 1985(3) equal protection clauses are the outlier in the KKK Act apparatus because those clauses explicitly reference equality and purpose; the support-or-advocacy clauses do not have that language, and like other similar KKK Act provisions, Plaintiffs are not required to prove discrimination.

III.   **The First Amendment does not shield Defendants from liability.**

Defendants' cursory First Amendment arguments, *see* Cisneros MTD 1-2; Park MTD at 17, are also unfounded. Although the First Amendment protects Defendants' freedom of speech, it does not provide a license to intimidate political opponents. *See Virginia v. Black*, 538 U.S. 343, 362-63 (2003); *see also United States v. Stevens*, 559 U.S. 460, 493 (2010) (stating that "[t]he First Amendment protects freedom of speech, but it most certainly does not protect violent criminal conduct, even if engaged in for expressive purposes"). Defendants chose to express their political views not through heated debate or peaceful counterprotest but by forming a violent conspiracy to ambush and intimidate supporters of an opposing candidate on a Texas highway. This choice takes their conduct outside the bounds of free speech guarantees. The First Amendment simply "does not protect activities that are violent or physically injurious, including threats of force and certain physical obstructions, such as blockades of pedestrian traffic." *United States v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997); *accord Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (ruling a prohibition on picketing "engaged in a manner which obstructs or unreasonably interferes with ingress or

24

egress to or from [a] courthouse . . . does not abridge constitutional liberty"). Likewise, even if the conspirators meant Plaintiffs no physical harm, "[t]he threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence," and is undeserving of First Amendment protection. *Nat'l Coal. on Black Civic Participation*, 498 F. Supp. 3d at 479.

That the Defendants sought to score a political point through their conspiracy makes no difference for First Amendment purposes and instead further establishes that their conduct is precisely what the KKK Act seeks to address. *See supra* Part I. The District Court in *Daschle v. Thune* reached the same conclusion when faced with relatively similar factual circumstances. The court ruled that the alleged conspiracy, which involved following and intimidating Native American voters outside polling places, was not First Amendment protected irrespective of the conspirators' expressive goals. TRO at 2, *Daschle v. Thune*, No. 04-cv-4177 (D.S.D. Nov. 2, 2004) (Ex. E). It held that "[w]hether the intimidation [wa]s intended or merely the result of excessive zeal" was not pertinent because "the result was the intimidation." *Id*. Here, too, Defendants' alleged conspiracy resulted in intimidation. *See supra* Part II.A. And, as in *Daschle*, the mere fact that this intimidating conduct was rooted in a desire to advocate for Defendants' favored candidate, as they assert, does not mean it warrants First Amendment protection.

Thus, what Defendants call "zealous advocacy" is instead an unlawful conspiracy under Section 1985(3). Their intimidation effort "inflicts harm upon the broader public's interest in selecting elected officials through a free and fair process," *Nat'l Coal. on Black Civic Participation*, 498 F. Supp. 3d at 488, and the First Amendment does not sanction their choices to participate in the conspiracy merely because they had political motivations for doing so.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny the Defendants' motions to dismiss.

Date: September 13, 2021

Respectfully submitted,

/s/ Dicky Grigg

LAW OFFICE OF DICKY GRIGG, PC
Dicky Grigg (Bar No. 08487500)
4407 Bee Caves Road
Building 1, Suite 111
Austin, TX  78746
(512) 474-6061
dicky@Grigg-Law.com
mel@Grigg-Law.com

CAMPAIGN LEGAL CENTER ACTION
Jonathan Diaz (*pro hac vice application pending*)
Hayden Johnson (*pro hac vice application pending*)
1101 14th Street, NW, St. 400
Washington, D.C. 20005
(212) 736-2000
jdiaz@campaignlegalcenter.org
hjohnson@campaignlegalcenter.org


*Attorneys for Amicus Curiae*
*Campaign Legal Center Action*

# EXHIBIT B

**Appendix of Legislative History Sources**

**<u>Index</u>**

Cong. Globe, 40th Cong., 3d Sess. 903 (Feb. 5, 1869)                2

Cong. Globe, 42d Cong., 1st Sess. 236 (Mar. 23, 1871)              3

Cong. Globe, 42d Cong., 1st Sess. 244 (Mar. 23, 1871)              4

Cong. Globe, 42d Cong., 1st Sess. 245 (Mar. 23, 1871)              5

Cong. Globe, 42d Cong., 1st Sess. 246 (Mar. 23, 1871)              6

Cong. Globe, 42d Cong., 1st Sess. 247 (Mar. 23, 1871)              7

Cong. Globe, 42d Cong., 1st Sess. 248 (Mar. 23, 1871)              8

Cong. Globe, 42d Cong., 1st Sess. 320 (Mar. 28, 1871)              9

Cong. Globe, 42d Cong., 1st Sess. 321 (Mar. 28, 1871)              10

Cong. Globe, 42d Cong., 1st Sess. 369 (Mar. 31, 1871)              11

Cong. Globe, 42d Cong., 1st Sess. 374 (Mar. 31, 1871)              12

Cong. Globe, 42d Cong., 1st Sess. 412 (Apr. 3, 1871)              13

Cong. Globe, 42d Cong., 1st Sess. 413 (Apr. 3, 1871)              14

Cong. Globe, 42d Cong., 1st Sess. 414 (Apr. 3, 1871)              15

Cong. Globe, 42d Cong., 1st Sess. 428 (Apr. 3, 1871)              16

Cong. Globe, 42d Cong., 1st Sess. 436 (Apr. 4, 1871)              17

Cong. Globe, 42d Cong., 1st Sess. 460 (Apr. 4, 1871)              18

Cong. Globe, 42d Cong., 1st Sess. 484 (Apr. 5, 1871)              19

Cong. Globe, 42d Cong., 1st Sess. 486 (Apr. 5, 1871)              20

Cong. Globe, 42d Cong., 1st Sess. 820 (Apr. 19, 1871)              21

selves with the general assertion, that the power over suffrage belongs to the States. But they cannot maintain this conclusion without founding on these two words: insisting that color may be a "qualification," and that, under the narrow power to make "regulations" a race may be disfranchised. To this wretched pretension are they driven. And now, if there be any such within the sound of my voice, I ask the question directly: can "color," whether of hair, eyes, or skin, be a "qualification" under our National Constitution? Under the pretense of making "regulations" of elections can a race be disfranchised? With all the power derived from both these words, can any State undertake to establish a Caste and organize an Oligarchy of the skin? To put these questions is to answer them.

Such is the case as presented by the champions. But looking at the National Constitution, we shall be astonished still more at this pretension. On other occasions I have gone over the whole case of Human Rights vs. State Rights, under the National Constitution. For the present I content myself with allusions only to the principal points.

It is under the National Constitution that the champions set up their pretension; therefore, to the National Constitution I go. And I begin by appealing to the letter, which from beginning to end does not contain one word recognizing "color." Its letter is blameless and its spirit is not less so. Surely a power to disfranchise for color must find some sanction in the Constitution. There must be some word of clear intent under which this terrible prerogative can be exercised. This conclusion of reason is reinforced by the positive text of our Magna Charta, the Declaration of Independence, where it is expressly announced that all men are equal in rights, and that just Government stands only on the consent of the governed. In the face of the National Constitution interpreted, first by itself, and, then by the Declaration of Independence, how can this pretension prevail?

But there are positive texts of the National Constitution, refulgent as the Capitol itself, which forbid it with sovereign irresistible power, and invest Congress with all needful authority to maintain the prohibition.

There is that key-stone clause, by which it is expressly declared that, "the United States shall guaranty to every State in this Union a republican form of government," and Congress is empowered to enforce this guarantee. The definition of a republican government was solemnly announced by our fathers, first, in that great battle-cry which preceded the Revolution, "taxation without representation is tyranny," and secondly, in the great Declaration at the birth of the Republic, that all men are equal in rights and that just government stands only on the consent of the governed. A Republic is where taxation and representation go hand in hand; where all are equal in rights and no man is excluded from participation in the government. Such is the definition of a republican government, which it is the duty of Congress to maintain. Here is a bountiful source of power, which cannot be called in question. In the execution of the guarantee Congress may—may, must—require that there shall be no Caste or Oligarchy of the skin.

I know well the arguments of the champions. They insist that the definition of a republican government is to be found in the State constitutions at the adoption of the National Constitution, and, as all these, except Massachusetts, recognized slavery, they find that the denial of Human Rights is republican. But the champions forget that slavery was regarded as a temporary exception; that the slave, who was not represented, was not taxed; that he was not a part of the "body-politic;" that the difference at that time was not between white and black, but between slave and freeman; that all freemen without distinction of color were citizens, and that according to the history of the times, there was no State which ventured

to announce in its Constitution a discrimination founded on color, except South Carolina, the persevering enemy of republican government for successive generations, so that if we look at the State constitutions, we find that they also testify to the true definition.

Here are words of authority, which the champions forget also. They forget that the Federalist in commending the Constitution, at the time of its adoption, insisted, that, if the slaves became free, they would be entitled to representation. I have quoted the striking words before, and now I quote them again:

"It is only under the pretext that the laws have transferred the negroes into subjects of property, that a place is disputed them in the computation of numbers; and it is admitted that if the laws were to restore the rights which have been taken away, the negroes could no longer be refused an equal share of representation with the other inhabitants."—*The Federalist*, No. 54, by Hamilton.

The champions also forget that in the debates on the adoption of the national Constitution it was changed by its opponents and admitted by his friends that Congress was empowered to correct any inequality of suffrage. I content myself with quoting the weighty words of Madison in the Virginia Convention:

"Some States might *regulate* the elections on the principle of *Equality*, and others might regulate them otherwise." * * * * * Should the people of any State, by any means, be deprived of the right of suffrage, it *was judged proper that it should be remedied by the General Government.*" * * * * "If the elections be regulated properly by the State Legislatures, the congressional control will very probably never be exercised. This power appears to be satisfactory and unlikely to be abused in any part of the Constitution."—*Elliot's Debates*, vol. iii, p. 367.

The champions also forget that Chief Justice Taney in that very Dred Scott decision, where it was ruled that a person of African descent could not be a citizen of the United States, admitted that, if he were once a citizen, that is, if he were once admitted to be a component part of the "body-politic," he would be entitled to the equal privileges of citizenship. Here are some of his emphatic words:

"There is not, it is believed, to be found in the theories of writers on government or in any actual experiment heretofore tried an exposition of the term *citizen*, which has not been considered as conferring *the actual possession and enjoyment* or *the perfect right of acquisition and enjoyment of an entire equality of privileges, civil and political.*"—19 *Howard*, 476.

Then from every authority, early and late, from Hamilton, writing in the Federalist, from Madison, speaking in the Convention at Richmond, from Taney, presiding in the Supreme Court of the United States, is there one harmonious testimony to the equal rights of citizenship.

If in the original text of the Constitution there could be any doubt, it was all relieved by the amendment abolishing Slavery and empowering Congress to enforce this provision. Already Congress, in the exercise of this power, has passed a *civil rights act*. It only remains, that it should now pass a *political rights act*, which, like the former, shall help consummate the abolition of slavery. According to a familiar rule of interpretation, expounded by Chief Justice Marshall in his most masterly judgment, Congress, when intrusted with any power, is at liberty to select the "means" for its execution, the Civil Rights act came under the head of "means" selected by Congress, and a Political Rights act will have the same authority. You may as well deny the constitutionality of the one as the other.

The amendment abolishing slavery has been reënforced by another, known as article XIV, which declares peremptorily, that "no State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States," and again Congress is empowered to enforce this provision. What can be broader? Colored persons are citizens of the United States, and no State can abridge their privileges and immunities. It is a mockery to say, that, under these explicit words, Congress is powerless to forbid any discrimination of color at the ballot-box. Why, then, were they inscribed in the Constitution? To

what end? There they stand, supplying an additional and supernumerary power, simple for safeguard against Caste or Oligarchy of the skin, no matter how strongly sanctioned by any State government.

But the champions, anxious for State Rights against Human Rights, strive to parry this position by insisting that, in another provision of this same amendment, the power over the right to vote is conceded to the States. Mark, now, the audacity and fragility of this pretext. It is true that "where the right to vote is denied to the male inhabitants of a State, or in any way abridged, except for participation in rebellion or crime," the basis of representation is reduced in corresponding proportion. Such is the penalty imposed by the Constitution on a State, which denies the right to vote, except in a specific case. But this penalty on the State does not in any way, by the most distant implication, impair the plenary powers of Congress to enforce the guarantee of a republican government, the abolition of slavery, and that final clause guarding the rights of citizens, three specific powers which are left undisturbed, unless the old spirit of slavery is once more revived and Congress is compelled again to wear those degrading chains which for so long a time rendered it powerless for Human Rights.

Mr. President, I make haste to the conclusion. Unwilling to protract this debate, I open the question in glimpses only. But, even in this imperfect way, it is clearly seen, first, that there is nothing, absolutely nothing, in the National Constitution to sustain the pretension of Caste or Oligarchy of the skin, as set up by certain States, and secondly, that there is in the National Constitution a succession and reduplication of powers, investing Congress with ample authority to repress any such pretension. In this conclusion, I raise no question on the power of the States to regulate the suffrage; I do not ask Congress to undertake any such regulation. I simply propose that, under the pretense of regulating the suffrage, States shall not exercise a prerogative, hostile to Human Rights, without any authority under the National Constitution and in defiance of its positive texts.

I am now brought directly to the proposed amendment of the Constitution. Of course, the question stares us in the face, why amend what is already sufficient? Why erect a supernumerary column?

So far as I know, two reasons are assigned. The first is that the power of Congress is doubtful. It is natural that those who do not sympathize strongly with the Equal Rights of all should doubt. Men ordinarily find in the Constitution what is in themselves, so that the Constitution in its meaning is little more than a reflection of their own inner nature. As I am unable to find any ground of doubt, in substance or even in shadow, I shrink from a proposition which assumes that there is a doubt. To my mind the power is too clear for question. As well question the obligation of Congress to guaranty a republican form of government, or the abolition of slavery; or the prohibition upon the States to interfere with the rights and privileges of citizenship, each of which is beyond question.

Another reason, assigned for a constitutional amendment is, its permanent character in comparison with an act of Congress which may be repealed. On this head I have no anxiety. Let this beneficent prohibition once find a place in our statute-book, and it will be as lasting as the National Constitution itself, to which it will be only a legitimate corollary. In harmony with the Declaration of Independence and in harmony with the National Constitution, it will become of equal significance, and no profane hand will touch its sacred text. It will never be repealed. The elective franchise once recognized can never be denied; once conferred can never be resumed. The rule of Equal Rights once applied by Congress under the National Constitution will be a permanent institution as long as the Republic endures; for it will be a vital part of that republican government to which the nation is pledged.

### MESSAGE FROM THE HOUSE.

A message from the House of Representatives, by Mr. McPherson, its Clerk, announced that the House had passed a resolution providing for the adjournment of the House, with the consent of the Senate, from Monday next, until the 1st of December next at eleven o'clock a. m., in the following words:

Whereas the Senate has adopted a resolution declaring " that the Senate will consider at the present session no other legislative business than the deficiency appropriation bill, the concurrent resolution for a joint committee of investigation into the condition of the States lately in insurrection, and the resolution now pending instructing the Committee on the Judiciary to report a bill or bills that will enable the President and the courts of the United States to execute the laws in said States, and the report that may be made by the Committee on the Judiciary on that subject," thereby refusing to consider any business which may originate in the House of Representatives, therefore.

*Resolved,* (the Senate permitting,) That this House will adjourn, when it adjourns on Monday next, until the first Monday of December next, at eleven o'clock a. m.

### PROTECTION OF LIFE, ETC., AT THE SOUTH.

The Senate resumed the consideration of the following resolution, submitted by Mr. Sherman on the 16th instant:

*Resolved,* That as organized bands of lawless and desperate men, mainly composed of soldiers of the late rebel armies, armed, disciplined, and disguised, and bound by oath and secret obligations, are proven to exist in the State of North Carolina, and have, by force, terror, and violence, defied civil authority in that State, and by organized perjury have rendered the courts powerless to punish the crimes they have committed, thus overthrowing the safety of person and property, and the rights which are the primary basis of civil government, and which are guarantied by the Constitution of the United States to all its citizens; and as there is good reason to believe that similar organizations exist, and have produced similar results in many parts of the late insurrectionary States; therefore, the Judiciary Committee is instructed to report a bill or bills to enable the President and the courts of the United States to execute the laws, punish and prevent such organized violence, and secure to all citizens the rights so guarantied to them.

Mr. SCOTT resumed, and concluded his speech commenced yesterday. [It will be published in the Appendix.]

During the delivery of Mr. Scott's speech the following message was received from the President of the United States:

*To the Senate and House of Representatives:*

A condition of affairs now exists in some of the States of the Union rendering life and property insecure, and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of the State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. It may be expedient to provide that such law as shall be passed in pursuance of this recommendation shall expire at the end of the next session of Congress. There is no other subject on which I would recommend legislation during the present session.

U. S. GRANT.

Washington, D. C., *March* 23, 1871.

Mr. CONKLING. I move that the message lie on the table and be printed.

The motion was agreed to.

Mr. MORTON. Mr. President, I desire to detain the Senate for a short time for the purpose of answering the Senator from Kentucky, [Mr. Stevenson,] who I am sorry is not now in his seat, in reference to the act of the Postmaster General taking the mail off the line from Louisville to Lexington, in that State. And in saying what I shall say in vindication of the Postmaster General it becomes necessary for me, in the first place, very briefly to review the condition of Kentucky as it is presented by the evidence before me.

The Senator from Kentucky, in his remarks last Saturday, used the following language:

"Perhaps during the last three and a half years that I administered the affairs of the government of that State half a dozen instances of violence did occur, not more."

I will remark that the three and a half years of his administration that he speaks of ended on the 13th of February last; and he says that during that period there were half a dozen cases of violence, " not more"—

"And what did they amount to? I know not of any secret political organization in that State. I know there are bad men in both parties; but I say, as I hope to answer at the great bar of God, as I would say at the bar as a witness, that there is no such organization in Kentucky composed of sixty men, throughout the Commonwealth, and that I do not believe it is political in its tendency."

He first says that during the three and a half years ending on the 13th of February last there were not to exceed half a dozen cases of violence, and that there were not concerned in these cases of violence to exceed sixty men throughout the entire Commonwealth.

I desire to remark here that if he is correct in that, the condition of Kentucky is remarkably good; that statement would be made of but very few States in this Union. The Senator says further on :

"Mr. President, these outrages exist everywhere. I admit frankly and freely that half a dozen instances occurred in Kentucky while I was Governor of the State which gave me great pain. Bad men, whose politics were unknown to me, did go secretly, sometimes masked, and attempt to offer indignity to negroes ; but, I say that such things were confined to a mere neighborhood, were wholly inconsiderable in numbers, and the political complexion of the parties was unknown. I state further, upon my own information, that no outrages received prompter or more indignant reprobation than those did from the distinguished and gallant men who were in the confederate service."

On neighborhood affairs, inconsiderable in number, and the reiteration of the statement of but six cases in three and a half years, less than two cases per annum! Now, I submit to the distinguished Senator that if he is correct in his statement in regard to the condition of affairs in Kentucky there was no occasion for him to send to the Legislature of Kentucky the two messages from which I will read. If he is right in his statement now, he was all wrong in his messages. If he was right in his allegations in the messages, he is all wrong now. From this conclusion there is no possible escape. I am not calling in question at all his sincerity, but I shall compare the statement that he has made on this floor with the message that he sent to the Legislature of Kentucky. I believe on the 27th day of January last; and I ask the attention of the Senate to the language of that message:

"During and immediately following the war Kentucky, from its geographical position as a border State, was subjected to a more severe ordeal from this cause than her neighbors; and accordingly, during the first years of my administration law—"

Only three years and a half altogether, mind you just now—

" During the first years of my administration lawlessness in some portions of the Commonwealth manifested itself in formidable organization, which defied the local authority, and perpetrated deeds of open violence under the pretext of regulating order and punishing crime."

Here he talks about formidable organizations that defied the local authority. That does not sound like six cases in three and a half years and only sixty men or less than sixty men in all the Commonwealth concerned in them, inconsiderable in numbers, as he says, and mere neighborhood affairs ! But he goes on in the message to say:

"By the use of the militia at my command, and the exhibition of my firm purpose to suppress such practices at all hazards, tranquillity was restored, and there has not been for some time in the localities which had suffered from such lawlessness any demonstrations having the semblance of organized resistance of the law. Still, in various portions of the State, there have been committed by lawless persons, acting in bodies generally under cover of night and sometimes in disguise, acts of violence upon individuals, either wholly innocent of offense or only subjects of criminal prosecution through the courts, most of which class of violators of the law have escaped detection and punishment."

Now, I submit this, taking together the whole extract from his message, it sounds more like half a thousand cases than half a dozen cases in three years and a half. He speaks of having called out the militia, of lawless violence that defied the civil authorities, and he goes on further to say that as the law then stood in Kentucky, I believe on the 27th of January last, he had no power to preserve the peace in Kentucky. But I will read his language:

"The other agency at my command, in the suppression of violence or in the execution of the law, is through the militia of the State. In its use I am, however, quite as much restricted as in the matter of proclamations. My authority extends no farther than to order out the militia of a county, upon the application of the local authority setting forth the necessity of their use in support of the civil power, or in case of imminent danger of riot. The same authority is vested in the judges of the various courts and the sheriffs and mayors of cities. Upon several occasions, when applied to, I have ordered out the local militia, but without authority, in ordinary cases, to act, except in response to the call of the local officers charged with the execution of the laws. Little good has resulted in these latter cases, save in the moral effect of such demonstrations."

"What is the most efficient remedy for the suppression of these growing evils rests exclusively with you. Whether in the establishment of a well-organized police system, under an enlarged head, or in some other way, must be determined by the law-making power. I am quite sure that no measure can be completely successful without conferring upon the Executive additional discretionary power, in any sudden emergency, to meet where the public security requires it."

Here, in view of the condition of Kentucky, he asks that extraordinary powers of a military character shall be conferred upon him. I ask how that compares with the declaration on this floor of only half a dozen cases in three and a half years!

"In this connection I desire to repeat my suggestions, as set forth in previous communications, of the absolute necessity of a thorough reorganization of the militia as an important adjunct in the enforcement of law."

The condition of Kentucky is such that there must be a reorganization of the militia to maintain the public peace. The Senator talks in this message of crimes that defy the civil power, that require the military power; and he speaks of these growing evils; ay, that is the language he uses, "these growing evils." What was the character of the crimes that the Governor of Kentucky refers to in this message? He does not mention their character, but I will tell the Senate what I understand the character of these crimes to be. It is the shooting, and the hanging, and the whipping of negroes all over that State, with more indifference than dogs are shot and whipped.

Then, Mr. President, if I judge from the message of the distinguished Senator while acting as Governor of Kentucky, he confirms all that has been said by the Louisville Courier-Journal ; he confirms all that has been said in the public prints for the last eighteen months in regard to murder, crime, and outrage of every kind in the State of Kentucky. It comes in aid of that great volume of evidence that pours in upon the country from day to day

*In legislation, or a ratified treaty, the employment of the Navy in the maintenance of the Government there is without any excuse of national defense, as also, without any excuse of a previous declaration of war by Congress.*

*Resolved,* That in any proceedings for the acquisition of part of the island of St. Domingo, whatever may be its temptations of soil, climate, and productions, there must be no exercise of influence by superior force, nor any violation of Public Law, whether international or constitutional; and therefore the present proceedings, which have been conducted at great cost of money, under the constant shadow of superior force, and through the belligerent intervention of our Navy, acting in violation of International Law, and initiating war without an act of Congress, must be abandoned, to the end that justice may be maintained and that proceedings so hostile to correct principles may not become an example for the future.

*Resolved,* That instead of seeking to acquire part of the island of St. Domingo by belligerent intervention, without the authority of an act of Congress, it would have been in better accord with the principles of our Republic, and its mission of peace and benevolence, had our Government, in the spirit of good neighborhood and by friendly action, instead of belligerent intervention, striven for the establishment of tranquillity throughout the whole island, so that the internal dissensions of Dominica and its disturbed relations with Hayti might be brought to a close, thus obtaining that security which is the first condition of prosperity, all of which, being in the nature of good offices, would have been without any violation of International Law, and without any usurpation of War Powers under the Constitution of the United States.

Mr. FINKELNBURG. I object to this bill, unless the amendment which I desire to offer shall be adopted.

Mr. SNYDER. When I called up this bill last Friday objections were made by the gentleman from Michigan [Mr. CONGER] and the gentleman from Missouri, [Mr. FINKELNBURG.] Those objections have been met and reconciled by private consultation, the amendments which they desire to offer being assented to by the friends of the bill. The gentleman from Ohio [Mr. BINGHAM] made the other day an inquiry whether the bill was amendatory of the only act providing for the construction of a bridge across the Arkansas river at Little Rock. I answer that inquiry in the affirmative. This bill is amendatory of the only act providing for the construction of a bridge across Arkansas river at the city of Little Rock. Therefore the connection and relation of the original act and this bill cannot be misunderstood.

Mr. BINGHAM. Does the gentleman mean to say that the act of which this bill is amendatory provides only for a bridge on that river?

Mr. SNYDER. On that river, at the city of Little Rock.

The SPEAKER. The Clerk will read the amendment sent to the desk by the gentleman from Michigan, [Mr. CONGER.]

The Clerk read as follows:

Strike out in the second line of the bill the words "said act," and insert in lieu thereof "an act to authorize the construction of a bridge across the Arkansas river at Little Rock, Arkansas, approved July 1, 1870."

Mr. FINKELNBURG. I move to amend by adding at the end of the first section "The piers of said bridge shall be parallel with the current of said river."

Mr. SNYDER. I will merely state that these amendments are perfectly agreeable to the friends of the bill, and I hope they will be adopted without objection.

Mr. HOLMAN. I ask that the second section of the bill be again read. I desire to hear the proviso.

The Clerk read the second section of the bill.

Mr. HOLMAN. I suggest the insertion of the additional words "by the Secretary of War," in the first part of that proviso. It has been usual to put these bridges under the control of the War Department; otherwise it would not seem that any person was authorized to require this to be done.

Mr. CONGER. These matters are still left under the control of Congress, so far as any action is to be had.

Mr. HOLMAN. It is customary to put these bridges under the control of the Secretary of War, and I hope the words I have suggested will be inserted, in order to remove all ambiguity.

