**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| ERIC CERVINI, WENDY DAVIS, DAVID GINS, and TIMOTHY HOLLOWAY,<br><br>          Plaintiffs,<br><br>   v.<br><br>ELIAZAR CISNEROS, RANDI CEH, STEVE CEH, JOEYLYNN MESAROS, ROBERT MESAROS, and DOLORES PARK,<br><br>          Defendants. | Civil Action No. 1:21-cv-00565-RP<br><br>Hon. Robert Pitman |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

Preliminary Statement ............................................................................................................1

Argument ...............................................................................................................................6

I.      The Support-Or-Advocacy Clauses Are Valid Exercises Of Congress's Article I Powers ..............................................................................................................................6

II.     The Support-Or-Advocacy Clauses Create An Independent Substantive Right To Engage In Support Or Advocacy In Federal Elections ...........................................8

        A.      The Support-Or-Advocacy Clauses Should Be Given A Substantive Interpretation Under The Rules of Statutory Interpretation............................9

        B.      This Court Should Follow Applicable Precedent To Conclude That The Support-Or-Advocacy Clauses Create An Independent Substantive Right...14

III.    Plaintiffs Need Not Prove That "Force, Intimidation, Or Threat" Mirrored 19th Century Klan Violence To Succeed On Their Support-Or-Advocacy Claims ......18

IV.     Park's First Amendment Defense Fails .................................................................22

V.      Plaintiffs' Conspiracy Claims Survive Summary Judgment ................................26

        A.      Disputes Of Material Fact Exist As To Whether Park Entered Into An Agreement With Co-Conspirators ................................................................28

        B.      Disputes Of Material Fact Exist As To The Intent Of Defendants' Conspiracy ...................................................................................................32

VI.     Plaintiffs' Assault Claims Survive Summary Judgment........................................37

        A.      A Reasonable Jury Could Conclude That Defendant Cisneros Intended To Create Apprehension Of Imminent Bodily Injury .........................................38

        B.      A Reasonable Jury Could Conclude That Defendant Dolores Park Intended To Aid And Abet Assault By Other Trump Train Drivers ...........................40

VII.    Plaintiffs' Claims For Emotional Distress And Mental Anguish Damages Under State Law Survive Summary Judgment.................................................................41

        CONCLUSION....................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Petrofina Co. of Tex. v. Crump Bus. Forms, Inc.*,
    597 S.W.2d 467 (Tex. Civ. App. 1980)................................................................28

*Andrews v. D'Souza*,
    2023 WL 6456517 (N.D. Ga. Sept. 30, 2023) ...............................................10, 15

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013)...................................................................................................7

*Associated Press v. United States*,
    326 U.S. 1 (1945).................................................................................................25

*Barron v. City of Balt.*,
    32 U.S. 243 (1833)...............................................................................................14

*Bourland v. State*,
    528 S.W.2d 350 (Tex. App. 1975).......................................................................28

*Brown v. Hartlage*,
    456 U.S. 45 (1982)...............................................................................................25

*Buckley v. Valeo*,
    424 U.S. 1 (1976)...................................................................................................7

*Burroughs v. United States*,
    290 U.S. 534 (1934)...............................................................................................7

*Burson v. Freeman*,
    504 U.S. 191 (1992).............................................................................................25

*Chahal v. Paine Webber, Inc.*,
    725 F.2d 20 (2d Cir. 1984)...................................................................................19

*City of Boerne v. Flores*,
    521 U.S. 507 (1997).............................................................................................16

*City of Tyler v. Likes*,
    962 S.W.2d 489 (Tex. 1997)................................................................................41

*Counterman v. Colorado*,
    600 U.S. 66 (2023)...............................................................................................25

*Cox v. Louisiana*,
    379 U.S. 536 (1965)....................................................................................23

*Creighton v. State*,
    2011 WL 743073 (Tex. App. Mar. 2, 2011)............................................38, 40

*Doe v. Mckesson*,
    71 F.4th 278 (5th Cir. 2023) .......................................................................23

*Federer v. Gephardt*,
    363 F.3d 754 (8th Cir. 2004) ......................................................................14

*Finley v. United States*,
    490 U.S. 545 (1989)....................................................................................12

*Gill v. Farm Bureau Life Insurance Co. of Missouri*,
    906 F.2d 1265 (8th Cir. 1990) .........................................................14, 16, 18

*In re Glenn*,
    900 F.3d 187 (5th Cir. 2018) ......................................................................12

*Graham v. Connor*,
    490 U.S. 386 (1989).......................................................................................9

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971).......................................................................................12

*Haddle v. Garrison*,
    525 U.S. 121 (1998)................................................................................21, 41

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...............................................................34, 37

*Hardin v. Obstetrical & Gynecological Assocs. P.A.*,
    527 S.W.3d 424 (Tex. App. 2017)...............................................................41

*Int'l Bankers Life Ins. Co. v. Holloway*,
    368 S.W.2d 567 (Tex. 1963)........................................................................28

*Irizarry v. Quiros*,
    722 F.2d 869 (1st Cir. 1983)........................................................................20

*United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*,
    250 F. Supp. 330 (E.D. La. 1965)..................................................................7

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) (en banc) ...........................................10, 19, 41

*Klocke v. Watson*,
   936 F.3d 240 (5th Cir. 2019) ........................................................................22

*Kush v. Rutledge*,
   460 U.S. 719 (1983)..........................................................................9, 12, 17

*Landry's, Inc. v. Ins. Co. of the State of Pa.*,
   4 F.4th 366 (5th Cir. 2021) ............................................................................11

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*,
   2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ...................................................15, 19

*Liberty Lobby, Inc. v. Anderson*,
   477 U.S. 242 (1986)....................................................................................6

*Loaisiga v. Cerda*,
   379 S.W.3d 248 (Tex. 2012) ............................................................................37

*Logan v. United States*,
   144 U.S. 263 (1892), *abrogated on other grounds by Witherspoon v. Illinois*,
   391 U.S. 510 (1968) ......................................................................................12

*McAndrew v. Lockheed Martin Corp.*,
   206 F.3d 1031 (11th Cir. 2000) (en banc) ...........................................................19

*McConnell v. Fed. Election Comm'n*,
   540 U.S. 93 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)............................................................7

*McCord v. Bailey*,
   636 F.2d 606 (D.C. Cir. 1980) .........................................................................13

*Milliken v. Skepnek*,
   1999 WL 496505 (Tex. App. July 15, 1999) ........................................................37

*MVS Int'l Corp. v. Int'l Advert. Sols., LLC*,
   545 S.W.3d 180 (Tex. App. 2017).....................................................................27

*Nat'l Coal. on Black Civic Participation v. Wohl*,
   498 F. Supp. 3d 457 (S.D.N.Y. 2020)................................................................15

*Nat'l Coal. on Black Civic Participation v. Wohl*,
   661 F. Supp. 3d 78 (S.D.N.Y. 2023)............................................................19, 25

*Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*,
   937 S.W.2d 60 (Tex. App. 1996), *aff'd*, 975 S.W.2d 546 (Tex. 1998) ..................32

*Oregon v. Mitchell*,
    400 U.S. 112 (1970)..................................................................................................7

*In re Park*,
    2023 U.S. App. LEXIS 24449 (5th Cir. Sept. 13, 2023) ....................................12, 18

*Parkway Co. v. Woodruff*,
    901 S.W.2d 434 (Tex. 1995)..................................................................................42

*Paynes v. Lee*,
    377 F.2d 61 (5th Cir. 1967) ........................................................................8, 14, 15

*Permanent Mission of India to the United Nations v. City of New York*,
    551 U.S. 193 (2007)...............................................................................................10

*Rainey v. State*,
    877 S.W.2d 48 (Tex. App. 1994)...........................................................................28

*Red Lion Broad. Co. v. FCC*,
    395 U.S. 367 (1969)...............................................................................................26

*Rost v. United States*,
    2021 WL 5190875 (W.D. Tex. Sept. 22, 2021)...........................................22, 27, 38

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
    547 U.S. 47 (2006).........................................................................................23, 25

*Sanchez v. Striever*,
    614 S.W.3d 233 (Tex. App. 2020).........................................................................37

*SCI Tex. Funeral Servs., Inc. v. Nelson*,
    540 S.W.3d 539 (Tex. 2018)............................................................................41, 42

*Singleton v. Darby*,
    609 F. App'x 190 (5th Cir. 2015) .........................................................................23

*Smiley v. Holm*,
    285 U.S. 355 (1932)................................................................................................7

*Snyder v. Phelps*,
    562 U.S. 443 (2011)...............................................................................................24

*Stromberg v. California*,
    283 U.S. 359 (1931)...............................................................................................13

*Tademy v. Sw.-Tex Leasing Co.*,
    2006 WL 8434113 (W.D. Tex. Oct. 30, 2006) .....................................................41

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ..................................................................................6

*Tri v. J.T.T.*,
    162 S.W.3d 552 (Tex. 2005) ...................................................................27

*United Brotherhood of Carpenters & Joiners of Am., Local 610 v. Scott*,
    463 U.S. 825 (1983) ...................................................................8, 9, 16, 17

*United States v. Bruce*,
    353 F.2d 474 (5th Cir. 1965) ..................................................................19

*United States v. Bryant*,
    996 F.3d 1243 (11th Cir. 2021) ..............................................................13

*United States v. Butler*,
    25 F. Cas. 213 (C.C.D.S.C. 1877) (No. 14,700) ....................................18

*United States v. Dunkel*,
    927 F.2d 955 (7th Cir. 1991) ..................................................................27

*United States v. Elam*,
    678 F.2d 1234 (5th Cir. 1982) ................................................................28

*United States v. Goldman*,
    25 F. Cas. 1350 (C.C.D. La. 1878) (No. 15,225) .....................7, 8, 15, 25

*United States v. Hansen*,
    599 U.S. 762 (2023) ..........................................................................22, 25

*United States v. Koutsostamatis*,
    956 F.3d 301 (5th Cir. 2020) ..................................................................10

*United States v. McDermott*,
    29 F.3d 404 (8th Cir. 1994) ....................................................................23

*United States v. Perez*,
    43 F.4th 437 (5th Cir. 2022) ...................................................................24

*United States v. Reagan*,
    596 F.3d 251 (5th Cir. 2010) ......................................................22, 27, 38

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................24

*United States v. Wilkinson*,
    460 F.2d 725 (5th Cir. 1972) ..................................................................35

*Virginia v. Black*,
   538 U.S. 343 (2003)................................................................24

*W.Va. Univ. Hosps., Inc. v. Casey*,
   499 U.S. 83 (1991) (Scalia, J.)...............................................19

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015)................................................................26

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993)................................................................23

*Ex parte Yarbrough*,
   110 U.S. 651 (1884)...................................................6, 8, 17, 26

## Statutes

42 U.S.C. § 1985(3) ........................................................... *passim*

52 U.S.C. §§ 10101(b), 10307(b) ...............................................15

Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 13-14, *codified at* 70 Rev. Stat. §
   5520 (1878), *repealed by* Act of Feb. 8, 1894, ch. 25, § 1, 28 Stat. 36, 37. ..............6

Act of May 31, 1870, ch. 114, §§ 3-4, 16 Stat. at 140-41, *ruled unconstitutional as
   a vehicle to enforce 15th Amendment in United States v. Reese*, 92 U.S. (2
   Otto) 214 (1875). ....................................................................11

17 Stat. 13 ...............................................................................11

Tex. Penal Code § 22.01(a)....................................................37

## Rules

Fed. R. Civ. P. 37(e)(2).............................................................36

Fed. R. Civ. P. 56 .....................................................................6

## Other Authorities

Cong. Globe, 42d Cong. 1st Sess................................................13

Craig R. Senn, *Ending Political Discrimination in the Workplace*, 87 Mo. L. Rev.
   365 (2022)...............................................................................16

Eugene Volokh, *Private Employees' Speech and Political Activity: Statutory
   Protection Against Employer Retaliation*, 16 Tex. Rev. L. & Pol. 295 (2012).................8, 16

Michael Weingartner, *Remedying Intimidating Voter Disinformation Through §*
*1985(3)'s Support-or-Advocacy Clauses*, 110 Geo. L.J. Online 83 (2021)............................15

*New Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English*
*Language* (London: Bell and Daldy 1864) ............................................................10, 11, 20, 21

Note, *The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382,
1399 (2020)................................................................................................................................15

## PRELIMINARY STATEMENT

In 2020, Eric Cervini, Wendy Davis, David Gins, and Timothy Holloway (together, "Plaintiffs") were, respectively, a volunteer, surrogate, staffer, and contractor for the Biden-Harris Presidential Campaign. Each of them intended to spend October 30, 2020 (hereinafter "October 30"), campaigning across central Texas in support of the Biden-Harris presidential ticket. Instead, as documented in multiple videos, Plaintiffs were chased, surrounded, harassed, and assaulted by a caravan of cars and trucks involving Defendants Eliazar Cisneros, Joeylynn Mesaros, Robert Mesaros, and Dolores Park (together, "Defendants"),[1] along with dozens of non-party co-conspirators. Defendants worked together, and with others, to swarm the Biden-Harris campaign bus for nearly an hour as it drove on Interstate 35 ("I-35"), preventing Plaintiffs from exercising their rights to support and advocate for their candidate and significantly injuring them in the process.

