## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| ERIC CERVINI, WENDY DAVIS, DAVID GINS, and TIMOTHY HOLLOWAY, §§§§ | |
| Plaintiffs, § | Civil Action No. 1:21-cv-00565-RP |
| §§ | |
| v. §§ | |
| ELIAZAR CISNEROS, RANDI CEH, STEVE CEH, JOEYLYNN MESAROS, ROBERT MESAROS, and DOLORES PARK, §§§§§§ | |
| Defendants. §§ | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE ROBERT PITMAN
UNITED STATES DISTRICT JUDGE:

Before the court are: (1) Plaintiffs' Motion for Rule 37 Discovery Sanctions Against Defendant Eliazar Cisneros (Dkt. 267), (2) Plaintiffs' Motion for Rule 37 Discovery Sanctions Against Defendant Joeylynn Mesaros (Dkt. 271), and (3) Plaintiffs' Motion for Rule 37 Discovery Sanctions Against Defendant Dolores Park (Dkt. 277), and all related briefing.[1]

On January 31, 2024, the court held an evidentiary hearing on the motions (the "Evidentiary Hearing"), at which all sides appeared and presented evidence in the form of witness

---

[1] The motions were referred by United States District Judge Robert Pitman to the undersigned for disposition pursuant to 28 U.S.C. § 636(b), Rule 72 of the Federal Rules of Civil Procedure, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Text Orders dated December 11 and 13, 2023 and January 2, 2024. Because the undersigned has determined that Cisneros's and Mesaros's conduct warrant sanctions, the undersigned submits this Report and Recommendation.

testimony and exhibits, as well as argument. The court heard testimony from four witnesses: Eliazar Cisneros, Joeylynn Mesaros, Dolores Park, and Thomas Park. Dkt. 319. The court admitted into evidence ten exhibits: Dkts. 320-1, 320-2, 320-3, 320-4, 320-5, 320-6, 320-7, 320-8, and 320-9.[2] With the parties' consent, the court also admitted into evidence all of the exhibits attached to the motions and related briefing before the court.  At the conclusion of the Evidentiary Hearing, the court denied Plaintiffs' motion against Defendant Dolores Park upon a finding that, although discoverable information in Park's possession was permanently lost, which prejudiced Plaintiffs, Plaintiffs did not otherwise meet their burden under Federal Rule of Civil Procedure 37(e). Upon careful consideration of the filings and relevant law, as well as the arguments, testimony, and evidence presented at the Evidentiary Hearing, the undersigned submits the following Report and Recommendations to the District Court with regards to the motions filed against Defendants Eliazar Cisneros and Joeylynn Mesaros.

## I. BACKGROUND

This lawsuit arises out of an alleged conspiracy to disrupt the Biden-Harris presidential campaign and intimidate its supporters during the 2020 election. Plaintiffs allege that they were ambushed by a self-described "Trump Train" that swarmed a Biden-Harris Campaign bus (the "Bus") traveling from San Antonio, Texas to Austin, Texas on Interstate 35 on October 30, 2020, as part of a scheduled campaign tour (the "Incident"). Plaintiffs filed this lawsuit against Defendants Eliazar Cisneros ("Cisneros"), Joeylynn Mesaros ("Mesaros"), and others on June 24, 2021, claiming (1) violations of Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), for conspiring "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to

---

[2] Exhibit 10 is a video that was delivered electronically to the court.

vote, from giving his support or advocacy" for a presidential campaign, (2) civil conspiracy, and (3) civil assault. Dkt. 151 ¶ 147.

Plaintiffs allege that Defendant Cisneros coordinated with dozens of other individuals to wait for and surround the Bus as it drove on Interstate 35. His deposition testimony confirmed his prior statements that he devised the plan, along with Jason Peña, to form a "convoy" and "welcome [the Bus] to Texas, so to speak." Dkt. 267-1 at 91–96. Plaintiffs allege that as part of the Trump Train on October 30, 2020, Cisneros drove close to the bus, abruptly braking and changing speeds to interfere with the bus's driving, and eventually striking and damaging an accompanying vehicle driven by a campaign staffer. Dkt. 151 ¶¶ 93, 109–115. Plaintiffs allege that following the Incident, Cisneros bragged on social media about his participation in the Trump Train, stating, "that was me slamming that fucker," (referring to the campaign staffer Cisneros collided with during the Incident) and that he "[got] the entire Biden Harris campaign cancelled in Texas[.]" Dkt. 267-1 at 232, 234.

Plaintiffs also allege that Defendant Mesaros, a passenger in a participating vehicle, helped coordinate with other participants to target the bus and documented the Incident through photographs and videos. Dkt. 241-6 at 173:14–174:3; Dkt. 191-6 at 2. On the day of the Incident, Mesaros messaged a now-deleted Facebook user that it was "go time on election countdown" and that she and her husband were "raging to chase down the Biden bus." Dkt. 320-3 at 7. After the Incident, Mesaros declared on Facebook that "[Trump Train] NB doesn't mess around y'all" and posted that the "Trump Train NB . . . gave [the Bus] a proper Texas welcome and a friendly escort out of town." Dkt. 245-124; Dkt. 245-125.

## II. APPLICABLE LAW

Federal Rule of Civil Procedure 37(e) provides that:

> If electronically stored information [("ESI")] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>
>>> (A) presume that the lost information was unfavorable to the party;
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>> (C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e). For a court to apply Rule 37(e), it "must determine that the following four predicate elements exist: [1] there is ESI that should have been preserved; [2] that ESI has been lost; [3] the ESI was lost because of a party's failure to take reasonable steps to preserve it; and [4] the ESI cannot be restored or replaced." *Via Vadis, LLC v. Amazon.com, Inc.*, 2021 WL 3134257, at *3 (W.D. Tex. July 23, 2021) (Yeakel, J.).

