**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

ERIC CERVINI, et al.                    )
                                        )
                    Plaintiffs,         )
                                        )
            v.                          )        Civil No. AU:21-CV-00565-RP
                                        )
ELIAZAR CISNEROS, et al.                )
                                        )
                    Defendants          )

**MEMORANDUM OF LAW OF THE UNITED STATES REGARDING THE
CONSTITUTIONALITY AND INTERPRETATION OF THE "SUPPORT OR
ADVOCACY" CLAUSE OF 42 U.S.C. § 1985(3)**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

    I.      The "support or advocacy" clause of 42 U.S.C. § 1985(3) ................................... 2

    II.     Proceedings in this case .......................................................................................... 3

ARGUMENT ........................................................................................................................... 6

    I.      The § 1985(3) "support or advocacy" clause establishes an independent
          substantive right to be free from the specified forms of election-related
          conspiracy. ............................................................................................................. 6

    II.     The § 1985(3) "support or advocacy" clause applies not only to conspiracies
          involving state action but also to wholly private conspiracies. ............................. 8

    III.    The § 1985(3) "support or advocacy" clause is not limited to conspiracies
          involving racial or class-based animus. ................................................................. 9

    IV.    The statute extends to "support or advocacy" beyond the act of voting. ............... 11

    V.     The statute falls within Congress's constitutional authority to regulate federal
          elections. ............................................................................................................... 13

    VI.    The statute does not violate the First Amendment, because the First Amendment
          does not protect the use or threat of violence. ...................................................... 17

CONCLUSION ....................................................................................................................... 18

## TABLE OF AUTHORITIES

**CASES**

*Allen v. McCurry*,
    449 U.S. 90 (1980).................................................................................. 3

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013)................................................................................ 16

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993).............................................................................. 6

*Bryant v. Mil. Dep't*,
    597 F.3d 678 (5th Cir. 2010)...............................................................11

*Burroughs v. United States*,
    290 U.S. 534 (1934)....................................................................... 15, 16

*Counterman v. Colorado*,
    143 S. Ct. 2106 (2023)........................................................................ 17

*Ex parte Yarbrough*,
    110 U.S. 651 (1884)....................................................................... 14, 15

*Gill v. Farm Bureau Life Ins. Co. of Mo.*,
    906 F.2d 1265 (8th Cir. 1990)..........................................................7, 11

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).............................................................................. 18

*Great Am. Fed. Sav. & Loan Ass'n v. Novotny*,
    442 U.S. 366 (1979).............................................................................. 6

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971)........................................................................... 8, 9

*In re Mesaros*,
    No. 23-50593 (5th Cir. Aug. 28, 2023), ECF No. 24 (unpublished per curiam
    order)............................................................................................ passim

*In re Park*,
    No. 23-50585 (5th Cir. Jan. 9, 2024), ECF No. 96 (unpublished per curiam order)
    .............................................................................................................. 5

*In re Park*,
    No. 23-50585 (5th Cir. Sept. 13, 2023), ECF No. 37 (unpublished per curiam
    order).................................................................................................. 4

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004) ...................................................................11

*Kush v. Rutledge*,
    460 U.S. 719 (1983)........................................................................... 1, 10

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)......................................................................... 10, 13

*McKesson v. Doe*,
    141 S. Ct. 48 (2020) (per curiam) ...................................................... 18

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982)............................................................................. 18

*Paynes v. Lee*,
    377 F.2d 61 (5th Cir. 1967)............................................................... 1, 8

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984)............................................................................. 17

*Scott v. Moore*,
    680 F.2d 979 (5th Cir. 1982) (en banc) ........................................ 10, 13

*Smiley v. Holm*,
    285 U.S. 355 (1932)............................................................................. 16

*United Bhd. of Carpenters, Loc. 610 v. Scott*,
    463 U.S. 825 (1983).......................................................................... 6, 7

*United States v. Classic*,
    313 U.S. 299 (1941)............................................................................. 16

*United States v. Comstock*,
    560 U.S. 126 (2010)............................................................................. 14

*United States v. Williams*,
    341 U.S. 70 (1951).......................................................................... 9, 12

*Virginia v. Black*,
    538 U.S. 343 (2003)............................................................................. 17

**CONSTITUTIONAL PROVISIONS**

Composition Clause, U.S. Const. art. I, § 2, cl. 1 ...................................... 14, 16