Mr. CONGER. I have no objection to the amendment.

Mr. SNYDER. Nor have I any objection to the amendment.

The amendment was agreed to; and the bill, as amended, was ordered to a third reading; and it was accordingly read the third time, and passed.

Mr. SNYDER moved to reconsider the vote by which the bill was passed; and also moved that the motion to reconsider be laid on the table.

The latter motion was agreed to.

### LIFE-SAVING STATIONS.

Mr. HILL, by unanimous consent, presented the following resolutions of the Legislature of the State of New Jersey; which were referred to the Committee on Commerce when appointed, and ordered to be printed:

Whereas N. Broughton Devereux, chief of the revenue marine, in his report of December, 1870, to the honorable the Secretary of the Treasury, recommended additional appropriation to the life-saving stations for the protection of life and property upon the New Jersey coast; and whereas Henry W. Sawyer, superintendent of the stations, and the commissioners of pilotage have recommended additional stations, with crews at each station, and improved surf-boats, for the reason that the present boats are unsafe and worn out: Therefore,

1. *Be it resolved by the Senate and General Assembly of the State of New Jersey,* That our Senators and Representatives in Congress be urged to secure an appropriation of $300,000 for the year 1871, for the purpose of more effectually securing life and property upon the New Jersey coast.

2. *And be it resolved,* That the Governor be requested to furnish a copy of the foregoing preamble and resolution immediately to the members of Congress from New Jersey.

### ORDER OF BUSINESS.

Mr. HOOPER, of Massachusetts. I hope there will be no objection to going to business on the Speaker's table.

The SPEAKER. The regular order of business would be the morning hour for reports.

Mr. HOOPER, of Massachusetts. I hope the bills on the Speaker's table will be taken up in their order.

Mr. COX. I call for the regular order.

The SPEAKER. The regular order of business being called, for the morning hour now begins at three minutes to two o'clock, and reports are first in order from the Regents of the Smithsonian Institution.

Mr. COX. I do not intend to consent to any bills from the Senate until they consent to an adjournment.

Mr. ELDRIDGE. No bills should be passed from the Senate until we have committees appointed.

### PROFESSOR JOSEPH HENRY.

Mr. POLAND. I am directed by the Regents of the Smithsonian Institution to report a joint resolution (H. R. No. 42) giving the consent of Congress to Professor Joseph Henry, secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him by the king of Sweden and Norway, grand master of said order.

The joint resolution was read a first and second time. It provides that the consent of Congress is given to Professor Joseph Henry, secretary of the Smithsonian Institution, to accept the title and regalia of a commander of the Royal Norwegian Order of St. Olaf, conferred upon him for his distinguished scientific services and character by the king of Sweden and Norway, grand master of said order.

Mr. FINKELNBURG. I would like to know if this is a title of nobility.

Mr. POLAND. I propose to make a brief explanation.

Mr. ELDRIDGE. Is there liberty to be given to this gentleman to become a saint?

Mr. POLAND. Professor Henry, who has been for many years at the head of the Smithsonian Institution, and has brought it into a high state of credit, both in this country and abroad, visited Europe during last season; and while there this compliment—the appointment to this order with its decorations and regalia—was granted to him by the king of Sweden, who is the grand master of this Order of St. Olaf. I have endeavored to ascertain what this Order of St. Olaf means, what it is. Nothing is to be found on the subject in any of the encyclopedias in the English language, but the Librarian, having at my suggestion made some examination of the subject, found in a German encyclopedia an article in regard to this order, which I will ask the Clerk to read. It gives all the information which I have on the subject.

Mr. PETERS. Is it in the German language?

Mr. POLAND. It is translated.

The Clerk read as follows:

"Not very long ago, 21st August, 1847, a Norwegian civil order was established by King Oscar I of Sweden and Norway, in honor of St. Olaf, and is composed of three classes; grand cross, commanders, and knights. It has as regalia a white enameled cross, with the arms of the kingdom, a golden lion crowned, holding the halberd of St. Olaf, on a red field, bordered by an enameled red ring with blue and double white borders. In each of the four corners of the cross is a crowned golden O, which commemorates the founder of the order, i. e., Oscar.

On the obverse there is an enameled red shield with the device, '*Ret og sandhed,*' (right and truth.) The ribbon of the order is watered, bright red, with blue and double white border."—*Meyer's Neues Conversations Lexicon,* xii., p. 255, 1855.

Mr. SCOFIELD. I desire to ask the gentleman from Vermont [Mr. POLAND] a question: whether he will bring to his aan here with all his regalia upon him, so that we may see what they are before we pass the bill?

Mr. POLAND. When that shall be the regular order I shall endeavor to see that done.

Mr. CONGER. I would like to inquire what there is in the Constitution of the United States to prevent this gentleman receiving the order and the title without an act of Congress. There is nothing, so far as appears before this House, which shows that he holds any office of profit or trust under this Government.

Mr. POLAND. It may be somewhat doubtful whether the secretary of the Smithsonian Institution is such an officer under the United States, though I am inclined to think he is. But Professor Henry is also a member of the Coast Survey.

Mr. SCOFIELD. I hold that it is his constitutional right to make himself ridiculous, if he has a mind to do so, without a law of Congress.

The previous question was seconded and the main question ordered; and under the operation thereof the joint resolution was ordered to be engrossed and read a third time; and being engrossed, it was accordingly read the third time.

The question recurred on the passage of the joint resolution; and being put, there were—ayes 56, noes 41; no quorum voting.

The SPEAKER, under the rule, ordered tellers; and appointed Mr. POLAND and Mr. HOLMAN.

The House again divided; and the tellers reported—ayes 99, noes 19.

### MESSAGE FROM THE PRESIDENT.

A message, in writing, from the President of the United States was communicated to the House by Mr. HORACE PORTER, his Private Secretary.

### PROFESSOR JOSEPH HENRY.

Mr. GETZ. I call for the yeas and nays on the passage of the joint resolution.

Mr. HOLMAN. I hope the House will not pass a joint resolution giving effect to these titles of nobility.

Mr. COX. This is not a title of nobility.

Mr. WOOD. Would it be in order to move that the House adjourn?

Mr. BINGHAM. Let us have the message read.

### CONDITION OF THE SOUTH.

The SPEAKER. The Chair lays before the House a communication from the President of the United States.

The Clerk read as follows:

*To the Senate and House of Representatives:*

A condition of affairs now exists in some States of the Union rendering life and property insecure and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some localities is now before the Senate. That the power to correct these evils is beyond the control of State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore, I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States. It may be expedient to provide that such law as shall be passed in pursuance of this recommendation shall expire at the end of the next session of Congress. There is no other subject, upon which I would recommend legislation during the present session.

U. S. GRANT.

WASHINGTON, D. C., *March 23, 1871.*

Mr. SHELLABARGER. Mr. Speaker, I move that the message just read be referred to a select committee of the House of nine members, to be appointed by the Chair, and upon that motion I ask the previous question.

Mr. COX. I move to lay that motion on the table.

Mr. ELDRIDGE. On that motion I demand the yeas and nays; and now I move that the House adjourn.

Mr. ACKER. I rise to a privileged question. I move that then the House adjourns to-day it adjourn to meet on Monday next at eleven o'clock.

The SPEAKER. That motion cannot be entertained.

Mr. RANDALL. I suggest to my colleague that he modify his motion and say Saturday.

The SPEAKER. That motion is not in order.

Mr. BROOKS, of New York. I call for the yeas and nays on the motion to adjourn, because the previous question is demanded by the gentleman from Ohio.

The SPEAKER. The Chair will state to the gentleman from Ohio [Mr. SHELLABARGER] who makes the motion that the debate on the motion that he has made to refer the communication from the President to a select committee is debatable in the widest sense.

Mr. SHELLABARGER. I rose, having that in my mind, for the purpose of proposing to gentlemen upon the other side of the House to name some reasonable time during which the motion I have made may be discussed, dividing the time equitably between the two sides of the House. If it is agreeable to gentlemen that we shall take a vote upon my motion at some reasonable day they suggest, I shall be earnestly in favor of acceding to such a proposition, and will withdraw the demand for the previous question.

Mr. BROOKS, of New York. If the gentleman from Ohio will permit me——

Mr. ELDRIDGE. Is debate in order?

The SPEAKER. The Chair supposed that this conversation was proceeding for the purpose of accommodation.

Mr. ELDRIDGE. I object to debate unless the previous question is withdrawn.

Mr. SHELLABARGER. I do not withdraw it. I only make a suggestion if it is agreeable to gentlemen on the other side.

Mr. ELDRIDGE. It does not look as if the gentleman desires debate here, when he moves the previous question the first thing.

The SPEAKER. The gentleman from Wisconsin will surely allow the gentleman from Ohio to make his proposition.

Mr. ELDRIDGE. I object to debate unless he withdraws the previous question.

Mr. SHELLABARGER. I will, then, for the purpose of making a statement——

Mr. ELDRIDGE. I object to debate.

The SPEAKER. The Chair will hear the gentleman from Ohio, as it relates to the order of business.

Mr. ELDRIDGE. He should then withdraw the previous question.

The SPEAKER. The Chair will not be dictated to on that point. The gentleman from Ohio is on the floor, not to debate at all, but to do that which it is the universal custom of the House to entertain, to make remarks in relation to fixing the order of business. The Chair does not waive the right of any gentleman in any motion which has been made, or will be made, but within brief limits he will hear the gentleman from Ohio.

Mr. ELDRIDGE. I desire to say that my right to make objection is unquestionable under the rule. The gentleman had the power to debate——

The SPEAKER. He is not debating. He has a right to make an explanation.

Mr. ELDRIDGE. I insist upon my rights under the rule to object unless he withdraws the previous question.

Mr. DAWES. Cannot he withdraw the previous question and hold the floor himself? If he do I think this is the only right he has.

Mr. SHELLABARGER. I was simply attempting to do what for six years it has been the practice of the House to permit, to make a proposition.

Mr. ELDRIDGE. I call the gentleman to order.

Mr. SHELLABARGER. I now withdraw the demand for the previous question and retain the floor for the purpose of making a proposition, which I now do, like the one which I made the other day. As the Speaker suggested, and as we all know, this motion opens up in all its largest and most unlimited sense debate on the subject-matter to which the message refers. I now propose that by unanimous consent we fix a day during which we shall debate the subject-matter of this message, dividing the time between the two sides of the House equitably, and so far as I am concerned I would say equally. If that, then, be agreeable to gentlemen on the other side, I now propose that, by unanimous consent, we fix such reasonable time for debate——

Mr. BROOKS, of New York. Will the gentleman allow me a moment?

Mr. SHELLABARGER. I will yield for a suggestion.

Mr. BROOKS, of New York. I think we cannot agree to the proposition of the honorable gentleman from Ohio, [Mr. SHELLABARGER.] I state so with all frankness, because we do not agree with him that this is so important a matter of legislation as many others that are before the country.

For example,* there are some of us who believe that we are now collecting annually from twenty to fifty million dollars of taxes more than are necessary for the support of this Government. There are others among us who believe that among the coal miners and the coal operators and the railroad operators of the State of Pennsylvania there are disturbances involving more peril and damage to the people of the United States, and to the great manufacturing and consuming interests of the country, than are involved in any disturbances which may exist in the southern country. If the President had sent a message here embracing all these troubles in all parts of the United States we should be prepared then to enter upon some discussion.

Mr. SHELLABARGER. I must resume the floor.

Mr. WOOD. Will the gentleman allow me a question?

Mr. SHELLABARGER. A question, yes.

Mr. WOOD. I desire to ask whether the gentleman feels authorized to make any proposition for the other side of the House?

Mr. SHELLABARGER. I feel authorized always, in exercising my rights as a member upon this floor, to make any reasonable suggestion to gentlemen on both sides of the House, and to ask for unanimous consent to any proposition. That authority I have exercised with all due modesty. And now, as it seems not to be agreeable to gentlemen upon the other side to enter upon this debate——

Mr. WOOD. If the gentleman from Ohio will permit me to say one word further.

Mr. SHELLABARGER. Certainly.

Mr. WOOD. I will say this: that I do not think there is any gentleman on this side of the House that possesses the power that he assumes to have in speaking for what we concede to be the majority of that side of the House. I doubt whether any gentleman here is prepared to make any statement, to reach any conclusion, or to make or to receive any proposition, which shall be conclusive upon his political friends.

I will say further, for myself personally, that I am sure I have no disposition to shrink from an investigation of this subject, or to avoid any discussion of this subject. But I do think that there are so many other questions pending before Congress of graver importance to the people of the United States, that they should be disposed of by proper legislation in advance of any further effort to agitate and inflame the public mind.

Mr. SHELLABARGER. I ask the gentleman from New York [Mr. WOOD] whether he now declines to name a time during which we may debate this subject?

Mr. WOOD. I have no power to do so.

Mr. SHELLABARGER. For himself he has the power.

Mr. WOOD. For myself individually——

Mr. SHELLABARGER. Will the gentleman state whether he objects to naming the time during which we may debate this subject?

Mr. WOOD. I have no power to speak for anybody but myself.

Mr. SHELLABARGER. What does the gentleman say for himself?

Mr. WOOD. I am ready now to act upon this proposition without any debate at all.

Mr. COX. Allow me to say a word.

Mr. SHELLABARGER. Certainly.

Mr. COX. I desire to say to my former colleague [Mr. SHELLABARGER] that after the remarks which have been made I cannot speak for any one except myself, only so far as I may assume to do so from the action which this side of the House has heretofore taken. This side of the House has supported the honorable gentleman from Massachusetts, [Mr. DAWES,] not only in his reasoning, but in his resolutions of the past ten days, without regard to party affiliation, and with a sole view to the tranquillization of our southern country.

The gentleman from Ohio [Mr. SHELLABARGER] who has submitted the pending motion for the reference of this message made the other day some very earnest and impressive remarks, to the effect that he desired a committee of investigation to be instituted to go down South and inquire into the facts. He now, with the same inconsistency (if he will allow me to say it) in which he indulged the other day, proposes to act in this House upon common clamor, upon newspaper rumor, to crystallize into legislation some form of punishment and afterward to ascertain the facts; to hang the man and then to find the evidence, to give him a new trial after he has been convicted and executed.

Now, Mr. Speaker, I want to come to my conclusion.

Mr. SHELLABARGER. Come quickly. [Laughter.]

Mr. COX. I will as quickly as I can drive it to you. My conclusion is that when we have in the most solemn manner voted committees of investigation as the basis of future legislation, when such resolutions are now pending between the Senate and House, it is irrational, it is unkind toward this side of the House to demand that we should now enter into a discussion with a view to legislation at this session. That is my point.

Mr. BUTLER, of Massachusetts. I desire to ask a single question of the gentleman from New York, [Mr. COX.] What "honorable gentleman from Massachusetts" has the Democracy supported?

Mr. COX. I spoke of the honorable gentleman from Massachusetts, [Mr. DAWES.] [Laughter.]

Mr. SHELLABARGER. Mr. Speaker, I have now submitted to the other side of the House the proposition that we should unanimously consent to fix some not unreasonably distant day on which to vote upon this matter, that we might in the mean time discuss the question which has been alluded to by the gentleman from New York [Mr. COX] as a most grave one. As that proposition is declined, I have nothing further to say at this moment than that the legislation pointed to and invited by the message of the President, is not invited to proceed upon "clamor." If it were not unparliamentary I would say that the remark of the gentleman from New York was unfit to be made. Why, sir, to-day a sworn officer of the United States comes to us

from the South covered with the marks of lashes, gored with the scourge of the murderous clans that infest one half of the Republic. Yet gentlemen come here and venture to say that we invite legislation upon mere "rumor" or "clamor." Mr. Speaker, I go no further with the debate at this time.

Mr. McHENRY. Who is the officer the gentleman has referred to?

Mr. SHELLABARGER. I now yield to the gentleman from Massachusetts, [Mr. DAWES.]

Mr. DAWES. Mr. Speaker, the gentleman from New York [Mr. Cox] has been pleased to say that he has supported me in all the suggestions and all the propositions I have made. The gentleman will bear in mind that while I have been fully convinced of the importance of the earliest possible adjournment of this Congress, and while every proposition I have submitted to the House has tended directly to that end, yet I have at all times pledged myself to coöperate in any legislation which the condition of things in any part of the country may demand. It is my belief that we ought to have—as I have no doubt we shall have under the concurrent resolution pending between the two Houses—a joint committee of such character and composition as will command for its conclusions as to facts and measures the assent of all sides in this House and all parties in the country. At the same time my friend from New York will recollect that I have stood here pledging myself to coöperate in any measure of legislation which would tend to restore peace to the country. Under these circumstances the President of the United States, whose duty under the Constitution requires him "from time to time to give to the Congress information of the state of the Union, and recommend to their consideration such measures as he shall judge necessary and expedient," has, under the obligations of his oath and his sense of duty, submitted to Congress a message, for which he is responsible in the discharge of his duty.

The ordinary proposition is made to refer that message for consideration to a select committee of this House in the absence of all regular standing committees. What less could be done? What ought we to do less than refer that message to such a committee, and to await its candid consideration of its recommendations? I do not understand why any gentleman on either side of this House shrinks from such a reference or from such conclusions as may be arrived at by a committee appointed by the Chair under the grave responsibility of the subject-matter under the attention of this House, to which the President has in his message invited our consideration. Why my friend from New York or any other gentleman, shrinks from such a reference I cannot understand.

Mr. ELDRIDGE. Will the gentleman allow me to reply to his inquiry?

Mr. DAWES. I wish only to say, in reply to my friend from New York, that I do not deviate, in urging upon the House the adoption of the motion of the gentleman from Ohio, one particle from the line which he has been pleased to say he has given me his support in following thus far, and in which I have had the coöperation of a majority of my own political associates as well as of gentlemen on the other side.

Mr. ELDRIDGE. Will the gentleman yield to me to reply to his inquiry?

Mr. DAWES. I will yield to the gentleman by the consent of the gentleman from Ohio, by whose courtesy I hold the floor.

Mr. ELDRIDGE. The gentleman charges us with shrinking from the appointment of a committee to consider the message just received from the President. There is no such feeling on this side of the House. That is not the occasion of the motions made which seemed to be dilatory. The gentleman from

Ohio, [Mr. SHELLABARGER,] a moment after the message was read, moved to refer it to a committee, and called the previous question. It was supposed he intended to act on that. He had the right to make all the explanation which he has made without calling the previous question, all the explanation he desired in reference to the order of business; but he called the previous question at once, and the steps which were taken here were taken because it was supposed he intended to close the mouths of gentlemen on this subject.

I will say further to the gentleman that the steps taken by us were not because of the proposed reference of the message, but because we think there ought to be committees of this House, and that this matter should be referred to a standing committee. We insist it should not be referred to a special committee or to a select committee, and if we are to legislate here all summer, if we are to continue in session, the appointment of the House should be appointed and the regular and appropriate committee should consider this subject, and not any select committee made up for the occasion.

Mr. DAWES. Then I understand the gentleman's first objection is that the gentleman from Ohio called the previous question, and alarmed him lest he was going to call for a vote without discussion. But the gentleman forgets that the gentleman from Ohio withdrew his demand for the previous question, and yielded to the demand for discussion.

The other objection of the gentleman from Wisconsin is that he wants the message referred to a standing rather than to a select committee. There is no standing committee to which it can be referred. And is there anything better in a standing than in a select committee appointed for the purpose of considering this particular subject, which, in the opinion of the President, is of such great importance as to require at his hand a special message?

Mr. RANDALL. I want it distinctly understood that I do not speak for any one but myself; and I say for one member on this side that I do not object to any proper reference of a message of the President of the United States on any subject upon which he may choose to speak. I believe, however, that now is not the time for this discussion at all.

Mr. DAWES. Then let us refer it and wait for the report.

Mr. RANDALL. For myself I would discuss the subject when I know what I am to discuss. When I hear the propositions which may emanate from the gentlemen appointed on the committee, if they be vindictive in their character, then will be the time for us to strike at them. Then will be the time to discuss them. Therefore, for myself, when the question comes, I will vote for the reference. However, relying mainly and in no inconsiderable degree upon the fairness heretofore exhibited by the Speaker in his appointments, I would just remark that we in numerical force are entitled to four members out of the nine. [Laughter.]

Mr. WOOD. I ask the gentleman from Ohio [Mr. SHELLABARGER] to yield to me for a few moments.

Mr. SHELLABARGER. I will by and bye. I have promised to yield now to my colleague, [Mr. GARFIELD.]

Mr. GARFIELD, of Ohio. I desire to say a few words only, the opportunity to do so having been afforded to me by the courtesy of my colleague. The House will probably remember that in a little discussion which was had here a few days since, when we were voting for the appointment of a joint committee, instead of proceeding to direct legislation, I made this point, that I wanted first of all to know whether the Executive of this Government needed any more legislation in order to enable him to keep the peace throughout the country, and that he had given us no sign that

any further legislation was needed. And I said then that until such sign was given I did not feel that anything more was needed than for this House to prepare for an inquiry into the whole question.

Now, however, there has come from the President of the United States a very temperate, a very prudent, and, as it seems to me, a very judicious message, in which he says, first of all, that he has undoubted authority for the assertion that there are outrages and combinations which the State authorities are not able to put down; and that he is in doubt, as the Chief Executive of this nation, whether he is empowered by existing laws of the United States to render such aid as the necessities of the case require. And therefore, to help him to resolve his doubts, he asks this Congress to stay here long enough to examine, first, the facts of the case, then the law of the case, and then to help him in its wisdom by such legislation as it may think the case requires. He also, to be very careful and very prudent about it, suggests that it may only be necessary to make a law to last until the next session of Congress ends. I think, therefore, the message is eminently temperate and eminently prudent. I do not, for my part, see how any man belonging to either side of this House can dare, with that paper on our desks, to vote for going away without first giving all the attention, all the consideration, and all the thought that we are capable of giving a request coming from the Chief Executive of the nation.

There is one other thing I desire to say, and only one. There are gentlemen here who represent districts wherein these very difficulties have arisen, and I am informed that many of them are ready now to tell us what they know about the situation; that they are willing to lay before this House facts within their own knowledge of which every member of the House should be possessed.

Mr. MORGAN. Will the gentleman yield to me for a question?

Mr. GARFIELD, of Ohio. In a moment I will. I take it that few statements on this subject can be more reliable than what a gentleman says of his own district, of his own constituents, of his own people, with whom he is well acquainted. Now, I do not believe that our friends on the other side will, I do not think they can stand before the country, did they desire to do so, in a resistance to a full, fair, and candid investigation of the facts and propositions that may be brought forward as has been stated by the President in his message.

I hope the fullest examination will be made of the constitutional question, and that the facts in regard to the condition of affairs in the South may be most amply debated. I do not want to go into that examination and that debate in any party spirit. The question to my mind is full of doubts. I want to resolve my own conscience, and I desire the matter to be dealt with in no factions or party spirit.

Mr. SHELLABARGER. I now yield to the gentleman from New York, [Mr. WOOD.]

Mr. WOOD. I am very much surprised that gentlemen on the other side should assume that there is any objection here to afford every facility and opportunity for a full, free, and thorough investigation as to these alleged outrages in the southern States. Why, sir, within ten days, by the vote of the Democratic party in this House, we have already provided for the appointment of two committees to investigate this very subject referred to by the President.

In the first instance, the committee was not only raised by the vote of the House, but absolutely has been appointed, and is now in existence as a committee of this House to investigate this very subject; and subsequently to that, after the Senate had passed a concurrent resolution providing for a joint committee of investigation, we coöperated with the Senate, and by the united vote of the Democratic side

of the House carried that resolution and sent it back to the Senate, and they have really rejected it by refusing to concur in our amendment.

When, therefore, it is alleged or implied that there is any opposition on this side of the House to a full, fair, and entire investigation, it appears to me that the gentlemen who make that allegation are not generous, certainly are not truthful, if they allege that we stand in the way of investigation.

As to the gentleman from Ohio [Mr. GAR-FIELD] who has just spoken, and has advocated a committee for the purpose of considering the message of the President, he himself but a few days ago sent up to the Clerk's desk and had read an extract from the exciting law, by which he proved conclusively that the President already possesses all the power necessary over the whole subject; and now, forsooth, he comes here and lectures us, and attempts to make the country believe that the Democrats in this House are opposed to an investigation, when he himself is upon record as saying that the President has all the power he need have or which Congress can give him over this whole question. No, sir; the truth is that these gentlemen do not really want an investigation; the truth is that they want to create an artificial condition of the public mind for a wicked purpose; that there is an object beyond the restoring of one section of the Union to its peaceful and harmonious relations to the other sections of the Union or to the Federal Government. They know, as the country knows, that the stimulant that warmed their party into existence is subsiding, and that it is necessary to apply more stimulant, so as to revive their sunken fortunes and to prevent their total political annihilation; and they wish to keep Congress here that we may be excited, that the people may become excited, that the country may be made to believe that some legislation at the hands of Congress is absolutely necessary to preserve life and protect property in the southern States.

Sir, we challenge investigation. We are ready to vote for this committee or for a dozen committees, expressing confidence in the Speaker that he will so constitute them as to give us a really truthful and impartial statement of the facts.

Mr. GARFIELD, of Ohio. Does the gentleman speak for his friends now?

Mr. WOOD. I speak for myself; but I have no doubt what the vote on this side of the House will be when the proper time comes.

Mr. SHELLABARGER. I yield now to the gentleman from Massachusetts, [Mr. BUTLER.]

Mr. BUTLER, of Massachusetts. Some days ago, Mr. Speaker, I was by a number, and I believe a majority of the Republicans on this floor, intrusted with the presentation of a bill, approved by them, which had for its object to remedy the state of disorder and wrong at the South. That bill I have persistently tried, as gentlemen upon both sides of the House know, to get before the House. I ask my friends upon the other side of the House to do me the justice to say that in doing so I offered to them when the bill came up, if it should come up, any time for debate that they desired; that they should fix their own time, so that we might have the subject fully discussed, and when the whole question was before the House and the country we could ascertain whether there was cause for legislation. I also call their attention and the attention of the country to the fact that my attempts have been met by motions of delay, of adjournment, of attempting to adjourn to some possible time, carried steadily by the Democratic majority. They have ever insisted upon not having a hearing upon that bill; and it will not do for them to say that the provisions of the bill were faulty, because it would have been open to amendment. There was no attempt on my part and no desire that the bill should not be amended in the fullest

possible manner that the judgment of the House should dictate; so that we could have had the measure discussed for at least two weeks past, if it had not been for the dilatory motions of the gentlemen upon the other side.