The record developed by Plaintiffs through discovery not only proves these acts and these outcomes, but also that they were intentional. Documents and testimony establish that the Defendants *each* believed that the 2020 election was a battle between good and evil, in which the Democratic Party and affiliated candidates—including then-Presidential candidate Joe Biden and Vice-Presidential candidate Kamala Harris—were evil. Defendants described those affiliated with the Democratic party as "evil," Ex. 1 at 117:8-11; 18-25, "Satan worshipping pedophiles," Ex. 2 at 52:3-16, "demons," Ex. 3, the "Devil," Ex. 4, "Antifa," Ex. 5 at 7:40, and "darkness" Ex. 4. Defendants have further described the election as a "war," with Defendant J. Mesaros explaining that "[b]iblically we are called to defend our families and our freedoms as a nation under God, when it is being taken away[,]" and "[i]t's now or never. We're losing our country." Ex. 3.

---

[1] This Consolidated Response focuses on the Defendants Cisneros, J. Mesaros, R. Mesaros, and Park as they were the only Defendants that filed Motions for Summary Judgment.

The record also shows that Defendants believed that extraordinary measures were justified to ensure that Democrats were defeated in 2020. In the months and weeks before October 30, Defendants each privately and/or publicly expressed support for aggressive tactics, including "instill[ing] a little bit of fear" by driving into a crowd of protestors, Ex. 6 at 43:16-22, gleeful references to making liberals "cry," Ex. 7; Ex. 1 at 139:15–140:6, or even throwing objects at protestors, Ex. 1 at 145:18–146:1. The record also reflects that Defendant Cisneros posted pictures of a firearm he called his "Antifa meat tenderizer" to his social media, Ex. 8, a nickname he repeated in interviews. Ex. 5 at 7:40. He asked his co-defendant, J. Mesaros, to custom-make a t-shirt saying, "don't make me Rittenhouse your ass," in reference to Kyle Rittenhouse, who shot and killed someone during a protest, Ex. 6 at 26:11-17; Ex. 9. And when heading to Washington D.C. for the January 6, 2021 rally that turned into a violent insurrection, Cisneros coordinated with others to bring collapsible batons and bear mace, allegedly because "Antifa and BLM [...] were attacking the elderly, [...] younger kids, [...] young girls[,] and [he] wanted to go out there and protect people against these thugs." Ex. 6 at 31:15-18.

Documents and testimony also show that the Defendants organized and prepared for the October 30 Trump Train. Defendant Cisneros recalls, well before October 30, "tr[ying] to come up with a plan to welcome [the Biden-Harris campaign] to Texas so to speak" by organizing a "convoy," and spreading the word to other Trump Train groups, including the New Braunfels Trump Train ("NBTT"). Ex. 10. Cisneros was aware that "[m]any people [who] wanted to be involved," "wanted to prevent" a potential Biden administration, and "to let [the Biden-Harris Campaign] know that what they stood for was not welcome here in Texas nor was it welcome in the United States." *Id*. The Mesaros Defendants, in turn, learned of the event from the New Braunfels Trump Train ("NBTT") Facebook page and posted online about their attendance. Ex. 1

at 160:14-25. Defendant Park, similarly, learned of the event from a text chain (which every member of the chain subsequently deleted) with other Trump Train participants who were aware of Defendant Cisneros' plan, and Park posted flyers online encouraging others to "greet the Biden bus," depicting an image of the bus with a red circle and line through it, "mean[ing] no." Ex. 11 at 195:1.

On October 30, each Defendant coordinated with other drivers in the Trump Train to locate and surround the bus, and to harass, intimidate, and threaten it through dangerous driving. *See infra* at 32-33. Indeed, documents, testimony, and videos make clear that Defendants engaged online to locate the bus and encourage others to swarm it while it was on I-35; drove in a coordinated manner to help others to surround the bus; and engaged in dangerous driving themselves, including lurching out in front of the many-ton bus from the highway shoulder, coordinating with other drivers to block the bus from exiting the freeway, driving around the bus without hands on the steering wheel while waving flags and filming, and/or ramming a staffer's car following the bus, which Cisneros later described as "me slamming that fucker" and "welcom[ing] him properly to Texas." Ex. 12; *see also infra* at 34, 39.

After the incident, documents, testimony, and videos show that Defendants gleefully celebrated the fact that they caused Plaintiffs to cancel events and leave Texas. As only a few examples, Cisneros posted about the Trump Train noting that "Texas welcomes Biden/Harris. We serve Brisket, Sausage, Leg quarters, Whataburger and 35 in [inch] tires . . . What would you like?" Ex. 12. He also bragged that he was smart enough "to get the entire Biden Harris campaign canceled in Texas[,]" Ex. 13, and proudly testified that he indeed believed he got the Biden-Harris campaign canceled, Ex. 6 at 108:22-24. Defendant Park posted photos of herself in the Trump Train, captioned "[t]here I go . . . escorting the Biden bus out of town," Ex. 14; Ex. 15, and later

shared a video to her Facebook captioned "THIS IS TEXAS—GTFOH!" meaning "get the fuck out of here," Ex. 16. J. Mesaros declared that "TTNB [referring to Trump Train New Braunfels] doesn't mess around y'all," and posted "YASSS! Byeee" in response to comments describing the incident as "show[ing] Kamala the way out" of Texas, Ex. 17.  J. Mesaros also posted that they "gave [the bus] a proper Texas welcome and [] escort out of town." Ex. 18. R. Mesaros posted a comment that he would "just as quick as run [Biden] out of Texas again" than see him visit the state, Ex. 19, and admitted that he had been referring to the incident, Ex. 2 at 228:3-6. And, in a sermon at a NBTT event shortly after the incident, Ex. 20, Defendant Steve Ceh—the NBTT group's leader—lauded the October 30 Trump Train, asking for videos taken that day and noting "[w]e're going to escort any socialist that comes into the State of Texas, we're going to escort them out of the stinking state." Ex. 21 at 235:6-11. J. Mesaros, who was filming the sermon, can be heard cheering in support. Ex. 20.

The record also details the harm Plaintiffs suffered from their experiences on October 30. *See infra* at 42-45. All Plaintiffs were prevented from engaging in political advocacy in support of their chosen candidates for President and Vice President, and from engaging in activities to support voter engagement and get-out-the-vote advocacy during the final days of the 2020 election. *Id*. In addition, each of the Plaintiffs suffered significant emotional distress as the result of the incident, causing them to miss work, decline significant professional and political opportunities, and make major changes to their lives and the lives of their families. *Id*.

Ignoring these facts, Defendants' motions for summary judgment mostly rehash previously rejected legal arguments and argue self-serving mischaracterizations of their actions and intentions that are directly refuted by the record. Their motions should be denied. Between the three motions, Defendants argue that the support-or-advocacy clauses of Section 1985(3) exceed Congress's

Article I Powers (*infra* Section I); that Plaintiffs can only succeed if Defendants interfered with rights found in the Constitution (*infra* Section II); and that Section 1985(3) requires something more closely related to postbellum violence in order to be actionable (*infra* Section III). These arguments fundamentally misread the relevant statute and caselaw and remain unpersuasive.

Defendants Park and Cisneros also grossly mischaracterize the factual record (whereas the Mesaros Defendants confine their argument to legal challenges). Park raises a First Amendment defense that relies on sanitized characterizations of her conduct and ignores, among other evidence, what amounts to videotaped confessions explaining and demonstrating for the camera how she aided and abetted the Trump Train's assault and false imprisonment of the bus (*infra* Section IV). Park also argues that there is no evidence that she entered into a conspiracy with other Defendants, solely because she "does not know and has never communicated with the other Defendants." This argument misstates the standard for conspiracy and ignores significant evidence showing Defendant Park's willful coordination with other Trump Train participants, including Defendants (*infra* Section V(A)). Park and Cisneros go on to argue that Plaintiffs have not established the illicit intent of Defendants' conspiracy under state law. But to do so, they must entirely ignore the record, which at a minimum shows a dispute of material fact, if not definitively proves Plaintiffs' case (*infra* Section V(B)). Finally, Defendant Cisneros appears to argue that emotional distress does not constitute an injury for state law claims, and that Plaintiffs have not shown sufficient injuries. But Cisneros does not even attempt to engage in an analysis of the facts (which plainly establish cognizable and significant injuries) and misstates the law. (*Infra* Section VII.)

At the very least, there are significant factual disputes that foreclose summary judgment. Overall, Defendants' arguments cannot withstand scrutiny; their motions for summary judgment should therefore be denied.

**ARGUMENT**

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Whether a genuine issue of material fact is presented will be determined by asking if a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc. v. Anderson*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the facts are to be construed in the light most favorable to the non-moving party. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

**I.   The Support-Or-Advocacy Clauses Are Valid Exercises Of Congress's Article I Powers**

Defendant Park concedes that the Supreme Court has upheld the support-or-advocacy clauses' since-repealed criminal enforcement provision[2] as a valid exercise of Congress's Article I authority. Dkt. 325 at 10; *see Ex parte Yarbrough*, 110 U.S. 651, 658-62 (1884). As a result, Defendant Park is forced to argue that Congress's Article I powers extend only to "ballot-casting" and not to regulating other federal campaign activities. Dkt. 325 at 9–10. That argument is breathtakingly broad—it would invalidate seemingly the entire body of federal campaign finance law, to start—and doubly wrong: the Supreme Court has repeatedly affirmed that Congress's powers under the Elections and Electors Clauses extend to campaign activity, and that the Necessary-and-Proper Clause augents those powers to allow Congress to regulate actions that might interfere with federal elections.[3]

---

[2] *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 13-14, *codified at* 70 Rev. Stat. § 5520 (1878), *repealed by* Act of Feb. 8, 1894, ch. 25, § 1, 28 Stat. 36, 37.

[3] This is Park's third time raising an argument challenging Congress's authority under Article I to pass the clauses. Plaintiffs incorporate their prior responses to those arguments by reference. *See* Dkt. 34 at 13-18; Dkt. 240 at 12-13.

First, the Supreme Court has upheld Congress's authority to regulate campaign activities.[4] Thus, this case seeks no extension of Congress's powers: all it asks is that the Court recognize that the same authorities that allow Congress to regulate campaign activity also allow Congress to protect those campaigns from tortious injury taken on account of that activity. Indeed, even during the 1870s the clauses were understood to properly regulate the "manner" of federal elections by protecting the "free interchange and comparison of views." *See United States v. Goldman*, 25 F. Cas. 1350, 1354 (C.C.D. La. 1878) (No. 15,225). Park is right to characterize those powers as "broad," Dkt. 325 at 10, which is exactly how the Supreme Court has described them, *e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) (Congress's powers are "broad"); *Smiley v. Holm*, 285 U.S. 355, 366-67 (1932) (same).

Second, the Necessary-and-Proper Clause provides an independent and sufficient basis for congressional enactment of the support-or-advocacy clauses. The Necessary-and-Proper Clause "augments" Congress's powers to regulate federal elections, *Oregon v. Mitchell*, 400 U.S. 112, 120 (1970), and Congress's exercise of those powers as well as the choice between various means and ends are questions "primarily addressed to the judgment of Congress." *Burroughs v. United States*, 290 U.S. 534, 547-48 (1934). They grant Congress the authority to regulate private parties "before the voting stage . . . whenever it is reasonably related to protection of the integrity of the federal electoral process." *United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 352 (E.D. La. 1965). Here, regulating tortious activity taken against political campaigns is necessary and proper to ensure the effectiveness of Congress's power to regulate the time, place, or manner of a federal election by ensuring that tortious activity does not interfere

---

[4] *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 187 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Buckley v. Valeo*, 424 U.S. 1, 13 (1976); *Burroughs v. United States*, 290 U.S. 534, 545-48 (1934).

with the fundamental fairness of an election by denying one locally disfavored campaign the same ability to campaign as another campaign. *See Goldman*, 25 F. Cas. at 1354; *see also Yarbrough*, 110 U.S. at 658-60 (noting necessary-and-proper clauses can provide a basis for support-or-advocacy clauses).

## II.    The Support-Or-Advocacy Clauses Create An Independent Substantive Right To Engage In Support Or Advocacy In Federal Elections

Relying heavily on the Supreme Court's decision in *United Brotherhood of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 834 (1983), and two Eighth Circuit cases, Defendants Park and the Mesaroses argue that Plaintiffs can only succeed if Defendants interfered with rights found in the Constitution—namely the right to vote and the right to speech free from state interference. Dkt. 325 at 7-8; Dkt. 326 at 3-4.