"[A] party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation[.]" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). But a lawsuit does not need to be filed before a duty to preserve can attach. "*[C]ommon sense* dictates that a party may reasonably anticipate suit being filed . . . before the plaintiff manifests an intent to sue" and "trial courts must look at the totality of the circumstances and decide whether a reasonable person in the party's position would have anticipated litigation[.]" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 762 F. Supp. 2d 942, 964–65 (S.D. Tex. 2010) (citing *Trevino v. Ortega*, 969 S.W.2d 950, 956 (Tex. 1998)) (internal quotation marks omitted).

Upon a finding of prejudice, a court "may order measures no greater than necessary to cure the prejudice." *UMG Recordings, Inc. v. Grande Commc'ns Networks, LLC*, 2019 WL 4738915, at *1 (W.D. Tex. Sept. 27, 2019) (quoting FED. R. CIV. P. 37(e)(1)). "[P]rejudice [] is satisfied where a party's ability to present its case . . . is compromised." *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 801 (N.D. Tex. 2011) (internal quotation marks omitted). In other words, "to satisfy the prejudice

requirement, the party seeking sanctions must demonstrate that the missing or altered evidence would have been relevant to her case." *Id.*

If a court finds that "the party who caused the loss of ESI 'acted with the intent to deprive another party' of the use of the information, the court may take one of three more severe steps: (1) presume the information was unfavorable to the destroying party; (2) instruct the jury it either may, or must, presume the information was unfavorable to the destroying party; or (3) dismiss the case or enter a default judgment." *UMG Recordings*, 2019 WL 4738915 at *1; *see also* FED. R. CIV. P. 37(e)(2). Finally, "[t]he Fifth Circuit permits an adverse inference against the destroyer of evidence only upon a showing of 'bad faith' or 'bad conduct.'" *UMG Recordings*, 2019 WL 4738915 at *4 (quoting *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005)).

## III. FINDINGS OF FACT

### A. Defendant Eliazar Cisneros

1.      Defendant Eliazar Cisneros used an LG Thin 40 cellphone (the "LG Phone") in the days leading up to and on October 30, 2020—the day of the Incident. Hr'g Recording Part 1 at 8:30–8:55, 18:24–18:29; Dkt. 283-2 at 8:2–19.

2.      Cisneros devised a plan to "get into vehicles and welcome the bus, so to speak" with Jason Peña ("Peña") at least a few days before October 30, 2020. Hr'g Recording Part 1 10:32–11:03, 11:40–11:52; Dkt. 320-1. Peña would later publicly refer to this plan he and Cisneros devised as "Operation Block the Bus" in a post Peña made in the "Alamo City Trump Train" Facebook Group on October 30, 2020. Hr'g Recording Part 1 at 12:33–14:49.

3.      Cisneros and Peña planned to "get[] a convoy and welcom[e] [the Bus] that way." Hr'g Recording Part 1 at 11:52–12:10; Dkt. 320-1. After the Incident, Cisneros posted on Facebook that he "welcomed" the campaign staffer he collided with "properly to Texas" with his "35 in[ch] tires." Dkt. 267-1 at 98, 232.

4.      To prepare for October 30, 2020, Cisneros and Peña agreed that Cisneros would be responsible for contacting people in San Antonio, Texas and that Peña would be responsible for contacting people in New Braunfels, Texas and San Marcos, Texas. Hr'g Recording Part 1 at 15:42–16:03; Dkt. 320-1.

5.      In the days preceding October 30, 2020, Cisneros coordinated with people from San Antonio, Texas, including Edward Niño ("Niño"), an organizer of the "Alamo City Trump Train," in connection with the "convoy" Cisneros and Peña were planning for October 30, 2020. Hr'g Recording Part 1 at 16:10–16:20, 19:20–19:40, 20:38–20:45; Dkt. 320-1.

6.      In the days preceding October 30, 2020, Cisneros and Peña spread the word about their plan through text messages and Facebook. Hr'g Recording Part 1 at 16:23–16:52; Dkt. 320-1.

7.      Cisneros knew that many people were very eager to be involved with his and Peña's plan based on his communications with them via text messages and on Facebook. Hr'g Recording Part 1 at 16:53–17:09, 17:12–17:22; Dkt. 320-1.

8.      Cisneros and Peña both drove in the "convoy" on October 30, 2020 that they helped to coordinate. Hr'g Recording Part 1 at 10:20–10:36, 19:06–19:15.

9.      On October 30, 2020, Cisneros "stationed" himself "approximately 10 to 15 miles South of San Antonio" on the northbound side of I-35 because he anticipated that the Biden-Harris Campaign Bus would be traveling north. Hr'g Recording Part 1 at 17:40–18:15; Dkt. 320-1.

10.     While Cisneros was waiting on the northbound side of I-35 for the Bus, he was exchanging text messages with Peña, Niño, and others (whose names Cisneros testified he cannot remember) about the Bus's location. Hr'g Recording Part 1 at 18:15–18:22, 20:52–21:33; Dkt. 267-1 at 120–21.

11.     Cisneros was also generally texting with Niño on October 30, 2020 about "following the Bus to welcome [it] to Texas." Hr'g Recording Part 1 at 18:41–18:59.

12.     Cisneros eventually left the side of I-35 without seeing the Bus and started to travel to New Braunfels, Texas for a Trump Train, but he received a text from Niño informing him that the Biden-Harris Campaign Bus was at Palo Alto College in San Antonio, Texas. Hr'g Recording Part 1 at 22:22–23:02, 26:10–26:32.

13.     Cisneros texted Peña that the Bus was at Palo Alto College. Cisneros then traveled to Palo Alto College, observed that the Bus was not there, and texted Peña to update him. Hr'g Recording Part 1 at 23:03–23:18, 26:33–26:45.

14.     Cisneros received a message and a picture from Edward Niño indicating that the Bus was at the AT&T Center in San Antonio, Texas, and Cisneros texted Peña to update him. Hr'g Recording Part 1 at 27:25–27:50; Dkt. 267-1 at 128–129.