Elections Clause, U.S. Const. art. I, § 4, cl. 1 ....................................... 14, 15, 16

Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18....................... 14, 16

U.S. Const. amend. I ........................................................................................... passim

U.S. Const. amend. XII .............................................................................................. 14

U.S. Const. art. II, § 1 .............................................................................................. 14

## FEDERAL STATUTES

42 U.S.C. § 1985 ........................................................................................................ 10

42 U.S.C. § 1985(3) ............................................................................................. passim

First Enforcement Act, 16 Stat. 140 (1870) ..................................................... 12

Third Enforcement Act, 17 Stat. 13 (1871)............................................................ 2

## OTHER AUTHORITIES

*A Democratic Attempt to Kill Thirty-Six Republican Girls*, *Milwaukee Daily Sentinel*,
    Oct. 22, 1868, at 2 ........................................................................................... 13

Cong. Globe, 42d Cong., 1st Sess. (1871) .......................................................... 9

Noah Webster, *An American Dictionary of the English Language* (Chauncey A. Goodrich
    ed., 1867) .......................................................................................................... 12

Select Comm. of the Senate to Investigate Alleged Outrages in the Southern States,
    *Report on the Alleged Outrages in the Southern States*, S. Rep. No. 42-1 (1871)
    ...........................................................................................................11, 13

## PRELIMINARY STATEMENT

The United States intervenes in this case for the limited purposes of defending the constitutionality of the "support or advocacy" clause of 42 U.S.C. § 1985(3) and advising the Court on the proper interpretation of the statute. The Court should interpret the "support or advocacy" clause in accord with the text and history of the statute, and should reject the defendants' invitation to impose spurious limits on the statute's application. The Court should also reject the defendants' challenges to the constitutionality of the "support or advocacy" clause, as the provision falls well within Congress's constitutional authority to protect federal elections and does not violate the First Amendment. The defendants urge the Court to impose various limitations on the application of the "support or advocacy" clause, but these suggested limitations all conflict with the text and history of the statute. Some of the defendants' suggested limitations also have already been squarely rejected by binding Supreme Court or Fifth Circuit precedent.

First, the language of the "support or advocacy" clause defines a substantive protection against conspiracy to interfere with support or advocacy of candidates in federal elections. The statute does not merely refer to rights defined by other provisions of law. Also, as the Fifth Circuit established in *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967), the text of the "support or advocacy" clause clearly reaches not only conspiracies involving state action but also purely private conspiracies. The "support or advocacy" clause also is not limited to conspiracies involving racial or class-based animus. The Supreme Court's opinion in *Kush v. Rutledge*, 460 U.S. 719 (1983), rules out any such limitation. The language of the "support or advocacy" clause likewise makes clear that its protection extends beyond the act of voting. If Congress had wanted to limit the statute's reach to voting, it would have simply used the term "voting," as it did in a

related statute enacted just one year earlier. Instead, Congress used the more expansive phrase "giving his support or advocacy in a legal manner."

The defendants do not raise valid constitutional objections to application of the "support or advocacy" clause. The Supreme Court has held that the Constitution vests Congress with broad authority to regulate elections for federal offices and insulate those elections and those offices against corrupting influences. The "support or advocacy" clause falls well within that authority. The "support or advocacy clause" does not run afoul of the First Amendment. The First Amendment does not protect the use or threat of violence. Application of the "support or advocacy" clause to violent conduct or threats, even if accompanied by protected political speech, would not violate the First Amendment.

The Court should reject the constitutional challenges the defendants have raised against the "support or advocacy" clause and should reject their erroneous interpretations of the statute.

## BACKGROUND

### I.    The "support or advocacy" clause of 42 U.S.C. § 1985(3)

The "support or advocacy" clause of 42 U.S.C. § 1985(3), as currently codified, provides:

> [I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Congress originally enacted the provision in 1871 as part of the Third Enforcement Act, 17 Stat. 13 (1871), also known as the Ku Klux Klan Act, among other common names. "The main goal of the Act was to override the corrupting influence of the Ku Klux Klan

and its sympathizers on the governments and law enforcement agencies of the Southern States."
*Allen v. McCurry*, 449 U.S. 90, 98 (1980).