Mr. MORGAN. Allow me a moment. I may perhaps have misunderstood the gentleman. I understood the gentleman from Massachusetts [Mr. BUTLER] to say that the bill which he introduced and asked to have referred to a committee met the approval of a majority of the Republicans on this floor. Am I right?

Mr. BUTLER, of Massachusetts. I will restate what I said, so that there shall be no mistake. I understand that the bill which I presented and which is in print does meet the approval of a majority of the Republicans on this floor. That it is perfect nobody dreams of claiming. Everything human is imperfect; everything human needs amendment, and nothing more and nobody more than my friends on the other side, except, perhaps, my bill.

Mr. NIBLACK. One moment. The gentleman will relieve us on this side of the House from some embarrassment if he will cease to call us his friends. [Laughter.]

Mr. BUTLER, of Massachusetts. Ah!

Mr. NIBLACK. We never recognize such relations.

Mr. BUTLER, of Massachusetts. There was a time when the Democratic party recognized me as a friend, ay, and as a leader; and they were very cross when I left them. [Laughter.] And, as a friend near me suggests, they have not got over it yet, but have been mad with me ever since. [Laughter.]

Mr. MORGAN. How many of us followed the gentleman, when at the Charleston convention he voted more than fifty times for Jefferson Davis for President of the United States?

Mr. BUTLER, of Massachusetts. Certainly, I then voted for the representative man of the Democracy. Subsequent events have proved that the difference between the gentleman and myself is that he would not vote for Jeff. Davis then but would now, and I did then but would not now. [Laughter.] There is no trouble about understanding this matter at all.

Mr. MORGAN. If the choice was between the member from Massachusetts and the gentleman from Mississippi the country would certainly justify me in making such a choice.

Mr. BUTLER, of Massachusetts. Will the gentleman repeat his statement? There is so much confusion here that I did not hear him. [After a pause.] I repeated my words for the gentleman when he did not hear me. Is he ashamed to repeat his? I did not hear him. [After another pause.] Then I will grant his the mercy of my silence as to what I did not hear.

I was about to say, when interrupted, that we offered the fullest opportunity for debate, and I trust that we may now, as men, as statesmen, as members of the House of Representatives, with a great evil before us, without heat, without acrimony of debate, and in pure and calm reason, discuss, first, of the question of law, then of the question of fact, and then of the question of remedy; try to find out what is best for the country. I trust that the fullest discussion will be allowed, and when every man has had his say on all those questions, that we shall then come to a direct vote, and show whether or not we care for the safety of the country and for the protection of life, liberty, and property.

Mr. LAMISON. Will my colleague [Mr. SHELLABARGER] yield to me for a few moments?

Mr. SHELLABARGER. How much time have I left?

The SPEAKER. There are twenty-two minutes of the hour remaining.

Mr. SHELLABARGER. I will yield to my colleague [Mr. LAMISON]—how much time?

Mr. LAMISON. But a minute or two.

Mr. SHELLABARGER. Very well.

Mr. LAMISON. I will detain the House

but a moment with what I desire to say. We have now been in session for twenty days, including to-day. During that time we have been notified from the other end of the avenue that there was nothing upon which the President desired this Congress to legislate; that there was no such condition of the country as required our longer presence here. To-day we have communicated to us a message from the President in which he says that the condition of the country requires legislation upon the subject named in his message. Sir, if there be any new incidents, if there be any new evidences of tumult and disorder in the South, if there be now anything in the condition of the South that did not exist twenty days ago, that did not exist even ten days ago, I think it would be but fair to members of this Congress that that information should be laid before them. I therefore desire to offer the following resolution.

Mr. SHELLABARGER. I did not yield to have any resolution offered.

Mr. LAMISON. At least let it be read as a portion of my remarks.

Mr. SHELLABARGER. I am willing to have it read.

The Clerk read as follows :

Resolved, That, if not incompatible with the public interests, the President of the United States furnish to the Congress of the United States all facts and documents now in the executive department touching the condition of public order in the States lately in rebellion, and to which reference is made in his message to the Senate and House of Representatives of March 23, 1871.

Mr. SHELLABARGER. That is a very good resolution, which we shall have pleasure in voting for when the proper time comes. I yield to the gentleman from Pennsylvania, [Mr. KELLEY.]

Mr. KELLEY. Mr. Speaker, I take the floor for a moment only, to reply especially to the gentleman from Ohio, [Mr. LAMISON,] who tells us that twenty-three days ago the President did not see such a condition of the country as required any recommendation of legislation or demanded to be brought particularly to public attention. During those twenty-three days, sir, the majority of the members of this House have declared to the people of the South their indisposition to strengthen the President's hands or to deal resolutely with the crimes which are now disgracing not only our country but republicanism and the age. This declaration expressed by the conduct of Congress has emboldened organized bands of lawless men in the South, and they to-day do what they did not dare do three weeks ago. Not content with hunting the poor negro, not content with scourging the "carpet-bagger," as they call the immigrant from the North, or the "scalawag," as they call the Union man who happens to have been born in the South, they now enter your mail-cars to assassinate or scourge the officers of the Government.

Mr. BECK. Where was that done?

Mr. KELLEY. It was done in Kentucky.

Mr. BECK. Let me tell the gentleman the facts of the case to which he refers, as I understand them. The mail-car was entered by one man, a Republican and a Union soldier, who was entitled to the place given to a negro. A grand jury at Louisville, I have heard, investigated the case till they found the facts to be as I state, and then, for that reason, they abandoned the investigation. This occurrence was in January last.

Mr. ELDRIDGE. The 26th of last January.

Mr. KELLEY. Let me tell the gentleman that there are two sides to that story, and that he makes a statement resting in part upon the testimony of a man who gave his evidence with a pistol at his head.

Mr. BECK. I have in my hand a resolution which I have desired to offer, calling for all the facts.

Mr. KELLEY. There are facts in reference to that case which will yet come out. But again, sir, the collection of the revenue of the

Government is interrupted. Officers charged with their collection, men who served in the Union Army and who bear the commission of the United States Government, come here showing the scars inflicted upon them by masked men at midnight. The inability or indisposition of Congress to make the laws of the United States potent throughout our national limits has invited these outrages, has given a premonition of what will be the condition of affairs between now and December, and has justified the President of the United States in asking us to give him power to protect life on every inch of our soil. I thank the gentleman from Ohio [Mr. SHELLABARGER] for his courtesy.

Mr. SHELLABARGER. How much time have I remaining, Mr. Speaker?

The SPEAKER. Fifteen minutes.

Mr. FARNSWORTH. I hope the gentleman does not intend to call the previous question on his motion.

Mr. SHELLABARGER. I yield to the gentleman from Alabama, [Mr. BUCKLEY.]

Mr. BUCKLEY. Mr. Speaker, I take the floor simply for the purpose of making one statement in reply to the gentleman from Kentucky, [Mr. BECK.] If he wants to know where the mails of the United States are interfered with I can tell him upon very good authority. Last autumn a United States mail agent named Frank Diggs, traveling officially in the mail car upon the Selma and Meridian railroad, was shot dead in broad daylight by a man who, as he took aim with his double-barreled shotgun threw from his face his mask; and this mail agent was engaged at that time in assorting the United States mails.

Mr. BECK. I spoke of the Kentucky case.

Mr. BUCKLEY. And yet this Government has never put forth one particle of power to arrest that murderer, nor can it under existing laws. The local authorities are either unable or unwilling to do it.

Mr. BECK. More shame, then, to the present administration of the Government.

Mr. BUCKLEY. The Government does not protect its own lawfully accredited agents there. But the fault is not with the Administration. The President, in the message just read, has asked of Congress additional legislation to enable him to suppress such lawlessness and murder.

Mr. BECK. Has not the Government of the United States the power to arrest anybody guilty of these outrages; and let me ask the gentleman why these men are not arrested?

Mr. BUCKLEY. Wait a moment. The successor of this man who was shot at that place was a confederate soldier who had served four years in the war of the confederacy and was afterward appointed agent on that same route; and the first trip he made he was warned by a man in disguise, who leaped into the mail car with pistol in hand, to leave that route or change his politics, or he would be shot the next trip he made. But I do not propose at the present time to go into these facts.

A MEMBER. What were his politics?

Mr. BUCKLEY. He was a Republican, of course. But, as I have said, I do not intend to go into the facts. I rose merely to answer the statement of the gentleman from Kentucky. Hereafter a more befitting occasion will be afforded, when this committee shall report their action, to lay before the House the facts in connection with these southern outrages, and to urge upon the attention of the House and country the necessity of promptly doing something to rescue our endangered liberties and to protect the citizens of the southern States in their persons, their property, and their lives.

Mr. SHELLABARGER. I will yield now for five minutes to the gentleman from Illinois.

Mr. FARNSWORTH. Mr. Speaker, I do not see what there is in the present stage of this matter to create such or so much excitement. The President has sent us a letter to-day in which, however, I understand he does not profess to have any information which was not in possession of the House before. He refers the House to facts in the possession of the Senate, alluding, no doubt to a report made some weeks since on investigations made by the Senate committee. That report we have all seen. No new facts are presented to the House. There is now no state of the case different from that which we have had ever since the 4th of March. There is nothing now. There is simply a sort of half and half recommendation on the part of the President that we should do something. He is in some doubt as to the power he has now under the law; and the Congress of the United States is very last tribunal to appeal to for the purpose of settling doubts in reference to points of law.

Mr. DAWES. I ask the gentleman from Illinois whether under those circumstances this ought not to be referred, for the very purpose of solving those doubts?

Mr. FARNSWORTH. I was about to speak of that. I do not agree, however, to the suggestion. I was about to say that the last tribunal to solve a legal doubt in the mind of the President is a committee of the House of Representatives. The President is furnished with an officer at the head of the Department of Justice to whom should be referred this question, if he has doubt as to whether the law is sufficient now for his purpose.

As to the facts, we have no new facts, and this House has resolved and reresolved five times since we met here on the 4th of March that it is not worth our while to remain here and legislate, but we should adjourn *sine die* at the earliest possible moment.

What is the necessity for all this excitement over the message which has been sent to us by the President? As I have stated, he adds nothing to our information on this subject. Gentlemen have created doubts in his mind, upon which, it seems, he has sent us a letter expressing in some sort his opinion that we should legislate. We have expressed our opinion over and over again that we had better not legislate on this question now. The more we legislate the more harm we will do and the more these evils will continue. Instead of doing good we are doing harm. This House has wisely so resolved repeatedly in the present aspect of this question; and I see nothing to change my resolution in that regard.

Mr. SHELLABARGER. I now yield for one minute to the gentleman from Indiana.

Mr. SHANKS. The gentleman from Illinois has stated to this House that there is nothing new in this message, that there is nothing in it which the House did not know before. I ask his attention to this fact, that the House has been divided on the very question which the President makes plain in his message, and that is, whether he has the power to enforce the law and protect these parties in the South.

Mr. FARNSWORTH. Do I understand the gentleman to ask me a question?

Mr. SHANKS. Wait a moment. I wish to say to the House that whatever an executive officer believes the law to be, that is a law to him; and if the President believes there is no power in his hands to protect these people in the South he will not exercise a power which he believes he does not possess.

Mr. FARNSWORTH. He does not say that.

Mr. SHANKS. He does say that as clearly as language can express it.

Mr. FARNSWORTH. He only expresses a doubt.

Mr. HOAR. It seems to me that that gentleman has studied slightly the principles of constitutional liberty who does not see that in a grave and momentous crisis like this it is proper that every extraordinary exercise of power should, if possible, instead of being left to the discretion of the Executive, be distinctly authorized beforehand by the representatives of the people. From the time Congress adjourns until its reassembling next winter the remedy for such wrongs, so far as it depends upon executive action, must of course be in accordance with the law, but the Executive himself has doubts as to what is the law and the extent of his power under it. Therefore, when the President informs us that, in his judgment, his powers are not clear, for this Congress to depart hence without making them clear is on the one hand to surrender the people to the executive interpretation of doubtful powers, and on the other hand to abandon the Executive to be denounced by every gentleman on the other side of the House for usurping power in every act he may do.

Mr. Speaker, it is not true that there has been no change since the 4th of March. The evidence comes to us by every mail and by every pulsation of the telegraph from day to day that these outrages are continuing and increasing. The Meridian outrage has been since the 4th of March. The outrage on Palmer the teacher, a man of culture, of education, of character, who, simply for teaching a colored school, was seized, held down by his hair, and scourged with fifty lashes, and has just come to Washington to tell the story of his wrongs, that outrage took place on the 8th of this very month. A few days subsequently the superintendent of schools in the county adjacent to that in which Palmer resided was driven away by these fiends, simply for exercising his duties. Since Congress assembled, some of the high State officers of the State of South Carolina have received notice from these secret bands to lay down their functions and depart. It is idle then for the gentleman from Illinois [Mr. FARNSWORTH] to get up here and say that nothing new has happened since Congress assembled.

Mr. FARNSWORTH. Did we not know all these facts before we voted to adjourn?

Mr. HOAR. No, sir. Any man who knew these facts and voted to adjourn has on his head the blood of those loyal men in the South who may fall victims to these outrages.

Mr. FARNSWORTH. I do not feel that. With a knowledge of the facts mentioned by the gentleman from Massachusetts, a large majority of this House has repeatedly voted to adjourn. The Governor of Mississippi, himself a Republican, has stated that the State authorities have power to deal with these outrages.

Mr. SHELLABARGER. I now yield to the gentleman from Maine, [Mr. PETERS.]

Mr. PETERS. As I have voted for adjournment, and have not given in my adherence to the so-called BUTLER bill, I desire to say a word, and only a word, on the motion before the House. We have received a message from the President. We are bound to give it a respectful consideration of some kind. It is usual to refer executive communications like this to some committee, and the implied assent of the House is usually given for the Speaker to make such references of his own accord. We have no standing committees. The only reference, therefore, which we can make is to a special committee. Courtesy, usage, justice, and every other consideration demand it.

The question before the House is not as to the merits of any particular bill. The committee may report that no action shall be had. We cannot tell in advance what kind of a bill it may recommend. Therefore it seems to me that the discussion in advance of the reference needs to be only of a very limited and unimportant character. With these views, I have no other alternative, and I do not see how other gentlemen can do otherwise than to vote for a reference of this bill to a special committee, as the gentleman from Ohio [Mr. SHELLABARGER] has moved.

Mr. SHELLABARGER. Now I have but a moment or two left.

The SPEAKER. The gentleman has three minutes.

Mr. SHELLABARGER. I wish to say this, that by no action or vote of mine shall the previous question be called upon any measure that

treason should be prohibited from again holding office under the Government; and even this disability has been removed by Congress whenever it has been asked for in good faith. Under these circumstances we have a right to expect and demand at least a quiet submission to just and wholesome laws from our late enemies. Unfortunately, however, our reasonable expectations have not been realized. There exists at this time in the southern States a treasonable conspiracy against the lives, persons, and property of Union citizens, less formidable it may be, but not less dangerous, to American liberty than that which inaugurated the horrors of the rebellion. The existence of this organization and its treasonable character are proved by the sworn testimony of an array of witnesses from all parts of the South, which must carry conviction to the minds of the most skeptical.

The evidence taken before the Senate committee in relation to the outrages, lawlessness, and violence in North Carolina establishes the following propositions:

1. That the Ku Klux organization exists throughout the State, has a political purpose, and is composed of the members of the Democratic or Conservative party.

2. That this organization has sought to carry out its purposes by murders, whippings, intimidation, and violence against its opponents.

3. That it not only binds its members to execute decrees of crime, but protects them against conviction and punishment, first by disguises and secrecy, and second, by perjury, if necessary, upon the witness-stand and in the jury-box.

4. That of all the offenders in this order, which has established a reign of terrorism and bloodshed throughout the State not one has yet been convicted.

James E. Boyd, a witness before this committee, against whom nothing can be alleged except that he was a confederate soldier, a supporter of Seymour and Blair in 1868, and initiated into the Ku Klux Klan as an auxiliary of the Democratic party, testifies, in answer to a question as to the designs and regulations of that order, as follows:

The meetings were to be held in secret places—in the woods, or some other place distant from any habitation, in order to avoid detection. The disguise prescribed was a long white gown, and a mask for the face. No applicant could be admitted as a member of the organization until his name had first been submitted to a regular camp. A county was divided into a certain number of districts, and each district composed a camp, which was under the command of a captain. The whole county constituted a klan, under the command of a chief. No person could be initiated at the number of way camp until his name had been submitted to the camp and his application unanimously agreed to by the members of the camp. The manner of making raids was prescribed by the regulations. No raid was to be made, no person punished, no execution done, unless it had first been unanimously agreed upon at a regular meeting of a camp of the klan and duly approved by the officers and the chief of the klan. The sign of recognition of the White Brotherhood was by sliding the right hand down along the opposite lappel of the coat. If the party to whom the sign was made was a member of the organization he returned it by sliding the left hand in the same manner down along the opposite lappel of the coat. The word of distress was "Shiloh." There was a sign of distress to be made when a brother was in distress and wanted assistance. I do not remember the sign; it was some sign made by the hand. But if the person was so situated that the sign made by the hand could not be seen, then the word "Shiloh" was used to denote distress.

Question. Upon the oath administered, the mode of procedure prescribed, and the government of the organization, so far as you have observed, are the members bound to carry out the decrees of the order, if they involve murder and assassination?
Answer. I think so, sir. If it was decided to take the life of a man a camp is ordered to execute the sentence, and is bound to do it.
Question. What would be the penalty if any member refused?
Answer. I do not know that any penalty was prescribed for that. A member could excuse himself from attendance at meetings or from going upon raids if he had a proper excuse. The penalty prescribed in the regulations for the punishment of any member who should disclose the secrets of the order was death. Each member was informed upon his initiation that if he disclosed the secrets of the organization he should be the first victim.
Question. If any arrests should be made by the civil authorities for murders or other crimes committed in pursuance of the decrees of a camp, to what extent did the obligations of members bind them to assist and protect each other?
Answer. To whatever extent was in their power.
Question. Did it go to the extent of giving testimony in behalf of each other or of acquitting if upon a jury?
Answer. I think that was one of the objects and intentions of the organization, that a person on the witness-stand or in the jury-box should disregard his oath in order to protect a member of the organization.
Question. Do you know of any instances of wrong or outrage perpetrated upon persons in pursuance of the decrees or orders of this organization?
Answer. I do not know of any decrees or decisions they made. I know of punishments that were inflicted by the organization.
Question. State any of them that you now remember.
Answer. The most serious instance in my county, I believe, was the hanging of a negro man by the name of Outlaw, who was taken from his house, in the town where I live, about one o'clock at night, by a band of from eighty to a hundred men, and hung upon an elm tree, not very far from the court-house door.
Question. When was that?
Answer. On the night of the 26th of last February.
Question. What was the offense charged against him?
Answer. I never heard of any. The newspapers have said that he was guilty of having shot at a band of Ku Klux that passed through the town some time previous, but that was not true.
Question. What is your knowledge of the object and extent of this organization throughout the State?
Answer. I can only state from hearsay—what I have heard from members of the organization. The number of the members of the organization is supposed to be forty thousand. Their object was the overthrow of the reconstruction policy of Congress and the disfranchisement of the negro. There are two other organizations besides that of the White Brotherhood, as I said before. I was a full member of one of them and partly a member in the other. I cannot say that I considered myself really a member of the other. One organization was called the Invisible Empire. There is another organization which rather superseded the White Brotherhood in my county, after it had gone on for some time, and was called the Constitutional Union Guards, whose oaths and manner of operation were about the same. There was very little difference; some change in the signs. The sign of recognition was by crossing the hand on the breast. * * * * *
Question. In speaking about the punishing of men, on these raids, in the first part of your testimony, what do you mean?
Answer. Whatever punishment was passed upon in the camp.
Question. For what were they punished?
Answer. I do not know; just whatever they saw proper. If they thought the man ought to be killed for being too prominent in politics, they would have a meeting and pass sentence upon him. I have no doubt in my own mind (though I have no information from others that such was the case) but what Outlaw was killed in order to break up the organization of the colored voters in my own county, or frighten them away from voting.
Question. Were other punishments inflicted in your county besides this?
Answer. Yes, sir. In consequence of Outlaw's murder, a negro by the name of William Puryear, a half simple fellow, who, it was said, saw some of his neighbors returning in disguise from Graham the night that Outlaw was hung, was drowned in the mill-pond.
Question. Were there any whippings in the county?
Answer. Yes, sir. I believe there were some hundred or one hundred and fifty in the last two years in the county, white and black. Some have been whipped two or three times.

I have quoted largely from the testimony of this witness for the purpose of showing the dangerous character of this organization. I also make an extract from the testimony of Hon. Thomas Settle, one of the judges of the supreme court, showing the same state of things and strongly corroborating the material statements of Mr. Boyd:

By the Chairman:
Question. Give us your belief as to the true position of the political organizations with reference to this organization.
Answer. Well, sir, I must think that the present Democratic party there, judging from the circumstances, are encouraging it. I do not think it is accidental. In the course of our investigation last summer it leaked out in the testimony that Hamilton C. Jones, present member of the Legislature, gave the signs of the Invisible Empire to James E. Boyd, who was then a Democratic candidate for the house of commons for Alamance county. Dr. Moore, also, who had been a member of the previous house, gave the signs of the Invisible Empire. Mr. Boyd had belonged to the White Brotherhood, and this was a new organization to make it more compact, it was said. After Dr. Moore had given the signs to Mr. Boyd they walked down to the Yarboro hotel and went into the room of Colonel Jones, who also gave Mr. Boyd the signs. It was not proved that they were members, but Mr. Boyd said in his

testimony that Mr. Jarvis was in the room when Hamilton C. Jones gave him the signs. It was further stated by Mr. Boyd that he learned from Dr. Moore that Frederick N. Strudwick, a grandson of a former chief justice, Frederick Nash, was on his way to assassinate Senator Shoffner, who had introduced the stringent militia bill. Well, at the next session of the Legislature, Mr. Jarvis was made speaker. He is speaker of the present house. No person proves positively that Mr. Jarvis was a member of the organization, but Mr. Boyd swore that Dr. Moore informed him that Jarvis was a member, and that Jarvis was in the room when Jones gave the signs. Mr. Jones is a prominent member of the senate, and Judge Warren, who is presiding officer, belongs to the public body men. Mr. Jones frequently presides in that body. It is notorious that the resolution of impeachment of Governor Holden was passed in caucus. Mr. Strudwick was charged with introducing, and did introduce, the resolution. He was also prominent in bringing forward a bill, which passed and became a law forthwith, to repeal the act which had been passed, introduced by Mr. Shoffner. I draw from these facts the inference that the Legislature must be controlled by those men who were honored by the party, and who were elected last summer as members of the party, and I think that is the general opinion.
Question. Do I understand you, then, to say that the weight of what is known as the Conservative or Democratic party at present gives encouragement to this organization, and that those of that party who denounce it are exceptions?
Answer. Yes, sir; that is the general opinion there.
Question. What has been the effect on the public mind with reference to the security of person and property, of these outrages, and the difficulty in the way of punishment?
Answer. Well, sir, I suppose any small man in North Carolina would tell you it is impossible for the civil authorities, however vigilant they may be, to punish those who perpetrate these outrages. The detective has so much with the courts as with the juries. You cannot get a conviction; you cannot get a bill found by the grand jury, or, if you do, the petit jury acquits the parties. In my official capacity I sit with Judge Pearson and Judge Dick. Judge Pearson issued a bench warrant last summer for some parties, and had them brought before him at Raleigh. He requested Judge Dick and myself to meet him. We did so, and the trial extended over three weeks, and there it came to our knowledge that it was the duty and obligation of members of this secret organization to put themselves in the way to be summoned as jurors, to acquit the accused, or to have themselves summoned as witnesses to prove an alibi. This they swore to; and such is the general impression. Of course it must be so, for there has not been a single instance of conviction in the State.
Question. Upon investigations made before you in your official capacity, have you any doubt that a state of things exists requiring men to shield themselves in the way you have mentioned?
Answer. None whatever. I am satisfied, from their own declarations and from the effect visible in all the courts, that it is so.
Question. Where they are charged with offenses, is there any probability of securing justice against them in counties where the organization exists at all?
Answer. Well, sir, my belief is that the organization extends to every county in the State. I am satisfied that the organization is a very extensive one. I have no doubt it is much more numerous in some counties than others, and I believe the middle or Piedmont region of the State is the chief nucleus, and that there the outrages have been the most numerous.

Judge Logan, of the ninth district, and Judge Henry, of the eleventh district, express substantially the same views. Their opinions are mainly founded upon the effects visible in the courts over which they preside and about which they can neither be mistaken nor deceived. Certain it is that these criminals are able to baffle and set at defiance all the ordinary appliances of the law. The testimony of Thomas W. Willeford, formerly a member of the Ku Klux Klan, throws additional light upon the secret workings of this order and discloses the means by which these results are brought about in the State and local courts. This witness testifies as follows:

Question. Did they tell you what the object was?
Answer. Yes, sir; in the first meeting. I was initiated in Kennedy's barn.
Question. Did you take the oath?
Answer. Yes, sir; and then the next Saturday went to the meeting.
Question. What did they tell you then was the object of the organization?
Answer. They told me it was to damage the Republican party as much as they could in breaking, stealing, whipping niggers, and such things as that.
Question. Murder?
Answer. The leading men it was to murder.
* * * * * * *
Question. Have you ever heard of a Ku Klux being convicted of any offense there?
Answer. No, sir.
Question. Was there anything in the obligation you took or the rules of the order as to your being obliged to defend men by your oaths, or otherwise?

1871.                    THE CONGRESSIONAL GLOBE.                    321

*Answer.* Yes, sir; if he could get you in as a witness you had to swear him out, let you be swearing a lie or not. If you swore against him, why you might just as well be a-traveling at once.

*Question.* You mean by that you would be in danger of your life from the order?

*Answer.* Yes, sir.

*Question.* Anything about getting on the jury?

*Answer.* Yes, sir; if we could get on the jury we could save him, do what you please.

*Question.* No matter what the proof?

*Answer.* Yes, sir; you could not bring proof enough to convict.