This Court has already rejected this argument multiple times in this litigation, recognizing that the support-or-advocacy clauses allow "plaintiffs to recover damages for interference with their election-related rights and [are] a 'specific remedy for interference by private individuals[.]'" Dkt. 64 at 12-13 (quoting *Paynes v. Lee*, 377 F.2d 61, 63-64 (5th Cir. 1967)); *see also* Dkt. 100 at 4; Dkt. 204 at 6. Defendants' fourth attempt to raise these arguments should do no better. As Plaintiffs have argued throughout this litigation, *see* Dkt. 75 at 9-15; Dkt. 167 at 3-4; Dkt. 240 at 19-21 (incorporated by reference), the support-or-advocacy clauses create "a free-standing federal statutory protection against conspiracies—whether private or governmental—aimed at retaliating against a person for a certain kind of conduct," namely giving "support or advocacy in a legal manner in favor of the election of a federal candidate." Eugene Volokh, *Private Employees' Speech and Political Activity: Statutory Protection Against Employer Retaliation*, 16 Tex. Rev. L. & Pol. 295, 324-25 (2012) (cleaned up). Not only is that view the better one in light of the statutory text—which says nothing about the constitutional rights Defendants suggest the clauses actually

protect—and the Klan Act's legislative history, but also it is the only interpretation that is consistent with the Fifth Circuit's prior holding in *Paynes v. Lee*.

A.    **The Support-Or-Advocacy Clauses Should Be Given A Substantive Interpretation Under The Rules of Statutory Interpretation**

The 1871 Klan Act does contain certain provisions intended only to be remedies for violations of independent constitutional rights. For example, the Supreme Court has been clear that Section 1 of the 1871 Klan Act (now codified at 42 U.S.C. § 1983) "merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (cleaned up). Likewise, the Act's equal protection clauses "provide[] no substantial rights [themselves] to the class conspired against," and the equal "rights, privileges, and immunities" protected by those clauses "must be found elsewhere." *Carpenters*, 463 U.S. at 833. But as the Supreme Court recognized in *Kush v. Rutledge*, not all the provisions of the Klan Act are identical—they have different texts and constitutional groundings that must be taken into account when interpreting the statute. 460 U.S. 719, 724-27 (1983).[5] Thus, whether the support-or-advocacy clauses are substantive or procedural turns on a question of statutory interpretation: when Congress used the words "support or advocacy" in the Klan Act did it mean to use the terms in their ordinary, common, everyday meaning (which would include political speeches by surrogates and supporters advocating for a federal candidate's election)? Or did it mean to give the terms

---

[5] Of Section 1985's five provisions, three protect the "institutions and processes of the federal government": Section 1985(1) bans interfering with federal officeholders, the first part of 1985(2) bans interfering with federal judicial proceedings, and the second part of 1985(3) (the support-or-advocacy clauses at issue here) bans interfering with support or advocacy in federal elections. *Id.* The two remaining provisions of the Klan Act deal with issues "not institutionally linked to federal interests and . . . usually of primary state concern": the second part of 1985(2) bans obstructing justice in state courts with the intent to deny the equal protection of the laws, and the first part of 1985(3) bans denying the private enjoyment of the equal protection of the laws or equal privileges and immunities under the law. *Id.* at 725. *See also* Dkt. 34 (Plaintiffs' motion to dismiss brief, discussing same).

support or advocacy the specialized, remedial meanings of "the constitutional right to vote" and the "constitutional right to engage in First Amendment protected activities?" Under the standard rules of statutory interpretation, the answer is clear: the clauses create a substantive right.

"In statutory interpretation, we have three obligations: (1) Read the statute; (2) read the statute; (3) read the statute!" *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) (cleaned up). Thus, "non-textual limiting constructions" of the Klan Act are "erroneous[]."*Kinney v. Weaver*, 367 F.3d 337, 352 n.14 (5th Cir. 2004) (en banc).

Defendants' argument is inconsistent with the clauses' plain meaning. The clauses' "plain language . . . prevents (among other things) conspiracies to prevent someone from advocating for a federal candidate for office ***or*** injuring someone for such advocacy" *Andrews v. D'Souz*a, 2023 WL 6456517, at *7 (N.D. Ga. Sept. 30, 2023). That substantive reading follows directly from the ordinary meaning of "support or advocacy," which includes speeches by surrogates in favor of presidential candidates and related presidential campaign activities. Dictionary definitions of 'support' and 'advocacy' "[a]t the time of the" Klan Act's "adoption in" 1871 confirm this. *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007). Dr. Webster's 1864 Unabridged Dictionary defines advocacy to mean "[t]he act of pleading for or support; vindication; defense; intercession." *New Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English Language* 24 (London: Bell and Daldy 1864)).[6] The same dictionary defines "support" as:

> 6. To carry on; to enable to continue; to maintain; as to support government; to support a war or a contest; to support an argument or debate. . . .

---

[6] Cited excerpts of *New Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English Language* (London: Bell and Daldy 1864) are included for convenience as Ex. 22.

9. To uphold by aid or countenance; as, to support a friend or a party; to support the administration.

10. To attend as a honorary assistant; as a chairman supported by a vice chairman . . . .

*Id.* at 1330.[7] Political assistance, argument, aid, and surrogacy all fall under these definitions.[8]

Defendants' interpretation also violates other rules of statutory interpretation, including:

1.    *The consistent usage canon.* When interpreting a statute, "[A] word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." *Landry's, Inc. v. Ins. Co. of the State of Pa.*, 4 F.4th 366, 370 (5th Cir. 2021) (cleaned up). Interpreting the words "support" and "advocacy" to mean only the constitutional right to vote and First Amendment rights would mean the words "support" or "advocacy" would have the same definition as other statutory terms (such as "vote" and "constitutional rights") found regularly in Reconstruction Statutes. The Reconstruction Congress referred directly to the right to vote when it wanted to; for example, the Enforcement Act of 1870 (the First Klan Act) included multiple provisions protecting the right to vote, and used the term "vote" or "voting" at least six times.[9] The same is true when the Reconstruction Congress wanted to reference the Constitution and constitutional rights. For example, Section 1 of the Klan Act protected against "deprivation[s] of any rights, privileges, or immunities secured by the Constitution." 17 Stat. 13.

_____

[7] *See also id.*, defining the noun form of "support" as "the act or operation of supporting, upholding, or sustaining[.]"

[8] Defendant Park also erroneously claims that the clauses "only protect[] the deprivation of 'a right or privilege of a citizen of the United States,'" quoting the clauses. Dkt. 325 at 10. She ignores the disjunctive "or" in the clauses that make clear that a plaintiff's injury can be to their "person," "property," **_or_** a deprivation of a right or privilege. *See* 42 U.S.C. § 1985(3).

[9] *See* Act of May 31, 1870, ch. 114, §§ 3-4, 16 Stat. at 140-41, *ruled unconstitutional as a vehicle to enforce 15th Amendment in United States v. Reese*, 92 U.S. (2 Otto) 214 (1875). The support-or-advocacy clauses use the word vote, just not in the key statutory phrase at issue here. *See* 42 U.S.C. § 1985(3) (unlawful to "conspire to prevent . . . any citizen who is lawfully entitled to vote, from giving his support or advocacy" (emphasis added)).

2. *The rule against redundancy.* It is "a cardinal rule of statutory interpretation that effect shall be given to every clause and part of a statute." *In re Glenn*, 900 F.3d 187, 190 (5th Cir. 2018) (cleaned up). Provisions of the Klan Act should not be interpreted to "deprive" them "of all independent effect" because "it is almost impossible to believe that that Congress intended, in the dissimilar language of the" Act to "simply . . . duplicate the coverage" of other statutory provisions. *Griffin v. Breckenridge*, 403 U.S. 88, 99 (1971). Here, Defendants' interpretation of the Act would make the support-or-advocacy clauses redundant with the equal protection clauses by according both provisions the exact same elements.

3. *The presumption against imparting meaning to codification activities.* It is an "established canon[] of statutory construction" that "it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Finley v. United States*, 490 U.S. 545, 554 (1989) (Scalia, J.) (cleaned up). In particular, Defendant Park argues that because "Supreme Court cases interpreting the clause immediately preceding the Support-or-Advocacy Clause" in Section 1985(3) have found the Klan Act to "supply only a remedy and not to create new substantive rights," the same must apply to the support-or-advocacy clauses. Dkt. 325 at 7 (citing *In re Park*, 2023 U.S. App. LEXIS 24449, at *8 (5th Cir. Sept. 13, 2023)). But the support-or-advocacy clauses were not codified together with the equal protection clauses until 1874—three years after they were enacted. *Kush*, 460 U.S. at 724 n.6. Thus, codification location should not be a tool to determine the "substantive meaning of the 1871 Act" because the 1874 codification process was "not intended" to change the meaning of the 1871 statutory provision. *Id.* at 724. "The combination and transportation of" the support-or-advocacy clauses and the equal protection clauses into "a single section of the Revised Statutes . . . cannot be held to have altered the scope and purpose of these enactments." *Logan v. United*

*States*, 144 U.S. 263, 302 (1892), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510 (1968).

4.     *The rule against anachronistic interpretations.* It is a "fundamental canon of statutory construction" that a court should not adopt "anachronistic interpretation of the text." *United States v. Bryant*, 996 F.3d 1243, 1262 (11th Cir. 2021). When the Klan Act was passed in 1871, First Amendment rights could only be asserted against the *federal* government, and not against *state* governments. It was not until a half-century later that the Supreme Court held that the First Amendment applied to state governments as well. *E.g.*, *Stromberg v. California*, 283 U.S. 359 (1931). Thus, the support-or-advocacy clauses cannot have been enacted as a vehicle to enforce First Amendment rights. Otherwise, in 1871, they would have provided a remedy only against the federal government and not even state governments. And they would have failed to address a key purpose of the Act: providing a legal remedy against the Klan.

Finally, Defendants' arguments are inconsistent with the Act's legislative history. Defendants use *Carpenters* and *Novotny* to suggest that what is true for the equal protection clauses must also be true for the support-or-advocacy clauses. But the Act's equal protection clauses were passed separately and under different constitutional authority than the support-or-advocacy clauses. The equal protection clauses were introduced in the House as part of an amendment designed to narrow an earlier proposal in order to ensure that the equal protection clauses' protection of rights, privileges, and immunities did not exceed Congress's powers under the Fourteenth Amendment. Cong. Globe, 42d Cong. 1st Sess. 477-78; *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980). By contrast, the support-or-advocacy clauses were introduced and passed without controversy several days later, *see* Cong. Globe, 42d Cong. 1st Sess. 704, 725, and raised none of the federalism concerns raised by the equal protection clauses. Thus, the

legislative history shows the same thing as the statutory text: the support-or-advocacy clauses are distinct from the equal protection clauses and should be accorded a distinct interpretation.

B.   **This Court Should Follow Applicable Precedent To Conclude That The Support-Or-Advocacy Clauses Create An Independent Substantive Right**

In spite of the clear textual and historical evidence that the clauses are substantive, Defendants Park and the Mesaroses urge this court to follow the Eighth Circuit's holdings in *Gill v. Farm Bureau Life Insurance Co. of Missouri*, 906 F.2d 1265, 1270 (8th Cir. 1990) and *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004), that the support-or-advocacy clauses can only be read as remedying other constitutional rights. Under their view, a support-or-advocacy claim against a private party can only be brought based on interference with the right to vote, but not for political advocacy, because constitutional First Amendment rights do not protect against non-state interference. *Gill*, 906 F.2d at 1270; *Federer*, 363 F.3d at 760.

But the Fifth Circuit has also interpreted the support-or-advocacy clauses, and it found that they create a substantive right.[10] In *Paynes v. Lee*, the Fifth Circuit examined whether a plaintiff could bring a support-or-advocacy claim even though the complaint did not allege a violation of the Fourteenth or Fifteenth Amendment, as it did not allege state action. *See* 377 F.2d at 63-64. *Paynes* concluded that the support-or-advocacy clauses were "something more and something different" than merely a remedy for Fourteenth Amendment violations taken under color of state law, and therefore the support-or-advocacy clauses create a "remedy for interference by private individuals." *Id.* at 63-64. That is the right view of the law: the First Amendment, after all, does not expressly apply to state actors, *see Barron v. City of Balt.*, 32 U.S. 243, 250-51 (1833); instead, it is incorporated against the states by the Fourteenth Amendment. As a result, *Paynes*'s holding

---

[10] Plaintiffs have found no other cases from appellate courts interpreting the support-or-advocacy clauses.

that the support-or-advocacy clauses extend beyond the bounds of the Fourteenth Amendment should also mean that they are not bounded by the First.