15.     Cisneros was texting and driving while searching for the Bus. Hr'g Recording Part 1 at 26:46–26:57.

16.     Cisneros arrived at the AT&T Center, saw that the Bus was there, and texted Peña to inform him that he had arrived at the AT&T Center and had located the Bus. Hr'g Recording Part 1 at 28:10–28:23.

17.     At the AT&T Center, Cisneros knew that there were people waiting for the Bus in New Braunfels, Texas at the Solms Road exit of I-35 because he had been and was at the time texting with them. Hr'g Recording Part 1 at 28:28–29:10.

18.     When Cisneros informed the people waiting at the Solms Road exit via text message that he had located the Bus, those people told Cisneros via text message that they would stay there and wait for the Bus. Hr'g Recording Part 1 at 28:28–29:10.

19.     Plaintiffs served several Requests for Production on Cisneros to which all of the above-described text messages would have been responsive, including requests for "[a]ll Documents and Communications about the Incident" and "[a]ll Documents and Communications about any allegations in the Complaint." Dkt. 267-1 at 245–47.

20.     Cisneros produced 35 text message screenshots to Plaintiffs on April 14, 2022 in response to Plaintiffs First Set of Requests for Production. Dkt. 283-2 at 16–19.

21.     On June 27, 2022, Cisneros swore in response to Plaintiffs' Interrogatory Number 9 that his production was complete: "[t]his Defendant has previously provided to Plaintiffs all saved content contained in Defendant's LG Thin 40 with Verizon Service." Dkt. 267-1 at 267–69.

22.     Yet, on April 14, 2022, when Cisneros produced the 35 text message screenshots to Plaintiffs, Cisneros did not produce any text messages with Peña. Hr'g Recording Part 1 at 29:22–29:48.

23.     On April 14, 2022, when Cisneros produced text messages to Plaintiffs, Cisneros did not produce any text messages with Niño.

24.     In a letter accompanying Cisneros's April 14, 2022 production, Cisneros's counsel claimed that other correspondence that may have been responsive to Plaintiffs' requests was destroyed because Cisneros's LG Phone was "hacked" and "deleted." Dkt. 267-1 at 259.

25.     Cisneros's counsel provided no explanation for why the 35 text message screenshots Cisneros did produce were available despite the LG Phone being "hacked" and "deleted." Dkt. 267-1 at 259.

26.     On July 7, 2022, Plaintiffs offered to bear the cost of a forensic examination in an attempt to retrieve this data, and asked that Cisneros respond by July 14, 2022. Dkt. 267-1 at 271.

27.     Plaintiffs received no reply. On July 14, 2022, Plaintiffs served several requests for production on Cisneros, which included a request to inspect Cisneros's LG Phone. Dkt. 267-1 at 280.

28.     Plaintiffs did not receive responses or objections from Cisneros on or before August 15, 2022, the date they were due. Dkt. 267-1 at 289.

29.     Plaintiffs emailed Cisneros's counsel three times between August 16, 2022 and August 31, 2022 regarding their requests for production before speaking with Cisneros's counsel on the phone on August 31, 2022. Dkt. 267-1 at 286–89.

30.     During the call with Cisneros's counsel on August 31, 2022, Cisneros's counsel represented to Plaintiffs that Cisneros intended to produce his mobile phone to Plaintiffs for inspection, and Plaintiffs requested that the phone be mailed to them no later than September 2, 2022. Dkt. 267-1 at 286–87.

31.     On September 2, 2022, Cisneros's counsel left a voicemail for Plaintiffs' counsel, stating that he was having trouble receiving the phone. Dkt. 267-1 at 286.

32.     On September 7, 2022, Plaintiffs' counsel requested a status update from Cisneros's counsel. Dkt. 267-1 at 286.

33.     Plaintiffs did not receive a response from Cisneros's counsel, and Plaintiffs filed a motion to compel Cisneros to produce his LG Phone. Dkt. 109.

34.     In response to Plaintiffs' Motion, Cisneros revealed—for the first time—that "[t]he last time [he] saw it was when [his] lawyer requested all information from it to produce for the plaintiffs" in April 2022. Dkt. 267-1 at 303–04; Hr'g Recording Part 1 at 47:32–47:45 (clarifying that he mistakenly listed April 2021 instead of April 2022 in this affidavit).

35.     Plaintiffs prevailed on their motion to compel following a hearing before the undersigned, and the court ordered Cisneros to "take all further necessary steps to locate the cell phone in question[.]" Dkt. 136.

36.     During this hearing, Cisneros also stated that his phone was not hacked and that his counsel may have "misunderstood" him. Dkt. 267-1 at 310.

37.     Shortly after the hearing, Cisneros found and produced the LG Phone, which he found "in a basket up in – up in a closet" in his bedroom at his mother's home. Dkt. 267-1 at 119–20.

38.     Cisneros turned the LG Phone over to Plaintiffs' forensic vendor, which Plaintiffs had engaged to retrieve data from it. Hr'g Recording Part 1 at 31:25–31:41. Cisneros could not recall his passcode, but the forensic vendor was able to bypass it to gain access to the LG Phone's contents.

39.     When the forensic vendor extracted the LG Phone's contents, there were no messages on Cisneros's LG Phone with Niño from October 24, 2020 through November 5, 2020 (UTC).

40.     When the forensic vendor extracted the LG Phone's contents, there were no messages on Cisneros's LG Phone with Peña from before December 12, 2020 (UTC).

41.     Other than one incomplete text message thread that Cisneros produced from October 30, 2020, *compare* Dkt. 267-1 at 262–64, *with id.* at 338–39, Cisneros has produced no other relevant text messages to Plaintiffs from October 30, 2020 that he sent or received while waiting for, searching for, or following the Bus. And Plaintiffs retrieved none of those messages from Cisneros's LG Phone.

42.     Plaintiffs made monumental efforts to obtain all of the above-described text messages from other sources, but were unsuccessful.