## II.    Proceedings in this case

The plaintiffs allege that they were traveling on a presidential campaign tour through Texas on October 30, 2020, when the defendants conspired to intimidate them by, for example, trying to run their bus off the road. *See* First Am. Compl. ¶ 7, ECF No. 151. The plaintiffs filed suit in this Court seeking declaratory relief and damages based on the "support or advocacy" clause of 42 U.S.C. § 1985(3) and Texas State tort law. First Am. Compl. ¶¶ 146–162 and 61. The defendants have disputed the plaintiffs' account of the events. The United States takes no position on the original parties' factual disputes or whether the factual record in the case substantiates the plaintiffs' claims.

Some of the defendants moved to dismiss the action. This Court denied the motion, ruling in part (1) that a claim under the § 1985(3) "support or advocacy" clause does not require racial or class-based animus; (2) that the § 1985(3) "support or advocacy" clause creates an independent substantive right; and (3) that a claim under the § 1985(3) "support or advocacy" clause does not require state action and can reach private conspiracies. Order 8–13, ECF No. 64. The plaintiffs filed an amended complaint, and some of the defendants again moved to dismiss the action, but the Court denied the motion, adhering to its earlier rulings on the application of the "support or advocacy" clause. Order 5–6, ECF No. 204. The Court also denied requests by defendants Dolores Park, Joeylynn Mesaros, and Robert Mesaros to certify an interlocutory appeal. Order 8.

The three defendants who had sought certification of an interlocutory appeal filed petitions for mandamus in the Court of Appeals for the Fifth Circuit. On August 28, 2023, the court issued an unpublished per curiam order in which it denied the petition filed by the Mesaros

defendants but went on to express doubts on behalf of two members of the panel about the viability of the plaintiffs' § 1985(3) claims. *In re Mesaros*, No. 23-50593 (5th Cir. Aug. 28, 2023), ECF No. 24 (unpublished per curiam order). The opinion, representing the views of Judges Engelhardt and Oldham, stated that although mandamus relief ultimately was not warranted, the case presented "substantial ground[s] for difference[s] of opinion" on "controlling question[s] of law" regarding the application of the § 1985(3) "support or advocacy" clause. *In re Mesaros*, slip op. at 6. The court opined that there was reason to doubt that the clause establishes independent substantive rights. *See id.* at 6–7. The court further expressed doubt about whether the plaintiffs had sufficiently alleged "a conspiracy to exercise 'force, intimidation, or threat'" sufficiently "related to the postbellum violence that necessitated the statute's enactment." *See id.* at 7–8. It further suggested that perhaps the "support or advocacy" clause should be interpreted as limited to "going to vote" and not encompassing political campaign activity. *Id.* at 8. The court also expressed concern that application of the statute to the case would exceed Congress's authority under the Elections Clause, U.S. Const. art. I, § 4, cl. 1, or would violate the First Amendment. *In re Mesaros*, slip op. at 8–9. Nevertheless, the court did not conclusively rule on any of these issues.

The court later denied defendant Park's petition for mandamus relief, issuing an opinion duplicating verbatim the August 2023 opinion in *In re Mesaros*. *In re Park*, No. 23-50585 (5th Cir. Sept. 13, 2023), ECF No. 37 (unpublished per curiam order duplicating the *In re Mesaros* opinion).

In this Court, four of the defendants requested that the Court reconsider its earlier denial of certification in light of the August 2023 mandamus ruling. The Court denied the reconsideration motions, concluding that the August 2023 mandamus ruling did not compel

certification and that certification was not warranted because it would not materially advance the ultimate termination of the litigation. Order 8, 10–14, ECF No. 258.

Defendant Park then filed a motion in the Court of Appeals to renew her request for mandamus. The Court of Appeals denied that motion. *In re Park*, No. 23-50585 (5th Cir. Jan. 9, 2024), ECF No. 96 (unpublished per curiam order).

On February 5, 2024, and February 7, 2024, four of the defendants—defendants Park, Joeylynn Mesaros, Robert Mesaros, and Eliazar Cisneros—filed motions for summary judgment. Among other arguments, the defendants raised arguments against application of the § 1985(3) "support or advocacy clause" related to the constitutional and interpretive questions that the Fifth Circuit panel had identified in the August 2023 mandamus ruling. *See* Mem. in Supp. of Dolores Park's Mot. for Summ. J. [*hereinafter* Park Mem.]; Mesaros Defs.' Mot. for Summ. J. [*hereinafter* Mesaros Mem.]; Mem. in Supp. of Eliazar Cisneros' Mot. for Summ. J. The plaintiffs filed a consolidated response to the defendants' motions on March 6, 2024. Pls.' Opp'n to Defs.' Mots for Summ. J., ECF No. 364.