The following testimony of Caswell Holt, a poor and ignorant, but honest and conscientious negro, who was twice visited by the Ku Klux, will show the manner in which these outrages are executed:

By the Chairman:

*Question.* Were those men disguised?

*Answer.* Yes, sir.

*Question.* How?

*Answer.* They all had long white robes on, all of them, legs gowns, and caps on their heads with three horns. I went to my house; my wife said, "What did they do to you?" I said, "Don't talk to me; they pretty nigh killed me." She kept on at me, and asked me what they said and did to me. At last she said, "Must I go down to the house for Mr. Holt?" I told her, "Yes, you may go down there and tell him to come up; I want to see him." I could neither sit, lie down, nor stand; I was up and down all night, trying to get some ease some way.

*Question.* To what extent was your back injured?

*Answer.* It was cut all to pieces; and my wife pulled a splinter out of me here [putting his hand on his right hip] as long as my finger, from one of the sticks they hit me with.

*Question.* Now go on and tell us about the time when you were visited again.

*Answer.* It went on in that way until the crop was gathered again; it was about two weeks before Christmas. I had done gathered the crop and sowed a little wheat on the place. I was going to move the next week. I would have left the week before they shot me, but there was a little road they wanted to cut out from Gun Creek to Company Shops, and I went there on Saturday and worked on that. I had been chopping very hard, and came home that night and laid down on the bed. The boys were all up there that night. The dog broke out after I laid down. There was a hole in the walls of the house; it was a log house; and the boys peeped out and said, "Here, pap, the Ku Klux are all around the house." I said, "They are?" They said, "Yes." By this time they were at the door, and said, "Open the door." They struck against the door with a stick, or something—bang against the door. I said, "No, sir; I don't open my door for no man, unless he asks me who he is and what he wants." He said, "God damn you, open the door." I thought when he come that way he wouldn't get me to open it, sure. I said, "No, sir." He said, "Strike a light before you open it." I said, "I've nothing to make a light of, and if I had I wouldn't do it, and I won't open the door." I then went to the door; it was a little thin poplar door, about three quarter inch plank. I stood at the door. My biggest boy was standing a little piece off from me. There was an ax sitting there, and I picked it up and went to reach it to him, so that if they should break in we would hurt some of them before they did too much mischief. I had a bowie-knife in my hand, standing there at the door. I was standing there as close as I am now to this table. They said, "Open the door." I said I shouldn't do it. Then one said, "Blow his brains out." Just as he said that they all fired through the door, just red-hot, just flaming red when they came through. I didn't think it was but one crack; but they said they shot a half a dozen times or more. I clapped my hand on here [putting his hand on his breast] and said, "There, they've shot me." My boy knew where there were some loose planks in the floor. He jerked up two of them, and they all ran through under the house—all the biggest of them; all but the three little ones I had.

*Question.* What occurred afterward?

*Answer.* The next morning I sent for the doctor to come and take out the balls, Dr. Montgomery. He came and took out the balls, and told them they had better move on to Graham, if I was to be moved, or else they wouldn't have to go to me at all. That evening they carried me to Graham, and got me there just at night.

*Question.* How many balls did they fire into you?

*Answer.* The witness indicated where he had been shot—in both arms and in his chest. There were five balls and two shot.

*Question.* What has been the effect of such proceedings upon the colored people of that county; do they feel safe?

*Answer.* They don't feel safe there at all, I can tell you that; and a great many of them have taken the notion to leave; they could hardly stay about there. They wanted to run them all off because the principal part of them voted the Radical ticket.

By Mr. NYE:

*Question.* Wanted to run all off who voted the Radical ticket.

*Answer.* Yes, sir.

*Question.* Did you hear that said?

*Answer.* Yes, sir; I heard it talked, and I saw them try it. They tried to turn me from voting the Republican ticket; but I did'nt turn, and that is what they shot me for I reckon. That is the case every election that has been there. They have been

trying to get us to vote the Conservative ticket; some they would get to vote it, and some they wouldn't.

*Question.* Were those that would not vote the Conservative ticket the ones that had these outrages committed on them?

*Answer.* Yes, sir. You never saw one bothered at all that voted the Conservative ticket.

Can any one, Mr. Speaker, contemplate these disclosures without surprise and well-founded alarm? Yet, sir, the Democratic party have from the first denied, and then palliated and excused these outrages. In Tennessee and other southern States the laws which had been passed by Republican Legislatures to suppress and punish the Ku Klux were repealed as soon as the Democratic party came into power. The relation of the Democracy to this order is precisely that of the receiver of stolen property to the thief. The murder of leading Republicans, terrifying the colored population, and putting whole neighborhoods in fear so that the Ku Klux can control an election, is heralded as a Democratic victory.

For the purpose of showing that it is well understood where these outrages are committed that the Democratic party is willing and anxious to receive the benefits of murder and rapine, I cite the testimony of W. P. Bynum, the solicitor of the ninth judicial district of North Carolina, found on page 54 of the Senate report:

*Question.* Do the political parties divide in their sentiments in regard to the outrages committed by this organization, or do those of the same political party differ with each other in regard to them? Give us the true state of feeling on that subject.

*Answer.* I think the Republican party, as a party, are universally opposed to these klans; they are regarded by them as confined to the Democratic party, or the Conservative party, as it is called there.

*Question.* The difficulty with me has been that I apprehend they are tacitly countenanced by the Conservative party, who are willing to derive the benefits that may result from their operations.

We may as well concede, Mr. Speaker, that if this system of violence is to continue in the South the Democratic party will secure the ascendency. If political opponents can be marked for slaughter by secret bands of cowardly assassins who ride forth with impunity to execute the decrees upon the unarmed and defenseless, it will be fatal alike to the Republican party and civil liberty. But, sir, we may well ask where this will end. How long will it be before the Tammany Hall Democracy, who are now furnishing arms to the Ku Klux of the South to murder southern Republicans, will introduce this new element of Democratic success into northern politics?

The report, Mr. Speaker, to which I have referred shows over one hundred and fifty authenticated cases where persons have either been murdered, brutally beaten, or driven away at the peril of their lives. And the same deplorable state of things exists in South Carolina, Georgia, Mississippi, Louisiana, Kentucky, Tennessee, and Texas. Jails have been broken open, the officers of the law killed while attempting to discharge their sworn duty, and the criminals turned loose upon the community. Revenue officers and mail agents of the United States have in some instances been murdered, and in others driven away from their posts. But a few days ago, over a hundred Alabama Ku Klux made a raid upon Meridian, Mississippi, and carried off their victims for execution. A meeting of the citizens was called to protest against these outrages. The Ku Klux became alarmed. At their instigation warrants were issued for the arrest of peaceable and well-disposed negroes upon the charge of "using seditious language." When the court convened they again assembled in force, and commenced the work of death. Judge Bramlette, the presiding magistrate, was shot and the scene closed by driving the Republican mayor out of the city. I copy the following statement of the exiled mayor from the New York Tribune:

The Ku Klux will endeavor to make the people of the North believe that Judge Bramlette was killed by a negro. They may make some believe it. But I do not believe that any of the arrested negroes

had any weapon other than a pocket-knife, as I was present at the trial for some time and sat close to the accused, and saw none. But in a direct line from the sheriff's office door to the main hall there sat one of those negroes; and I believe, although I saw not the shooting, that one or many of the Ku Klux, in carrying out their design, shot Judge Bramlette. After the negro was shot he jumped out of the two-story window; after which he was killed. George Dennis, colored, was shot in the court-room, after which he was thrown from the two-story window on to the brick pavement below, and as that did not kill him, they then cut his throat. After they had killed J. A. Moore they went and burned his house; and so they continued their hellish barbarities. They surrounded my brother's house. They were all armed with double-barreled shot-guns, and, as I was told, two hundred in number.

Many good citizens of Meridian plead for me, as well as many in the Ku Klux columns, who were in them, not from choice but from necessity. They appointed committee after committee to wait upon me and to inform me that I must leave by ten o'clock next day. Their principal commanders visited me. I wanted to know the whys and wherefores, but they said they came not to argue any question of right; the verdict had been rendered. They treated me respectfully, but said that their ultimatum was that I must take a northern-bound train. I yielded. At about half past twelve o'clock at night perhaps three hundred came and escorted me to the cars. Some difficulties and dangers presented themselves, but I got here in safety.

I am much a sufferer in pain and feeling; but I believe that the State of Mississippi is able to indemnify me. Let me urge the necessity of having martial law proclaimed through every southern State. The soldiery to be sent there should be quartered on the rebels. Leniency will not do. Gratitude they have none. Reciprocation of favors they never dream of.                                WM. STURGES.

NEW YORK, *March* 15, 1871.

The Democracy have eagerly seized upon a telegram of Governor Alcorn for the purpose of concealing the enormity of this affair. But, sir, a careful analysis of that remarkable dispatch will furnish conclusive evidence of all the weakness, imbecility, and indifference of the State authorities which has ever been charged. Governor Alcorn says, "A riot occurred recently at Meridian, but was promptly suppressed." What is this statement worth in face of the facts that there were two riots, and neither suppressed until the rioters had accomplished their murderous designs? The Governor continues: "Some minor outrages have been committed on other points of the Alabama border in the night by parties in disguise." The murder of Union people all along the Alabama border is termed "minor outrages." When, a few years ago, Martin Koszta, a Hungarian refugee, who had declared his intention to become a citizen of the United States, was seized upon foreign territory by an Austrian press-gang, our Government exhibited her glory and greatness by demanding his release, even at the risk of war. But at this day, with the lessons of the rebellion before us, the Union people of the South are murdered morning, noon, and night; and when we propose to legislate in their behalf, we are told by gentlemen on the other side of this House that Congress has no power under the Constitution to protect the lives of the citizens of the Republic. Hear this language of Governor Mississippi a little further: "My only difficulty," he says, "in these cases is to discover the wrong-doers." Here is a confession of the whole case. It presents the singular spectacle of a Governor of a State apologizing for the murder of American citizens and acknowledging his inability to even discover the offenders.

The whole South, Mr. Speaker, is rapidly drifting into a state of anarchy and bloodshed, which renders the worst Government on the face of the earth respectable by way of comparison. There is no security for life, person, or property. The State authorities and local courts are unable or unwilling to check the evil or punish the criminals. It is not a question of power or numbers. If the cowardly miscreants who conceal their crimes by hideous disguises, the dark pall of night and the darker pall of perjury, would give the loyal people of the South an open field and a fair fight they would protect themselves. But, sir, the Ku Klux system is ingeniously devised for the

always more developed in the southern people than in the northern. Slavery induced this propensity, as it led them into a war against the nation. I regard the present manifestations as the receding of the waves which were produced by that storm of blood which prevailed for four years, and spent its main force upon six hundred battle-fields.

There is a struggle in the South on the part of those who ruled before the war to recover their lost domination. It is legitimate for any class of people to seek control or power if the means employed are consistent with the laws of the land. I think the Democratic party of the South do, in many instances, resort to appliances which cannot be justified and are pointedly in conflict with that just and celebrated sentiment of Thomas Jefferson, that "error of opinion may be safely tolerated when reason is left free to combat it." They have not always left reason free to combat their principles. That the condition of those at the close of the war who had joined their fortunes with the confederacy was uncomfortable, I well understand. It is as hard to bear misfortunes which are self-imposed as it is to endure those which are brought upon us by others. Soldiers keenly appreciate the sting of defeat. The southern people had lost their cause, and were broken up in their property. They had been unus'd to labor. The whole social fabric had become a scattered wreck. Although these calamities were the results of their own wrongful acts in warring against the nation, still the prospect was uninviting, and required the exercise of the greatest philosophy to pass out of such a state peacefully and successfully. It will take time and patience and industry and the subduing of prejudices and passions to bring them out; and it is the duty of the nation to lend every aid legitimately in its power to hasten the day when the wrongs and disasters of the past shall be effaced from memory.

The white people of the South are most strongly prejudiced against the colored people. Not so much, however, against them for their color as for their previous condition. The sudden and radical change which has made the slave a coequal citizen does not commend itself so readily to the mind of the whilom slaveholder as to those of us who were reared and educated under other circumstances. While the war was progressing Federals and Confederates learned to regard each other as enemies, and it was a feeling that pervaded the minds of the entire population of both sections. This feeling unhappily did not die away with the sound of the last discharge of fire-arms, and it is hardly a law of mind that it should cease instantaneously. Hence northern soldiers and northern men who settled in the South were regarded as inimical, and the feeling as a rule was reciprocal. While we believe that the people of the South were criminally wrong in engaging in the rebellion, still we must concede the fact that the great mass of them were sincere. Their opinions resulted from false political teachings of thirty years' duration.

Observation has shown us that conscience is largely the creature of education. Hence, the people of the South look upon laws for the punishment of treason and restrictions upon political privileges and immunities as unkind and oppressive. These are some of the facts which we are to consider and springing from which are some of the causes from which the present condition of the South has resulted.

When the war closed there were two elements of population in the South whose future status was undetermined: the blacks, who had never enjoyed citizenship, and the large mass of the whites, who for their acts might be deprived of citizenship. The solution of the problem, so far as it enfranchised and citizenized both classes, was a wise policy. Whether the nation ought to have gone further and made citizens of all need not now be discussed. Whatever may have been best then, it is clear to my mind

what course should now be pursued. I would grant general amnesty at once. It will not be followed by any dangerous consequences. Good only will flow from such an act.

Why not grant amnesty? Is it withheld from fear of adding strength to a political foe? For such a reason it would be ignoble to withhold it. But it will not add a feather's weight to the one side or the other. All can vote now. Disqualification at best is only a limitation on the number of men who may hold Federal offices. It has been urged that amnesty should be withheld because violence and outrages are perpetrated in the South. Disfranchisement incites to acts of violence. That men feel wronged when their political privileges are restricted is rather natural in America. One such man embitters a whole community if he attempts it, and if he does not make complaint himself, his neighbors and friends do it for him. This is an age and a country of enfranchisement rather than of disfranchisement. It is morally and physically impossible to maintain tranquillity in any State, in any section, when any considerable portion of the people of that State or section are disfranchised. You may send your Army to capture, and your courts to try and punish offenders, but you had better send also the full guard of citizenship to those who are without it. I would use force, if necessary, to quell disorders, but I would remove every exciting cause of discontent.

But it is said that the white people of the South are opposed to the conferring of political privileges upon the blacks. The assertion is true. I do not believe, however, that they will attempt to annul or abrogate the fifteenth amendment any sooner than the Democrats will everywhere. Whether opposition to it shall cease depends entirely upon the action of the Democratic party. If that party says that the amendment shall not be executed, their partisans in the South will obey the mandate. If, on the contrary, the decision is to submit to it, the advice will be followed. The exercise of political franchises by the blacks will be more tolerable to the hostile whites if they are permitted to enjoy as much themselves. Turn this question over as you will, and look at it from every stand-point, to my mind the arguments for amnesty are unanswerable.

Tennessee disfranchised more than a third of her adult male population. That the State government should speedily fall into the hands of the friends of those who were affected by this proscriptive policy was inevitable. No other result could have been expected. It required more than the legacy of fifteen hundred State troops left by Governor Brownlow to Governor Senter to prevent the popular uprising. The result in that State is to be most deeply deplored, for she gave more of her sons to the Union Army than any or perhaps all of the States which seceded, and she furnished many of the ablest, most unflinching, and self-sacrificing patriots of the South. Missouri had her proscriptive laws and the ties of party were not strong enough to bind men to their support. The Republican party cannot afford to continue disabilities. Wherever a liberal policy has been adopted victory has perched upon the Republican standard; the opposite policy has been followed only by disasters.

Mr. Speaker, my own State has had her carnivals of blood, more bloody than any other State or all other States combined. Her present condition is a source of congratulation to my party for the wise course which has been pursued. The New Orleans Republican of a recent date holds the following language:

"There is no complaint as to Louisiana, thanks to the superior intelligence and greater industry of our people, who have found more profit in accepting the laws and in attending to their material interests than in defending their ancient prejudices and in resisting the manifest will of the nation."

The profoundest peace there prevails. It is as quiet as Vermont. This result is largely

due to the liberal policy adopted by the Republican party of the State. I would do injustice not to say that something is also due to the advanced grounds taken by the Democratic party in that State, and I must commend their example to their brethren in other States. The Republicans planted themselves squarely upon the platform of amnesty, and struck from the State constitution and abrogated all disfranchisements for participation in the rebellion by a nearly unanimous vote at the ballot-box. The Democratic party in their State convention passed resolutions accepting the principles of the fifteenth amendment, and invited negro delegates to sit in convention with them on terms of equality. After these occurrences there was no war of races threatened or predicted. Peace has smiled upon the people ever since, and if the two political parties of the nation would follow the examples which have been furnished them in the State of Louisiana we might confidently look for an early dawn of a halcyon period throughout the South and the whole country.

Of the people of the southern States are anxious to recover from the losses of the war and to resuscitate their broken fortunes. They appreciate fully the advantages of works of internal improvement, and are turning their attention to the subject to the best of their ability. Every act of the Government which encourages the development of resources creates a feeling of satisfaction. Legislate as you will, and enforce order and obedience to law with as strong a hand as you may, still you will accomplish more in the way of removing exciting causes and in softening animosities, by general amnesty acts and by generous and well-adapted legislation to promote the development of the material resources of the South.

But, sir, I do not expect such marked results from the action of the General Government as do gentlemen of more sanguine temperaments. By far the most depends upon the action and efficiency of the local governments. The people themselves must sooner or later rise up in their might and put an end to crimes and disorders. I deplore turbulence everywhere and am willing to grant the requisite force for its suppression whenever it may be practically and safely employed. But I do not despair of the Republic nor of the South, nor do I totally believe in the efficacy of force, and force alone. Time, tolerance, and education are potent remedies for American evils. May I venture to say, in conclusion, that, with all the terrible facts before us, and with all the exaggerations which are so likely to occur, there is not a man of intelligence and thought who did not at the close of the war fear more extensive and obstinate disorders in the South than any which have been experienced?

I yield whatever time I have left to the gentleman from Ohio, [Mr. MONROE.]

Mr. MONROE. Mr. Speaker, I do not propose in the few words which I have to offer to enter upon an examination of the condition of affairs in our southern States. Enough, I suppose, will be admitted in that respect to justify the entertainment and discussion of this bill. I think it must be generally admitted that there exists in that portion of our country an extensive and powerful secret organization, which has become the occasion of very general complaint. Without assuming anything in regard to the character of this organization, as political or otherwise, without assuming anything in regard to the ultimate object which it seeks to accomplish, the plain fact remains that members of this organization, with its approval, by means of murder, burning, and scourging, have established in many neighborhoods a reign of terror.

It is well known that there are large districts in which life, liberty, and property are, to a portion at least of the people, insecure to an extent which is most alarming, and that yet the authors of this criminal disorder are not convicted, and the State whose laws they vio-

lowed by a second, and a third, and so on, until constitutional restraints are soon broken down. "Eternal vigilance is the price of liberty," a maxim as true as trite. On this subject, Junius, in his advice to the English people, expresses himself in language as forcible as it is beautiful, and it will apply to us with even greater force. He says:

"If an honest, and I may truly affirm, a laborious zeal for the public service, has given me any weight in your esteem, let me exhort and conjure you never to suffer an invasion of your political constitution, however minute the instance may appear, to pass without a determined, persevering resistance. One precedent creates another. They soon accumulate and constitute law. What yesterday was fact to-day is doctrine. Examples are supposed to justify the most dangerous measures; and when they do not suit exactly, the defect is supplied by analogy."

This was the advice of a great statesman to his countrymen, and it seems the English people appreciate its value, for at a much later period Macaulay says:

"We have been taught by long experience that we cannot without danger suffer any breach of the constitution to pass unnoticed."

A short experience ought to have been sufficient to have taught us the same thing. We have a written Constitution, prescribed by the sovereign power, the people, containing suitable limitations and restrictions on the known tendency of power to transcend its proper limits; but we do not profit by either the lessons of philosophy or the advice of patriot statesmen.

Our people seem to labor under the delusion that liberty is indestructible. If they will continue, they will soon find a sad end to their delusion. We have seen bad precedents followed by worse. We have seen innovations repeated, and each succeeding one magnified. This bill is the last and greatest of these innovations. We have seen act follow act, until all the original rights of the States have been absorbed and centered in Congress, and Congress now proposes to pass all the power thus absorbed into the hands of one man. Let this bill pass, and then farewell to the Republic.

Although the people have until the late elections been silent and passive, I pray God they may yet reclaim the lost ground; and the hope of every patriot now rests on them. I appeal to them to correct these abuses and to restore the Government to its original beauty.

Men who knowingly err will generally justify themselves on some pretext, and though they have to do so by appealing to some popular prejudices. Revenge is one of the base passions of human nature, and, no doubt, has great weight in shaping public sentiment at the North against the southern people. And there are those who would pander to this vicious passion by justifying the extreme measures of Congress as a proper punishment to the people of the South for their errors.

Such a motive may have influence with some, but it is an aggravation of the wrongs. Congress has no right to inflict punishment on individuals or on whole communities. How blind and misguided is that policy which undertakes to bring back a misguided people by oppressing and punishing them! Was ever a people brought to love or even respect a government which oppressed them? Man can never be brought to love those who oppress him. Religion may teach it, but in vain. And if there be any such thing as a free government which does not command the respect and approbation of the people, statesmen have failed to show us how it can be maintained. Punishment was not the object; it was a shallow pretense, used to deceive the people. The veriest rebel or secessionist at the South becomes at once a loyal citizen, purged of his offense, by joining the party and sustaining its extreme measures. Many of its most prominent men at the South, from Governors down, were the most zealous and active secessionists. They are rewarded and not punished. There is great joy over their conversion to the Republican party.

This proves that punishment was not the object. If the southern people are disloyal, as they are charged with being, oppression has made them so, and the Radical party is responsible therefor. At the close of the war they acknowledged their error, they had suffered grievously for it, and were anxious to be restored to their relations with the Government, and did all in their power to place themselves right. They were repulsed with scorn and consigned to punishment under military despotisms.

That old Roman was wise who said in the Roman Senate the way to attach a conquered people to their conquerors is to treat them with kindness. And it was said that Romulus was very wise, with respect to the people he subdued, by making those who were his enemies the same day citizens. The southern people are even yet treated as enemies, and such treatment is very sure to make them so. Kindness is the fountain from which attachment springs as well for Governments as for individuals.

A Roman emperor made a conspirator against his life his warm friend by forgiveness and kindness. Had the Republican party pursued this policy after the war closed it would have given renewed strength and renewed attachment to the Government. Besides, sir, the secessionists had some claims to forgiveness, especially from New England. It was a plant of northern origin, as early as 1796, under the nurture of the Hartford Courant, and upon the acquisition of Louisiana it received a new stimulus and bid fair to bring forth its fruits. Its spread was encouraged by public journals, public meetings, legislative bodies, and from the pulpits. It was fostered by such names as Plummer Pickering, Hillhouse, Hunt, Otis, Griswold, and others, and culminated in that Hartford convention which sent delegates to Washington as its advocates. Its prospects, however, were blighted by the general joy produced by General Jackson's brilliant defense of New Orleans.

To say nothing of the effect of this bill on the South, what of the northern people? By sustaining the Radical party they but forge the chains that ere long will encircle them in the toils of slavery. They have encouraged precedents which this day by this bill threaten to break up their State governments and place them under a one-man, military despotism, which will subject their lives, liberties, and property to military tribunals. And what of the western people, that great community of noble men whose minds should be as free as the air they breathe, will they too crouch before the tyrant's scepter, voluntarily surrender their rights, and willingly take upon themselves the yoke of slavery?

Will they quietly stand by and see a military satrap, with licentious soldiery, take possession of their States and State governments? Will they calmly see the standard of military supremacy erected on the ruins of civil power? The North, the West, and Middle States had better beware. They will but fill the chalice which ere long will be applied to their own lips. When it comes they will have but themselves to blame. In adhering to the Republican party, they have but fostered the monster which is now about to crush them.

I yield for twenty minutes to the gentleman from Pennsylvania, [Mr. STORM.]

Mr. STORM addressed the House in remarks which will appear in the Appendix.

Mr. ARCHER. I yield now to the gentleman from Missouri, [Mr. MCCORMICK.]

Mr. McCORMICK, of Missouri, and Mr. MOORE addressed the House in speeches which will appear in the Appendix.

Mr. LOWE. Mr. Speaker, the questions presented for consideration upon the bill before the House are of the very first importance. We are confronted with the two inquiries whether the proposed legislation is needful and whether it is lawful. If these conditions concur, if the exigencies of the public welfare demand it, and if the bill may be constitutionally enacted into a law, then there can be no doubt of the duty of the House and of Congress to provide such redress as this bill proposes. That life and personal rights are insecure and systematically invaded in several of the States may be palliated, but cannot be successfully denied. The evidence is contained in the voluminous report of the Senate committee elicited from a crowd of witnesses; and it is also brought to us by the public press and by the mouths of those who speak of what they know and have seen.

While murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective. Combinations, darker than the night that hides them, conspiracies, wicked as the worst of felons could devise, have gone unwhipped of justice. Immunity is given to crime, and the records of the public tribunals are searched in vain for any evidence of effective redress. If there is no remedy for this, if the rights of citizenship may be denied without redress, if the Constitution may not be enforced, if life and liberty may not be effectively protected, then, indeed, is our civil Government a failure, and instead of enjoying liberty regulated by law, its subjects may live only by the sufferance of lawless and exasperated conspirators. The cardinal doctrine of our institutions is that all citizens are equal before the law, and that the law shall equally secure to all, their natural and inalienable rights.

It is well to remember these fundamental doctrines. It is well to remember for what purpose Government is organized, that it may be so administered as to secure its appropriate ends. It is for the purpose of practically enforcing these cardinal principles that this bill is proposed. The President has advised the House that the condition of the country in certain districts is such that life and property are insecure and the carrying of the mails and the collection of the revenue dangerous, and that the power to arrest these evils is, in his judgment, beyond the control of State authority. If this condition does not anywhere exist, if there is nothing, in fact, for this bill to operate upon, if there are no outrages committed, if there are no organized bands of disguised conspirators, why such opposition to this measure? If there is nothing for the bill to apply to, nobody can be inconvenienced by its passage. If there are no Ku Klux organizations conspiring to banish and destroy, then nobody's rights, whether real or fancied, can be injured by a bill to put them down.