Although *Paynes* concerned intimidation on account of registration rather than advocacy for a federal candidate, *Paynes* is best read as supporting the view that the support-or-advocacy clauses create an independent substantive right to engage in support or advocacy.[11] Thus, the Southern District of New York and multiple commentators have read *Paynes* to support the view that "the Support or Advocacy Clause gives rise to an independent substantive right." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486 n.30 (S.D.N.Y. 2020).[12] Under that view, "the support and advocacy clause of Section 1985(3), . . . unlike the equal protection part of Section 1985(3)[,] does not require allegations of a . . . violation of a separate substantive right." *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *6 (E.D. Va. Aug. 13, 2018) ("*LULAC*").

---

[11] The Mesaros Defendants' argue that "[w]hen this distinction [between voter-registration activity and interference with speech or advocacy] is observed, *Paynes* loses its application[.]" Dkt. 326 at 4. Defendants provide no reason for this Court to limit *Paynes* to these exact facts and conclude that it only protects the right to vote free from intimidation. As explained *supra* at 6-8, Congress's Article I powers provide a sufficient basis for the support-or-advocacy clauses and their application in this case. Just as Congress can and has created a substantive statutory right to vote free of intimidation by private parties in federal elections, *see* 52 U.S.C. §§ 10101(b), 10307(b), it can also create a substantive statutory right to engage in support or advocacy free from intimidation and injury in federal elections. Indeed, even during Reconstruction the clauses were not seen as being limited to registering to vote and putting ballots in a box. *See, e.g.*, *Goldman*, 25 F. Cas. at 1352 (recognizing that a conspiracy to "prevent an influential person of the opposite political party from giving his support and advocacy to a particular candidate, to arrest him and restrain him of his liberty until after the election" would be "forbidden" by the support-or-advocacy clauses).

[12] *See also* Michael Weingartner, *Remedying Intimidating Voter Disinformation Through § 1985(3)'s Support-or-Advocacy Clauses*, 110 Geo. L.J. Online 83, 102 (2021); Note, *The Support or Advocacy Clause of § 1985(3)*, 133 Harv. L. Rev. 1382, 1399 (2020); *cf. Andrews*, 2023 WL 6456517, at *7 (following the Southern District's "a lengthy and reasoned analysis" in *National Coalition*).

The substantive approach is more faithful to the statutory text than the Eighth Circuit's "misreading of § 1985[.]" Eugene Volokh, *supra* at 9, 16 Tex. Rev. L. & Pol. at 324.[13] The Eighth Circuit, like Defendants here, was wrong to rely on *Carpenter* to interpret the support-or-advocacy cases. *See Gill*, 906 F.2d at 1270 (relying on *Carpenters* for the supposed proposition that a "First Amendment claim could not be actionable in the absence of State Action"). Both the majority opinion and the dissent from *Carpenters* made clear—and as this Court has already recognized, Dkt. 64 at 10—*Carpenters* expressly does not interpret the support-or-advocacy clauses. *See* 463 U.S. at 827 (equal protection clauses are statutory language "[t]his case concerns"); *id.* at 839 n.1 (Blackmun, J., dissenting) (observing that the "first clause" of "Section 1985(3)" was "at issue here," and not support-or-advocacy clauses).

Indeed, *Carpenters* had no reason to consider the support-or-advocacy clauses, as *Carpenters* dealt with a union attack on a construction site. And the differing constitutional grounding of the equal protection clauses and the support-or-advocacy clauses makes *Carpenters* a poor guide for interpreting the support-or-advocacy clauses: the equal protection clauses must be remedial because they are passed pursuant to expressly remedial constitutional authority. *See City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) (Congress's powers to enforce the Reconstruction Amendments are "remedial"). By contrast, Congress's Article I powers to regulate federal elections grant Congress the ability to create substantive rights enforceable against private parties, which obviates any need for this Court to look past the ordinary meaning of the words "support or advocacy" for fear of exceeding Congress's constitutional powers. *See supra* Section

---

[13] *See also* Craig R. Senn, *Ending Political Discrimination in the Workplace*, 87 Mo. L. Rev. 365, 396-97 (2022) (explaining "[l]egal scholars have" rejected Eighth Circuit case law, "persuasively arguing that" it "mistakenly conflates Section 1985(3)'s 'equal protection' and 'support or advocacy' clauses").

I; *cf. Kush*, 460 U.S. at 726 (constitutional concerns about equal protection clauses in Klan Act do "not apply to the portions of the statute that prohibit interference with . . . federal elections").

Finally, *Carpenters*'s caution against making the federal courts "the monitors of campaign tactics in both state and federal elections," 463 U.S. at 836, does not otherwise provide a basis to look beyond or otherwise restrict the ordinary meaning of the terms "support or advocacy." Again, the support-or-advocacy clauses cannot make the federal courts the monitor of state elections because the clauses protect only federal elections. Thus, there is no risk that the support-or-advocacy clauses could ever, for example, "be brought to bear on any act of violence resulting from union efforts to organize an employer." *Id.* at 838. Nor is there any risk that the Clause will be used to "punish every assault and battery committed by two or more persons," *id.* at 834, because the clauses are only implicated by assaults and batteries (and other tortious conduct) taken on account of federal campaign activities. And while Congress cannot regulate assaults and batteries that have no connection with a federal interest or function, Congress has unquestionable authority to protect federal campaign activities and other federal functions from assault, batteries, and other forms of interference for the same reasons they can legislate against torts committed against federal officers. *See supra* Section I; *Yarbrough*, 110 U.S. at 658-67.

*       *       *

Plaintiffs respectfully contend that the best reading of *Paynes* controls this Court's disposition of this appeal and requires the conclusion that the support-or-advocacy clauses create an independent substantive right enforceable against private parties. But even if the Court concludes that *Paynes* is not controlling, the result should be the same: the support-or-advocacy

clauses should be interpreted according to their ordinary and plain meaning.[14] And Defendants provide no argument—let alone a persuasive one—as to how Plaintiffs were not engaged in support and advocacy for a federal candidate under the ordinary meaning of the terms.

### III.    Plaintiffs Need Not Prove That "Force, Intimidation, Or Threat" Mirrored 19th Century Klan Violence To Succeed On Their Support-Or-Advocacy Claims

Defendant Park argues that the words "force, intimidation, or threat" in the support-or-advocacy clauses do not extend to her actions while driving in the Trump Train. Dkt. 325 at 8.[15] She cites to *In re Park*, in which the Fifth Circuit motions panel questioned whether "§ 1985(3) require[s] something more closely related to the postbellum violence that necessitated the statute's enactment," as *Gill* held. *In re Park*, 2023 U.S. App. LEXIS 24449, at *9-10 (citing *Gill*, 906 F.2d at 1269).

But Park fails to show how this case is not a "modern mirror image of the political violence Congress sought to address in 1871." Dkt. 42 at 14. After all, whatever the outer breadth of Congress's concerns about the Klan in 1871 were, assaults and false imprisonments were plainly within the ambit of activity that Congress was legislating against, and using vehicles to menace a campaign bus on a highway should be recognized as an unlawful intimidation tactic now just as much as menacing voters on the road was in 1878.[16]

---

[14] For the same reason, the support-or-advocacy clauses do not require a showing that the conspiracy in question stemmed from race- or other class-based animus, despite Mesaroses and Park's glancing suggestions to the contrary. *See* Dkt. 325 at 11; Dkt. 326 at 6. Plaintiffs address that argument in full in previous briefing, and to the extent the Court seeks to revisit it, respectfully incorporate that by reference. *See* Dkt. 34 at 21-26; Dkt. 75 at 6-8; Dkt. 240 at 21-22.

[15] Plaintiffs have previously responded to Park's arguments on this issue and respectfully incorporate their prior briefing by reference. *See* Dkt. 240 at 13-15.

[16] *United States v. Butler*, 25 F. Cas. 213, 220 (C.C.D.S.C. 1877) (No. 14,700) (describing testimony, noting that conspirators forced men traveling on the road to "to get down on their knees, and made to swear that they would vote the Democratic ticket"); *see also Daschle v. Thune*, No.

And regardless, the e*n banc* Fifth Circuit has already foreclosed this argument. In *Kinney*,

the Fifth Circuit held that the Klan Act should not be limited to Congress's imagination in 1871:

> [T]he defendants are also incorrect in assuming that the statute's reach is restricted
> to those factual scenarios that the enacting legislature could have specifically
> contemplated. On the contrary, the Supreme Court has instructed that
> Reconstruction-era civil rights statutes are to be given a sweep as broad as their
> language . . . ensuring that their protections remain relevant to modern
> circumstances.

367 F.3d at 351 (cleaned up). Per the *en banc* Court, what matters is the statutory text, not the

Klan's chosen tactics in 1871, and "the whole code canon compels this Court to interpret the same

term consistently across similar statutes." *Nat'l Coal. on Black Civic Participation v. Wohl*, 661

F. Supp. 3d 78, 126 (S.D.N.Y. 2023); *see also W.Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88-

91 (1991) (Scalia, J.). Thus, the terms "force, intimidation, and threat" in the Klan Act should be

interpreted similarly to other electoral intimidation provisions in federal law.

Critically, both the Fifth Circuit and other federal courts have broadly interpreted Klan Act-

like prohibitions on acts that "intimidate, threaten, or coerce" voters in Section 131(b) of the Civil

Rights Act of 1957 and Section 11(b) of the Voting Rights Act of 1965 to apply to more than just

violent Klan-like electoral intimidation. *See, e.g.*, *United States v. Bruce*, 353 F.2d 474, 477 (5th

Cir. 1965). Unsurprisingly, then, federal courts interpreting the support-or-advocacy clauses,[17] as

well as courts interpreting parallel "force, intimidation, or threat" language in Section 1985(2)'s

administration of federal justice clauses, have not limited those terms to Klan-like tactics either.[18]

---

4:04-4177, ECF No. 6, at 2 (D.S.D. 2004) (granting TRO against campaign intimidating voters,
and prohibiting campaign operatives from "following Native Americans from polling places").

[17] *See, e.g., Nat'l Coal.*, 661 F. Supp. 3d at 125-26 (disinformation robocalls constitute
"intimidation and threats"); *LULAC*, 2018 WL 3848404, at \*4 (defamation constitutes "force,
intimidation, and threat").

[18] *See, e.g., McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034-36 (11th Cir. 2000) (en
banc) (threats of employment termination and termination can constitute "force, intimidation, and
threat"); *Chahal v. Paine Webber, Inc.*, 725 F.2d 20, 22 (2d Cir. 1984) (a threat against a person's

The record shows that Defendants' conspiracy was achieved using "force, intimidation, or threat" under this standard. Surrounding a bus with, in Park's words, "about 100 cars," Ex. 23 at 0:08-0:22, on the interstate and attempting to control its movements by physically blocking it with their vehicles and driving dangerously, constitutes force.[19] Park herself narrates her participation in collective action that forcibly imprisoned the bus on the road, noting that the bus was trying "to sneak and get off the freeway but it's not going to work. Everyone is just going to surround it," Ex. 24 at 3:04-3:10, and that "it [was] hard to turn off" the freeway due to the presence of so many Trump vehicles, *id.* at 00:50. In that same video, as she can be seen driving past the bus, honking, Park brags that she "scared the driver." *Id.* at 3:55. And this says nothing of the violent tactics used by Defendant Cisneros [*infra* at 34] and the videos showing participants in the caravan driving within feet of the bus while yelling, making hand gestures, and filming, *see, e.g.*, Ex. 25; Ex. 24, pulling out in front of the bus from the highway shoulder, Ex. 25 at 10:55-11:35, and brake-checking the many-ton bus as it attempts to drive down a major highway with people inside, Ex. 25 at 08:30-08:46, 11:46, 13:37, 17:58.

Experiencing such dangerous driving as a driver or passenger with no idea when the experience might end is an objectively intimidating feeling all four Plaintiffs described. *See* Ex. 26 at 123:11-15 (stating that the incident was a "traumatic experience over the course of an hour-and-a-half where [he] believed that [his] life was in danger"); *see also* Ex. 27 at 190:9-12 (similar); Ex. 28 at 257:12-22 (similar); Ex. 29 at 243:7-9. Plaintiff Gins found the conduct so intimidating that he decided to cancel campaign stops in San Marcos and Austin out of a fear that violence

---

continued employment was "force, intimidation, or threat"); *Irizarry v. Quiros*, 722 F.2d 869, 871 (1st Cir. 1983) (denying employment sufficient to "intimidate").

[19] *See* Ex. 22 at 531 ("force" defined as, among other things, "[p]ower exerted against will or consent; compulsory power; violence; coercion").

could occur if they held an event. *See* Ex. 26 at 171:17-172:3. Even Defendant Park admitted to feeling unnerved about the driving conditions, noting in one video that "if my husband sees this, he's going to kill me," Ex. 24 at 2:30-2:34, and testifying at her deposition that she almost collided with a truck trying to drive around the hazards caused by the Trump Train, Ex. 11 at 328:25-329:19. And Park's commands that Plaintiffs "GTFOH," meaning "get the fuck out of here," Ex. 16, and statements by other co-conspirators like Defendant Cisneros that Plaintiffs should be served "35 in [inch] tires," Ex. 12, especially when accompanied by the dangerous driving described above, are threats.[20] The record contains ample evidence for a jury to conclude that Defendant Park and her co-conspirators used "force, intimidation, or threats" to accomplish their goals.