43.     Plaintiffs deposed Peña on May 23, 2023. During his deposition, Peña invoked the Fifth Amendment with regard to whether he had deleted any text messages related to the Incident, and he confirmed that any text messages he did have did not transfer to the new phone he acquired after October 30, 2020. Dkt. 267-1 at 362–64.

44.     Plaintiffs also deposed Niño on September 28, 2023, and Niño testified that he no longer has the phone containing his text messages from October 2020. Dkt. 267-1 at 355–56.

45.     Cisneros has never offered a credible explanation for why he is unable to produce the above-described text messages.

46.     Cisneros testified before this court on October 27, 2022 that he only deleted messages from unknown numbers containing threatening communications. Hr'g Recording Part 1 at 33:32–35:00; Dkt. 283-2 at 16:16–18:13. These deletions clearly would not have included the text messages at issue.

47.     Cisneros changed his story when he testified before this court on January 31, 2024. In that hearing, Cisneros testified for the first time that he also deleted messages with Peña before Plaintiffs filed their lawsuit because they got into a "quarrel," Hr'g Recording Part 1 at 30:58–31:20. However, Cisneros was communicating with Peña via text messages after Plaintiffs' lawsuit was filed, Dkt. 267-1 at 370. Additionally, Plaintiffs possess text messages that were retrieved from Cisneros's LG Phone with Peña from December 12, 2020 (UTC), and Cisneros provided no explanation for how Plaintiffs retrieved certain messages from Cisneros's LG Phone with Peña, but not others. Dkt. 267-1 at 345–47.

48.     Cisneros knew about Plaintiffs' lawsuit on June 24, 2021, the day it was filed. Hr'g Recording Part 1 35:05–35:19; Dkt. 283-3.

49.     Thereafter, Cisneros received a copy of the Complaint and a preservation letter. Hr'g Recording Part 1 at 35:20–35:36.

50.     By November 1, 2020, within two days after the Incident, Cisneros knew that the Texas State Police, the New Braunfels Police, the Austin Police, the San Marcos Police, and the FBI were all investigating the facts regarding the October 30, 2020 Incident. Hr'g Recording Part 1 at 42:04–42:29.

51.     By November 1, 2020, Cisneros was also aware of an FBI investigation into his actions on October 30, 2020 because his mother texted him a screenshot on November 1, 2020 of an article concerning that investigation. The article featured a picture of the truck Cisneros drove on October 30, 2020, which was visible in the screenshot Cisneros's mother sent him. Hr'g Recording Part 1 at 37:58–38:17; Dkt. 320-2.

52.     Cisneros shared a video of the Incident with at least one Texas Police Department. Hr'g Recording Part 1 at 1:14:15–1:14:45. He did not share any other documentary evidence he possessed, including his text messages, with any law enforcement agencies. Hr'g Recording Part 1 at 1:14:44–1:15:21.

53.     Within a few weeks after October 30, 2020, Cisneros went to Nevada because, as Cisneros testified, he was afraid for his safety. While there, a friend told him that the FBI was looking for him. Dkt. 283-2 at 11:14–24; Hr'g Recording Part 1 at 38:22–38:44.

54.     Within a few weeks after October 30, 2020, Cisneros reached out to the FBI regarding the Incident. Hr'g Recording Part 1 at 41:27–42:05.

55.     The FBI agent with whom Cisneros was in contact informed Cisneros that he would not be allowed to record his interview, and Cisneros decided to stop communicating with the FBI at that point. Cisneros then began to search for an attorney. Hr'g Recording Part 1 at 36:22–37:03.

56.     Throughout discovery, Cisneros made several inconsistent and incorrect statements regarding his LG Phone and text messages. Hr'g Recording Part 1 at 1:11:28–1:11:35.

57.     Cisneros filed a sworn affidavit with this Court on September 22, 2022, in which he swore that "[t]he plaintiffs request that I produce a cellular device I own and used on October 30, 2020. From this device, I have previously extracted and turned over to the plaintiffs all text messages, emails, and voicemails associated with the event in question." Dkt. 267-1 at 293–94. This statement was false; a comparison of the sole text message thread from October 30, 2020 that Cisneros produced to Plaintiffs in April 2022 with the full version of the thread retrieved from his LG Phone by Plaintiffs reveals that Cisneros's initial production omitted four messages that were a part of that thread. *Compare* Dkt. 267-1 at 262–64, *with id.* at 338–39.

58.     Cisneros also swore in his September 22, 2022 affidavit that "the device is not in use, nor is it active nor has it been active since November of 2020, charged, or otherwise in service[.]" Dkt. 267-1 at 294. This statement was also false; Plaintiffs' Sanctions Motion, Dkt. 267, attached several text message threads retrieved from Cisneros's LG Phone that show Cisneros was using the LG Phone after November 2020, *see e.g.,* Dkt. 267-1 at 332–33, 341–43, 345–47.

59.     For example, Cisneros used the LG Phone on December 27, 2020 to coordinate bringing collapsible batons and bear mace to Washington, D.C. for the events of January 6, 2021 to purportedly protect people from "Antifa and BLM." Dkt. 267-1 at 32, 341–43.

60.     Cisneros himself contradicted his September 22, 2022 affidavit with another affidavit he executed less than a month later on October 14, 2022, explaining that he "went back to the LG 40" in March 2021. Dkt. 267-1 at 303; Dkt. 267 at 6.

61.     Cisneros testified before this court on January 31, 2024 that he could not recall whether he had possession of his LG Phone in April 2022. Hr'g Recording Part 1 at 45:45–46:15. However, Cisneros swore in his October 14, 2022 affidavit that he had turned on his LG Phone in April 2022 to send the information contained in it to his attorney. Dkt. 267-1 at 304; Hr'g Recording Part 1 at 47:32–47:45 (clarifying that he mistakenly listed April 2021 instead of April 2022 in this affidavit).