The briefs of the original parties regarding the defendants' motions for summary judgment address a range of additional issues, including the plaintiffs' claims under Texas State tort law and the sufficiency of the evidence presented by the plaintiffs. The United States has intervened for the limited purpose of defending the constitutionality of the "support or advocacy" clause of 42 U.S.C. § 1985(3) and advising the Court on the proper interpretation of the statute. The United States takes no position on the merits of the original parties' other arguments or any factual disputes in the case.

**ARGUMENT**

I.      **The § 1985(3) "support or advocacy" clause establishes an independent substantive right to be free from the specified forms of election-related conspiracy.**

The § 1985(3) "support or advocacy" clause is best interpreted as establishing an independent substantive right to be free from conspiracies to interfere with election-related support or advocacy, not merely providing a remedy for violation of rights established by other provisions of law.

The "support or advocacy" clause employs specific and direct language to establish protection for "support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person." 42 U.S.C. § 1985(3). It defines the scope of the protection directly, independent of any other source of law.

Defendants Park and Cisneros note that courts have held that a neighboring clause in § 1985(3), which deals with conspiracy to deprive persons of "the equal protection of the laws, or of equal privileges and immunities under the laws," *id.*, does not create substantive rights of its own, and instead merely provides a remedy for violation of rights established by other provisions of law. *See* Park Mem. 7–8; *In re Mesaros*, slip op. at 6; *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68, 278 (1993); *United Bhd. of Carpenters, Loc. 610 v. Scott*, 463 U.S. 825, 830–31 (1983); *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). But the holdings in those cases pertained only to that particular clause of § 1985(3), and they were based on the statutory language used in that clause, which refers to "equal protection of the laws" and "privileges and immunities under the laws," without specifying the content of the pertinent "laws." *See, e.g.*, *United Bhd. of Carpenters, Loc. 610*, 463 U.S. at 833 ("The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere . . . ."); *Bray*, 506 U.S. at 274 ("A § 1985(3) private conspiracy 'for the purpose of depriving . . . any

person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws,' requires an intent to deprive persons of a right guaranteed against private impairment." (omission in original) (citing *id.*)). The "support or advocacy" clause, by contrast, itself delineates the right to be protected: an individual right to "giv[e] [one's] support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States." 42 U.S.C. § 1985(3).

The defendants cite a 1990 case in which the Eighth Circuit concluded that the "support or advocacy" clause does not establish independent substantive rights. *See Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1270–71 & n.27 (8th Cir. 1990); Park Mem. 8, 11; *In re Mesaros*, slip op. at 6 (discussing *Gill*). Respectfully, the court in *Gill* followed faulty reasoning and reached an incorrect result. The court in *Gill* did not identify any reason why the "support or advocacy" clause should be interpreted as only creating a remedy for violations of other rights. The court merely cited the Supreme Court's opinion in *United Brotherhood of Carpenters, Local 610*, without examining whether that case's conclusions with respect to the equality clause were equally applicable to the "support or advocacy" clause. As discussed above, the different language of the "support or advocacy" clause calls for a different interpretation.

The defendants also point to the text in § 1985(3) providing for damages when a person is "deprived of having and exercising *any right or privilege of a citizen of the United States*," Park Mem. 10 (emphasis added) (quoting 42 U.S.C. § 1985(3)). But reading that language in its proper context shows that it does not support the defendants' argument. The relevant text provides:

> [I]f one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his

> person or property, *or* deprived of having and exercising any right or privilege of
> a citizen of the United States, the party so injured *or* deprived may have an action
> for the recovery of damages occasioned by such injury *or* deprivation, against any
> one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added). This text, with its use of the disjunctive "or," makes clear

that damages may be available for "injury" to "person or property" without reference to any

"right or privilege of a citizen of the United States."

## II.    The § 1985(3) "support or advocacy" clause applies not only to conspiracies involving state action but also to wholly private conspiracies.

A claim under the § 1985(3) "support or advocacy" clause does not require state action.

The statute applies not only to conspiracies involving state action but also to wholly private

conspiracies.