It is not impossible that in some instances exaggeration of the violations of law may have been made in reporting them to the public, but it must be a very stubborn incredulity which after perusing the report of the Senate committee, after hearing the credible narrations of eye-witnesses, would deny the substantial fact that in many districts in the South there is a demand for some further safeguards to life, liberty, and property, safeguards that may involve the element of sufficient power and force to carry into execution the guarantees of the Constitution in favor of personal security and personal rights.

It is claimed with great vehemence and pertinacity on the other side of the House that there is no constitutional authority in Congress to pass this law; that, even admitting the facts to be true as alleged, Congress is powerless to grant relief within the scope of the just powers of the Federal Government. If I were of that opinion, I should never give my vote for the bill, for there is no evil so great but that the obligations of the Constitution are paramount to any necessity for the removal of the evil.

But this is not the first time the Constitution

Mr. SHELLABARGER. I beg the gentleman's pardon; the Constitution uses no such words.

Mr. VAN TRUMP. Where does the gentleman find the power: in the legislative article or in the executive article?

Mr. SHELLABARGER. It is a question of interpretation between my colleague and myself. The Constitution does not say that Congress shall have the power; it does not say that the President shall have the power. It is a question of interpretation. The gentleman interprets the power to be in Congress. On the question as to which interpretation is right I refer the gentleman to the most learned treatise on the subject in the English language, from one of the ablest lawyers that America has ever produced; I mean Horace Binney.

Mr. VAN TRUMP. I understand that. I cannot yield for a speech.

Mr. SHELLABARGER. Very well, then; I will say that I take the other view.

Mr. VAN TRUMP. If this is not to come out of my time, of course I have no objection.

The SPEAKER. It must come out of the gentleman's time.

Mr. VAN TRUMP. I merely asked the gentleman where he found the power which he states.

Mr. SHELLABARGER. The bill proceeds upon the theory of the gentleman that the power is in Congress. The bill assumes that it is in Congress.

Mr. VAN TRUMP. Then I ask the gentleman, if that power can be thus delegated, why not the power to levy taxes, to make appropriations, to declare war, to raise and support armies, and to coin money, as well? It is a legal deduction from which there can be no escape that if Congress has the constitutional authority to delegate to the President any portion of their legislative functions, they have the same authority to remit to him the entire mass of their legislative power. And the converse of the proposition must be equally true, that if they have no authority to delegate their *whole* power, they are in like manner powerless to delegate any *portion* of it.

The whole question is settled by the well-known maxim that a power created in the nature of a *trust* cannot be delegated by the agent in whom the trust was originally reposed. The people, in their primary capacity, are the original and exclusive source of all legislative power; as a matter of convenience it is delegated by them, through the instrumentality of constitutions, to their representatives, as *agents*, who hold it in trust for the benefit of the people. This great power is intrusted to them to be exercised in *their* discretion, in *their* judgment, and not in that of others not selected by the people for that purpose. In a constitutional Government like ours, when the people have once delegated their power, it cannot be *redelegated* back to them, even by their agents created by themselves. A familiar instance of this doctrine is to be found in those cases where a Legislature has passed an act to be submitted to the people for adoption or rejection at the ballot-box. There is scarcely a State in the Union whose supreme judicial tribunal has not decided these submissions unconstitutional and absolutely null and void. Said Chief Justice Marshall, in the case of Wyman vs. Southard:

"It will not be contended that Congress can delegate to the courts, *or to any other tribunals,* powers which are strictly legislative."

But, Mr. Speaker, I maintain the proposition that not even Congress has the power to suspend the writ upon the facts presented by the President in his message. The Constitution declares that—

"The privilege of the writ of *habeas corpus* shall not be suspended, unless when, in cases *of rebellion* or invasion, the public safety my require it."

Now, this language was carefully considered and adopted by the framers of the Constitu-

tion. The term "rebellion" is here used in plain and palpable contradistinction to those of "insurrection" and "domestic violence," in other and separate parts of the Constitution, and for very different objects. That the Constitution contemplates the "rebellion" of a State or States, *as such,* and not a mere combination of persons as individuals in a state of "insurrection" against the authority of either the particular State itself or the United States, I think is quite manifest. The construction is in harmony with the whole theory of the Federal Constitution, in marking the line of distinction and separation between the jurisdiction of the Federal and State authority. If the public disorder sought to be overcome amounts to less than a "rebellion," in this assumed constitutional sense of the term, and therefore an "insurrection" only, as provided for in section four of the fourth article of the Constitution, the sovereign power of the State, in which the authority to suspend is also lodged, can apply the remedy by a suspension of its own writ, and thus accomplish every end which could be reached by a Federal exercise of the same power, as was done by the State of Massachusetts during the Shay insurrection.

The simple definition of the two terms will sustain this view of constitutional interpretation. All the leading philologists concur in the rendition of the meaning of the term "insurrection" as an uprising of *individuals* against the authority of Government, in relation to some particular law or grievance. As, for example, the insurrection in the western counties of Pennsylvania grew out of the popular objection to the excise law; and Shay's insurrection, in Massachusetts, from the public opposition to the collection of private debts by judgment and process in the courts, as well as a most bitter animosity to impost duties and poll-taxes. Rebellion is an armed resistance to the authority of Government, *with an intention to overthrow it.* Now, if these premises are sound, in relation to the true interpretation of these terms as used in the Constitution, it is in my opinion quite clear that even Congress itself could not constitutionally suspend the writ at this time, and in relation to the character of the disturbances which exist in the South, as alleged by those who demand its suspension.

The facts as claimed, either by the President himself or his most excited partisans, do not call for any higher exertion of power or any more stringent remedy than that which is provided for in the fourth section of the fourth article of the Constitution, to wit, upon due notice and requisition, either by a State Legislature, or, when such Legislature is not in session or cannot be convened in time for the emergency, then by the State Executive, the United States, (whether through Congress or the Executive is not defined by the Constitution,) shall protect such State against "*domestic violence,*" not by the suspension of the writ of *habeas corpus,* but by force of arms, either by the regular Army or by calling forth of the militia, as is provided for in the fifteenth clause of the eighth section of the first article of the Constitution. In no event, therefore, except in the specified cases of rebellion or invasion, can the writ of *habeas corpus* be suspended by the General Government, whether to do so belongs to Congress or the President. This is very clear to my mind because of the significant discrimination made by the Constitution between the classified wrongs of rebellion, insurrection, and domestic violence. But, sir, even if this interpretation were in doubt, that doubt, by the well-known canons of legal construction, would have to be resolved against an exertion of the power, for the reason that such suspension is in derogation of common right, as well as against the personal liberty of the citizen upon mere suspicion of guilt, and in order to uphold and protect both the common right and the individual liberty an equitable

construction is to be put upon the terms used in the Constitution.

And now, Mr. Speaker, why is it that the Republican leaders are so blind as not to see, or so reckless as not to take heed, of the storm of public indignation which must surely follow these gross usurpations of executive power, whether committed by the President himself or accomplished by congressional instrumentality? Sir, I appeal to those gentlemen on this floor who were once Whigs but are now Republicans, whether it does not shock their Whig recollections to find themselves ranged as apologists and defenders of the unconstitutional extension of the executive power in this Government? Have they not taken a wide departure from their former principles, as announced from many a stump and declared through many a platform of that grand old constitutional party to which we once belonged and felt a common pride in its high-toned and national principles?

What, Mr. Speaker, was the great and leading principle in the creed of that party? Was it not the question of executive power in this Government and uncompromising opposition to all usurpation, whether civil or military? What was it but this question which made these Halls ring with the intellectual thunders of a Webster or the indignant and impassioned eloquence of a Clay? The gentleman from Massachusetts [Mr. DAWES] smiles. I say to him that I can smile with a better grace than he, for I stand now where I stood then.

Mr. DAWES. So do I.

Mr. VAN TRUMP. Then you have a very curious way of showing it. I beg the gentleman from Massachusetts to remember, now that he is a Republican, what he would have recognized as sound doctrine when he was a Whig, that "*power,* like water, is ever working in its own way," and that the most aggressive of all political power is the executive power of a nation, whether republican or monarchical.

[Here the hammer fell.]

Mr. BUCKLEY addressed the House. [His remarks will be found in the Appendix.]

Mr. ELLIS H. ROBERTS. Three facts combine to show the necessity for a bill substantially like that now under consideration. First, the violence and lawlessness, for which it is proposed to provide a remedy, occur in many widely separated districts; second, the character of the victims selected and the methods of outrage, indicate a common source and purpose, an organized conspiracy; and, third, the organization to which they are traced is political in its origin and aims, and is military in form.

That great soldier and good man, General Thomas, was one of the first to expose the existence and dangerous nature of the Ku Klux organization; and in his report for 1868, pointed out its effects in Tennessee. The minority of the Senate committee concede that these outrages have been committed in six or eight counties of North Carolina. The application of Governor Scott for help reveals the condition of South Carolina. Ex-Governor Stevenson, by a message, declared that dangerous lawlessness prevailed in Kentucky. Governor Alcorn on Saturday sent a message to the Legislature, bringing into prominence the arson and massacres in Mississippi. In Arkansas, the repressive measures of Governor Clayton have exposed while they have checked the crimes. In Alabama, the gubernatorial applications' for national troops prove the necessity for relief. The exposures of the situation of Georgia, made by Governor Bullock, are startling and forcible. From Florida, the story is yet fresh in our ears of the murder of Yearty, a deputy marshal of the United States and a member of the Legislature of Florida.

These acts of violence are not directed against colored citizens only, although if they were that would be no palliation of their enormity; for the nation is under especial obliga-

tions to protect those whom it has just introduced to its privileges and its responsibilities. Colonel Huggins, assistant assessor of internal revenue, who was scourged with a hundred lashes at Aberdeen, in Mississippi, who has told the story of his sufferings to some who sit upon this floor and now hear me, was not guilty of the offense of negro blood; neither was York, the mail agent, butchered in Alabama, other than a pure Caucasian. Persons lately domiciled in the troubled districts are not the only victims. Wentersmith, whose gray hairs cry aloud for justice, was for many years State senator of South Carolina when only the chivalry were permitted to hold office.

But one rule never fails: the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans. They may be black or white; they include those who wore the blue and those who wore the gray; new-comers and life-long residents, but only Republicans. Stain the door-lintels with the mark of opposition to reconstruction and of hostility to the national Administration, and the destroying angel passes by. Omit that sign, and the torch may kindle the roof that covers women and children; the scourge may fall upon shoulders that stoop with weakness and with age; the bullet may pierce the breast without warning. Such uniformity of result can come only from design. Republicans only are beaten and mutilated and murdered, because the blows are aimed at Republicans only.

Classify the outrages still further. Take the political census of the States lately in rebellion by districts. Mark those which are strongly Republican and those which are decidedly Democratic. In neither of them will you find systematic assaults upon citizens. The districts which are politically doubtful are scarlet with human gore. On the contested ground arises the smoke of school-houses and of churches. There terror marches in darkness. For example, in Florida the most turbulent county is Columbia, in which the Democracy is desperately struggling for the mastery. In South Carolina turbulence is most common in counties like Union, Lawrence, Spartanburg, and York, where Republican majorities are so small that violence may overthrow them. And so it is in other States penetrated by the conspiracy.

Where Democratic majorities are large no advantage accrues from lawlessness and desperation. Where Republican majorities are large such devices would be unavailing. Where the political balance wavers, mutilation and murder are resorted to to reduce the Republican vote. There Republican voters are driven from their homes. There the masked horror dominates.

What use of reason and argument when banishment may reduce the numbers on the other side, or the bludgeon and the bayonet may compel a sudden conversion? As this violence increases, there is joy in one political party throughout the land. Boasts go forth that the States in which these outrages are flagrant will vote for a conservative candidate for President in 1872.

Yes, Mr. Speaker, this is reaction against republican principles. Butcher electors or banish them by scourging, and it is a Ku Klux victory. Journals in opposition to the national Administration catch up the pæan. The achievements are terror and bloodshed beside the Alabama, the Santee, and the Savannah. The jubilee echoes at the mouth of the Hudson, in the council-chambers of Tammany; here beside the Potomac, on the lips of the minority of this House. Through apathy and accident disaster falls upon the Republican party in New Hampshire, and more than once on this floor the result is proclaimed as "another Ku Klux affair." Alas! for our country, that, so far as regards spirit and purpose, the sneer is truth itself.

So, clear on its face does the new barbarism prove that it is political in its origin and aims. Positive verbal testimony in the same direction is not lacking. It would be fair to rely upon the plea made by the minority of the Senate committee in their report, who say distinctly of North Carolina:

"The undersigned believe that all the disorders which exist in that State were created by the unjustifiable and unconstitutional legislation of Congress in regard to its government."

And again:

"To any fair-minded man we confidently commit the proofs contained in the testimony now presented by the committee, and aver that in the face of such wrongs as have been inflicted upon an unfortunate and crushed people by the rulers placed over them—not by their own consent, but by the exercise of despotic powers by the Congress of the United States—to example of equal submissiveness and patient endurance can be found in history as is now presented by the people of the State of North Carolina."

And the same doctrines are the staple of the Opposition in this House.

These words accuse and justify the outrages in North Carolina on political grounds; for these acts are represented not even as constitutional resistance to an obnoxious government. They are in this choice phrase "submissiveness" and "patient endurance." That is the deliberate report made to the Senate, but designed for the country and the world, and bearing the signatures of two leading Democratic Senators. Is it not strange, then, that the witnesses summoned, some of whom were members of the secret organization, agree in declaring the object purely political; and, in the forcible language of the witness Willeford, "it was to damage the Republican party as much as it could, burning, stealing, whipping negroes, and the like; the leading men it was to murder." Long testifies that "the membership was entirely confined to the Democratic or Conservative party;" and Boyd swears "the object was the overthrow of the reconstruction policy of Congress and the disfranchisement of the negro."

The military form of the organization is indicated by such titles as it has in North Carolina: the "Constitutional Union Guards," the "Invisible Empire," and the like. It appears in the oath in which "the camp" designates the place of meeting and the body itself. Long testifies that "each county constituted a klan under command of a chief." It appears also that large numbers of rebel soldiers are enrolled upon the lists. Their weapons are often new and of improved patterns; and however poor may be the individual member he never lacks for arms or ammunition; they are provided of uniform size and style to local organizations. In many respects the Ku Klux Klan is an army, organized and officered, and armed for deadly strife. Witnesses before the Senate committee testify that the commander stated the force of the Ku Klux in North Carolina alone as forty thousand men. These figures may not be accurate, as all estimates of large numbers are prone to excess; but they signify that the organization is a vast host, terrible as an army with banners.

These, then, are no common crimes. They are not sporadic, accidental, scattering; they constitute an epidemic of arson and of blood. They are not due merely to a moral tide or current, such as sometimes occurs in the sphere of moral and intellect as well as in that of matter. They are deliberate, systematic, instigated from a common source, seeking a common end. They have a political origin. Only one party finds profit in these monstrous crimes; only one party palliates or finds excuse for them; only one party hesitates about employing all available means for repressing them. At the door of that party, its leaders and its instigators, lies a large share of the responsibility for the mutilation, the arson, and the murder.

Such crimes, occurring in many and distant localities, identical in character, directed only

against members of one political party, always traceable to one organization, always calculated to crush out practical support of human rights and personal liberty, always designed to counteract the triumphs of the war for the Union, and to exalt the men and the principles, and the influences more subtle than principle, defeated in that conflict, furnish the problem with which this Government has now to deal.

What is the duty of the patriot in the case? If Republicans have a duty, surely no less, even more, have Democrats. The stain and odium of these crimes fall upon every American. The mail-agent, Gibson, butchered in Kentucky, was the representative of your Government. The assessor, Jones, driven out of North Carolina; the victims escaping to tell you to your faces, of their wrongs, have a claim to protection from you as well as from me. Since this blood is at the door of the opponents of this Administration, every such opponent owes a personal obligation to stop the mutilation and the murder. They have not prevented them. They do not check them. What remedy, then, can legislation and Administration provide for these startling evils?

In so grave an emergency people naturally turn to the Government for help. In the present case the wronged and outraged victims appeal to the Republic, for fidelity to which they are abused. So serious are the difficulties, that every human resource should be employed to afford relief. Every American citizen turns instinctively to that power which was ordained "to establish justice, insure domestic tranquillity, and secure the blessings of liberty." They look to Congress "to provide for the common defense and general welfare of the United States." This is a nation, and in no nook or cranny of its domain is there a spot where the national ægis does not cover the humblest of its citizens. So much is guaranteed in the clause of the Constitution that "no State shall abridge the privileges or immunities of citizens of the United States;" and statutes may rightfully so provide, and may be enforced by every proper means. The present violence is directly aimed to break down, not only national law, but the recent amendments to the national Constitution. Shall it be conceded that these are alia mere brutum fulmen? May we create citizens and not protect them? Does the Constitution enfranchise a race, only to consign it helplessly to wrong and outrage and murder?

No, Mr. Speaker, the constitutional power exists to protect the citizens of the Republic. Upon that branch of the subject the argument of the chairman of the select committee, the eminent gentleman from Ohio, [Mr. Shellabarger,] and of the other distinguished gentlemen who have followed him on this side, are unanswered and unanswerable. And the argument of the gentleman from South Carolina [Mr. Elliott] and his appeal shame the ability and patriotism of the minority of this House.

The doctrine of State sovereignty is proclaimed anew. The chief of the "lost cause," Jefferson Davis, at Selma, Alabama, in the month of March, just past in the midst of popular applause, "expressed the hope that he would yet live to see the sovereignty of the States vindicated," and predicted that it would ultimately triumph. Concede that sovereignty, and Alabama must cease its outrages upon citizens of other States domiciled within her borders. Against the plea of State rights to cover the butchery of citizens, the same State rights protest. Citizens of New York seeking homes in South Carolina and Alabama have had their roofs burned over them and have been driven away by violence. Yes; citizens of New York are victims of these outrages. And if State rights are to beset up, I insist upon the claim of the Empire State, that its citizens shall have all privileges and immunities of

citizens in every State of this Union. And for the security of those privileges and immunities I appeal to all the power of the national Government.

And there are ethics which underlie and inspire and interpret constitutions. Obligations are mutual. Allegiance presupposes protection. The chief sovereignty guaranties that, and failure anywhere it must correct. Nothing can so weaken the life of a Government as even to seem to neglect its citizens. No higher duty can exist than to protect them. Be they white or black, they must have free speech, a free ballot, and a safe home. Born here or there, beside the lakes or the gulf, beyond the seas or under the shadow of the Capitol, once a citizen, however humble, he may claim the protection of the laws. The carpet-bag has been made the pretext of slaughter; let it become the symbol of the expulsion of the new barbarism. The American must travel, must be free to move. That freedom has made the wealth and greatness of our territories. It has chosen our remotest rivers for its daily pathway. It burrows in the mines of Nevada as naturally as it saunters on Broadway. Its white plume waves on the Sierras and penetrates the forests of the farthest north. The carpet-bag is a sign of the vitality of our people. You may possibly limit the Russian to the hamlet of his birth; to the American the continent belongs. He carries his nationality with him. He will be protected in the harbor of Constantinople, and he will be delivered from British prisons on a simple certificate of naturalization. So he must be protected where the magnolia blooms and the cotton bursts its bolls; where the orange-tree and the sugar-cane woo the sun, as well as where the maize lifts its spears and the early snows bring their mantle of peace.

History, indeed, is conclusive that mere severity is not statesmanship. Elizabeth and Cecil tried harsh measures upon Ireland, and their example has been long followed by their successors. Sir Henry Sidney had overrun four provinces, had blown up castles, and harried towns; and as Froude says, "it was the way of a bird in the air, the way of a ship upon the sea, the way of a serpent upon the rock." For a single emergency armies serve a purpose; for permanent government the iron hand is always a failure. The best brains of England have failed to make it successful in India, in Ireland, anywhere. We have tried it with our Indians, and it has failed. You may annihilate communities; you may make the country a desert, as parts of India and of Ireland have been—swept clean as a threshing-floor.

But our danger is not in that direction. The vast extent of our territory renders the centrifugal force fully adequate to counterbalance every tendency to centralization. Disintegration is the shadow before us. It is the Ku Klux mystery that threatens despotism. Congress has been patient and moderate, has been magnanimous beyond any parallel. The President has always been slow to draw pointed darts even from the quiver of his unquestioned powers. One objection to the pending bill is that existing laws confer upon the Executive all needed authority, and that he has not put forth his strong hand enough.

Fortunate are we that such a criticism can be made. Thrice blessed is that people whose great chieftains, successful in war, respect not only the popular will but the spirit of republican institutions. This is the distinction of our Republic alone among the nations. Cæsar, Cromwell, Napoleon, followed one path so often trod. Washington found no foot-marks in the way he sought. His peculiar glory is that he preferred the liberties of his country to personal power. The narrow way he adorned welcomes now another soldier who has preferred to err on the side of moderation, who has relied upon the virtue and self-restraint of the American people, who made haste to put

up the sword, and has not willingly drawn it again from the scabbard. This is not weakness; it is strength. It is not hesitation nor trepidation; it is courage to be patient; it is sublime faith in the right and the might of government by the people.

Let emphasis fall on this fact. So far as charges of usurpation are made, as a palliation of southern outrages, the tyranny is charged upon Congress. Your laws, Mr. Speaker, are the only man on horseback. The enactments of a Congress which has made haste to give every State its full voice in legislation are the shackles and the gyves of the cheap rhetoric on the other side. No pretense is put forward that the Executive has gone beyond the letter of the law. The statutes deliberately enacted by the representatives of all the people are the sole excuse for the scandalous epithets of gentlemen on the other side. If they constitute an offense, you and the members of this House, and of the Senate, are the offenders. The President has never overstepped the strictest limits of his authority in the case.

Run over in your mind, Mr. Speaker, the assaults made upon the principles involved in this bill. We have heard from the ablest constitutional lawyers on the Democratic side of the House, from their ablest reasoners. What have they told us? Let me do them entire justice and extend to them full courtesy. They have vouchsafed to us very little of legal or constitutional argument, but a great deal of denunciation of the Republican party. They have touched very little upon the sacred rights of the citizen, and the grand obligations of government by the people, but they have had much to say about who may and who may not come back to this Hall. They forget there has been a war and a victory. They reproduce the old prejudices of pro-slavery days, and they still assume that the rule of violence beneath a southern sun is chivalry.

Is this quite true, Mr. Speaker? Is this Ku Klux organization made up of the modern knights of the round table? Are they the true conservators of law and order in the land? If the denunciations uttered by the gentleman from Kentucky [Mr. BECK] and others who followed him on that side are true, the proposed bill is bad, but is in no worse than its predecessors, or at least is a natural outgrowth of the policy of reconstruction pursued from the beginning. We may be guilty now, but so we have been guilty in raising every soldier, in providing every dollar, in emancipating every slave, in winning every victory, in leading back every State.

Did you observe, too, the chaste wit with which on Saturday the attempt was made to belittle the sufferings of the southern people? The same men were wont to ridicule "bleeding Kansas." Nero fiddled while Rome was burning. It is Democratic statesmanship to chuckle and to laugh over the mutilation and murder of American citizens.

To men to whom these things appear seemly it may seem decent also to denounce as tyranny the legislation which has enfranchised a race and saved a Republic. But, step by step, our opponents have learned the lessons which the Republican party has taught them. The effort to render freedom national and slavery sectional was quite as radical and as dangerous, our enemies being witnesses, as is the present bill. Sir, the glory of the Constitution was never known until the Republican party demonstrated that it meant more than the protection of slavery. Was that usurpation? That Constitution has been the true framers of popular liberty; but it was left for this generation, and for you, Mr. Speaker, and your party, to set in it the three amendments of personal liberty, of equal citizenship, and of a free ballot—the three blazing stars in the sword-belt of Orion—to guide political mariners forever. This enlargement of equal rights has been the tyranny, the

usurpation of Congress, approved by the people for the past ten years.

And now, since strange crimes demand adequate remedies, it is fitting that the Representatives of the people should define the policy and designate the limitations of executive power. Under the aggravation presented; in the emergency which has arisen; before the appeals urged and the necessity tempting him; with the precedents of the war still fresh and living, history presents no brighter illustration of moderation and regard for constitutional liberty than President Grant has exhibited in this matter. He has established his claim to confidence. The authority, wisely limited in duration, which this bill confides to his discretion, is not too broad for the occasion, and may properly be lodged to him.

Notice that the alternative of the legislation proposed is one of two things; either these outrages are to go on practically unpunished until they exhaust themselves, or, as some gentlemen propose, the President must act upon the doubtful authority now possessed by him. Let rather the laws follow the crime; let the courts be their instrument; and let the Executive keep strictly within the letter of the statute.

But let us be frank, and not over-sanguine. No pacification is possible without the coöperation of the people themselves. Peace is not a mantle to be thrown over a community. It cannot be conveyed by inoculation. It must spring from men's hearts, must blossom in their lives, must out of their characters spread forth broad and beautiful. Legislation can supply the conditions; administration may remove some of the obstacles; that is all. A wise ruler may utter the appeal, "let us have peace." He may point the way; the people themselves alone can walk therein. So far as legislation has not already supplied the proper conditions, let them be supplied at once; so far as administration has not removed the obstacles, let that deficiency be remedied at once; and I dare predict that to the full extent allowed by the Constitution and the laws the obstacles shall be removed. But neither Congress nor the President can perform the duty which belongs to the citizen himself.

On the territory of the rebellion the enfranchisement of a race long down trodden, the organization of free labor, the introduction of free speech and of new habits of thought and of life, presented difficult problems at best. To have solved them at once without friction would be to have gone counter to all experience, to have reconstructed human nature itself. Something has been done; far more than we might have feared, far less than we could have wished, for complete pacification. And we have the anomaly of the party in opposition claiming that the States lately in rebellion are now as orderly and law-abiding as any in the Union. If the truth were so, the Republican party, its Congress, and its Administration, could have no more eloquent eulogy. But the wails of the suffering, the blood of righteous brethren crying out for help, warn us that the gray jacket is still worn; that neither in spirit nor in conduct has the rebel in all cases become again the citizen.