Finally, even were this Court to agree with Park that (1) "force, intimidation, or threat" should be limited only to those factual scenarios closely related to Klan postbellum violence and (2) that this case is not sufficiently close to such actions to qualify, that still would not justify dismissal. Defendant Park and her co-defendants can violate the support-or-advocacy clauses without resort to "force, intimidation, or threat" by conspiring to "injure any citizen in person or property" on account of having engaged in support or advocacy. 42 U.S.C. § 1985(3). In *Haddle v. Garrison*, the Supreme Court held that the phrase "injured in his person or property" in Section 1985 refers to "principles of tort law." 525 U.S. 121, 127 (1998). Thus, even where conduct does not rise to the level of force, intimidation, or threat, it can still nonetheless be actionable provided that it is part of a conduct to injure on account of support-or-advocacy.

---

[20] *See* Ex. 22 at 1378 ("threat" defined as a "[d]eclaration of an intention or determination to inflict punishment, loss, or pain on another; a menace.").

IV.   **Park's First Amendment Defense Fails**

Defendant Park also attempts to raise a First Amendment defense, arguing that her activities are protected by the First Amendment because Plaintiffs have supposedly not shown "Dolores Park conspired with the co-Defendants to engage in an unlawful association." Dkt. 325, at 16.[21]

That argument cannot give rise to a valid First Amendment defense because it asks and answers the wrong question. Plaintiffs, of course, dispute Park's factual contentions; the record contains substantial evidence, including what amounts to a videotaped confession, of Park's intent to engage in aggressive driving maneuvers to aid other Trump Train vehicles in surrounding the bus and constraining its movements. *See infra* at 31-32. But if Plaintiffs cannot show that she unlawfully conspired then the First Amendment does not come into play because Park would not have violated the Klan Act in the first place. And by contrast, if Plaintiffs establish that she did unlawfully conspire, then Park's First Amendment argument necessarily fails. The First Amendment allows even the regulation of direct political speech when laws withstand "First Amendment scrutiny," *United States v. Hansen*, 599 U.S. 762, 784 (2023), and Park does not brief—and therefore waived—any argument that the Klan Act cannot withstand First Amendment scrutiny. So, the First Amendment analysis ends there.

---

[21] Park is the only defendant who arguably raises a First Amendment defense. Defendant Cisneros confusingly invokes the Texas Citizens Participation Act ("TCPA"), Texas's anti-SLAPP statute, "because it highlights the Constitutionally protected nature of defendants' actions as well as the political nature of the plaintiffs' action in bringing this suit." Dkt. 329-1 at 8. This is not enough to raise a First Amendment defense, *see United States v. Reagan*, 596 F.3d 251, 254-55 (5th Cir. 2010); *Rost v. United States,* 2021 WL 5190875, at *8 (W.D. Tex. Sept. 22, 2021), nor does the TCPA apply here, as the Fifth Circuit has ruled that the TCPA "cannot apply in federal court," *Klocke v. Watson*, 936 F.3d 240, 245 (5th Cir. 2019), as revised (Aug. 29, 2019).

But if this Court wishes to inquire further, Park's First Amendment defense fails for three additional reasons: (1) dangerous driving is not expressive conduct, (2) if it is expressive conduct, that conduct would be categorically excluded from First Amendment protection, and (3) the Klan Act can withstand constitutional scrutiny.[22]

  *1. Not expressive conduct.* The First Amendment only protects conduct that "is inherently expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65-66 (2006) ("*FAIR*"). Thus, it does not extend to "veering cars" at a bus,[23] creating traffic hazards,[24] or unlawfully obstructing a public highway,[25] or assault.[26] Those activities are not inherently expressive; rather they only have meaning based on accompanying speech. And where conduct is made expressive only by "the speech that accompanies it"—such as by, for example, pointing to how members of the Trump Train were also engaging in speech supporting Donald Trump, as Defendant Park does—that is "strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *Id.* at 66. As a result, Park "may be held liable for . . . her own wrongful conduct, even if otherwise participating in expressive activity." *Doe v. Mckesson*, 71 F.4th 278, 290 (5th Cir. 2023).

---

[22] Plaintiffs have previously briefed this issue following similar arguments made by Defendant Park in this litigation, and respectfully incorporate that by reference. *See* Dkt. 240 at 15-19.

[23] *United States v. McDermott*, 29 F.3d 404, 407 (8th Cir. 1994).

[24] *See Cox v. Louisiana*, 379 U.S. 536, 554-55 (1965) ("One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest."); *Singleton v. Darby*, 609 F. App'x 190, 193 (5th Cir. 2015) ("The First Amendment does not entitle a citizen to obstruct traffic or create hazards for others.").

[25] *See Doe v. Mckesson*, 71 F.4th 278, 290-94 (5th Cir. 2023).

[26] *See Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment.").

Park cites *Snyder v. Phelps*, 562 U.S. 443 (2011), for the proposition that "the First Amendment protects speech any reasonable person would find intimidating." Dkt. 325 at 14. *Snyder* is inapposite; it involved an indisputably peaceful protest. *See* 562 U.S. at 449. Indeed, Justice Breyer's concurrence and Justice Alito's dissent both emphasized a counterfactual hypothetical that is much more closely related to the case at hand: "[S]uppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means." *Id*. at 461 (Breyer, J., concurring); *see also id*. at 471 (Alito, J., dissenting). The same reasoning is fatal to Park's First Amendment challenge here.

       2.    *Categorically Excluded*. Even if Defendants' conduct had inherently conveyed some message, any such message would fall into at least two well-established categorical exceptions to First Amendment protection: true threats and conduct incidental to criminal or tortious conduct. *See United States v. Stevens*, 559 U.S. 460, 468-69 (2010). The "prevention and punishment" of speech falling into these categorical exceptions has "never been thought to raise any Constitutional problem." *Id.* at 469 (cleaned up).

Defendants' conduct was a true threat—that is, where "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003); *see also, e.g.*, *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022). Defendants' activity made it clear that by campaigning in Defendants' community, Plaintiffs risked their safety. Plaintiffs got the message, *see* Ex. 26 at 123:11-15; Ex. 30; Ex. 27 at 189:16-190:12 (noting that Plaintiffs feared for their lives and were subjected to an imminent threat of bodily harm), as would have any reasonable person in their

situation. *See Counterman v. Colorado*, 600 U.S. 66, 77 (2023) (a statement can amount to a true threat "based solely on its objective content" rather than the subjective intent of the speaker).

Any "speech" here was also integral to a course of unlawful conduct, namely: reckless driving and conspiracy to commit assault. "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *FAIR*, 547 U.S. at 62 (cleaned up). Thus, the First Amendment does not immunize Defendants from liability merely because they may *also* have used some "speech," assembly, or other expressive activity to further their unlawful conspiracy. *See, e.g.*, *Brown v. Hartlage*, 456 U.S. 45, 55 (1982) ("Although agreements to engage in illegal conduct undoubtedly possess some element of association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment.").

    *3.   Constitutional Scrutiny*. Even if Defendants' conduct here were to constitute protected speech under the First Amendment, speech can still be regulated where those regulations survive "ordinary First Amendment scrutiny." *Hansen*, 599 U.S. at 784. The support-or-advocacy clauses survive any level of constitutional scrutiny, including strict scrutiny, because they further multiple compelling governmental interests. *See Nat'l Coal.*, 661 F. Supp. 3d at 121 n.29. They prevent voter intimidation and promote electoral integrity. *See Burson v. Freeman*, 504 U.S. 191, 198 (1992) (plurality). They promote "the free interchange and comparison of views on the part of people who are voters," *Goldman*, 25 F. Cas. at 1354, which is "essential to the welfare of the public," *Associated Press v. United States*, 326 U.S. 1, 20 (1945). And they are equally "essential to the successful working of this government," by ensuring that tortfeasors cannot

unilaterally silence disfavored perspectives and "control . . . elections by violence and by corruption," *Yarbrough*, 110 U.S. at 666.

And the support-or-advocacy clauses are narrowly tailored, as they do not limit Defendants' ability to speak in favor of Donald Trump or Joe Biden. Defendants are free to put whatever bumper stickers on the car they want; fly whatever flags they want; and hold whatever signs they want at Biden campaign events. All the clauses prohibit is Defendants' dangerous and intimidating tactics with multi-ton pickup trucks and other vehicles that blocked a public highway and made it physically dangerous for Plaintiffs to engage in political speech. And that is not an interest that the First Amendment offers much—if any—protection to: "The right of free speech of . . . any other individual does not embrace a right to snuff out the free speech of others." *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 387 (1969). Thus, the application of the support-or-advocacy clauses here—limiting Defendants' ability to engage in certain physically dangerous non-speech conduct that silences Plaintiffs' ability to engage in core political speech in favor of a federal presidential candidate—is an appropriate measure. *Cf. Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (noting a law must "be narrowly tailored, not . . . perfectly tailored").

## V.   <u>Plaintiffs' Conspiracy Claims Survive Summary Judgment</u>

At the outset, every Defendant who filed a summary judgment motion concedes that, if the Court agrees with Plaintiffs' reading of support-or-advocacy clauses, Defendants are not entitled to summary judgment on Plaintiffs' Claim I (the support-or-advocacy clause).[27] No Defendant

---

[27] Defendant Park asserts in her section on undisputed facts that "Plaintiffs have not established the required elements to prove each of their claims against Dolores Park," Dkt. 325 at 1, but then confusingly states that "[t]his case does not hinge on a material issue of fact, but on an interpretation of law," *id*. at 6. Because she never argues why the undisputed facts as to Plaintiffs' federal claim demonstrate that she is entitled to summary judgment, *compare id., with id.* at 17-19 (three pages arguing why Plaintiffs' <u>state</u> claims fail as a matter of law), parsing her confusing statements would only uncover, at most, a "skeletal 'argument'" regarding Plaintiffs' federal claim

argues here that they are entitled to summary judgment because material facts are undisputed, and so any factual sufficiency argument on Plaintiffs' Count I has been waived. *See United States v. Reagan*, 596 F.3d 251, 254-55 (5th Cir. 2010) (defendants' failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver"); *Rost v. United States*, 2021 WL 5190875, at *8 (W.D. Tex. Sept. 22, 2021) (same). For the reasons argued above, the Court should deny Defendants' motions in their entirety as to Plaintiffs' federal claims.

For Plaintiffs' state conspiracy claims, Plaintiffs must demonstrate that:

"(1) a combination of two or more persons; (2) . . . seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result."

*MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 196 (Tex. App. 2017) (citing *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)). Defendant Park argues that she is entitled to summary judgment because she did not have a "meeting of the minds" with any other co-conspirator, Dkt. 325 at 18. And Defendants Park and Cisneros both argue that they are entitled to summary judgment because they did not intend to accomplish an unlawful purpose. *Id.*; Dkt. 329-1 at 3-4. Because material disputes of fact exist as to both elements, Defendants' motions for summary judgment should be denied.[28]

---

that this Court should not bear the burden of fleshing out. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

[28] Cisneros does not challenge that there was an agreement with other members of the Trump Train, nor does Park challenge Plaintiffs' injuries. And the Mesaros Defendants do not raise *any* factual sufficiency arguments. These arguments have thus been waived for summary judgment. *Reagan*, 596 F.3d at 254-55; *Rost,* 2021 WL 5190875, at *8. Facts related to any Defendant who did not properly raise a factual sufficiency argument are covered only to the degree they are relevant to their role as co-conspirators of other Defendants.

A. **Disputes of Material Fact Exist as to Whether Park Entered into an Agreement with Co-Conspirators**

In seeking summary judgment, Park argues that there is no evidence of a "meeting of the minds" between Park and "any of the co-defendants," Dkt. 325 at 18, because Park "does not know and has never communicated with the other defendants," *id.* But (of course) an agreement to engage in a conspiracy does not require co-conspirators to contact one another via traditional correspondence or know the names of co-conspirators involved. "The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. App. 1975). A civil conspiracy can be established by circumstantial evidence, *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581-82 (Tex. 1963), and "[s]imilar methods of operation together with joint activities and relationships support the finding of a single conspiracy," *Rainey v. State*, 877 S.W.2d 48, 51 (Tex. App. 1994). *Cf. United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982) ("[A] single conspiracy will be inferred" where "there are several parts inherent in a larger common plan, or where the . . . nature of the activity is such that knowledge of the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants[.]") "Statements that the witness did not agree or conspire" do not disprove an agreement because they "are not readily controvertible statements[.]" *Am. Petrofina Co. of Tex. v. Crump Bus. Forms, Inc.*, 597 S.W.2d 467, 471 (Tex. Civ. App. 1980).