62.     Cisneros testified before this court on October 27, 2022 that he could not remember the identities of anyone he texted with on October 30, 2020. Dkt. 283-2 at 9:9–21. Plaintiffs subsequently gained access to his LG Phone. After this, Cisneros testified at his deposition that he could recall texting with Peña and Niño on October 30, 2020. During the hearing before this court on January 31, 2024, Cisneros testified once again that he did text with Peña, Niño, and others in the days leading up to and on October 30, 2020. Hr'g Recording Part 1 at 17:12–17:22; 20:52–21:20; 58:42–59:12.

63.     Cisneros's text messages with Peña, Niño, and others in the days leading up to October 30, 2020 and on October 30, 2020 have been lost because Cisneros deleted them.

64.     The content of these text messages with Peña, Niño, and others in the days leading up to October 30, 2020 and on October 30, 2020 cannot be restored or replaced through additional discovery, including discovery from Verizon, which was the service provider for Cisneros's LG Phone.

65.     The text messages that Cisneros deleted are highly relevant to Plaintiffs' claims, and Plaintiffs have been prejudiced by the loss of those text messages.

66.     Cisneros deleted these messages in bad faith and with the intent to deprive the Plaintiffs of the text messages.

### B. Defendant Joeylynn Mesaros

1.     In September 2020, Defendants Joeylynn Mesaros ("Mesaros") and Robert Mesaros (together, the "Mesaroses") saw a Trump Train drive through New Braunfels and pass their home for the first time. Hr'g Recording Part 2 at 1:28–1:43. The Mesaroses then began attending Trump Train events leading up to the 2020 presidential election. Hr'g Recording Part 2 at 5:05–5:26.

2.     At Trump Train events, Mesaros would occasionally meet other participants and exchange phone numbers with them. Hr'g Recording Part 2 at 9:33–10:10. She sometimes texted with other Trump Train participants whom she met. Hr'g Recording Part 2 at 8:41–8:58. It is also "highly probable" that Mesaros sent text messages to her husband Robert Mesaros about attending Trump Train events. Hr'g Recording Part 2 at 8:59–9:16.

3.     Shortly after learning about the New Braunfels Trump Train, Mesaros found and joined its Facebook group. Hr'g Recording Part 2 at 1:43–1:50. It was mostly through Facebook that Mesaros learned about new Trump Train events and opportunities. Hr'g Recording Part 2 at 1:51–1:59.

4.     During October 2020 and leading up to the 2020 presidential election, Mesaros joined several Facebook groups related to the activities of different Trump Train groups, including the Trump Train New Braunfels Facebook group, Alamo City Trump Train Facebook group, Patriots of New Braunfels Facebook group, and other Facebook groups. Hr'g Recording Part 2 at

2:00–3:22. Most of these groups were private Facebook groups that were not available to the public. Hr'g Recording Part 2 at 3:32–3:57. Mesaros would sometimes make her own posts in these Facebook groups and leave comments on other members' posts. Hr'g Recording Part 2 at 3:22–3:31.

5.      In the months preceding the 2020 presidential election, Mesaros actively used her own personal Facebook account to make posts, comment on other people's posts, and message with other people using Facebook Messenger about Trump Train events. Hr'g Recording Part 2 at 3:59–4:38; Dkt. 271-7 at 49–86; Dkt. 320-3. Mesaros used her personal Facebook account to post about Trump Trains and Trump Train events. Hr'g Recording Part 2 at 3:59–4:16.

6.      On October 30, 2020, a convoy of drivers in a self-described "Trump Train" swarmed and followed a Biden-Harris Campaign bus traveling from San Antonio, Texas to Austin, Texas on Interstate 35 as part of a scheduled campaign tour. Dkt. 271 at 2.

7.      During the Incident, Mesaros rode as a passenger in a vehicle driven by her husband, Robert Mesaros, while following the Biden-Harris Campaign bus on Interstate 35 and documented the incident through photographs and videos. Hr'g Recording Part 2 at 10:28–10:40; Dkt. 271 at 2.

8.      While waiting for the Biden-Harris Campaign bus on Interstate 35, Mesaros messaged an unknown individual on Facebook Messenger that "[i]t's go time on election countdown," and "[w]e're raging to chase down this Biden bus." Dkt. 320-3; Hr'g Recording Part 2 at 7:26–8:21.

9.      Throughout the day on October 30, 2020, Mesaros used Facebook to learn about the location of the Biden-Harris Campaign bus and receive updates while the bus was traveling through central Texas. Hr'g Recording Part 2 at 5:46–5:56. She also used Facebook to

communicate about meeting up with other Trump supporters along Interstate 35. Hr'g Recording Part 2 at 5:36–5:45. Mesaros made her own Facebook posts about seeing the Biden-Harris Campaign bus on Interstate 35. Hr'g Recording Part 2 at 5:57–6:05.

10.     When Mesaros had to leave and rejoin the Trump Train on October 30, 2020, she exchanged phone numbers with Shana Evans and texted with Evans to stay up-to-date as to the Biden-Harris Campaign bus's location and whether it had passed through New Braunfels. Hr'g Recording Part 2 at 12:38–13:16.

11.     Mesaros knew about Plaintiffs' lawsuit on June 24, 2021, on the day it was filed. Dkt. 320-5 at 3; Hr'g Recording Part 2 at 16:48–16:56.

12.     After becoming aware of the litigation, Mesaros and her husband agreed to delete social media content relevant to the litigation. Hr'g Recording Part 2 at 17:44–17:59. On June 24, 2021 at 3:57 PM, Mesaros texted her husband "[w]e probably need to delete our social media posts ASAP about chasing the bus." Dkt. 320-5 at 3. Two minutes later, Robert Mesaros responded "I agree." *Id.* He also texted "I doubt they'll get anywhere with the lawsuits, but it's a good idea either way." *Id.*

13.     At 4:23 PM, Mesaros replied that she believed the Plaintiffs were "looking for more people based on other posts, tags and license plates in videos" to add as defendants in the lawsuit. *Id.*; Hr'g Recording Part 2 at 19:04–19:23. At 4:25 PM, she further instructed Robert Mesaros to "make [his] profile private and update all previous posts to private" and "make sure Randi, Isaac, and any of them are deleted." Dkt. 320-5 at 3. "Randi" refers to Randi Ceh, another defendant in this litigation. Hr'g Recording Part 2 at 20:40–20:51. Mesaros was worried that these individuals could still see her personal posts and information, and she wanted to protect her and her husband from being "sucked into the lawsuit." Hr'g Recording Part 2 at 21:14–21:36.