As the Court observed in its March 2022 ruling, Order 12–13, ECF No. 64, the Fifth

Circuit has already resolved the issue. In *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967), the Fifth

Circuit held that the "support or advocacy" clause provides "protect[ion] from individual as well

as from State interference." *Id.* at 64. The defendants acknowledge as much, but they argue that

the *Paynes* holding applies only to conspiracies to interfere with *voting*. The defendants argue

that a claim of conspiracy to interfere with election *advocacy* requires state action, because the

First Amendment only restricts governmental actors. *See* Park Mem. 10–13; Mesaros Mem. 3–6.

The defendants' argument fails because it rests on the erroneous premise that the "support

or advocacy" clause draws from and depends on the First Amendment. As discussed above, the

"support or advocacy" clause does not refer to another source of law, including the First

Amendment. Rather, it uses specific terms to afford direct protection to "support or advocacy in

a legal manner, toward or in favor of the election of any lawfully qualified person." 42 U.S.C.

§ 1985(3). Nothing in that language restricts the statute to conspiracies to violate the First

Amendment or that involve state action. In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the

Supreme Court concluded that the neighboring equality clause does not require state action. The Court observed that the equality clause contained no language suggesting such a requirement. *See id.* at 96–98. It compared the equality clause against neighboring provisions that did refer to state action in some manner. *See id.* at 98–99. And it observed that the legislative history contained "no suggestion whatever that liability would not be imposed for purely private conspiracies." *Id.* at 100.

Much of the same analysis applies to the "support or advocacy" clause. There is no language in the "support or advocacy" clause suggesting a state action requirement, in contrast to the neighboring provisions that do refer to state action. The statute speaks only of "two or more persons" who "conspire," without any language that would exclude private actors, and it specifies the required purpose—to "prevent" a person "from giving his support or advocacy in a legal manner" toward a candidate in a federal election—which likewise does not suggest any state action requirement. 42 U.S.C. § 1985(3); *see Griffin*, 403 U.S. at 96–97; *cf. United States v. Williams*, 341 U.S. 70, 78 (1951) (opinion of Frankfurter, J.) (reasoning that a provision of the First Enforcement Act applied to private conduct because other provisions showed that "Congress knew how" to refer to "color of State law" if it wanted to). And the legislative history also contains no indication that the scope of the "support or advocacy" clause is limited to state action. *See* Cong. Globe, 42d Cong., 1st Sess. 704, 724 (1871) (adoption of "support or advocacy" clause).

## III.    The § 1985(3) "support or advocacy" clause is not limited to conspiracies involving racial or class-based animus.

The § 1985(3) "support or advocacy" clause also is not limited to conspiracies involving racial or class-based animus.

The Supreme Court's opinion in *Kush v. Rutledge*, 460 U.S. 719 (1983), rules out any requirement of racial or class-based animus. In *Kush*, the Supreme Court grouped the provisions of § 1985 into two categories. The provisions in the first group, which includes the "support or advocacy" clause, deal with "institutions and processes of the Federal Government," and "contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws." *Kush*, 460 U.S. at 724–25. The provisions in the second group "encompass underlying activity that is not institutionally linked to federal interests and that is usually of primary state concern." *Id.* at 725. These provisions do contain language requiring "intent to deprive . . . victims of the equal protection of the laws." *Id.* The Court explained that only the provisions in the second category require evidence of racial or class-based animus, because they refer to "equal protection of the laws" and "equal privileges and immunities." The Court held that the other portions of § 1985 do not require racial or class-based animus, because they do not contain that critical language. *See Kush*, 460 U.S. at 726; *see also* Order 11, ECF No. 64.

Furthermore, the historical record demonstrates that the Third Enforcement Act was motivated out of concern for political violence as much as, if not more than, racial violence. "Today's Ku Klux Klan proclaims itself to be a racist organization. But in 1871 it was regarded primarily as a political one. . . . Congressmen consistently noted the pervasive regional hostility toward the Republicans as a reason for extending federal protection in section 1985(3)." *Scott v. Moore*, 680 F.2d 979, 992–93 (5th Cir. 1982) (en banc), *rev'd on other grounds*, *United Bhd. of Carpenters, Loc. 610*, 463 U.S. 825; *see also McDonald v. City of Chicago*, 561 U.S. 742, 856–57 (2010) (opinion of Thomas, J.) ("Militias such as the Ku Klux Klan, the Knights of the White Camellia, the White Brotherhood, the Pale Faces, and the '76 Association spread terror among