There is much of the difficulty. After the war the country south of the Potomac and the Ohio was covered by the embers of the great conflagration. By care and prudence they would have soon become ashes, but a breath would fan them to destructive flames. The Administration has labored to cool down every passion on the soil. It has appeared for the interest of the party in opposition in the nation to revive partisan animosities, and especially to arouse hostility against the newly enfranchised citizens. Without measuring the consequences, perhaps, fanatics and journals of the Democratic party have kept stirring up the embers of the strife, and they are to-day responsible for whatever of unnatural disorder

"With all the concealment which cunning could invent or perjury secure, or bribery purchase, or the fear of punishment inspire, or the dread of violence from bands of conspirators and Democratic desperadoes could command, or the blandishments of more accomplished knaves could entice, or the hope of office could buy, or fear of the loss of place could bring, all of which would naturally conspire to throw obstacles in the way of or defeat the investigation of the committee, it is by no means possible that the extent of these frauds has been revealed ever in any one ward; but this may be approximated from the proof as to election districts in various parts of the city, and by statistical tables showing the voting population at previous periods, with the average increase in those periods, from which the actual voting population of 1868 may be computed with reasonable certainty."

"It has already been shown that illegal or fraudulent certificates of naturalization were issued, probably to the extent of 68,343, on most of which votes were cast, and the 'repeaters' cast many thousand illegal votes in addition."

"Challenging illegal voters was so far prevented by terrorism and violence that it was of rare occurrence either at the registry or on the day of the election, and in many districts no challenges were made. It would be impracticable here to describe fully the means resorted to to prevent challenges, but they are abundantly shown in the evidence."

In the light of these facts, and the volume of sworn testimony by which they are verified, how puerile indeed appear the suggestions of the gentleman in reference to the aspirations of the President. My colleague says:

"The power proposed by this bill to be conferred on the President is despotic. It is to place him on a footing with the Czar, the Sultan, and the Mogul."

What sort of footing the Czar, Sultan, and the Mogul are on the honorable gentleman did not stop to explain, but the footing which the Republican members of this House propose to place the President on, if I understand the tenor of their speeches and the scope and bearing of the bill and amendments under discussion, is a footing which will enable him to suppress disorder, violence, and bloodshed, and protect the citizen in the enjoyment of his constitutional rights. Is it for this reason that the legislation proposed strikes terror to the hearts of the Ku Klux Democracy of the South and arouses the indignation of Democratic leaders everywhere?

The object of the Republican members of Congress, so far as I know, is to prevent murder, manslaughter, mayhem, robbery, and criminal obstruction of legal process:

To put down insurrection, domestic violence, unlawful combinations, or conspiracies. To secure to all men, white and black, the "inalienable rights of life, liberty, and the pursuit of happiness."

To give to all the equal protection of the laws. This is the scope and tenor of the bill and amendments under consideration. Do gentlemen cry out because they fear justice will be done to them and their constituents? Is it the fear that the halter will draw which gives them so poor an opinion of the law? Is there anything in the proposed legislation to make my colleague wax hot and exclaim—

"Do you intend to break down all the barriers which protect your constituents; to place the President above the Constitution, and announce to the world that this is a Government of force and not of law?"

Surely not. We propose simply to have a government of both force and law; force guided by law. We propose to raise up barriers to protect our constituents in the enjoyment of their constitutional rights and privileges. We propose to leave the President where he is, under the Constitution, the executor of the laws and the servant of the people. We propose to clothe him with full power to protect the weak, preserve the peace, maintain order, and "put down unlawful combinations to overthrow or set at defiance the constituted authorities of the States." If he abuses the trust, the people through their Representatives in Congress will impeach him, will expel him from the Executive Mansion, and make him as powerless for harm as the poorest beggar on the street. The President is required by the Constitution to "take care that the laws are faithfully executed." We propose simply to enable him to discharge the duty imposed on him by the Constitution; nothing less, nothing more.

My colleague thinks the Constitution does not authorize such legislation. In the opinion of our Democratic friends the Constitution forbids the coercion of rebel States, the suppression of the rebellion, the preservation of the Union, and the emancipation of the slave. It is not strange, therefore, that they should now find constitutional objections to any interference on the part of the General Government for the suppression of treasonable organizations, and the protection of loyal citizens in the enjoyment of their constitutional rights and privileges.

I quote from my colleague's speech in reference to this point:

"Now, sir, I deny that there is in the fourteenth article of amendments to the Constitution of the United States any power conferred which authorizes the President to use the Army, the Navy, and the militia against the people of a State without having been first called upon by the Legislature, or the Governor of that State, there being no time to convene the Legislature. The fourteenth article of amendments, under which it is claimed by the advocates of this bill that this power is given, is as follows:

"'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law.'

"Is there any power conferred there, unless it be to go into the courts for redress against a violation of these rights?"

It will be observed that in his anxiety to make out his case he fails to quote the Constitution fairly, by omitting the concluding paragraph of section one, article fourteen, which reads as follows:

"Nor deny to any person within its jurisdiction the equal protection of the laws."

That is to say, the Constitution declares that—

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Now, certain States have denied to persons within their jurisdiction the equal protection of the laws. The proof on this point is voluminous and unquestionable. It consists of the sworn testimony of ministers of the Gospel who have been scourged because of their political opinions, of humble citizens who have been whipped and wounded for the same reason, of learned judges within whose circuits men were murdered, houses were burned, women were outraged, men were scourged, and officers of the law shot down; and the State made no successful effort to bring the guilty to punishment or afford protection or redress to the outraged and innocent. The State, from lack of power or inclination, practically denied the equal protection of the law to these persons. It is to remedy this evil and cover these proscribed and outraged citizens with the shield of the Constitution that we propose to authorize the President to send military aid to the local authorities in these lawless sections. As to our constitutional right to do this, I cannot do better than read from a speech of my learned colleague from the seventh district, [Mr. SHELLABARGER:]

"My answer is that the President may, under such circumstances, send military aid; and to make this answer complete, I now again go back to the first section of the fourteenth article. That section provides two things which I wish to notice. The first provision is that—

"'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.'

"This provision requires that the laws on this face shall not 'abridge' the privileges or immunities of citizens. It secures equality toward all citizens on the face of the law. It provides that those rights shall not be 'abridged'; in other words, that one man shall not have more rights than the rest of the laws than another man. By that provision equality of legislation, so far as it effects the rights of citizenship, is secured. But the section does not stop there. It contains two other provisions, only one of which I need now notice. It provides:

"'Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'

"These laws must be, first, equal, in not abridging rights; and second, the States shall equally protect, under equal laws, all persons in them. Therefore, under the provisions of the fourteenth amendment, when these clauses are put in juxtaposition, in order to bring the idea together, Congress shall have power to make and enforce all proper legislation which shall be necessary to require of the States that they shall not abridge the rights of citizenship, and also that they shall protect all persons equally. Nothing can be plainer. The thing is so absolutely self-evident that it admits of no enforcement by argument. Now things are provided—equal laws and protection for all; and whenever a State denies that protection Congress may by law enforce protection. The amendment does not say that in such case the laws of Congress must be made so that the protection cannot be furnished to the people until it is invited by the Legislature or Executive of the very State which is denying it. To say in such a case as that that Congress cannot protect until it is invited to protect by the State, which is doing the mischief, which is making the denial, is to attribute absurdity to the provision."

It is true, as my colleague from the thirteenth district [Mr. MORGAN] has affirmed, that General Halleck while admitting, "that there may be special organizations of outlaws in particular localities under the name of Ku Klux," denies the necessity for military interference; but this after all is simply the opinion of one man, whose judgment may have been biased very naturally by social intercourse with wealthy and educated rebel sympathizers, who control public opinion and manufacture public sentiment in his military district. His simple statement, therefore, cannot invalidate the fact patent to all eyes, sworn to by hosts of witnesses, corroborated by thousands of well-authenticated outrages, sustained by the indelible scars of those who have been scourged and maimed, that in certain sections of the South freedom of speech and of political action is no longer tolerated.

There may, indeed, be States in the South not cursed by this proscriptive spirit, where oath-bound murderers and scourgers do not meet in conclave to pass sentence upon inoffensive men. It may be true, as Governor Warmoth says, that in Louisiana there is "a growing spirit of harmony and good-will." It is probable that Governor CLAYTON spoke truthfully of Arkansas when he said that "law and order, peace and security reign throughout our borders;" but you cannot prove there was no shedding of innocent blood by armed Ku Klux in Mississippi by showing that Arkansas is peaceful. You cannot wipe out the damning record of Ku Klux outrages in North Carolina by showing that there is a growing spirit of harmony in Louisiana. You cannot prove that men have not been murdered, scourged, and outraged in one section upon the decree of an organization whose sole object is the intimidation or death of their political opponents, by evidence that in certain other sections the Ku Klux Klan is unknown. In the trial of a criminal you do not summon as witnesses those who did not see him commit the offense alleged; you call those who did. It is by the mouth of these that the fact is established. My colleague [Mr. MORGAN] says, in reference to the South:

"Mr. Speaker, no gentleman upon this floor will deny that one mouth utter the echoes of the war peace and security existed from Maine to the Rio Grande. I wait for a reply. No gentleman contradicts my statement; but I will produce my authority, a letter written May 25, 1865, by General Sherman to Colonel Bowman. He says:

"'I do want peace and security, and the return to law and justice from Maine to the Rio Grande; and if it does not exist now, substantially, it is for state reasons beyond my comprehension.'

"I hold in my hand another authority, for which my friends on the other side will have respect. It is a report made on the 22d of July, 1865, and signed 'U. S. Grant, Lieutenant General.' General Grant says:

"'General Lee's great influence throughout the whole South caused his example to be followed, and to-day the result is that the armies lately under his leadership are at their homes, desiring peace and quiet, and their arms are in the hands of our ordnance officers.'

"He says that the armies of the confederacy were at their homes, desiring 'peace and quiet,' and 'their arms are in the hands of our ordnance officers.'

borne in mind that the constitution now limits the debt of the State to $25,000,000. Our present bonded indebtedness must now preclude us from making further appropriations as subsidy or other assistance to works of internal improvement. I do not forget that it is the policy of the State to use all proper means to assist and protect every enterprise calculated to increase facilities for production and transportation. The railroads, canals, and other public works so fostered will, I doubt not, inure to the incalculable benefit of the whole people. Still, I think that we have granted such aid about as far as we safely can. We must now strive to live within our income. If we reduce the taxes to the least amount necessary to conduct the government upon an economical basis, in a short time the problem of the payment of the debt will solve itself. With peace and prosperity, with untold agricultural and mineral wealth, with a system of improvements carefully fostered by the State, our capital will soon double; and, without increasing the tax, the bonds can be rapidly retired."

Now comes a paragraph which is, perhaps, more applicable to the comments made by the Senator from Indiana, [Mr. MORTON,] in his recent remarks upon the efforts of Democrats in the very State Legislatures of the South to promote and carry to a successful issue various schemes of plunder. Here is what the Governor says in reference to that style of gentlemen:

"I warn you, gentlemen, against certain schemes of plunder which are already organized, and will continue to be organized and presented to you for your votes. These are propositions which, under the guise of public improvements or of claims against the State, are simply plans to rob the treasury and fill the pockets of unprincipled speculators. The persons who will probably importune you most perfinaciously for the most barefaced of these speculations are well-dressed gentlemen, claiming to be the representatives of the most respectable of our people. It is these pleasant gentlemen in broadcloth, with their gigantic swindles, embracing millions, and not the poor and needy applicant for some long-delayed but petty act of justice, who have most depleted the public till in the past and will endeavor to do so again."

The Democratic press of the city of New Orleans daily confess their reliance and confidence in his protection of the public purse. By his statesmanship he has evolved order out of chaos, by his determination he has subdued the spirit of misrule, by his conciliation and magnanimity he has disarmed political enmity of much of its rancor, and by his fidelity to the high duties of his office he has set a noble example to the Chief Magistrates of other States which it would be well for the peace and welfare of our country should be followed. He is himself the impersonation of the success of the reconstruction measures of Congress and Republican principles when faithfully and ably administered.

The Senator from Mississippi [Mr. AMES] truthfully said that over eight hundred political outrages had been perpetrated in Louisiana in the sixty days preceding the election of 1868. He could have doubled that number without exaggeration.

Would that I could blot out from history the record of the deeds of blood of which her people have been guilty within a few years past; but I bear willing testimony that peace now reigns within her borders, and that persecution of political opinion has been in a great degree modified. Her people have aroused to the fact that their welfare is best subserved by devotion to their material interests rather than by lawless defense of old opinions and prejudices. Our chief Executive has, by the exercise of courage and statesmanship, so met the occasion as to evoke peace, good will, and prosperity out of lawlessness, prejudice, and distress, while our people are entitled to every credit for their submission to the laws and for their efforts to subdue the passions of the past.

We have extended the mantle of amnesty over all political offenses, with the result of greater toleration of opinion and an awakened interest in the affairs of the Commonwealth and of the nation. Louisiana needs not such legislation as is now proposed, but I mistake her people if they do not cheerfully give it their assent, and if they shall not court its application within her limits should future events render such application necessary.

My remarks, Mr. President, have had very

little reference to the issue that is now before this body; but there having been a direct attack made upon my State with reference to the administration of its public affairs, with reference to the conduct of the party in power, and with particular reference to the character of the man who has done more than any other man there to retrieve it from the rule of misfortune and Democracy, I felt it incumbent on me to make my remarks particularly pertinent in the way of a reply to these charges.

Mr. EDMUNDS. I move that the Senate proceed to the consideration of executive business; but I desire it to be understood that I do not wish to occupy the floor to-morrow in this debate.

The VICE PRESIDENT. The Chair understands that the Senator from New Jersey [Mr. FRELINGHUYSEN] desires to occupy the floor; but he is not at this moment in the Chamber.

Mr. WILSON rose.

The VICE PRESIDENT. Does the Senator from Massachusetts claim the floor?

Mr. WILSON. I understood that the Senator from North Carolina [Mr. POOL] desired specially to take the floor to-morrow.

The VICE PRESIDENT. If the Senator from Vermont yields for that purpose, the Chair will recognize the Senator from North Carolina.

Mr. EDMUNDS. Certainly. I merely made the motion as a matter of business; not to get the floor.

The VICE PRESIDENT. The Chair recognizes the Senator from North Carolina.

Mr. POOL. I do not desire to go on now, but I wish to submit some remarks to-morrow.

Mr. EDMUNDS. The Senator from North Carolina having the floor, I renew my motion.

PAPERS WITHDRAWN.

Mr. PRATT. Before that motion is put, I wish to have an order entered for the withdrawal of papers.

The VICE PRESIDENT. If there be no objection, the Chair will receive the proposition.

On motion of Mr. PRATT, it was

Ordered, That J. B. Chipman have leave to withdraw his petition and papers from the files of the Senate.

PETITIONS AND MEMORIALS.

Mr. PATTERSON. I present the petition of Worcester Willey, a missionary among the Cherokee Indians, praying compensation for property taken by United States troops during the late war; if there be no objection, I should like to have the petition referred to the committee.

The VICE PRESIDENT. The Senator from Rhode Island [Mr. ANTHONY] gave notice this morning that he would object this day to receiving any business which was not in order under the restrictive rule adopted by the Senate.

Mr. EDMUNDS. I object at any rate. I promised the Senator from Rhode Island that I would do so.

The VICE PRESIDENT. The petition will lie on the table.

EXECUTIVE BUSINESS.

On motion of Mr. EDMUNDS, the Senate proceeded to the consideration of executive business. After fifty-six minutes spent in executive session, the doors were reopened; and (at four o'clock and thirty-three minutes p. m.) the Senate adjourned.

HOUSE OF REPRESENTATIVES.

TUESDAY, April 4, 1871.

The House met at eleven o'clock a. m. Prayer by the Chaplain, Rev. J. G. BUTLER, D. D.

The Journal of yesterday was read and approved.

ENFORCEMENT OF FOURTEENTH AMENDMENT.

The SPEAKER. The House resumes the consideration of House bill No. 320, to enforce

the provisions of the fourteenth amendment to the Constitution of the United States, and for other purposes, upon which the gentleman from North Carolina [Mr. COBB] is entitled to the floor.

Mr. COBB. Mr. Speaker, before I proceed to discuss the question before the House, I desire to express my regret at the absence of my colleague, Mr. SHOBER; for it has been my intention to confine my remarks almost exclusively, by way of reply, to expressions which fell from him in his speech here last Saturday. I am sorry he is not present.

Mr. Speaker, it will be readily perceived that I shall speak under very great disadvantages. Serious and continued ill-health has prevented my attendance upon the sittings of the House during the past week, and nothing less than a sense of duty, "the performance of a sacred filial duty to my mother," could have induced me to disregard the remonstrance of my physician and bring me from my chamber, at the risk of a relapse, to raise my feeble voice in defense of the State of North Carolina and her people. I have felt a deep interest in these proceedings, and whenever my strength has permitted have read with attention the remarks delivered for and against the bill proposed by the gentleman from Ohio, [Mr. SHELLABARGER.] This deep interest brings me here this morning.

My Republican colleague, [Mr. THOMAS,] who is a member of the select committee reporting the pending bill, is not in the city; no doubt detained at home either by sickness in his family or his own illness, else I should transfer to his able management the conduct of the argument this morning. But, sir, there being no other upon this side of the House from my State to speak for the people of North Carolina, I accept the responsibility, and ask the attention of the House to what I have hurriedly prepared upon the subject. As one of the Representatives of North Carolina upon this floor, I deem it incumbent on me to say a few words in defense of that State and in condemnation of the acts of violence and crime which reckless and lawless men, banded together, have committed, to the common disgrace of us all.

The investigation which has recently taken place was necessary to separate the people from the lawless bands who commit these crimes and to place the reproach and dishonor of them upon the real perpetrators. This was positively necessary to the vindication of the people of the State before the country. The people of North Carolina are law-abiding, indisposed to violence, and disposed to industry and domestic tranquillity; but they have been beset by banded organizations of murderers and assassins who, in the interest of still rebellious leaders, and I believe with their sanction and support, have committed numberless atrocities and crimes at which humanity is shocked. I rise to call attention to the fact that these banded assassins do not number exceeding forty thousand men, while there are two hundred thousand voters in the State. I rise to defend one hundred and sixty thousand freemen against the base imputations thrown out upon this floor, and to fix the guilt upon the forty thousand Ku Klux, who alone, it seems, have found apologists and defenders here from North Carolina Representatives.

Every good man in the land must be horrified at and must condemn the scourging of women and men, the hanging and assassination of citizens, and other untold outrages, which the country now knows have been committed in thirty, and perhaps more, counties of the State, and have gone entirely unpunished in the courts of justice. Sir, I confess my surprise and pain to see those professing to represent that good State in this House attempting to confound its good people with the murderous bands who have perpetrated these crimes, and thus cast reproach and disgrace upon the whole State. Those who have endeavored

Can these means be made effectual? Can we thus suppress these wrongs? I will say we can but try. The United States courts are further above mere local influence than the county courts; their judges can act with more independence, cannot be put under terror, as local judges can ; their sympathies are not so nearly identified with those of the vicinage ; the jurors are taken from the State, and not the neighborhood; they will be able to rise above prejudices or bad passions or terror more easily. The marshal, clothed with more power than the sheriff, can make arrests with certainty, and, with the aid of the General Government, can seize offenders in spite of any banded and combined resistance such as may be expected. Thus, at least, these men, who disregard all law, can be brought to trial. Here we stop. The court is to do the rest, acting under all its solemn obligations of duty to country and God. Can we trust it, or are we afraid of our own institutions? Does the grim shadow of the State step into the national court, like a goblin, and terrify us? Does this harmless and helpless ghost drive us from that tribunal—the State that mocks at justice, the State that licenses outlawry, the State that stands dumb when the lash and the torch and the pistol are lifted every night over the quiet citizen? We believe that we can trust our United States courts, and we propose to do so. That is the head and front of our offending. We believe that the effect of this measure will be to restore peace and overawe the conspirators. We believe that the ruffians who prowl in darkness will take warning. We believe that they will vanish, as the birds of night do at the coming sun. We believe that the terrified and humbled friends of the Union will lift up their heads, confident of future safety. We believe that the officers of justice, shielded by the national power, will proceed promptly, without fear or favor, and that the trembling and tottering States will spring up and resume the long-neglected administration of law in their own courts, giving, as they ought themselves, equal protection to all.

What will be the result if some such measure as the one proposed is not adopted no one can tell. The patient, law-abiding, submissive men who have endured so much may not endure these wrongs forever. At last the most helpless and harmless turn upon their pursuers, and, in their madness, carry destruction to a point where even the courageous may shudder. The revolts and uprisings of the oppressed and humble poor mark the bloodiest pages of history. Mercy to all demands that we act with promptness and energy. How long will a population whose rights are neglected and despised remain attached to a Government treating them with indifference? And who can ever restore the lost respect and confidence in a national Power that cannot for years permits human rights to be trodden down, disavowing the ability to find a remedy for the evil or punishment for the offenders? At length, worn out by long suffering and in utter disgust at the want of protection, the best friends of the Government will give it up, and that disunion they fought so gallantly to prevent will be welcomed by them as the last plank to which the shipwrecked mariner clings. That nation is not worth saving that does not protect its friends, and that allows its bitterest foes to insult, scourge, banish, and murder those who have risked and suffered everything to preserve its life.

But it is said that these outrages are to be expected ; that they are the natural result of the rebellion; that really the South is in better condition than could have been anticipated before the war closed ; that there are not so many bloody crimes as were expected ; that, therefore, we are doing well enough, and that these bad passions must be allowed to work off as they will. Now, this may be a consolation to those of us who live at a safe distance

from the scene of these wrongs, but to the unfortunate victims it must be a very sad apology. When in all time before was it said that it was useless to punish crime because there was not as much of it as had been expected, or that the offenses were not as outrageous and flagrant as had been expected? When was it said that criminals were not to be punished because it was expected that they would break the law? When was it said before that it was better to punish the man who had committed a crime when it was not expected than when it was expected?

Those reckless outlaws who have nothing to lose, who have been ruined by the rebellion, under this process of reasoning are to be allowed immunity from their crimes because they are too wicked to do anything else than commit them, and society must tamely submit to them as to the earthquake, the tornado, and the pestilence; to thank God that it is no worse, and pray for deliverance at some future day, when these men shall have died or got tired of their depredations on society. That they have not utterly overthrown society and brought on a reign of anarchy is a subject of congratulation to us, and is, as a matter of commendation in them; and they should not be punished, but held up as extremely exemplary rebels, who are not half so bad as they could be, and who, while they have outraged men in small numbers and mainly in the dark, might have done so in larger numbers, with hostile arms, in broad daylight. And to the philosophic victim of their malignity it must lend a peculiar satisfaction to reflect, when a hundred of his neighbors drag him from his bed at midnight, take him alone to some silent grove, and, stripping him naked, apply fifty lashes to his back, that he is peculiarly honored in that respect on that occasion among all the men of his county. Or, should the mode of punishment selected be the halter, how pleasant must be the reflection to him, as he is about to swing off into the dread unknown, that the Constitution of his country does not allow men to be treated thus in large numbers at one time, but wisely and benignly provides that it may be done privately, separately, and apart from others, so as to exonerate the act from the foul imputation of "domestic violence," in which event, according to the laws in such cases made and provided, the General Government kindly looks down upon its erring children and leaves all their crimes to go unpunished because the State ought to take the matter in hand and will not ! And when, in the last agony, he looks at his persecutors, and thinks of the Constitution of his country as they construe it, he closes his eyes with the sweet reflection that possibly these outrages may at length grow so numerous as to alarm the Governor or Legislature, who then will call for help, and that in all probability not more than ten thousand can thus suffer before something will be done.

But while treating of the subject of expectations, may it not be proper to suggest to those who so loudly declaim against the mismanagement in the South since the war, as the result of Republican rule, that men who engage in rebellion and civil war must expect to get into trouble and to have all business, public and private, deranged? They cannot expect that after fighting for years to tear down and destroy, and succeeding pretty well in doing so, the very moment the arms of treason are snatched from their hands, all the ruin they have made will be reconstructed. They cannot expect at once to be put in charge of the rebuilding of the works they have destroyed. They must expect somebody else to do that, and perhaps to do it awkwardly. They must not expect that all the losses and injuries and misfortunes will be confined to the march of armies, the waste of war, the scars and wounds and deaths of battle. But they must expect that all business, all social life, all public

affairs, all offices, taxes, and expenditures, all institutions and morals, all that interests man, will be smitten with a curse for years. And they must not expect to lay all this at the door of the men who, having put their rebellion down, are kindly and wisely striving to do all things to restore order and peace.

Again, the complaint of the Democrats is that this is a political movement, because we seek to protect Republicans from outrage for opinion's sake. They can see no political bearing in the thing so long as Republicans are whipped, overawed, burned out, banished, or murdered because they have political opinions; but the moment we talk of punishing the men who do these damnable deeds it becomes politics. It is unfair and despotic political legislative interference to carry elections the very moment we begin to talk of punishing the Ku Klux who has murdered his Republican neighbor.

The Democrats do get and use the entire benefit of the Ku Klux Klans. It is exactly, as they say, political. They get up a reign of terror, they encourage crimes of the most frightful nature to carry elections. We would suppress them, would punish them ; we would restore order, fair-dealing, equality, and peace, to secure free elections. Which is the better? Choose ye. And when the Democrats have obtained power in the nation by these means, what may we not expect? Can we hope for any good? Is it not the downfall, the dread end, the beginning of anarchy, dismemberment, political death? This is a question of politics involving all safety, all property, all liberty, all life.

But it is said, further, that we have already sufficient legislation to protect all, and that nothing additional is needed. An answer that may be deemed sufficient to all this is, that whatever we have done has proven partially ineffectual, and that at least an ordinary regard for the public welfare should dictate to us the importance of seeking some additional remedy for the existing evils. Says Judge Marshall:

"The Constitution is framed for ages to come, and is designed to approach immortality as nearly as human institutions can approach it. Its course cannot always be tranquil. It is exposed to storms and tempests, and its framers must be unwise statesmen indeed if they have not provided it, as far as its nature will permit, with the means of self-preservation from the perils it may be destined to encounter."

If the present enactments are insufficient to check the progress of disorder Congress, without hesitation, should exhaust every means to meet the emergency. The enactments of 1795, of 1807, of 1861, of 1862, and 1863 were framed to repress insurrection and rebellion against the State and national governments by the aid of the militia and the regular Army ; and among other things it was provided that causes, civil or criminal, could be removed from the State courts to the circuit court of the United States, arising under any act done or omitted to be done under color of the national authority during the rebellion.. And in pursuance of this many causes were so removed and disposed of in the United States courts ; but, except in this instance, the jurisdiction of United States courts was not extended to cases and offenses triable in State courts.