Park's affiliation with the Trump Train began when she attended weekly "flag wave" events in San Antonio, and her involvement developed quickly in a short time. *See* Ex. 11 at 123:17-23 (Park attended Trump-related events at Cornerstone Church); Ex. 31 at 42:3-10, 92:15-24 (Park attended weekly Cornerstone Church Trump Train events in San Antonio); Ex. 32 (Park

Instagram flyer for "caravan" for Trump "every Saturday Cornerstone Church parking lot" dated October 5, 2020); Ex. 33 (Instagram post for "Trump caravan" including photo of "All Aboard the Trump Train" flag dated October 9, 2020); Ex. 34 and Ex. 35 (Instagram post and video of Park "driving with Trump Train" in San Antonio dated October 10, 2020); Ex. 36 and Ex. 37 (Facebook video and post of Park and Johnny Park driving in Trump Train dated October 17, 2020); Ex. 38 and Ex. 7 (Instagram post and video of Park in a car waving a Trump flag dated October 19, 2020). Through her involvement at Trump Train events, Park made several friends and encouraged others to participate by sharing promotional flyers for the San Antonio events on her social media. *E.g.*, Ex. 39 (Cornerstone Flyer 10/26). Notably, Park testified that she learned of the Biden-Harris bus tour and October 30 Trump Train directly through a group text with non-party co-conspirators Sarah Hill, Malorie Lerma, and Laura Kirby—all friends she met at other Trump Train events (and all of whom later deleted the relevant text chain). Ex. 40, Rog. No. 4; Ex. 41 at 37:18-38:1; Ex. 42 at 75:5-9; Ex. 31 at 42:3-10. When Park caught wind of the Trump Train's plans to "welcome" the Biden-Harris Campaign bus, she quickly created a flyer to spread the word and encourage others to participate and "Greet the Biden bus Trump style." Ex. 11 at 188:23-189:2; Ex. 43; Ex. 44 (D. Park Greet the Biden bus flyer on Facebook); Ex. 45 (D. Park Chump Style flyer on Instagram).

Park's participation in promoting the October 30 Trump Train required knowledge that others were organizing and planning the event on the ground. *See, e.g.*, Ex. 11 at 188:21-189:2, 189:14-17 (Park learned of the bus coming to Texas and researched for additional information on Facebook to make flyers); 190:3-16 (Park knew the Trump Train was at 12:30 on October 30); 192:3-14 (Park used "Greet the Biden bus" and "Trump style" language she had seen elsewhere in flyers she designed, on which she included imagery of the bus with a superimposed red "cancel"

or "no" symbol). Park even implied on a Facebook post that she would be helping to plan the event. *Id.* at 215:22-216:14 (Defendant Park Facebook post stating "[w]e are putting together a Trump welcoming party" was referring to Defendant Park, Ms. Lerma, Ms. Hill, and Ms. Kirby and the October 30 Trump Train). Given Park's actual knowledge of the Trump Train's plans to interfere with the Biden-Harris bus tour, and her distribution of a promotional flyer in furtherance of this plan, a jury could easily infer the existence of an agreement between Park and the other Trump Train participants.

Perhaps more importantly, Park's *contemporaneous statements and driving behavior* during the incident on I-35 make clear her active agreement and coordination with other vehicles in the Trump Train as part of a concerted effort, with the goal of assaulting the bus and impeding its movement. Park filmed herself on Facebook Live while driving, and explained and demonstrated her and other drivers' roles driving as a pack to surround the bus, stating that "we're following a bunch of cars. Do you want to know why? Biden's here … We're following the Biden Bus." Ex. 46 at 00:43-00:55. In another video, she explains that "people are lining the freeways, it's hard to turn off," Ex. 24 at 0:50-0:55, and that "this Biden bus is surrounded, like seriously surrounded," *id.* at 1:15-1:22. She then notes that "a lot of people are ahead of the Biden bus. A lot of people. So, wherever [the bus is] pulling into, they have an escort." *Id.* at 1:35-1:44. She describes herself as not merely a passive observer, but as part of the cause of the bus's distress: she explains there are "Trump people everywhere . . . 100 or more cars, and *we're* escorting the Biden Bus," Ex. 23 at 0:08-0:22 (emphasis added), shouts "Biden, go home!" and says that it's "funny, funny, funny" that so many cars are surrounding the bus, *id.* at 0:48-0:59, and as she passes the bus, she says, "*I'm* gonna show you how many people are Trump people" and brags that she "scared the driver," Ex. 24 at 3:50-3:57 (emphasis added).

Park also contemporaneously narrated her awareness that she was driving dangerously as part of the Trump Train. She exclaims in one video that "if my husband sees this, he's going to kill me." Ex. 24 at 2:30-2:34. She additionally testified to almost being involved in a collision with a truck trying to drive around the Trump Train, *see supra* at 21, and to witnessing the collision between Cisneros and the staffer vehicle when it occurred, but nonetheless continued following the bus and driving in a coordinated manner to box it in. Ex. 11 at 343:1-343:4.

Finally, Park directly collaborated with other Trump Train vehicles, ensuring their access to the bus despite the assaultive conduct she was observing. On video, Park says that "there are thirty to forty cars in front of the Biden bus" and that the bus is "trying to switch lanes to get rid of everyone. Everyone is just switching lanes, look. Hold on *I've got to switch lanes*." Ex. 24 at 2:44-2:54, 2:59-3:03 (emphasis added). Looking at the bus, she says "they," meaning the bus, "think they're gonna sneak and get off the freeway but it's not gonna work. *Everyone is just going to surround it*." *Id.* at 3:04-3:10 (emphasis added). In a separate video, she explained that "they," meaning non-Trump Train drivers, "try to break us up but it doesn't work. It doesn't work, *there's too many of us*," meaning Trump Train vehicles, and that "someone just lets everyone in." Ex. 23 at 2:30-2:40 (emphasis added). Park then demonstrates this very tactic while blocking a semi-truck attempting to pass her, explaining that "you just scoot over and then you let everyone else in like this, watch" at which point there is audible honking. *Id.* at 3:11-3:22. Park's driving and videotaped admissions show that she was aware of the coordinated effort to assault and falsely imprison the bus, considered herself to be aligned with that effort, and, as part of her agreement to help swarm the bus, herself engaged in aggressive and unsafe driving to assist other Trump Train drivers. (As discussed *infra* Section VI(B), this is also substantial evidence that she aided and abetted assault.)

B.      **Disputes Of Material Fact Exist As To The Intent Of Defendants' Conspiracy**

Defendants Park and Cisneros urge that Plaintiffs have not established Defendants' specific intent to accomplish an unlawful purpose, which they describe as assault or battery. Dkt. 325 at 18; Dkt. 329-1 at 3. But a conspiracy to accomplish tortious conduct is an unlawful conspiracy. *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 937 S.W.2d 60, 69 (Tex. App. 1996), *aff'd*, 975 S.W.2d 546 (Tex. 1998). In arguing that their conduct could not have been tortious, Defendants selectively pick helpful facts and assert conclusorily that "no one was driving tortiously," Dkt. 329-1 at 3; *see also* Dkt. 325 at 18, ignoring multiple videos capturing the Trump Train's coordinated dangerous, coercive, and assaultive driving.[29]

The record is replete with evidence showing that Defendants intended to tortiously interfere with the bus and its passengers.[30] Although Defendants and their co-conspirators repeatedly described their plans for October 30 in veiled terms like "welcome" or "greet," *see, e.g.*, Ex. 10; Ex. 43, Defendants concede that those terms were never meant to be taken at face value. *See, e.g.*,

---

[29] For example, a 42:04 minute video Plaintiff Davis captured from her vantage point at the front of the bus, Ex. 25, captures repeated instances of Defendants and their co-conspirators engaged in assaultive, harassing, and/or intimidating driving tactics. *See, e.g.*, Ex. 25 at 04:40-05:10 (bus closely surrounded by five Trump Train vehicles); 07:20-07:34 (bus changes lanes to avoid Trump Train vehicles and red Toyota Tundra cuts dangerously close to maintain proximity to bus); 08:30-08:46 (brake checking by grey Ford F-150, bringing it within feet of the bus, and boxing in from center lane by red Toyota Tundra); 10:55-11:35 (several vehicles, including the Mesaros Defendants, pull from lanes of traffic to shoulder at Exit 206 before re-entering traffic directly in front of bus); 14:20-14:45 (grey Ford F-150 drives closely in front of the bus and brings it to a crawl while red Toyota Tundra and other vehicles move freely at higher speeds in center lane); 16:00-17:06 (similar; grey Ford F-150 straddles dotted line to prevent bus's forward progress); 18:20-19:00 (grey Ford F-150 and white Toyota Tundra weave in and out of vehicles to remain near bus and staffer in white SUV as bus attempts to move to center lane); 24:30-26:25 (white Toyota Tundra drives closely in front of the bus and brings it to a crawl).

[30] The record also contains ample evidence to support a jury's conclusion that Defendants intended to prevent Plaintiffs from supporting or advocating for their preferred federal candidate by using force, intimidation, or threats, or to injure Plaintiffs on account of that support. *See* 42 U.S.C. § 1985(3). Because no Defendant challenged the factual sufficiency of Plaintiffs' federal claim, those facts may not be fully addressed in this brief.

Ex. 6 at 97:22-24 ("Q. "[Y]ou're referring to 'welcoming' him with your 35-inch tires. Right? A. Yes."); Ex. 1 at 207:3 ("Yeah, so it's not a literal welcome."); *see also* Ex. 47 at 10 (discussing the use of doublespeak in extremist groups). Park expressed a desire to "make the liberals cry" through her participation in Trump Trains. Ex. 7. And when posting about the incident on social media immediately after, Park made clear she wanted the Plaintiffs to feel like they needed to "GTFOH," or get the fuck out of here. Ex. 16.

Park was aware that the driving tactics employed by Trump Train drivers were frightening, intimidating, and created conditions where a collision could occur. Ex. 24 at 3:55; Ex. 11 at 329:7-12, 17-19. She testified to feeling intimidated and scared herself by conditions on the road and took evasive maneuvers when a semi-truck driver began driving aggressively around the Trump Train, in what she assumed was an attempt to "break[] [them] up." Ex. 11 at 329:7-12. She also testified that she got in front of the truck "because [she] felt safer" and that otherwise the truck was "going to run [her] off the road." *Id.* at 329:17-19.[31] When asked by the Court at a hearing what the bus driver was supposed to do given that he "had a bus full of people he [wa]s trying to protect," and the potential risks those on the bus could have faced if the driver had allowed the Trump Train to stop the bus, Park offered no alternatives and said she "understood" the point. Ex. 48 at 197:22-198:23. What is more, Park even brags, in contemporaneous video, that she "scared the driver"—referring to Plaintiff Holloway—when driving past the bus. Ex. 23 at 3:55.

Cisneros's driving was also intimidating and harassing. Despite insisting under oath that no one would feel harassed, assaulted, or trapped by his conduct, Cisneros repeatedly took dangerous maneuvers to stay in close range with the bus, including pulling onto the shoulder and

---

[31] Unfortunately for those on the Biden bus, they were unable to protect themselves in a similar manner because at the time, they were "seriously surrounded" by Park's co-conspirators. Ex. 24 at 1:15-1:22.

then back in front of the bus, Ex. 6 at 144:13-146:15. Although the bus changed lanes several times in an attempt to lose the Trump Train, it could not, and Cisneros pulled to the shoulder five different times in an approximately 12-minute period to stay close to the bus. Ex. 25 at 9:54-23:54; *see also* Ex. 49 at 8. Video evidence shows that Cisneros sped up to prevent a Biden-Harris staffer from remaining with the bus, Ex. 50, and used his truck to push the staffer's car, causing a collision, Ex. 51; Ex. 6 at 151:18-152:5. Although Cisneros claims, citing only to Park's expert witness testimony and the testimony of a sympathetic non-party witness, that the staffer hit *him*, *see* Dkt. 329-1 at 3, Cisneros contemporaneously described himself as "slamming that fucker" and "welcom[ing] him properly to Texas." Ex. 12. In an interview about the incident, Cisneros asserted that the staffer whose vehicle he "slam[med]" was "Antifa, I'm more than sure." Ex. 5 at 7:40.[32]

Cisneros's intent in colliding with the "Antifa" staffer's car is further informed by a nearly identical incident in September 2020, in which Cisneros drove his truck into a crowd of Black Lives Matter protesters who were marching on the streets of San Antonio, drawing screams from the crowd. Ex. 52; Ex. 53. Cisneros testified at his deposition that he drove into the crowd of protestors "just to make a statement," but when asked whether he knew if he put anybody in fear

---

[32] Park and others have, at times, protested that they cannot be held liable for Cisneros's driving. But under well-established principles of conspiracy law they can even if the object of the conspiracy was not one to side-swipe. Once participants have agreed to participate in an unlawful conspiracy, "a conspirator can be liable even if he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy." *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983). Here, one unlawful object of the conspiracy was using "force, intimidation, and threat"—namely the use of dangerous driving tactics—as well as coordinated assaults—which are independently actionable as conspiracies to injure under the Act—to deter the plaintiffs from engaging in support or advocacy in a federal election and punish them for having done so. *See* Dkt. 151 ¶¶ 146-151. Thus, all participants in the conspiracy can be held liable for the side swiping because it "was a reasonably foreseeable consequence of the scheme," *Halberstam*, 705 F.2d at 487, and an overt act "in furtherance of the object of such conspiracy," 42 U.S.C. § 1985(3).

of being hit by his truck, he testified, "I hope so. I hope I instilled a little bit of fear, yeah." Ex. 6 at 41:8-9, 43:16-21.