14.     Mesaros knew that she and her husband were named defendants in the lawsuit within at most one hour of texting her husband to delete social media content. On June 24, 2021 at 4:37 PM, Joeylynn Mesaros texted Robert Mesaros a link to a web page for the organization Protect Democracy, which contained a link to Plaintiffs' Complaint. Dkt. 320-5 at 4. Minutes later, at 4:51 PM, Robert Mesaros texted a screenshot of the Complaint showing pictures of the Mesaroses' vehicle. *Id.*

15.     Mesaros followed through with her plan to delete social media content. At some point during this text message exchange, Mesaros began intentionally deleting certain social media content relevant to the litigation. Hr'g Recording Part 2 at 21:5–22:04. During her deposition, Mesaros confirmed that she deleted social media data "regarding the events of 10/30[.]" Dkt. 271 at 3.

16.     Mesaros testified that although she deleted two of her social media posts (while at a pool party after finding out about the lawsuit), she immediately stopped deleting any social media content once she found out that she was a defendant in this lawsuit. Hr'g Recording Part 2 at 21:49–22:00, 22:36–23:20. She also testified that the two social media posts she did delete happened to be the same two that Plaintiffs had already captured. Hr'g Recording Part 2 at 21:35–21:48. Mesaros's account of this event is implausible, and the undersigned finds that she and her husband deleted relevant social media content that is now lost.

17.     As of July 3, 2021, Robert Mesaros was still contemplating deleting his entire Facebook. Dkt. 320-6; Hr'g Recording Part 2 at 23:44–24:37. As of this time, he and Mesaros were "comb[ing] through old posts" to identify posts that might show the Mesaroses' participation in the October 30, 2020 Trump Train and identify their truck. Dkt. 320-6.

18.     Joeylynn Mesaros intentionally deleted her own Facebook posts about the incident, including a post she made on October 30, 2020 that is referenced in Plaintiffs' Complaint stating "The Trump Train NB stumbled onto the Biden Bus this afternoon and gave them a proper Texas welcome and friendly escort out of town!" Dkt. 284 at 8.[3]

19.     Mesaros produced a document showing all of her comments on Facebook posts dating back to early 2020. Dkt. 271 at 3 n.3; Dkt. 271-7; Hr'g Recording Part 2 at 35:50–36:48. For certain comments posted October and November 2020, the document displays metadata for a comment that once existed, but the document does not display the text or content of that comment. Dkt. 271-7 at 72–79; Hr'g Recording Part 2 at 36:50–37:12. The deletion of inculpatory comments was likely part of the Mesaroses' purge of their social media.

20.     Mesaros never disclosed to Plaintiffs that she purposefully deleted certain relevant social media content. Rather, Plaintiffs learned for the first time that Mesaros purposefully deleted certain relevant social media content when Robert Mesaros produced selected messages between the Mesaroses on August 16, 2023. Hr'g Recording Part 2 at 28:36–29:06.

21.     The cell phone Mesaros used on October 30, 2020 became permanently damaged. Dkt. 271 at 3–4; Hr'g Recording Part 2 at 39:01–39:20. Mesaros permanently lost phone data from key time periods, including shortly before, during, and after October 30, 2020. Dkt. 271 at 3–4; Hr'g Recording Part 2 at 39:01–39:59. Mesaros was unable to produce to Plaintiffs any communications from her cell phone from October 2020 and the weeks immediately preceding and following. Dkt. 271 at 3–4; Hr'g Recording Part 2 at 10:49–11:44.

22.     On July 17, 2021, Mesaros received a preservation letter pertaining to this litigation, which instructed her of her obligation to preserve relevant documents, including "social media

---

[3] This post is also available at Dkt. 241-125.

data, including posts . . . and direct or private messages," "cellular phones," and "smart phones." Dkt. 271 at 2; Dkt. 284 at 2.

23.     At some point after this lawsuit was filed, Robert Mesaros downloaded all of the photos and videos from Joeylynn Mesaros's cell phone that he believed were related to the litigation, but he did not download and save any other phone data, including text messages. Dkt. 271 at 4; Dkt. 284 at 3; Hr'g Recording Part 2 at 42:17–42:39.

24.     Prior to the filing of this lawsuit, Mesaros regularly dropped her cell phone and broke the screen. Hr'g Recording Part 2 at 44:33–44:46. This occurred approximately three times per year. *Id.*

25.     About two months after Mesaros became aware of this litigation, in either July or August of 2021, Mesaros dropped her phone such that it was damaged but still functional. Dkt. 271 at 4; Hr'g Recording Part 2 at 44:16–44:30.

26.     In September of 2021, Mesaros's cell phone became permanently damaged, and Mesaros lost access to all of the content on her phone. Dkt. 271 at 4; Hr'g Recording Part 2 at 44:05–44:12.

27.     Mesaros testified that the phone became permanently damaged when it fell out of her pocket onto a tile floor in a dressing room at Target. Hr'g Recording Part 2 at 45:10–45:20, 46:27–46:30. Mesaros testified that the phone fell, at most, three-and-a-half feet from her pocket while trying on a swimsuit. Hr'g Recording Part 2 at 45:21–46:24. Mesaros testified that as a result of that drop, pieces of glass left in the phone caused the phone to automatically push its passcode buttons before becoming permanently disabled. Hr'g Recording Part 2 at 46:37–47:00, 47:57–49:46.

28.     In September 2022, Mesaros engaged a vendor, Crowe LLP ("Crowe"), to assess the phone. Crowe found that the phone also sustained severe damage to the internal battery and charging port. Hr'g Recording Part 2 at 47:01–47:48; Dkt. 284-3 at 4.