blacks *and white Republicans by breaking up Republican meetings, threatening political leaders*, and whipping black militiamen." (emphasis added)); Select Comm. of the Senate to Investigate Alleged Outrages in the Southern States, *Report on the Alleged Outrages in the Southern States*, S. Rep. No. 42-1, at xxii (1871) (finding that the testimony established that the Ku Klux Klan acted against "members of the republican party, both white and colored"); *id.* at xxxi (finding "That the Ku-Klux organization does exist, has a political purpose, is composed of members of the democratic or conservative party, has sought to carry out its purpose by murders, whippings, intimidations, and violence, against its opponents").

Thus, there is no basis for imposing "a non-textual limiting construction," *Kinney v. Weaver*, 367 F.3d 337, 352 n.14 (5th Cir. 2004), on the "support or advocacy" clause. *See Bryant v. Mil. Dep't*, 597 F.3d 678, 688 (5th Cir. 2010) (relying on *Kush* to hold that "[a] cause of action under [42 U.S.C.] § 1985(1) requires no allegation of racial or class-based discriminatory animus"); *Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1269 n.21 (8th Cir. 1990) (recognizing that a claim under the "support or advocacy" clause is not "subject to the racial or other invidious discrimination requirement applicable to equal protection claims").

## IV.    The statute extends to "support or advocacy" beyond the act of voting.

The defendants argue that the "support or advocacy" clause is limited to the act of voting and does not extend to "generalized election advocacy," Park Mem. 13–14, but that argument is contradicted by the text and history of the "support or advocacy" clause.

First, and most obviously, the defendants' interpretation is not compatible with the statutory text. Had Congress intended to reach only "voting," it most likely would have used the term "voting." And if it had intended not to reach "advocacy," it would not have used the term "advocacy." The use of the elaborate and expansive phrase "giving his support or advocacy in a legal manner" instead of the simpler term "voting" shows that Congress intended to extend

protection to a broad range of election-related support or advocacy. *See also* Noah Webster, *An American Dictionary of the English Language* 994 (Chauncey A. Goodrich ed., 1867), https://www.loc.gov/resource/gdcmassbookdig.americandictio00we/?sp=1022 (definition of "support" encompassing "[t]he act or operation of upholding or sustaining" or, in verb form, "[t]o uphold by aid or countenance" or "[t]o defend successfully, as a cause").

Indeed, "voting" is the term Congress used in the First Enforcement Act, enacted just one year earlier in 1870. Section 4 of that Act provided for civil and criminal liability "if any person, by force, bribery, threats, intimidation, or other unlawful means, shall hinder, delay, prevent, or obstruct, or shall combine and confederate with others to hinder, delay, prevent, or obstruct, any citizen from doing any act required to be done to qualify him to *vote* or from *voting* at any election." First Enforcement Act, § 4, 16 Stat. 140, 141 (1870) (emphasis added). That earlier-enacted provision demonstrates that "Congress knew how" to refer narrowly to voting when it wanted to. *United States v. Williams*, 341 U.S. 70, 78 (1951) (opinion of Frankfurter, J.) (reasoning that another provision of the First Enforcement Act applied to private conduct because other provisions showed that "Congress knew how" to refer to "color of State law" if it wanted to). The First Enforcement Act also makes clear that the "support or advocacy" clause cannot be limited to voting. If it were, Congress would not have had reason to enact the "support or advocacy" clause in the Third Enforcement Act, because it would have been duplicative of the voting provision in the First Enforcement Act.

The defendants' argument also fails to take account of the historical context in which Congress enacted the "support or advocacy" clause. Just as the concerns of Congress were not confined to racial violence, neither were they confined to the narrow act of voting. The Klan and others "terroriz[ed] citizens for their political views" as part of a "pervasive campaign to prevent

Republicans from establishing the policies of Reconstruction in . . . the South." *Scott*, 680 F.2d at 993; *see also McDonald*, 561 U.S. at 857 (opinion of Thomas, J.) (noting that the politically motivated terror at the time included "breaking up Republican meetings" and "threatening political leaders"). Congressional testimony preceding the Third Enforcement Act established that Klan members met to determine whether someone "ought to be killed for being too prominent in politics," or whether "to break up" local Black Republican organizations by killing their leaders. S. Rep. No. 42-1, at ix, xxi. "The testimony, almost without exception, establishe[d] that the outrages perpetrated by [the Klan] were inflicted upon members of the republican party, both white and colored; in some instances the fact that they were of that party being given as the reason for the punishment." *Id.* at xxii.