These laws were intended and were made for incipient and existing insurrections and rebellions; and it were as wise to say that they were sufficient in the work of reconstruction, and that nothing need have been passed on that subject, as to say that they are adapted to the present emergency. The evils of rebellion and civil war ended and of treason disarmed are upon us now with the attendant derangement caused by the emancipation and enfranchisement of the slaves. They are seen in smothered hatred, secret revenges, spasmodic outbreaks, bitter jealousies and animosities ; in fine, in strong hostility to our Government, breaking out in opposition to law covertly, in treachery, deceit, and double-deal-

the South disgraceful to the nation and shocking to the civilization of the age.

It seems to me that a man must shut his eyes and close his ears and summon all his prejudices, or he must be convinced that lawlessness and disorder are holding high carnival in a large part of the domain of this nation. He must set at defiance all human testimony, and resolve that he will not believe even though the dead victims of this spirit of diabolism should rise in their bloody garments, and from their watery graves, and bear witness to the fearful fact.

But even let it be conceded that the telegraph is prolific of lies in this regard, let it be conceded that letter-writers exaggerate, let it be conceded that the newspapers are filled with untruths, still here upon this very floor, in our very midst, members of this body are the witnesses who can speak and who have spoken, and who do bear witness to the fact that the lives and property of citizens of the southern States are in peril every hour, and that the State authorities will not or cannot afford them protection, and that they can only be made safe against outlaws by the intervention of Federal authority.

Sir, I am reliably informed that not three days ago a member of this House was urged by an official, who is charged with the important duties in connection with the enforcement of the criminal law, not to vote for this bill, for the reason that he could not safely return to his home if he did. And, sir, what is the purpose of all this bloody work? I assert—and all well-authenticated evidence proves the truth of the assertion—that it is for the express purpose of controlling government in the States where these things are done, by preventing citizens from exercising their legitimate constitutional privileges. It is to overthrow by force and violence political opinion; it is to destroy by violence the freedom of the ballot-box, and therefore it is the most dangerous form of domestic violence and rebellion against the laws. My colleague said:

"The utmost extent of insubordination is confined to a very small number of persons, and they are in a few localities. They are merely common criminals, without politics or higher motives of action than the base aims of individual offenders."

I will let these gentlemen here upon this floor answer whether this "insubordination is confined to a very small number of persons" and a "few localities." "They are merely common criminals," says my colleague. Yes, in one sense they are common, unfortunately very remarkably so; but the character of their criminality is very uncommon everywhere in the wide world except in the localities lately darkened by rebellion.

If my colleague means that they are to be classed with the ordinary criminals of the country, as I suppose he does, I must beg to differ with him. Men who bind themselves together by oaths to do deeds of cold-blooded murder and perpetrate every other crime that has ever been denounced by the laws of God or man, who mask themselves and perpetrate deeds that would shame a savage, are no ordinary criminals. They are men schooled in crime. They are sprouts of that greatest of all crimes, treason. And when my colleague says that they are "without politics" I must differ with him again. What is the purpose of murdering poor and defenceless negroes? Is it for gain or "the base aims of individual offenders?" No. What is the purpose of driving officers from their places? Is it for gain or the "base aims of individual offenders?" No. It is to get rid of votes, to get possession of local and State governments.

My colleague almost admits this, for in the same connection he says:

"It is undoubtedly true that millions of people, good, loyal, and true, dislike some of the southern State governments as now organized. It is not in the power of intelligent and virtuous citizens to do less."

That is by way of apology for these outrages. They "dislike" the "State governments."

Therefore these outrages are committed. What for? I know of but one legitimate deduction from the language, and that is to get rid of either the State governments or those who hold offices under them. This looks as though they were not entirely "without politics." But why do they dislike the "State governments?" These are States with republican forms of government; the officers are elected by the people; what is the matter with these governments that these "intelligent and virtuous citizens" should "dislike" them? I think I can furnish a solution of the meaning of my colleague when he says that they "dislike the State governments as now organized."

Further on he says:

"Remove from them all disabilities, and then invite them to assume again all the rights, capacities, and responsibilities of freemen; let them organize their local governments in the persons of their best citizens; do not force upon them bad, corrupt, and incompetent officers, nor attempt to govern them by strangers, nor give the legal, moral, or partisan support of Congress to the political plunderers and oppressors who have so long ran riot among them. Then you may hope for speedy restoration of law, order, peace, real and enduring, in the South."

That tells the whole story. There must be lawlessness and disorder or there could be no restoration of "law, order, and peace." But, sir, when is this delightful state of tranquillity to come? It is when these violators of law, these disturbers of the peace, have acquired control of the local governments. Then law, order, and peace are to prevail. But the inference is that until then the work of blood shall still go on. Does this look as though there was no politics in this business? No, sir; it is a confession that politics is at the bottom of it all. It means that this is a struggle for political power. It means that it is an effort to get control of government by violence; it means that those who cast ballots must become subservient to the will of those who "dislike the State governments as now organized;" and, failing to do so, this work must go on until death or intimidation shall end the exercise of the highest constitutional rights and privileges of unoffending American citizens.

But suppose it should turn out that these things are exaggerated? Having the constitutional power to do so, what possible harm can there be in placing upon the statute-book a law denouncing such acts as it is charged are being committed, and such organizations as are alleged to exist, as great and heinous crimes to be punished by appropriate penalties? If no scourgings, no burnings, no murders are perpetrated, who will be injured? If there are no such lawless conspirators there will be no one to be punished as such. If all is peace and order there will be no infliction of penalties. Why is it, then, and all Christendom will ask why it is, that there is such a persistent effort to prevent legislation to maintain the equal rights of every citizen before the law?

I remember that there was a time in the history of this nation when its very existence was in peril. I remember that here on the floor of this House, and also in the body that occupies the further end of the Capitol, no measure could be suggested to keep the peace and preserve the Government that did not meet with determined opposition and fierce and bitter denunciation. Can it be that the same spirit that then pervaded these Halls and stalked about through the land is rioting here now? If one half that is told us is true, and protection is not afforded these unoffending citizens by the General Government that owes them protection, the next thing will be a resort to the instincts of all animated nature, to a law that rises high above all human enactments, the law which prompts and justifies self-protection. That involves civil strife and anarchy and the destruction of all law, and the numberless evils that follow in its train.

If it should hereafter become manifest that we have been misinformed; that these troubles only existed in perverted imaginations, no harm will come from the legislation pro-

posed. If they do exist, now is the time to smite them down, now is the time to strike, now is the time to make these disturbers of the peace, these violators of individual rights, feel the power of the Government, and to teach them that there is not of all the thirty-eight millions of the citizens of this nation one so humble that his rights under the Constitution and laws can be lawlessly smitten unnoticed to the ground.

Sir, we ought to learn a lesson from the past. In the state of Indiana, during the rebellion, there existed an organization of oath-bound conspirators, working in the dark, drilling in the night for the purpose of seizing the government of that State and plunging it into open rebellion against the Constitution and laws of the nation. The day was fixed when they would "let slip the dogs of war." At the appointed time these conspirators were secretly gathering about the capital, prepared for their desperate work, and but for the vigilance and prompt action of the State and Federal authorities Indiana would have been scourged and blackened with civil strife.

And so it will be now in the South unless the Ku Klux organizations existing there are confronted with the majesty of the law. Let us provide for the punishment of these men for their lawlessness and conspiracies, and then we may confidently hope that "law, order, and peace will be restored to the South" and the nation.

[During the delivery of the foregoing speech, the ten minutes having expired, Mr. PACKARD obtained the floor and yielded his time to enable Mr. WILSON, of Indiana, to conclude his remarks.]

Mr. HARRIS, of Virginia. Mr. Speaker, in the few minutes allotted to me, I do not intend to discuss the general merits of this bill. But there is one feature of it which strikes me as being sufficient to condemn it even in the estimation of its friends, as it must in the judgment of the country. This bill presents an aspect of jurisprudence which I have never seen in any legislation. In the various States of this Union, as in England, there are laws for the punishment of offenses, and also laws to punish attempts to commit offenses; but both in England and America the laws punish the *attempt* with less severity than the actual commission of the offense. But this bill presents the anomaly of inflicting for the *attempt* to commit an offense a higher degree of punishment than is allotted to the offense when committed. In other words, by this bill a conspiracy of two or more persons to commit an assault and battery is made a *felony*, punishable by ten years' imprisonment in the penitentiary and a fine of $10,000, while assault and battery committed by one man is a misdemeanor, and may be punished by a fine of one cent and costs.

I appeal to members of the legal profession to say whether in the history of the law they have ever witnessed such an anomaly as that. And I appeal to gentlemen from the North to say whether their own section of country will stand legislation like that? Are they willing to say that when two men combine together to commit assault and battery, but fail to carry out their intent, fail to hurt a hair of the head of anybody, they shall be convicted of felony, sent to the penitentiary for ten years, and subjected to a fine of $10,000? That is the effect of this bill. Not only that; but if two men conspire and combine for the purpose of committing an offense, yet do not commit it, and do any act toward its commission, the President of the United States, under the third section, is empowered to declare martial law and send troops to that portion of the country. When a man has conceived the design of committing an offense, and has done any act in furtherance of the design, this bill allows him no opportunity to repent of his intention. The offense is then complete with all its horrible consequences to the party and the country.

tion to deprive a citizen of a right secured to him by the Constitution of the United States.

Mr. ELDRIDGE. But when it is of that magnitude, does it not amount to an insurrection or rebellion?

Mr. COOK. It might or might not. Suppose the combination in the State is too strong for the State laws to restrain it; and suppose a hundred men not engaged in that combination at all should form a conspiracy, by force, intimidation, or threats to prevent the Governor from calling upon the national power to protect the right of the citizen, that would be an offense against the Constitution of the United States.

Mr. FARNSWORTH. How prevent the Governor from doing that?

Mr. COOK. By intimidation, by threats.

Mr. BINGHAM. By making him a prisoner.

Mr. POTTER. Then the Lieutenant Governor would take his place.

Mr. FARNSWORTH. Does this bill provide for the case of the Governor being so intimidated?

Mr. COOK. No, sir. I use the illustration only in reply to the gentleman from Wisconsin, to show that where individual rights, secured by the Constitution of the United States, are affected by combination, such combinations are offenses against the United States. Let me make an illustration which my colleague [Mr. FARNSWORTH] will appreciate. In our State, not many years ago, there was a law passed which provided that no property should be sold upon a judgment of a court, by virtue of an execution, unless that property should bring two thirds of its appraised value. Now, a citizen of the State of New York sued a citizen of our State, and got a judgment against him, to be discharged under our laws. He appealed to the supreme court of our State, and our supreme court sustained that law. I am narrating a history which my colleague well knows. Then the citizen of the State of New York, claiming that that law was a violation of a right secured to him by the Constitution of the United States, which provided that no State should impair the obligation of contracts, claimed an appeal to the Supreme Court of the United States.

Now, sir, if my colleague and myself, and a hundred others in my State, who desired to pay our debts in real estate at two thirds of the appraised value, which we might be able to get our neighbors to place upon it for that purpose, if we had conspired to prevent the citizen of the court from certifying the case to the Supreme Court of the United States, and thus deprived that plaintiff of a right under the Constitution of the United States, we should have been committing an offense against the United States which might be punished by national law.

I think if the Government of the United States may not protect a citizen in the exercise and enjoyment of a right secured to him by the Constitution of the United States, it cannot rightfully demand of that citizen any allegiance to that Government, in its constitutional sphere. The duty of allegiance and the right of protection cannot be separated.

Now, sir, there are other illustrations of this principle which I might cite. A citizen of the United States, in any State of the Union, has a right to vote for any officer of the United States Government. He has a right to have his cause tried within a United States Federal court where that court has jurisdiction of the case. Now, if there be any combination of men who shall combine and conspire together for the purpose of preventing a legal voter from giving his vote or a witness from testifying in a court of the United States in a proper case, or to compel a jury in a United States court to give a false verdict, or to punish him for giving a true verdict, or to punish a witness for testifying truthfully, that combination is an offense against the United States; for the sim-

ple reason, easily understood, that it seeks to deprive a citizen of the United States of a right guarantied to him by the Constitution of the United States. If you can touch in any point or particle any right of a citizen secured by the Constitution of the United States, you might, upon the same principle and by the same logic, overthrow the entire Constitution and destroy the whole Government. If we have not a right to legislate for the defense of every right secured by the Constitution we have no authority to legislate for the security of any right. That seems to be perfectly plain.

I must hurry on. I cannot amplify as I would like to do. But there is one other illustration which I would like to make. I, as a citizen of a State, have a right to support and advocate the election of any qualified person to any office under the United States Government. That is a right which is secured to me by the Constitution of the United States. Any combination of men who shall conspire to prevent me from advocating the election of any qualified person to any office under the Government of the United States, or to a seat in this House, is an offense against the Government of the United States, for such a combination or conspiracy strikes down a right secured to me by the Constitution as a citizen of the United States. The citizen, in the support or advocacy of any qualified person to an office under the national Government, is exercising a right secured to him clearly by the fundamental law of this nation. Hence, a combination to deprive the citizen of that right, or to punish him for its exercise, is an offense against the United States, and may be so declared and punished by national law.

Mr. ELDRIDGE. I would like the gentleman to state how he applies his doctrine to a case which arose a few years ago in the State of Wisconsin—the Booth case—in which the Supreme Court of the United States issued a certiorari to the supreme court of Wisconsin requiring the latter court to send up a record. The State court refused to do so. It was a case arising under the fugitive slave law; and the State put itself in direct opposition to the United States. The Supreme Court of the United States did not pretend to say that there was any power to punish those judges of the State court; it simply made an order that some other certificate should be sufficient, and upon that the Supreme Court acted. No prosecution was ever undertaken against those State judges. I ask the gentleman whether that is such a case as he thinks might be punished?

Mr. COOK. I ask the gentleman to state his own view, whether, in his opinion, it is a case which might be punished.

Mr. ELDRIDGE. That is a convenient way of evading my question; but I will say that in my opinion the case presented no offense under the Constitution of the United States.

Mr. COOK. I will answer the gentleman's question. If an attempt had been made to prevent a record being certified to the Supreme Court in a proper case by force, intimidation, or threat, it would have been an act which the national Government might prohibit by law, and if done in violation of a law might punish. We have the right to so frame the law that a man shall not be deprived of a hearing in the Supreme Court of the United States in a proper case by unlawful means.

Mr. ELDRIDGE. The Federal Government had no power in that case to require the action of the State officers; it had no control over them.

Mr. COOK. That is an entirely different question from the one whether the Government of the United States may punish a set of men who combine to prevent, by intimidation, force, or fraud, the exercise of the rights of a citizen. The gentleman must understand that.

Mr. ELDRIDGE. The State officers in the case I mention not only threatened not to

do the act, but refused to do it and did not do it.

Mr. COOK. But they acted judicially; they did not propose to deprive a citizen of his right by violence. There was no force, intimidation, or threat.

Mr. ELDRIDGE. Oh, yes; and they were sustained by the whole Republican party.

Mr. COOK. No matter; I must go on with my argument, for I have but very little time. It does not matter whether a constitutional right is enacted into a law or not, so far as the existence of the right is concerned. And when you come to punish a combination, to deprive a citizen of such right, every lawyer knows that the combination to do any unlawful act may be declared a crime.

The combination may be to do an act not in itself a crime but simply unlawful, but a combination to do that unlawful act is a crime; or, so is a combination to do a lawful act by unlawful means. Every lawyer understands this principle. There are rights secured by the fourteenth article of amendments. What are those rights? The amendment provides that no State shall deny to any portion of its citizens the equal protection of the laws. That is the right which the Constitution secures to every citizen of the United States, to have the equal protection of the laws, the equal protection of the laws in a State through the executive, and through the legislative and the judicial departments of every State government, and every combination of men by force and intimidation or threat to prevent the Governor of a State calling upon the Executive of the United States to secure the aid of the United States to protect the rights of all citizens alike, or to induce the Legislature of a State by unlawful means to deprive citizens of the equal protection of the laws, or to induce the courts to deny citizens the equal protection of the laws under the Constitution of the United States is the offense against the Constitution of the United States, and may be defined and punished by national law. And that, sir, is the distinct principle upon which this bill is founded.

[Here the hammer fell.]

Mr. BIRD addressed the House. [His speech will be published in the Appendix.]

Mr. TYNER. Seven days debate on the pending bill have been sufficient to indicate all of good and to foreshadow all of evil to be accomplished by its passage. The friends and the enemies of the measure ought now to be content to submit it to the ordeal of amendments and a vote. If others were willing to do likewise, I would not be found prolonging this discussion. But I have caught the common infection, and must, in the ten minutes allotted me, sum up as best I can the reasons that will influence my vote. The vote itself will doubtless be satisfactory to those who sent me here and the reasons I shall offer to fortify it may not increase their approval.

I will not commit the silly blunder of discussing in ten minutes the constitutional questions involved. My business is simply to refer to some of the facts on which legislation is now to be based.

The necessity of legislation to protect the life, liberty, property, and immunities of citizens of the States lately in rebellion ought not to astonish any one. It was to have been expected from the upheaving of the foundations on which society there rested. One third of an entire population, in the full enjoyment of all their rights as citizens, with all their privileges undisturbed, and with a representation in the national councils based, not only on their own numbers, but on a part of their property also, for reasons unsatisfactory to the balance of the world, rashly determined to submit their destiny to the arbitrament of the sword. They were defeated, as all armed enemies of a just Government deserve to be. Humiliated by defeat, inflamed by passion, bankrupted in property, and reduced from the

could have prevented; and such damages may be recovered in an action on the case in the proper circuit court of the United States; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in such action: *Provided,* That such action shall be commenced within one year after such cause of action shall have occurred. And if the death of any person shall be caused by any such wrongful act and neglect, the legal representatives of such deceased person shall have such action therefor and may recover not exceeding $5,000 damages therein, for the benefit of the widow of such deceased person, if any there be, or if there be no widow, for the benefit of the next of kin of such deceased person.

And that the same stand as section six of the said bill, and that section six stand as section five, and that section five be transferred to the end of the bill as section seven.

GEORGE F. EDMUNDS,
MATT. H. CARPENTER,
*Managers on the part of t e Senate.*
S. SHELLABARGER,
LUKE P. POLAND,
*Managers on the part of the House.*

Mr. EDMUNDS. It is right that I should explain the effect of this report. There were four points of disagreement open between the two Houses on the previous conference. Upon the first three points of disagreement, the present conferees have adopted the previous report, leaving the bill in these respects as it was recommended to be left by the former report, precisely word for word. As to the last section, in the way it stood originally, being the amendment offered by the Senator from Ohio, [Mr. SHERMAN,] the conferees of the Senate found it impossible to bring the Representatives of the House to agree to that section in the form in which it stood, on account of difficulties which had occurred to a majority of the House of Representatives respecting our power to deal with the particular organization in a State called a county or a town and for such other reasons as it is not necessary now to state. Thereupon, in order to aid in the repression of these outrages by tumults and conspiracies, the conferees on the part of the House of Representatives and ourselves agreed to substitute for that the provision which the Secretary has read, the substance and effect of which is to make the whole body of the inhabitants of the vicinity who have knowledge that a conspiracy is formed to destroy the property or to injure the person of any peaceable inhabitant, and who refuse or neglect to exert all lawful means to repress it, having the power to assist in preventing it, responsible. It is, in other words, dealing with the citizen under the Constitution.

Every citizen in the vicinity where any such outrages as are mentioned in the second section of this bill, which I need not now describe, are likely to be perpetrated, he having knowledge of any such intention or organization, is made a peace officer, and it is made his bounden duty as a citizen of the United States to render positive and affirmative assistance in protecting the life and property of his fellow-citizens in that neighborhood against unlawful aggression; and if, having this knowledge and having power to assist by any reasonable means in preventing it or putting it down or resisting it, he fails to do so, he makes himself an accessory, or rather a principal in the outrage itself, and his fellow-citizen, who is thus wronged on account of his refusal to help him to protect himself, is made responsible for it. I think, Mr. President, that in substance and effect this reaches the same result; and I am not at all sure but that it is quite as effectual as the redress against the county, without liability against the inhabitants of it, would have been. Therefore I hope the Senate will agree to the report which we have made.

Mr. SHERMAN. Mr. President, I do not intend to detain the Senate very long in regard to this matter. We have been debating now for three weeks a bill which is deemed by Congress so important as to hold us in session pledged only to transact business in regard to that particular subject. Our committees have been faithfully at work, and have reported us a bill to meet outrages which have scarcely a parallel in history. The startling fact upon

which this bill is based is that an organized conspiracy, spreading terror and violence, burning and robbing, murdering and scourging both white and black, both women and men, and pervading large communities of this country, now exist unchecked by punishment, independent of law, uncontrolled by magistrates. We have specific cases, amounting to hundreds, of murder and violence, many of which have occurred since we have been in session here; our officers are driven from their duty; one officer since we have been sitting here has been scourged, his property destroyed, and his wife and children driven from his home. Another case occurred the other day in Tennessee, where two of our deputy marshals were killed in the discharge of their duty. Lawless bands of men, amounting to hundreds, while we have been in session here, have been roaming over the country independent and unchallenged, committing these atrocities, without fear of punishment, cheered by their neighbors, and despising your laws and your authority. We are called upon to legislate in regard to these matters. This condition of affairs, though doubted in the beginning, is now admitted on all hands.

Now, what is the result of this long debate? What remedy do you offer the victims and with what punishment do you threaten the guilty?

First, the party injured may sue in the courts of the United States for money damages. Whom? Disguised outlaws. What is the use of suing them? First, how can you identify them? What remedy have you? You are told by judges of the courts that the grand juries are closed against you; that the petit juries are closed against you; that organized perjury is enlisted against you. You know that of all the multitude of injuries not in a single case has redress ever been meted out to one of the multitude who has been injured. And now these scourged and mutilated victims are told by this bill that they may sue these murderous outlaws for a pecuniary compensation in the courts of the United States instead of the local courts. There they will meet the same grand jury, the same petit jury, the same organized perjury; and the only advantage you give them is a United States judge, one in a State far from the witnesses to be summoned and the place of their sufferings. How hopeless, how feeble, how like a stone to these poor sufferers is this remedy. How these disguised assassins will jeer at your lawsuit. Most likely their plea of abatement will be the assassination of the suitor who appeals to your court.

Mr. President, the second remedy is that the offenders may be indicted as criminals in the courts of the United States. How indicted? How can you indict them when you have the proof positive that at the place of the crime where the facts are notorious no indictment can be found and no indictment has been found? No man can be tried as a criminal, and no man has been tried and punished for these enormities. And yet these suffering people are told, as your alternative remedy, as the limit of your power and disposition to protect them, that they may choose either a civil remedy in the courts of the United States far away from their homes, or they may institute a criminal prosecution in the same courts. What a choice you offer them! I hate to exceed the damages, a judgment not worth the paper on which it is written, or an idle prosecution with death or banishment staring them in the face! Is this the only alternative, I am willing to make not only local civil war, but in order to put down civil

war, and there is no other remedy, I am willing to again appeal to the power of the nation to crush, as we have once before done, this organized civil war. If we must have war it must not be waged solely by the Ku Klux Klan—another name for the same rebel armies who defied the authority of the nation so long, but who now, organized and disguised, seek by assassination to renew the war. This bill will enable the President to again meet force with force, and I do not hide from myself the terrors of this kind of warfare, or the dangerous precedent we set for this kind of legislation. I am willing to vote for it. I am willing to do anything to punish and put down these outrages. That is the third and the chief remedy proposed by this bill.

But, sir, while we give the authority, have we or can we provide the means for its enforcement? The military force of the United States is very limited. It has ample occupation on the western plains. There are not troops enough in the Army of the United States to deal with this class of people now holding in terror vast regions of our territory. Shall you call out the militia? When and where shall this militia be organized, how armed, how equipped, how officered? These are grave and difficult questions. Still, the President of the United States may be compelled to resort to that; and there is, therefore, some virtue in this bill.

What next? There was a remedy provided by the vote of the Senate, twice given, once after a short debate. It was that when these outrages were committed in a community that made no effort to put them down, that took no means to arrest the offenders, and the outrage was a tumultuous and unlawful riot, aimed at the authority of the United States, then, and only then, the persons injured might sue the county or municipal division in which they occurred. And, now, why is not that remedy adopted—a remedy as old as the English law, older than the English law; a remedy derived from the old Saxon law in the country from which we draw all our institutions? There, for centuries, the law has been that when any community fails to protect its citizens, the community itself shall be responsible in damages. What is the objection to it? Is it not just that when a whole community allow a band of outlaws at night or in day, as they have done, to go and kill and slaughter, and murder, whip, and scourge, burn and rob, the community which allows these things to go on unchallenged and unpunished shall be punished? Is it to be said by the Congress of the United States that the property of a community is so sacred that it ought not to be affected because these outlaws do burn and rob and whip and scourge? Why, sir, these crimes could not exist a day if they were not sustained by the public sentiment of the property-holders of the community?

There is no county in North Carolina where twenty of the richest men in that county could not put down these bands of outlaws. If they would only will, they have the way, they have the power; and yet you will not touch the property of these people lest you may do injustice. Sir, we are told, by some mystic process, by some mode of reasoning, which I cannot comprehend, which seems to me so absurd that I cannot even fashion its face, that the Constitution of the United States does not allow a county to be sued in the courts of the United States. Why not? By what authority is any corporation sued? Where is the provision of the Constitution of the United States that allows a railroad company to be sued? A railroad company is the creature of State law, a pure creature of State law, having no power except what are given it by the State law. Where is the power to sue a railroad company? Only in the general clause which confers upon the courts of the United States the power to entertain suits between persons. Suits may be brought by a citizen of one State against the citizen of another State. There is no express

# EXHIBIT C

CHAP. XXII.—*An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes.*

April 20, 1871.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication"; and the other remedial laws of the United States which are in their nature applicable in such cases.