Although Park, Cisneros, and other co-conspirators now offer post-hoc explanations of their intentions on I-35, Defendants Park and Cisneros witnessed the egregious harassment of Plaintiffs and without changing course, continued in the convoy. "The law provides a rebuttable presumption that every man intends the natural and probable consequences of his own acts." *United States v. Wilkinson*, 460 F.2d 725, 730 (5th Cir. 1972). A reasonable juror could conclude that Cisneros and Park understood and intended the natural and obvious consequences of their acts.

Further, in the immediate aftermath of the Incident, both Cisneros and Park publicly celebrated the result they now claim they had no intention to cause: forcing the Biden campaign out of Texas. As noted above, Park posted a video of the Incident with the caption "THIS IS TEXAS—GTFOH!" Ex. 16. In that video the man filming is laughing, while saying the Trump Train is "chasing them" and "literally escorting the bus out of town." Ex. 54. Days later, Park called the Incident "so fun sincerely so fun," again admitting that "we surrounded their bus" and explaining that she "wanted to make sure [the bus] was safely out of town." *Id.* Cisneros also posted approvingly about the success of the plan he and non-party Jason Peña-Ahuyon had hatched—a plan which Peña-Ahuyon himself described as #OperationBlockTheBusRN (RN meaning "right now"). Ex. 10; Ex. 6 at 113:7-114:1. In addition to bragging about "slamming that fucker" and "serving 35 in[ch] tires," Ex. 12, Cisneros also boasted that he was "[s]mart enough to get the entire Biden-Harris campaign cancelled in Texas[.]" Ex. 13. And even during his deposition, Cisneros reflected on the success of his "Operation": "[s]o was it a success that I kind of saved Texas from people like that, that would quit in the smallest face of adversity? I would— I would want somebody a lot stronger than that. Somebody who won't quit." Ex. 6 at 109:17-21.

Finally, a reasonable jury could conclude that Defendants' and others' destruction of evidence concerning their participation in the October 30 Trump Train is evidence of unlawful intent. As detailed in previous briefing (which Plaintiffs respectfully incorporate), each Defendant, as well as nearly all the non-party witnesses Plaintiffs deposed or subpoenaed, has somehow lost or destroyed evidence. *See* Dkt. 241-1 at 8-11; Dkt. 241-8; Dkt. 267; Dkt. 271; Dkt. 277; Dkt. 348. Evidence has been lost due to alleged accidents, incompetence, admitted attempts to avoid association with the incident, and even, in one instance, the sea.[33] It has also been deliberately deleted or destroyed; Magistrate Judge Lane found at an evidentiary hearing that Cisneros and J. Mesaros had both destroyed evidence "with the intent to deprive [Plaintiffs] of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2); Ex. 48 at 233:9-237:4.

Cisneros, in particular, has lost all call logs and text messages from around October 30, which would have shown him coordinating with non-parties to track and chase the bus. Dkt. 265. He has testified variously that this loss was the result of hacking by unknown persons (Dkt. 265-6; Dkt. 265-7), theft by his brother (Dkt. 265-1 at 5), and even suggested that it may have been inadvertently deleted by Plaintiffs' discovery vendor Ex. 48 at 49:4-14. He claimed his phone was lost (Dkt. 265-13; Dkt. 265-14) and then, once it was found, that he could not remember the passcode (Dkt. 265 at 5). After Plaintiffs' discovery vendor was able to bypass his passcode with his consent, he had no explanation for the fact that evidence from the relevant time period was missing. Dkt. 265 at 7. Park, purportedly due to an auto-delete function on her phone, lost all texts from the relevant period, which would have shown her coordination via a particular group text chain with certain non-parties to promote and participate in the incident. Dkt. 277-8; Ex. 11 at

---

[33] *See* Ex. 55 at 18:4.

20:23-22:6. Conveniently, all the non-parties in the group text chain have also deleted those messages.[34] Ex. 41 at 37:18-38:1; Ex. 42 at 75:5-9; Ex. 31 at 42:3-10.

Presented with an extensive loss of evidence at the hands of both Defendants and non-parties, a reasonable jury could conclude that the Defendants and other co-conspirators sought to scrub evidence of their planning of and participation in the incident *precisely because* they understood that the October 30 Trump Train was an unlawful conspiracy to assault, intimidate, and interfere with Plaintiffs' ability to support and advocate for the candidates of their choice.

## VI.   Plaintiffs' Assault Claims Survive Summary Judgment

For Plaintiffs' third and final claim, civil assault, Plaintiffs must prove that Defendants intentionally, knowingly, or recklessly (1) caused bodily injury to Plaintiffs; (2) threatened Plaintiffs with imminent bodily injury; or (3) caused physical contact with Plaintiffs when Defendants knew or reasonably believed the contact to be offensive or provocative. *Sanchez v. Striever*, 614 S.W.3d 233, 239 (Tex. App. 2020) (the elements of assault are the same in civil and criminal cases) (citing *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012)); *see also* Tex. Penal Code § 22.01(a) (criminal assault). Alternately, Plaintiffs may demonstrate Defendants aided and abetted assault by showing that Defendants (1) provided aid to someone committing a wrongful act that injured Plaintiffs; (2) were aware of their role as part of an illegal or tortious act at the time they provided the assistance; (3) and that Defendants knowingly and substantially assisted in the principal violation. *Halberstam v. Welch*, 705 F.2d 472, 477-78 (D.C. Cir. 1983); *see also Milliken v. Skepnek*, 1999 WL 496505, at *6 (Tex. App. July 15, 1999) ("Where one person assists another

---

[34] Although Judge Lane found that Park failed to preserve her texts, including the critical group text, the Court declined to order sanctions against her, declining to make the specific finding that her deletion was the result of an intent to deprive Plaintiffs of the evidence. Ex. 48 at 234:8-12. Nonetheless, the fact that every member of the group text happened to delete it is still probative evidence of Park and her co-conspirators' intent.

in making an assault, both are principals and liable in damages"). A defendant's intent or knowledge is a question of fact, determined by the totality of the circumstances. *Creighton v. State*, 2011 WL 743073, at *2 (Tex. App. Mar. 2, 2011).

Defendants Cisneros and Park[35] argue in turn that each of them is entitled to summary judgment because they either did not create a threat of imminent bodily injury (Cisneros), *see* Dkt. 329-1 at 4-5, or did not aid and abet others' assault (Park), *see* Dkt. 325 at 18-19. Because material disputes of fact exist as to Plaintiffs' assault claims against both Cisneros and Park, their motions for summary judgment as to Count III should be denied.

A.     **A Reasonable Jury Could Conclude That Defendant Cisneros Intended To Create Apprehension Of Imminent Bodily Injury**

Cisneros asserts that undisputed evidence shows that he and other Defendants were *merely* "driving along the plaintiff bus, wa[]ving flags, [and] demonstrating support of their preferred presidential candidate, at a speed with the flow of traffic." Dkt. 329-1 at 4. But the record contains ample evidence for the jury to determine that Cisneros assaulted Plaintiffs.

Contrary to his assertions, a reasonable juror could conclude that Cisneros intentionally and knowingly induced in Plaintiffs an apprehension of imminent bodily injury on October 30. Cisneros's own recollection of the incident shows that he planned to threaten and instill fear in Plaintiffs. In an email, Cisneros describes hatching a plan with non-party Jason Peña-Ahuyon to "welcome [the bus] to Texas so to speak" by "getting a convoy and welcoming them that way." Ex. 10. The email further explains that his "intention" was to let the Biden-Harris campaign know that "what they stood for was not welcome here in Texas nor was it welcome in the United States." *Id.* Cisneros testified that he felt his participation in the incident achieved this goal because the

---

[35] Again, because the Mesaros Defendants never address Plaintiffs' assault allegations at all, they have forfeited the argument. *Reagan*, 596 F.3d at 254-55; *Rost*, 2021 WL 5190875, at *8.

Trump Train "let[] [Plaintiffs] know what we stood for here in Texas" and that the passengers on the bus responded with "cowardice." Ex. 6 at 108:17-21, 109:9-10.[36]

During the incident, Cisneros engaged in aggressive, dangerous, and reckless driving, putting Plaintiffs and others at risk of physical danger. He admitted at his deposition to repeatedly pulling onto the shoulder of I-35 and then back out in front of the bus, *id.* at 144:13-146:16, an objectively dangerous driving tactic. At one point, while on the shoulder waiting for the bus, Cisneros filmed and posted a video of himself mocking Vice President Kamala Harris for thinking it was "a good idea to campaign in Texas," and insisted that the bus needed an "escort" before driving back onto I-35 to chase down the bus. Ex. 56. While it was surrounded, the bus and an SUV driven by an accompanying campaign staffer were forced to drive defensively, switching lanes several times and even straddling two lanes at once to ensure sufficient space to maneuver. *See, e.g.*, Ex. 25 at 7:20-7:34, 18:20-19:00. Video evidence shows Cisneros sped up to block the staffer's vehicle from remaining behind the bus and prevent the staffer from switching lanes. Ex. 50. Cisneros testified to driving deliberately in this manner "because I can." Ex. 6 at 148:16-151:11. Cisneros ultimately collided with the staffer's vehicle, Ex. 50, and then followed him as the staffer tried to pull over on the interstate shoulder, cutting abruptly in front of the bus to do so, Ex. 25 at 18:26. He later described the collision as "slamming that fucker" and "welcom[ing] him properly to Texas," Ex. 12, called the staffer, "Antifa," Ex. 5, and testified that the incident "was [] a success [in] that [he] kind of saved Texas from people like that," meaning the Biden-Harris Campaign. Ex. 6 at 109:17-19.

---

[36] These statements of intent to instill fear are further informed by Cisneros's well-documented history of violent confrontation with political opponents with an explicit "hope" of instilling fear. *See supra* at 34-35 (describing Cisneros driving his truck into a crowd of protesters).

Cisneros deliberately located Plaintiff Cervini online after the incident to harass and intimidate him, posting on Cervini's Facebook, "How did you like Texas?" Ex. 57, and boasting that he was "[s]mart enough to get the entire Biden Harris campaign cancelled in Texas," Ex. 13, a belief he reaffirmed at his deposition, Ex. 6 at 108:22-24. Cisneros also bragged that he had "welcome[d] Biden/Harris" to Texas with "Brisket, Sausage, Leg quarters, Whataburger and 35 in[ch] tires." Ex. 12.

Cisneros's arguments for dismissal of Plaintiffs' assault claims are without basis. Disputes of material fact exist as to whether Cisneros assaulted Plaintiffs.

B.     **A Reasonable Jury Could Conclude That Defendant Dolores Park Intended To Aid And Abet Assault By Other Trump Train Drivers**

Defendant Park argues that "she did not commit any acts in furtherance of unlawfully aiding and abetting an assault or battery on the bus." Dkt. 325 at 19. She provides no evidence to support her position, nor could she. As previously explained, *supra* at 31, the videos Park herself took while driving on I-35—which her brief conveniently omits—make clear that she understood that the bus was surrounded and unable to exit, and that she directly assisted and encouraged the convoy in assaulting the bus and impeding its movement (in addition to driving dangerously herself and scaring the bus's driver). And, in the wake of the incident, Park publicly celebrated the fact that their driving had its intended impact—forcing the Plaintiffs to "GTFOH." Ex. 16; *supra* at 33. This is more than enough to create a material dispute of fact as to whether she (1) provided aid to someone committing assault, (2) was aware of her role in the wrongful conduct, and (3) knowingly and substantially assisted. *Creighton*, 2011 WL 743073, at *2. Park's motion for summary judgment on Count III should be denied.