29.     Mesaros's account of the circumstances of the damage to her phone is implausible, and the undersigned does not credit that this is the manner in which her phone became permanently damaged.

30.     At the time Mesaros found out about the lawsuit on June 24, 2021, Mesaros was aware that she was not saving a backup of her phone's data through her iCloud account. Hr'g Recording Part 2 at 43:11–43:18. For years, Mesaros received notifications that her phone data was not being backed up to an iCloud account or any other storage mechanism. Hr'g Recording Part 2 at 43:27–43:56. However, at no point from the date the lawsuit was filed on June 24, 2021 to the date that Mesaros permanently damaged her phone did Mesaros preserve her phone data through an iCloud back-up or any other method. Dkt. 271 at 5; Hr'g Recording Part 2 at 44:51–45:04.

31.     Mesaros failed to take reasonable steps to protect her phone from further damage, including using a more protective phone case, after dropping it previously. Hr'g Recording Part 3 at 44:33–44:46.

32.     The Mesaroses were unable to "reset" the damaged phone through their own efforts, use of software, or assistance of an Apple technician. Dkt. 271 at 4; Dkt. 284 at 3. Although either party could have requested additional records from Spectrum, the service provider for Mesaros's phone, these records would not have replaced the data that was lost, i.e., the content of the communications. Dkt. 291 at 2–3.

33.     Plaintiffs offered to bear the cost to use Plaintiffs' discovery vendor to attempt to recover data from Mesaros's phone, but counsel for Mesaros refused this offer. Dkt. 271 at 4.

34.     Mesaros's vendor, Crowe, conducted an inspection of her cell phone. Dkt. 271 at 4; Dkt. 284 at 3. Crowe was unable to recover data from Mesaros's phone, and confirmed Mesaros's iCloud account had no text message data between January 27, 2018 and September 24, 2021 because Mesaros was not backing up her cell phone's data during this time. Dkt. 271 at 4–5.

35.     Mesaros permanently lost all text messages sent on October 30, 2020 and the weeks immediately preceding and following, including, but not limited to, all text messages with Shana Evans and Robert Mesaros from these days. Hr'g Recording Part 2 at 10:49–11:44, 39:01–40:19. Mesaros has been unable to produce these communications to Plaintiffs. *Id.*

36.     Plaintiffs have been unable to obtain these communications from Shana Evans because Evans lost access to the contents of her phone when it was dropped in the ocean. Hr'g Recording Part 2 at 16:11–16:43.

37.     Plaintiffs have been unable to obtain these communications from Robert Mesaros because he was unable to produce any text messages between the Mesaroses from before November 19, 2020. Hr'g Recording Part 2 at 11:44–12:33.

38.     There is no way for Plaintiffs to know what other relevant communications once existed but have been permanently lost.

39.     Certain of Mesaros's social media posts, and other social media content, regarding the events of October 30, 2020 have been lost because Mesaros deleted them. Mesaros's text messages, and other phone data, from October 30, 2020 and the weeks immediately preceding and following have been lost because Mesaros failed to take reasonable measures to safeguard her phone's data.

40.     The content of this social media and text messages cannot be restored or replaced through additional discovery, including discovery from Spectrum or others, such as Shana Evans and Robert Mesaros.

41.     The social media that Mesaros deleted and phone data that she lost are highly relevant to Plaintiffs' claims, and Plaintiffs have been prejudiced by the loss of this ESI.

42.     Mesaros deleted her social media content, and instructed her husband to do the same, in bad faith and with the intent to deprive the Plaintiffs of this information. Mesaros also intentionally failed to take reasonable steps to preserve her phone's data in bad faith.

43.     Plaintiffs have no way to recover the permanently lost information.

## IV. CONCLUSIONS OF LAW

### A.  Defendant Eliazar Cisneros

1.     Plaintiffs moved the Court to sanction Cisneros under Federal Rule of Civil Procedure 37(e). Dkt. 267.

#### i.  Rule 37(e) Predicate Elements

1.     Based on the above factual findings, Cisneros's loss of ESI satisfies all four of the predicate elements of Rule 37(e).

2.     First, Cisneros had a duty to preserve his text messages with Peña, Niño, and others that he sent and received in the days leading up to and on October 30, 2020 (the "Text Messages") as of November 1, 2020 at the latest. A reasonable person in the position of Cisneros should have anticipated litigation after the Incident on October 30, 2020.

3.     The Text Messages Cisneros should have preserved included those with Peña and others communicating his plan to form a convoy and "welcome [the Bus] to Texas so to speak."

Dkt. 320-1. These Text Messages also include those he sent and received with Peña, Niño, and others while tracking and following the Bus on October 30, 2020.

4.      Second, the Text Messages have been lost. Plaintiffs inspected Cisneros's LG Phone and found that the Text Messages at issue were no longer on the LG Phone.

5.      Third, the Text Messages were lost because Cisneros failed to take reasonable steps to preserve them. In fact, Cisneros intentionally deleted the above-described Text Messages.

6.      Fourth, the Text Messages cannot be restored or replaced by additional discovery. The content of the Text Messages has been permanently lost despite Plaintiffs' monumental efforts to obtain them from other sources. Cisneros's testimony regarding the content of the Text Messages is no substitute for the Text Messages themselves; "[t]he content of text messages cannot be replaced by simply eliciting testimony from the Defendant[] and by having Plaintiff[s] accept that testimony rather than relying on the actual messages" because reliance on memory alone "deprive[s] [Plaintiffs] of the opportunity to know 'the precise nature and frequency' of those private communications, which occurred during a critical time period." *Jim S. Adler, P.C. v. McNeil Consultants, LLC*, 2023 WL 2699511, at *36 (N.D. Tex. Feb. 15, 2023) (quoting *Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109, at *4 (N.D. Ill. Mar. 23, 2018)).

ii.  *Rule 37(e) Prejudice and Intent*

1.      Plaintiffs were prejudiced by the loss of the text messages. The loss deprives Plaintiffs of insight into Cisneros's motivations, state of mind, and communications with potential co-conspirators.