The forms of violence that prompted the enactment of the statute in 1871 were broad enough to encompass physical intimidation of persons traveling for political rallies. Such conduct was not foreign to the Congress or the public of 1871—an item published in the *Milwaukee Daily Sentinel* in 1868 decried the "Ku-Klux treachery" of a "dastardly attempt to murder . . . thirty-six young ladies who represented the states at the Republican rally at Bonaparte [Iowa]" by causing the "large wagon in which they were" to crash. *A Democratic Attempt to Kill Thirty-Six Republican Girls*, *Milwaukee Daily Sentinel*, Oct. 22, 1868, at 2 (attached as Exhibit 1).

## V.    The statute falls within Congress's constitutional authority to regulate federal elections.

The statute falls within Congress's constitutional authority to regulate elections for President, Vice President, and Congress and shield those elections and those offices from corrupting influences.

The Supreme Court has held that the Constitution vests Congress with broad authority to regulate federal elections, through several constitutional provisions: (1) the Elections Clause, U.S. Const. art. I, § 4, cl. 1;[1] (2) the constitutional provisions that establish the pertinent offices and provide for them to be filled by election;[2] and (3) the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18.

In *Ex parte Yarbrough*, 110 U.S. 651 (1884), petitioners were convicted under the (since repealed) criminal counterpart to the "support or advocacy" clause for conspiring to beat a voter several months after a federal election. *See id.* at 655–56. The petitioners challenged their convictions, arguing in part that the statute lay beyond the authority of Congress. The Court rejected the challenge. It reasoned that the Constitution established "a government whose essential character is republican," led by an elected President and Congress, and which "must have the power to protect the elections on which its existence depends from violence and corruption." *Id.* at 657–58. While the Constitution did not expressly confer such a power on Congress, the Court held that the Necessary and Proper Clause provided sufficient authority. *Id.* at 658; *cf. United States v. Comstock*, 560 U.S. 126, 134 (2010) ("[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."). The Court further reasoned that the Elections Clause, at least with respect to congressional elections, encompassed authority to

---

[1] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1.

[2] Composition Clause, U.S. Const. art. I, § 2, cl. 1 (composition of Congress and election of members of Congress); U.S. Const. art. II, § 1; U.S. Const. amend. XII.

"protect the act of voting, the place where it is done, and the man who votes, from personal violence or intimidation and the election itself from corruption and fraud." *Ex parte Yarbrough*, 110 U.S. at 661.[3]

In *Burroughs v. United States*, 290 U.S. 534 (1934), the Court upheld the authority of Congress to impose disclosure requirements for political contributions for elections for President and Vice President. *See id.* at 547. The Court found that, given the role of the President in the constitutional system, Congress must have authority to "safeguard" presidential elections "from the improper use of money to influence the result" as a matter of "self protection"—a power "to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Id.* at 545. The Court relied on *Ex parte Yarbrough* and held that the reasoning of that case applied to elections for President and Vice President. *See Burroughs*, 290 U.S. at 545–47.

*Burroughs* casts light on two key points that the Fifth Circuit did not consider in the August 2023 mandamus ruling. First, the August 2023 mandamus ruling incorrectly suggested that Congress's power over federal elections derives from the Elections Clause alone. *In re Mesaros*, slip op. at 8 ("Congress only has power to regulate 'The Times, Places and Manner of holding Elections . . . .'" (omission in original) (quoting U.S. Const. art. 1, § 4, cl. 1)). It failed to account for the constitutional provisions providing for election of the President, Vice President,

---

[3] The petitioners in *Ex parte Yarbrough* argued that because the indicted acts took place eight months after the election, they were too attenuated from the election to fall within the scope of Congress's authority under the Elections Clause. *See* Statement and Argument of Counsel for Petitioners 9, *Ex parte Yarbrough*, 110 U.S. 651 (No. 15), https://perma.cc/5YAR-T4TK ("In no instance have the acts of Congress, passed to regulate federal elections, been invoked to punish acts of conspiracy or violence committed after—some months after—the election, and because of the manner in which citizens of the United States have cast their votes at such elections . . . ."). The Court did not accept that argument.

and Congress, and Congress's authority to effectuate those provisions through legislation under the Necessary and Proper Clause.