*Margin:* Any person under color of any law, &c. of any State, depriving another of any right, &c. secured by the Constitution of the United States, made liable to the party injured. Proceedings to be in the courts of the United States. 1866, ch. 31. Vol. xiv. p. 27. Penalty for conspiring by force to put down the government of the United States, &c.;

SEC. 2. That if two or more persons within any State or Territory of the United States shall conspire together to overthrow, or to put down, or to destroy by force the government of the United States, or to levy war against the United States, or to oppose by force the authority of the government of the United States, or by force, intimidation, or threat to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, or by force, intimidation, or threat to prevent any person from accepting or holding any office or trust or place of confidence under the United States, or from discharging the duties thereof, or by force, intimidation, or threat to induce any officer of the United States to leave any State, district, or place where his duties as such officer might lawfully be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or to injure his person while engaged in the lawful discharge of the duties of his office, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duty, or by force, intimidation, or threat to deter any party or witness in any court of the United States from attending such court, or from testifying in any matter pending in such court fully, freely, and truthfully, or to injure any such party in his person or property on account of his having so attended or testified, or by force, intimidation, or threat to influence the verdict, presentment, or indictment, of any juror or grand juror in any court of the United States, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or on account of his being or having been such juror, or shall conspire together, or go in disguise upon the public highway or upon the premises of another for the purpose, either directly or indirectly, of depriving any person or any class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State from giving or securing to all persons within such State the equal protection of the laws, or shall conspire together for the purpose of in any manner impeding, hindering, obstructing, or defeating the due course of justice in any State or Territory, with intent to deny to any citizen of the United States the due and equal protection of the laws, or to injure any person in his person or his property for lawfully enforcing the right of any person or class of persons to the equal protection of the laws, or by force, intimidation, or threat to prevent any citizen of the United States lawfully entitled to vote from giving his support or advocacy in a lawful

*Margin:* or to hinder the execution of any law of the United States; or to seize any property of the United States; or to prevent any person from holding office, &c. under the United States; or to induce any officer to leave the State, &c.; or to injure him in person or property while doing, or to prevent his doing, his duty; or to prevent any party or witness from attending court or testifying therein; or to injure him for so attending or testifying; or to influence the conduct of any juror; or to injure any juror on account of his acts, &c. Penalty for conspiring or going in disguise upon the public highway, &c. to deprive any person or class of equal rights, &c. under the laws; or to prevent the State authorities from protecting all in their equal rights. Penalty for conspiring to obstruct, &c. the

due course of justice, &c. in any State with intent to deny to any citizen his equal rights under the law;

or, by force, &c. to prevent any citizen entitled to vote from advocating in a lawful manner the election of any person, as, &c.

Courts. Punishment.

Any conspirator doing, &c. any act in furtherance of the object of the conspiracy, and thereby injuring another, to be liable in damage; therefor.

Proceedings to be in courts of the United States.

1866, ch. 31. Vol. xiv. p. 27.

manner towards or in favor of the election of any lawfully qualified person as an elector of President or Vice-President of the United States, or as a member of the Congress of the United States, or to injure any such citizen in his person or property on account of such support or advocacy, each and every person so offending shall be deemed guilty of a high crime, and, upon conviction thereof in any district or circuit court of the United States or district or supreme court of any Territory of the United States having jurisdiction of similar offences, shall be punished by a fine not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, as the court may determine, for a period of not less than six months nor more than six years, as the court may determine, or by both such fine and imprisonment as the court shall determine. And if any one or more persons engaged in any such conspiracy shall do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby any person shall be injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the person so injured or deprived of such rights and privileges may have and maintain an action for the recovery of damages occasioned by such injury or deprivation of rights and privileges against any one or more of the persons engaged in such conspiracy, such action to be prosecuted in the proper district or circuit court of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts under the provisions of the act of April ninth, eighteen hundred and sixty-six, entitled "An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication."

What to be deemed a denial by any State to any class of its people of their equal protection under the laws.

When the due execution of the laws, &c. is obstructed by violence, &c the President shall do what he may deem necessary to suppress such violence, &c.

Persons arrested to be delivered to the marshal.

Sec. 3. That in all cases where insurrection, domestic violence, unlawful combinations, or conspiracies in any State shall so obstruct or hinder the execution of the laws thereof, and of the United States, as to deprive any portion or class of the people of such State of any of the rights, privileges, or immunities, or protection, named in the Constitution and secured by this act, and the constituted authorities of such State shall either be unable to protect, or shall, from any cause, fail in or refuse protection of the people in such rights, such facts shall be deemed a denial by such State of the equal protection of the laws to which they are entitled under the Constitution of the United States; and in all such cases, or whenever any such insurrection, violence, unlawful combination, or conspiracy shall oppose or obstruct the laws of the United States or the due execution thereof, or impede or obstruct the due course of justice under the same, it shall be lawful for the President, and it shall be his duty to take such measures, by the employment of the militia or the land and naval forces of the United States, or of either, or by other means, as he may deem necessary for the suppression of such insurrection, domestic violence, or combinations; and any person who shall be arrested under the provisions of this and the preceding section shall be delivered to the marshal of the proper district, to be dealt with according to law.

What unlawful combinations to be deemed a rebellion against the government of the United States.

Sec. 4. That whenever in any State or part of a State the unlawful combinations named in the preceding section of this act shall be organized and armed, and so numerous and powerful as to be able, by violence, to either overthrow or set at defiance the constituted authorities of such State, and of the United States within such State, or when the constituted authorities are in complicity with, or shall connive at the unlawful purposes of, such powerful and armed combinations; and whenever, by reason of either or all of the causes aforesaid, the conviction of such offenders and the preservation of the public safety shall become in such district impracticable, in every such case such combinations shall be deemed a rebellion against the government of the United

Case 1:21-cv-00565-RP   Document 42   Filed 10/07/21   Page 58 of 65

FORTY–SECOND CONGRESS. Sess. I. Ch. 22. 1871.   15

States, and during the continuance of such rebellion, and within the limits of the district which shall be so under the sway thereof, such limits to be prescribed by proclamation, it shall be lawful for the President of the United States, when in his judgment the public safety shall require it, to suspend the privileges of the writ of habeas corpus, to the end that such rebellion may be overthrown : *Provided,* That all the provisions of the second section of an act entitled "An act relating to habeas corpus, and regulating judicial proceedings in certain cases," approved March third, eighteen hundred and sixty-three, which relate to the discharge of prisoners other than prisoners of war, and to the penalty for refusing to obey the order of the court, shall be in full force so far as the same are applicable to the provisions of this section : *Provided further,* That the President shall first have made proclamation, as now provided by law, commanding such insurgents to disperse : *And provided also,* That the provisions of this section shall not be in force after the end of the next regular session of Congress.

SEC. 5. That no person shall be a grand or petit juror in any court of the United States upon any inquiry, hearing, or trial of any suit, proceeding, or prosecution based upon or arising under the provisions of this act who shall, in the judgment of the court, be in complicity with any such combination or conspiracy ; and every such juror shall, before entering upon any such inquiry, hearing, or trial, take and subscribe an oath in open court that he has never, directly or indirectly, counselled, advised, or voluntarily aided any such combination or conspiracy ; and each and every person who shall take this oath, and shall therein swear falsely, shall be guilty of perjury, and shall be subject to the pains and penalties declared against that crime, and the first section of the act entitled "An act defining additional causes of challenge and prescribing an additional oath for grand and petit jurors in the United States courts," approved June seventeenth, eighteen hundred and sixty-two, be, and the the same is hereby, repealed.

SEC. 6. That any person or persons, having knowledge that any of the wrongs conspired to be done and mentioned in the second section of this act are about to be committed, and having power to prevent or aid in preventing the same, shall neglect or refuse so to do, and such wrongful act shall be committed, such person or persons shall be liable to the person injured, or his legal representatives, for all damages caused by any such wrongful act which such first-named person or persons by reasonable diligence could have prevented ; and such damages may be recovered in an action on the case, in the proper circuit court of the United States, and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in such action : *Provided,* That such action shall be commenced within one year after such cause of action shall have accrued ; and if the death of any person shall be caused by any such wrongful act and neglect, the legal representatives of such deceased person shall have such action therefor, and may recover not exceeding five thousand dollars damages therein, for the benefit of the widow of such deceased person, if any there be, or if there be no widow, for the benefit of the next of kin of such deceased person.

SEC. 7. That nothing herein contained shall be construed to supersede or repeal any former act or law except so far as the same may be repugnant thereto ; and any offences heretofore committed against the tenor of any former act shall be prosecuted, and any proceeding already commenced for the prosecution thereof shall be continued and completed, the same as if this act had not been passed, except so far as the provisions of this act may go to sustain and validate such proceedings.

APPROVED, April 20, 1871.

---

During such rebellion, and within certain limits, the President may suspend the writ of habeas corpus.

Provisions of act 1863, ch. 81, § 2, Vol. xii. p. 755, made applicable hereto.

Proclamation to be first made, &c.

Vol. i. p. 424.
Vol. xii. p. 282.
See pp. 949–954.
This section not to be in force after, &c.

Certain persons not to be jurors in certain cases.

Jurors to take oath.

False swearing in taking this oath to be perjury.

Repeal of first section of act 1862, ch. 108. Vol. xii. p. 430.

Any person knowing that certain wrongs are about to be done, and having power to prevent, &c., neglects so to do, and any such wrong is done, is made liable for all damages caused thereby.

Suits therefor in courts of the United States.

Who may be joined as defendants.

Limitation. If death is caused by such wrongful act, the legal representatives of deceased may maintain action, &c. and for whose benefit.

Former laws, &c. not repealed, &c.

Former offences to be prosecuted.

Case 1:21-cv-00565-RP   Document 42   Filed 10/07/21   Page 59 of 65

April 20, 1871. **CHAP. XXIII.** — *An Act for convening the next legislative Assembly of the Territory of New Mexico, and for other Purposes.*

Legislature of Territory of New Mexico may convene on, &c. Election authorized.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the legislature of the Territory of New Mexico be, and it is hereby, authorized to convene on the first Monday of December, A. D. eighteen hundred and seventy-one; and that an election for the members of both branches of said legislature be authorized to be held on the day of the next general election, under the existing laws of said Territory.

APPROVED, April 20, 1871.

---

April 20, 1871. **CHAP. XXIV.** — *An Act concerning the Compensation of the Collector of Customs for the District of Willamette, in the State of Oregon.*

Pay of collector of customs in Willamette collection district, Oregon. 1870, ch. 127, § 1. Vol. xvi. p. 150.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section one of the act approved June fourteenth, eighteen hundred and seventy, entitled "An act to establish the collection district of Willamette, in the State of Oregon," shall be, and is hereby, amended as follows: Strike out all of said section after the words "to reside at Portland," and insert in lieu thereof, "and said collector shall be allowed a salary at the rate of one thousand dollars per annum, with the fees allowed by law, and a commission on all customs money collected and accounted for by him, such salary, fees, and commissions not to exceed at the rate of three thousand dollars per annum."

APPROVED, April 20, 1871.

---

April 20, 1871. **CHAP. XXV.** — *An Act amending an Act to reduce internal Taxes, and for other Purposes, approved July fourteenth, eighteen hundred and seventy.*

Bonded merchandise transported by carriers by rail, may be transferred from car to car when the gauges of connecting railroads differ, under, &c. 1870, ch. 255, § 32. Vol. xvi. p. 271.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the thirty-second section of said act is hereby amended by adding to the last clause thereof as follows: *Provided,* That in case of difference in width of gauges of connecting railroads, the goods may be immediately transferred from one car to another under the personal supervision of an inspector, and such rules and regulations as the Secretary of the Treasury may prescribe.

APPROVED, April 20, 1871.

---

April 20, 1871. 1862, ch. 102, § 1. Vol. xii. p. 428.

**CHAP. XXVI.** — *An Act to amend the Act approved June sixteenth, eighteen hundred and sixty-two, entitled "An Act providing for the [S]election of Jurors to serve in the several Courts of the District of Columbia.*

Preamble.

WHEREAS, by the first section of said act, the list of jurors to serve in said courts is to be made by the register of Washington city, and the clerks of the city of Georgetown, and levy court of Washington county, and said officers are abolished by the act approved February twenty-first, eighteen hundred and seventy-one, entitled "An act to provide a government for the District of Columbia": Therefore,

1871, ch. 62. Vol. xvi. p. 419.

Supreme court of the District of Columbia to designate persons to make lists of jurors.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, until the legislative assembly shall otherwise provide, the supreme court of the District of Columbia may, by orders in general term from time to time, designate necessary officers or persons to make the lists of jurors for service in said court, instead of said abolished officers.

Justice of circuit court may order talesmen to be summoned.

SEC. 2. That the justice holding the special term usually called the circuit court, may order talesmen to be summoned by the marshal whenever the panel drawn for service in said court, for any reason, becomes defective.

APPROVED, April 20, 1871.

# EXHIBIT D

AN

# AMERICAN
# DICTIONARY

OF THE

## ENGLISH LANGUAGE;

EXHIBITING

THE ORIGIN, ORTHOGRAPHY, PRONUNCIATION, AND DEFINITIONS
OF WORDS.

By NOAH WEBSTER, LL.D.

ABRIDGED FROM THE QUARTO EDITION OF THE AUTHOR.

TO WHICH IS ADDED A

### SYNOPSIS OF WORDS

DIFFERENTLY PRONOUNCED BY DIFFERENT ORTHOËPISTS.

REVISED AND ENLARGED BY

### CHAUNCEY A. GOODRICH,

PROFESSOR IN YALE COLLEGE.

WITH

PRONOUNCING VOCABULARIES OF SCRIPTURE, CLASSICAL, AND
GEOGRAPHICAL NAMES.

PHILADELPHIA:
J. B. LIPPINCOTT & CO.
1867.

*stitium.*] 1. A space between things ; but *chiefly*, a narrow or small space between things closely set, or the parts which compose a body. 2. Time between one act and another.—*Ayliffe.*

†IN-TER-STINC̄'TĬVE, a. Distinguishing.—*Wallis.*

IN-TER-STĬT'TIAL (-stish'al), a. Pertaining to or containing interstices.

IN-TER-STRAT'Ĭ-FĬED (-strat'e-fīde), a. Stratified among or between other bodies.—*Encyc.*

†IN-TER-TALK' (in-ter-tawk'), v. i. To exchange conversation.

IN-TER-TAN"GLE, v. t. To intertwist ; to entangle.

IN-TER-TEX'TŪRE, n. [L. *intertextus.*] The act of interweaving, or the state of things interwoven.

IN'TER-TĪE, ⎰ n. In *carpentry*, a short, horizontal timIN'TER-DUCE, ⎱ ber, framed between two posts in order to tie them together.—*Brande.*

IN-TER-TIS'SŪED, a. Wrought with joint tissue.—*Everest.*

IN-TER-TRAN-SPĬC'Ŭ-OUS, a. Transpicuous within or between.

IN-TER-TROP'ĬC-AL, a. Situated between the tropics.

IN-TER-TWĪNE', v. t. To unite by twining or twisting one with another.—*Milton.*

IN-TER-TWĪN'ED' (in-ter-twīnd'), pp. Twined or twisted one with another.

IN-TER-TWĪN'ING, ppr. Twining one with another.

IN-TER-TWĪN'ING-LY, adv. By intertwining or being intertwined.

IN-TER-TWIST', v. t. To twist one with another.

IN-TER-TWIST'ED, pp. Twisted one with another.

IN-TER-TWIST'ING, ppr. Twisting one with another.

IN-TER-TWIST'ING-LY, adv. By intertwisting or being intertwisted.

IN'TER-VAL, n. [Fr. *intervalle;* L. *intervallum.*] 1. A space between things ; a void space intervening between any two objects. 2. Space of time between any two points or events. 3. The space of time between two paroxysms of disease, pain, or delirium; remission. 4. The distance between two given sounds in music, or the difference in point of gravity or acuteness. 5. A tract of low or plain ground between hills, or along the banks of rivers, usually alluvial land on rivers.—*Hutchinson.*

IN-TER-VEĬN'ED' (-vānd'), a. Intersected as with veins.

IN-TER-VĒNE', v. i. [L. *intervenio.*] 1. To come or be between persons or things; to be situated between. 2. To come between points of time or events. 3. To happen in a way to disturb, cross, or interrupt. 4. To interpose or undertake voluntarily for another.

†IN-TER-VĒNE', n. A coming between ; intervention.—*Wotton.*

IN-TER-VĒN'IENT, a. Coming or being between; intercedent; interposed.—*Bacon.* [*Little used.*]

IN-TER-VĒN'ING, ppr. or a. Coming or being between persons or thing, or between points of time; intermediate.

IN-TER-VEN'TION, n. [L. *intervuntio.*] 1. A state of coming or being between; interposition. 2. Agency of persons between persons ; interposition ; mediation ; any interference that may affect the interests of others. 3. Agency of means or instruments. 4. Interposition in favor of another ; a voluntary undertaking of one party for another.

IN-TER-VEN'TOR, n. [L.] A person selected anciently by a church to mediate in differences, and unite contending parties.

†IN-TER-VEN'ŪE, n. [Fr. *intervenu.*] Interposition.

IN-TER-VERT', v. t. [L. *interverto.*] To turn to another course or to another use.—*Wotton.* [*Little used.*]

IN-TER-VER'TE-BRAL, a. Being between the vertebræ.

IN'TER-VIEW (in'ter-vū), n. [*inter* and *view.*] A mutual sight or view ; a meeting ; a conference or mutual communication of thoughts.

IN-TER-VIS'I-BLE, a. In *surveying*, an epithet applied to stations which are mutually visible, or can be seen the one from the other.

IN-TER-VOLVE' (in-ter-volv'), v. t. [L. *intervolvo.*] To involve one within another.—*Milton.*

IN-TER-VOLV'ED' (in-ter-volvd'), pp. Involved one within another ; wrapped together.

IN-TER-VOLV'ING, ppr. Involving one within another.

IN-TER-WEAVE', v. t. ; pret. *interwove* ; pp. *interwoven.* 1. To weave together; to intermix or unite in texture or construction. 2. To intermix ; to set among or together. 3. To intermingle ; to insert together.

IN-TER-WEAV'ING, ppr. Weaving together

IN-TER-WEAV'ING, n. Intertexture.—*Milton.*

IN-TER-WISH', v. t. To wish mutually to each other. [*Little used.*]

IN-TER-WISH'ED' (-wisht'), pp. Wished mutually.

'N-TER-WORK'ING, n. The act of working together.

IN-TER-WŌVE', pret. of *interweave.* Milton uses it for *interwoven.*

N-TER-WŌV'EN, pp. or a. Woven together ; intermixed ; intermingled.

IN-TER-WRĒATH'ED' (in-ter-reethd'), a. Woven in a wreath.

IN-TEST'A-BLE, a. [L. *intestabilis.*] Not capable of making a will ; legally unqualified or disqualified to make a testament.

IN-TEST'A-CY, n. The state of dying without making will or disposing of one's effects.

IN-TEST'ATE, a. [Fr. *intestat ;* L. *intestatus.*] 1. Dying without having made a will. 2. Not devised ; not disposed of by will.

IN-TEST'ATE, n. A person who dies without making a will.—*Blackstone.*

IN-TES'TIN-AL, a. Pertaining to the intestines of an animal body.—*Arbuthnot.*

IN-TES-TIN-A'LI-A, n. pl. A class of animals which infest the interior of the bodies, and especially the intestinal canal of other animals.—*Brande.*

IN-TES'TINE, a. [Fr. *intestin ;* L. *intestinus.*] 1. Internal; inward; opposed to *external ;* [applied to the human or other animal body.] 2. Internal with regard to a state or country ; domestic, not foreign ; as, *intestine* feuds. This word is usually or always applied to evils.

IN-TES'TINE, n. ; usually in the *plural*, INTESTINES. The bowels ; a muscular canal or tube extending from the stomach to the anus.

IN-TEXT'ŪRED, a. Inwrought; woven in.

†IN-THĬRST' (-thurst'), v. t. To make thirsty.—*Bp. Hall.*

IN-THRALL', v. t. [*in* and *thrall.*] To enslave ; to reduce to bondage or servitude ; to shackle.

IN-THRALL'ED' (in-thrawld'), pp. or a. Enslaved ; reduced to servitude.

IN-THRALL'ING, ppr. Enslaving.

IN-THRALL'MENT, n. Servitude ; slavery ; bondage. *Milton.*

IN-THRŌNE', v. t. 1. To seat on a throne ; to raise to royalty or supreme dominion. [*See* ENTHRONE.] 2. To induct a bishop into a vacant see.

†IN-THRŌN-Ĭ-ZĀ'TION, n. The act of enthroning, or state of being enthroned.

†IN-THRŌN'ĬZE, v. t. To enthrone.

IN'TI-MA-CY, n. Close familiarity or fellowship ; nearness in friendship.—*Rogers.*

IN'TI-MATE, a. [L. *intimus.*] 1. Inmost; inward ; internal. 2. Near ; close. 3. Close in friendship or acquaintance ; familiar.

IN'TI-MATE, n. A familiar friend or associate ; one to whom the thoughts of another are intrusted without reserve.

†IN'TI-MĀTE, v. i. To share together.—*Spenser.*

IN'TI-MĀTE, v. t. [Fr. *intimer.*] To hint ; to suggest obscurely, indirectly, or not very plainly ; to give slight notice of.

IN'TI-MĀ-TED, pp. Hinted ; slightly mentioned or signified.

IN'TI-MATE-LY, adv. 1. Closely ; with close intermixture and union of parts. 2. Closely ; with nearness of friendship or alliance. 3. Familiarly ; particularly.

IN'TI-MĀ-TING, ppr. Hinting; suggesting.

IN-TI-MĀ'TION, n. [Fr.] Hint ; an obscure or indirect suggestion or notice ; a declaration or remark communicating imperfect information.

†IN'TĪME, a. [L. *intimus.*] Inward; internal.—*Digby.*

IN-TIM'I-DĀTE, v. t. [Fr. *intimider.*] To make fearful; to inspire with fear.—SYN. To dishearten ; dispirit; abash ; deter ; frighten ; terrify.

IN-TIM'I-DĀ-TED, pp. Made fearful; abashed.

IN-TIM'I-DĀ-TING, ppr. Making fearful; abashing.

IN-TIM-I-DĀ'TION, n. The act of making fearful ; the state of being abashed.

IN-TINC̄-TIV'I-TY, n. The want of the quality of coloring or tinging other bodies.—*Kirwan.*

IN-TĪRE', ⎰ *See* ENTIRE and its derivatives.
IN-TĪRE'LY. ⎱

IN-TĪ'TLE. *See* ENTITLE.

IN'TŌ, prep. [*in* and *to.*] 1. Noting entrance or a passing from the outside of a thing to its interior parts. It follows verbs expressing motion; as, to go *into* a house. 2. Noting penetration beyond the outside or surface, or access to it; as, to see *into* a subject. 3. Noting insertion ; as, to put a leaf *into* a book. 4. Noting mixture; as, to put several things *into* composition. 5. Noting inclusion ; as, to put a thought *into* language. 6. Noting the passing of a thing from one form or state to another ; as, to be led *into* error.

IN-TOL'ER-A-BLE, a. [Fr., from L. *intolerabilis.*] 1. Not to be borne ; that can not be endured; insupportable. 2. Insufferable ; not to be allowed.

IN-TOL'ER-A-BLE-NESS, n. The quality of being not tolerable or sufferable.

IN-TOL'ER-A-BLY, adv. To a degree beyond endurance.

IN-TOL'ER-ANCE, n. 1. Want of capacity to endure.— *Brande.* 2. Want of toleration ; the not enduring at all, or not suffering to exist without persecution.

IN-TOL'ER-ANT, a. [Fr.] 1. Not enduring ; not able to en

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**

**NOV 0 2 2004**

CLERK

*******************************************************************************

|  |  |  |
|---|---|---|
| THOMAS A DASCHLE, | * | CIV 04-4177 |
|  | * |  |
| Plaintiff, | * |  |
|  | * |  |
| vs. | * | **TEMPORARY** |
|  | * | **RESTRAINING ORDER** |
| JOHN THUNE; | * |  |
| SOUTH DAKOTA REPUBLICAN | * |  |
| PARTY; and JOHN DOES 1-200, | * |  |
|  | * |  |
| Defendants. | * |  |
|  | * |  |

*******************************************************************************

Under the principles of *Bush v. Gore*, 531 U.S. 98 (2000), the Court finds that the Plaintiff Thomas A. Daschle has standing to bring the present action. The action shows that Plaintiff Daschle is suing on his behalf as well as on behalf of persons who are unable to protect their own rights, that being Native Americans, to vote in this South Dakota General Election. See also *Oti Kaga, Inc. v. South Dakota Housing Authority*, 342 F.3d 871, 881-82 (8th Cir. 2003), and cases cited therein.

Oral testimony, photographs, and arguments were presented by the Plaintiff and the Defendants concerning today's events in a hearing from 8:00 P.M. until 11:30 P.M. this evening. Due to the fact that the General Election voting commences at 7:00 A.M. tomorrow morning, the Court cannot prepare a more detailed opinion.

After receiving evidence on behalf of Plaintiff and Defendants in the form of oral testimony as well as photographs, the Court applies the four factor tests from *Dataphase Systems, Inc. v. C L Systems, Inc.*, 540 F.2d 109 (8th Cir. 1981), and concludes that there clearly is the threat of irreparable harm to the Movant in that if Native Americans are improperly dissuaded from voting, those voters normally simply disappear and there is no identifying most of them and even if

identified, they can't vote later. The harm that will be inflicted upon the Movant is far greater than any injury granting the temporary restraining order will cause Defendants. The Movant and the Native American voters whose rights are asserted by the Movant will suffer the irreparable harm described above while Defendants are only being required to follow the law. The Court does find that the Movant is more likely to succeed on the merits of the equal protection claim and the claims under 42 U.S.C. § 1973i(b) and 42 U.S.C. § 1985(3), as the Court finds that there was intimidation particularly targeted at Native American voters in Charles Mix County by persons who were acting on behalf of John Thune. The Eighth Circuit has ruled that injunctive relief is available under § 1985(3). *See Brewer v. Hoxie School District*, 238 F.2d 91 (8th Cir. 1956). Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters in Charles Mix County. This is a small Native American population within which word travels quickly. Finally, the public interest is served by having no minority denied an opportunity to vote. Accordingly,

IT IS ORDERED that a Temporary Restraining Order is entered against Joel C. Mandelman and all other Defendant John Does acting on behalf of John Thune in Charles Mix County prohibiting them from following Native Americans from the polling places and directing that they not copy the license plates of Native Americans driving to the polling places, or being driven to the polling places, and further directing that the license plates of Native Americans driving away from the polling places also not be recorded.

Dated this ___ day of November, 2004.

BY THE COURT:

Lawrence L. Piersol
Chief Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
        DEPUTY