## VII.   Plaintiffs' Claims for Emotional Distress and Mental Anguish Damages Under State Law Survive Summary Judgment

Defendant Cisneros alone argues that, as a matter of law, Plaintiffs cannot recover damages for mental anguish under Texas law for their state law claims,[37] even though he simultaneously acknowledges that mental anguish damages are recoverable for intentional conduct, and intentional conduct is clearly at issue in this case. Dkt. 329-1 at 5-7. As this Court has already acknowledged, "courts have permitted civil conspiracy and civil assault claims to move forward when plaintiffs seek damages for mental and emotional injuries." Dkt. 64 at 13-14 (citing *Tademy v. Sw.-Tex Leasing Co.*, 2006 WL 8434113, at *5 (W.D. Tex. Oct. 30, 2006)). In Texas, "mental anguish is recognized as a real and serious harm" that is normally available for "torts involving intentional or malicious conduct" because "such conduct entails a high level of culpability." *Hardin v. Obstetrical & Gynecological Assocs. P.A.*, 527 S.W.3d 424, 436 (Tex. App. 2017) (cleaned up). The cases cited by Defendant Cisneros agree. *See* Dkt. 329-1 at 5-6; *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997) ("Mental anguish damages are recoverable for some common law torts that generally involve intentional or malicious conduct[.]"); *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018) (citing *Likes* and reiterating that mental anguish damages may be available where the plaintiff can show intentional or malicious conduct).

Defendant Cisneros also seemingly argues that Plaintiffs' injuries are not sufficient for mental anguish or emotional distress damages as a matter of law. Dkt. 329-1 at 5-7. Cisneros contends that (1) Plaintiff Cervini was not in sufficient proximity to the bus; (2) Plaintiffs Gins

---

[37] To the extent Defendant Cisneros also contends that emotional distress does not constitute an injury for Plaintiffs' support-or-advocacy claims, as Plaintiffs have previously briefed, *see* Dkt. 34 at 27-28 (incorporated here by reference), the Supreme Court has recognized that harm that constitutes an injury under traditional common-law principles of tort law constitutes injury under Section 1985. *Haddle*, 525 U.S. at 127; *see also Kinney*, 367 F.3d at 353 (following *Haddle* to conclude that economic injury due to interference with employment is cognizable under § 1985).

and Holloway did not immediately quit the campaign and their professional fields following the incident; and (3) Plaintiff Davis had other events in her life which contributed to her feelings of depression in the wake of October 30. *Id.* at 7. Cisneros asserts without support that Plaintiffs are "invent[ing]" their distress, *id.* at 6-7,[38] citing to *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 (Tex. 1995), *id.* at 6.[39] But in contrast to the plaintiffs in *Woodruff* who expressed only "anger, frustration, or vexation" and testified only to being "hot" and "upset," *id.*, Plaintiffs here have testified to "substantial disruption[s] in [their] daily routine[s]—not "mere emotions." *Woodruff*, 901 S.W.2d at 444-45. Every Plaintiff in this case has suffered lasting emotional distress and mental anguish from their experiences on October 30. As the driver of the bus, Plaintiff Holloway bore the emotional weight of having to transport his passengers and himself to safety, and, unsurprisingly feared for his life and felt acute distress while navigating through the Defendants' harassment and dangerous driving. Ex. 28 at 257:12-16. After the incident, Plaintiff Holloway had trouble sleeping for months and began taking sleep aids for the first time in his life. Ex. 30 ¶¶ 4-5. Holloway was so traumatized by what happened that, after 15 years of work as a bus driver, he decided to start an entirely new business to avoid bus driving. Ex. 28 at 290:13-291:13; Ex. 30 ¶ 6. The fact that he did not *immediately* terminate his job with the Biden campaign and that he did not quit his profession *permanently* does not diminish this concrete harm.

---

[38] Defendant Cisneros's argument that the incident could not have caused mental anguish is to no avail—although "[v]erifiability is at issue in every mental anguish case," the "source of the anguish . . . is irrelevant in considering whether" Plaintiffs have "met [their] burden." *Nelson*, 540 S.W.3d at 544.

[39] Cisneros also bizarrely argues that Plaintiff Cervini cannot meet the standard for bystander injury applicable to claims of intentional infliction of emotional distress and medical malpractice. Dkt. 329-1 at 6-7. No such claims are at issue in this case. Cervini is seeking emotional and mental anguish damages as a result of his own experiences on October 30, 2020—not because of his perception of other Plaintiffs' injuries.

Plaintiff Gins felt "[his] life was in danger" as a result of Defendants' collective actions in following, assaulting, and harassing the bus and its passengers. Ex. 26 at 123:11-15. About an hour into the ordeal, he walked to the back of the bus and broke down in tears. *Id.* at 123:15-24. He called his manager begging for "her to assure us that there would be some kind of safety provided; that the people that were surrounding us [wouldn't try] to board the bus or continue to run us off the road." *Id.*

Since then, Gins has suffered from persistent acute anxiety and its physical manifestations, including nausea, lethargy, and trouble getting out of bed in the morning. *Id.* at 124:1-3; 178:15-24. He felt unable to discuss the incident with others, and wanted to "stay at home and avoid [] triggering feelings." *Id.* at 178:14-24. And, even though he did not immediately quit working in politics, the distress Gins endured has impacted his career. Gins volunteered to work fulltime in then-President-Elect Biden's Presidential Inaugural Committee in Washington, D.C., and was offered the opportunity to drive in the motorcade of the Inaugural parade. *Id.* at 124:4-9. ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ Ex. 58. Even now, when confronted with the video taken from the bus at his deposition, Gins described his "heart [] racing," having "hot flashes," and feeling like he "needed to walk out of the room from the sheer impact." Ex. 26 at 168:1-7.

Plaintiff Cervini experienced similar distress from that day. From his vantage point in a vehicle a few minutes ahead of the bus, Cervini watched the highway entrances flood with "dozens and dozens" of Trump Train vehicles. Ex. 29 at 240:18-22. Beginning to feel fearful for himself and for those on the bus, *id.* at 241:13-18, Cervini sent a message to those on the bus ███████████

████████████████████████████████████████████████████████████████

Ex. 59. Though he was fortunately in an unmarked vehicle not easily identified as part of the Biden-Harris campaign while he was on I-35, he was aware from ongoing Signal messages that everyone on the bus was afraid for their lives, and was frightened not only for them but for himself as a Biden-Harris supporter. Ex. 60 ¶¶ 4-5. When he finally met back up with the bus at the AFL-CIO in Austin, his fear further intensified as "the folks in the Trump train were harassing the bus and me, individually[.]" Ex. 29 at 241:13-18; Ex. 60 ¶ 7. After parking in the AFL-CIO parking lot, Plaintiff Cervini "ran 20 or 30 feet from my car to the bus to join the other Plaintiffs[.]" Ex. 60 ¶ 7. Being on the ground with drivers he knew were targeting Biden-Harris supporters for hours caused him to be "scared for [his] life[.]" Ex. 29 at 243:3-9. As a historian of modern political movements, he was acutely aware of "what can happen in emotionally volatile situations [a]nd how there has been political violence in America in recent years." *Id.* at 243:5-9.

For the remainder of 2020, he continued to fear for his safety, and sought professional help for his "psychological state after 2020," which "this [incident] contributed to[.]" *Id.* at 246:23-24. He felt anxious and had difficulty concentrating and sleeping. Ex. 60 ¶¶ 12-13. His anxiety was especially heightened by fears about the safety of his mother, who until the summer of 2021 still lived in Texas. Ex. 29 at 247:15-20. These safety concerns motivated Plaintiff Cervini to talk to the FBI about the threats he and his mother had received, *id.* at 248:20-23, and heavily influenced his decision to permanently move to California and to relocate his mother from Texas to California, *id.* at 247:15-248:1; Ex. 60 ¶¶ 12-13.

Plaintiff Davis also suffered substantial emotional distress. On the day of the incident, as she watched the vehicles swarm and surround the bus, Davis recalls feeling unsafe and frightened "not knowing" what the Trump Train might do next. Ex. 27 at 189:16-190:12. She was aware that buses overturn "rather easily" and felt it was a real possibility that "a tire could get shot out, or

something more violent might happen. It was a scary situation because there was aggressive behavior and uncertainty surrounding what the limit of that aggressive behavior might look like." *Id.* Since that day, Davis has experienced anxiety and insomnia and was prescribed medication to alleviate her symptoms. *Id.* at 164:14-25, 170:16-19. As a politician, Davis is no stranger to "great controversy." *Id.* at 173:14-15. But because of the incident and the persistent anxiety it caused, she felt the need to hire private security for the first time in her political career, and still experiences anxiety during public speaking engagements today. *Id.* at 173:13-17. For example, when speaking at the state Capitol as recently as last year—something she has done frequently over the course of her career—Davis found herself for the first time "scanning the crowd" and wondering "whether [she] would come home that day." *Id.* at 222:21-24.

Plaintiffs each suffered emotional distress and mental anguish because of Defendants' actions. At bottom, Cisneros's argument is that the Court should not *believe* Plaintiffs' testimony regarding their emotional distress and mental anguish. But whether Plaintiffs' testimony about their distress is credible is of course an issue for the jury.

## <u>CONCLUSION</u>

Defendants have failed to meet the standard required for summary judgment. Accordingly, Defendants' motions for summary judgment should be denied.

DATED: March 6, 2024

Respectfully submitted,

*/s/ Samuel Hall*

**TEXAS CIVIL RIGHTS PROJECT**
Christina M. Beeler (TX Bar No. 24096124)
Sarah Xiyi Chen (CA Bar No. 325327) (*pro hac vice*)
Veronikah Rhea Warms (TX Bar No. 24132682) (*pro hac vice*)
Travis Fife (TX Bar No. 24126956)
Texas Civil Rights Project
1405 Montopolis Drive
Austin, TX 78741
Telephone: (512) 474-5073
Facsimile: (512) 474-0726
Email: ashley@texascivilrightsproject.org
christinab@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

**THE PROTECT DEMOCRACY PROJECT, INC.**
John Paredes (NY Bar No. 5225412) (*pro hac vice*)
Orion Danjuma (NY Bar No. 4942249) (*pro hac vice*)
The Protect Democracy Project, Inc.
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
john.paredes@protectdemocracy.org
orion.danjuma@protectdemocracy.org

Cameron O. Kistler (DC Bar No. 1008922) (*pro hac vice*)
Cerin Lindgrensavage (DC Bar No. 1741602) (*pro hac vice*)
JoAnna Suriani (DC Bar No. 1645212) (*pro hac vice*)
Anne Harden Tindall (DC Bar No. 494607) (*pro hac vice*)
The Protect Democracy Project, Inc.

2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
cameron.kistler@protectdemocracy.org
cerin.lindgrensavage@protectdemocracy.org
joanna.suriani@protectdemocracy.org
anne.tindall@protectdemocracy.org

Benjamin L. Berwick (MA Bar No. 679207)
(*pro hac vice*)
The Protect Democracy Project, Inc.
15 Main Street, Suite 312
Watertown, MA 02472
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
ben.berwick@protectdemocracy.org

Jared Fletcher Davidson (LA Bar No.
37093)
(*pro hac vice*)
The Protect Democracy Project, Inc.
3014 Dauphine Street, Suite J
New Orleans, LA 70117
Telephone: (202) 579-4582
Facsimile: (929) 777-8428
jared.davidson@protectdemocracy.org

**WILLKIE FARR & GALLAGHER LLP**
Michael Gottlieb (DC Bar No. 974960) (*pro hac vice*)
Robert Meyer (DC Bar No. 405632) (*pro hac vice*)
Samuel Hall (DC Bar No. 242110) (*pro hac vice*)
Meryl Conant Governski (DC Bar No. 1023549) (*pro hac vice*)
Jamielah Yancey (DC Bar No. 1619055) (*pro hac vice*)
Rebecca Heath (DC Bar No. 1644402) (*pro hac vice*)
Amy R. Orlov (DC Bar No. 1780213) (*pro hac vice*)
Aaron E. Nathan (NY Bar No. 5478227) (*pro hac vice*)

Noah Mussmon (DC Bar No. 90006660)
(*pro hac vice*)
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, D.C. 20006-1238
Telephone: (202) 303-1000
Facsimile: (202) 303-2000
Email: mgottlieb@willkie.com
rmeyer@willkie.com
shall@willkie.com
mgovernski@willkie.com
jyancey@willkie.com
rheath@willkie.com
aorlov@willkie.com
anathan@willkie.com
nmussmon@willkie.com

Madeleine Tayer (NY Bar No. 5683545)
(*pro hac vice*)
John P. Catalanotto (NY Bar No. 5857750)
(*pro hac vice*)
Christina Adele Peck (NY Bar No.
5923545) (*pro hac vice*)
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mtayer@willkie.com
jcatalanotto@willkie.com
cpeck@willkie.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2024, a true and correct copy of the foregoing has been served on all counsel of record, in compliance with the Federal Rules of Civil Procedure and as agreed by the parties.  I further certify that a redacted copy was emailed to Steve Ceh and Randi Ceh per agreement of the parties.


DATED:  March 6, 2024                    Respectfully submitted,

                                         */s/ Samuel Hall*

                                         **WILLKIE  FARR  GALLAGHER LLP**
                                         Samuel Hall (DC Bar No. 242110) (*pro hac vice*)
                                         Willkie Farr & Gallagher LLP
                                         1875 K Street, N.W.
                                         Washington, D.C. 20006-1238
                                         Telephone: (202) 303-1000
                                         Facsimile: (202) 303-2000
                                         Email: shall@willkie.com