2.      Cisneros deleted the text messages in bad faith and with the intent to deprive Plaintiffs of the evidence. Cisneros's inconsistent sworn statements, his stonewalling in discovery,

and his deletion of text messages from the time most critical to Plaintiffs' claims shows his intent to deprive Plaintiffs of this evidence.

### B. Defendant Joeylynn Mesaros

1.      Plaintiffs moved the Court to sanction Mesaros under Federal Rule of Civil Procedure 37(e). Dkt. 271.

*i.    Rule 37(e) Predicate Elements*

1.      Based on the above factual findings, Mesaros's loss of ESI satisfies all four of the predicate elements of Rule 37(e).

2.      First, Mesaros's ESI should have been preserved. Mesaros should have preserved her social media data and text messages that are relevant to this litigation, including, but not limited to, her communications with participants in the October 30, 2020 Trump Train, her communications about the Incident, and records of what she witnessed on October 30, 2020. Mesaros became aware of the litigation against her and the relevance of her social media and text messages on the day the lawsuit was filed.

3.      Second, Mesaros's ESI has been lost. The social media data that Mesaros purposefully deleted is no longer available. Mesaros no longer has access to the data from her phone from key time periods—including shortly before, during, and after October 30, 2020— because Mesaros lost all access to the contents of her phone when it became permanently damaged in September of 2021.

4.      Third, Mesaros's ESI was lost because she failed to take reasonable steps to preserve it. With regards to the lost social media data, Mesaros not only failed to preserve it, but she purposefully deleted it. Mesaros is also responsible for the loss of her phone data. Mesaros repeatedly failed to take reasonable precautions to preserve this data over several months, even

though she knew that she regularly and frequently dropped her phone. Mesaros was aware for years that her phone did not back up data to an iCloud account, yet she never chose to expand her iCloud storage plan when she learned of this lawsuit, despite having a history of dropping and damaging her phone and failing to use a protective phone case. Instead, Mesaros and her husband preserved certain photographs and videos from October 30, 2020 and the days after, but failed to preserve her text messages or any other phone data from this same time period on the same device.

5.      Fourth, Mesaros's ESI cannot be restored or replaced. Mesaros deleted social media content from her Facebook profile, which automatically deleted those same posts from other locations where they may have been shared. Mesaros's own forensic vendor confirmed her text messages are lost. Other efforts to collect copies of those messages from others, including Robert Mesaros and Shana Evans, have also been unsuccessful.

     *ii.* *Rule 37(e) Prejudice and Intent*

1.      Mesaros's loss of ESI has prejudiced Plaintiffs. The lost social media data and text messages are highly relevant to Plaintiffs' case, including Mesaros's communications regarding her plans to attend the October 30, 2020 Trump Train and what she witnessed on the day of the Incident. The loss deprives Plaintiffs of insight into Mesaros's motivations, state of mind, and communications with potential co-conspirators.

2.      Mesaros acted in bad faith and with the intent to deprive Plaintiffs of ESI. Mesaros intentionally deleted her social media data and encouraged her husband to do the same with the goal of depriving Plaintiffs of relevant ESI. Although Mesaros claims the destruction of her phone was inadvertent, her failure to take the most basic steps to back up her phone data—even after the phone was initially damaged—demonstrates similar intent with regards to her phone data.

3.

## V. CONCLUSION

These findings of fact and conclusions of law are driven, in part, by the undersigned's credibility determinations. Specifically, Cisneros and Mesaros lacked credibility in relation to the explanations they offered for the failure to preserve and produce the contents of their respective cell phones. While the undersigned found Park's explanation for the failure to preserve her cell phone contents credible, the testimonies of Cisneros and Mesaros on the subject were not believable. The determinations made by the court and the recommended sanctions against Cisneros and Mesaros are a direct result of their unbelievable testimony, under oath, before the undersigned.

## VI. RECOMMENDATIONS AND PERMISSIVE INFERENCES

For the reasons given above, the undersigned **RECOMMENDS** the District Court:

1.      **GRANT** Plaintiffs' Motion for Rule 37 Discovery Sanctions Against Defendant Eliazar Cisneros (Dkt. 267) and Motion for Rule 37 Discovery Sanctions Against Defendant Joeylynn Mesaros (Dkt. 271).

2.      **INSTRUCT** the jury that Eliazar Cisneros intentionally deleted text messages relevant to Plaintiffs' claims in this litigation with Jason Peña, Edward Niño, and others from the days leading up to October 30, 2020 and on October 30, 2020, and that the jury may presume that Eliazar Cisneros deleted those text messages because they were unfavorable to his case and would have been used by Plaintiffs to establish his liability.

3.      **INSTRUCT** the jury that Joeylynn Mesaros intentionally deleted social media content relevant to Plaintiffs' claims in this litigation and instructed her husband Robert Mesaros to do the same, and that the jury may presume that Joeylynn Mesaros deleted this social media content because it was unfavorable to her case and would have been used by Plaintiffs to establish her liability.

4.      **INSTRUCT** the jury that Joeylynn Mesaros intentionally failed to preserve her text messages from key time periods including shortly before, during, and after October 30, 2020, and that the jury may presume that Joeylynn Mesaros failed to preserve these text messages because they were unfavorable to her case and would have been used by Plaintiffs to establish her liability.

5.      **INSTRUCT** the jury that Joeylynn Mesaros intentionally failed to preserve other phone data from key time periods including shortly before, during, and after October 30, 2020, and that the jury may presume that Joeylynn Mesaros failed to preserve this phone data because it was unfavorable to her case and would have been used by Plaintiffs to establish her liability.

## VII. OBJECTIONS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battles v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(*en banc*).

SIGNED March 21, 2024.

_____
MARK LANE
UNITED STATES MAGISTRATE JUDGE