Second, *Burroughs* shows that the panel was mistaken when it stated that the Supreme Court has upheld only "laws intimately related to ballot-casting," *In re Mesaros*, slip op. at 8. *Burroughs* upheld disclosure requirements for political contributions, which shows that the Court has recognized that Congress has broader power to protect federal elections from corrupting influences.

Similarly, in *United States v. Classic*, 313 U.S. 299 (1941), the Supreme Court held that Congress's authority extends to regulating primary elections. The Court reasoned that, although modern primary elections did not exist at the time of the Founding, they were "a necessary step in the choice of candidates for election as representatives in Congress" and accordingly implicated the Composition Clause and the Elections Clause, as well as Congress's authority to effectuate those provisions through legislation under the Necessary and Proper Clause. *Id.* at 320.

Other cases likewise have held that the Elections Clause confers authority to "provide a complete code for congressional elections," including authority to regulate the "protection of voters" and "prevention of fraud and corrupt practices . . . in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013) (explaining that the "substantive scope" of the Elections Clause is "broad" and "Times, Places, and Manner" "are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections'" (quoting U.S. Const. art. I, § 4, cl. 1, and *Smiley*, 285 U.S. at 366)). The § 1985(3) "support or advocacy clause," which aims to protect elections for President, Vice President, or

Congress from corruption by "force, intimidation, or threat" against citizens "lawfully entitled to vote," falls well within the scope of authority recognized by these cases.

**VI.    The statute does not violate the First Amendment, because the First Amendment does not protect the use or threat of violence.**

The § 1985(3) "support or advocacy" clause also does not violate the First Amendment, because the First Amendment does not protect the use or threat of violence even if it has some connection to political or expressive activity.

The First Amendment does not protect "true threats" of violence, that is, "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman v. Colorado*, 143 S. Ct. 2106, 2114 (2023) (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). "True threats of violence . . . lie outside the bounds of the First Amendment's protection" and are a "historically unprotected category of communications," *id.* at 2113–14, because "a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur,'" *Black*, 538 U.S. at 360 (alteration in original) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). Threats of violence do not gain First Amendment protection merely because they are made in conjunction with protected expressive activity. *See, e.g.*, *Black*, 538 U.S. at 360–63 (holding that a State may validly regulate cross burning with an intent to intimidate even though cross burning is a form of symbolic expression).

To state the obvious, the First Amendment likewise does not protect the actual *use* of violence, even in connection with protected political activity. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) (noting that "violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no

17

constitutional protection"); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) ("The First Amendment does not protect violence."); *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment.").

Imposing civil liability for violent threats or acts in connection with protected expression does require "precision of regulation" with respect to "the grounds that may give rise to damages liability" and "the persons who may be held accountable for those damages." *Claiborne Hardware Co.*, 458 U.S. at 916–17; *accord McKesson v. Doe*, 141 S. Ct. 48, 50 (2020) (per curiam). But the "support or advocacy" clause fully comports with that principle, as it imposes liability only on persons who conspired to employ "force, intimidation, or threat" or "injure [a] citizen in person or property." 42 U.S.C. § 1985(3).

Thus, while the First Amendment surely protects the right to assemble a vehicle caravan to voice support for a favored candidate and heckle supporters of an opposing candidate, even in a raucous or offensive manner, it just as surely does not protect threatening or committing violence against the supporters of the opposing candidate. Application of the § 1985(3) "support or advocacy" clause to such conduct[4] would not violate the First Amendment.

## CONCLUSION

The Court should reject the defendants' invitation to accord the "support or advocacy" clause of 42 U.S.C. § 1985(3) an unduly narrow interpretation that is not supported by its text or history, and it should reject the challenges the defendants have raised to the constitutionality of the statute.

Date: April 5, 2024                    Respectfully submitted,

---

[4] Once again, the original parties appear to dispute whether the defendants conspired to threaten or commit violence, and the United States takes no position in that dispute.

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Directors

/s/ JAMES C. LUH
JAMES C. LUH
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St NW
Washington DC 20530
Tel: (202) 514-4938
E-mail: James.Luh@usdoj.gov
Attorneys for Intervenor United States