IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WENDY DAVIS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:21-CV-565-RP |
| | § | |
| ELIAZAR CISNEROS, et al., | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

Before the Court are Defendant Dolores Park's ("Park") objections to the expert testimony of Dr. Theron Bowman. (Dkts. 314, 317, 416). Plaintiffs Wendy Davis, David Gins, and Timothy Holloway (collectively, "Plaintiffs") filed a response in opposition, (Dkts. 334, 337), and Park filed a reply, (Dkts. 353, 356). Also before the Court is Plaintiffs' motion to exclude the expert testimony of Dr. Paul Dorothy. (Dkts. 313, 316). Park filed a response in opposition, (Dkts. 341, 345), and Plaintiffs filed a reply, (Dkts. 358, 359).[1] Having considered the parties' briefs, the record, and the relevant law, the Court issues the following order.

## **I. BACKGROUND**

This case arises out of an incident alleged to have occurred during the 2020 U.S. presidential election campaign period (hereinafter, the "Incident"). Plaintiffs assert that on October 30, 2020, they were traveling on I-35 between San Antonio and Austin, Texas, in a Biden-Harris campaign tour bus. (Am. Compl., Dkt. 151, at 2–3). At that time, they allege, "dozens of individuals in at least forty vehicles" participated in a "Trump Train" to show support for presidential candidate Donald Trump by surrounding the campaign bus on the highway. (*Id.*). Plaintiffs state that for at least ninety

---

[1] The preceding docket numbers refer to both unsealed and sealed versions of each filing.

minutes, the "Trump Train" forced the campaign bus to slow down to a crawl on the highway, that cars came within inches of the campaign bus, boxing it in, and that one "Trump Train" vehicle slammed into a Biden campaign staffer's car, causing Plaintiffs to fear for their lives and suffer emotional trauma. (*Id.* at 2–3). Plaintiffs allege that Park, Defendants Eliazar Cisneros, Joeylynn Mesaros, Robert Mesaros, Randi Ceh, and Steve Ceh (collectively, "Defendants"), and others coordinated to wait for and surround the campaign bus. (*Id.* at 3).

Based on these allegations, Plaintiffs assert that Defendants violated the Ku Klux Klan Act ("KKK Act"), 42 U.S.C. § 1985(3), which creates liability for those that "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner" in favor of a Presidential or Congressional candidate for federal office. Plaintiffs also assert two claims under Texas state tort law: that Defendants engaged in a civil conspiracy; and that Defendants engaged in a civil assault. (*Id.* at 58–62). This case is currently set for trial beginning on September 9, 2024. (Dkt. 405).

Plaintiffs designated Dr. Theron Bowman ("Dr. Bowman") as an expert witness, (Dkt. 261), to assess (1) whether Defendants or other "Trump Train" participants violated the Texas Transportation Code or the Texas Criminal Code during the Incident; and (2) "how the [I]ncident affected driving conditions on the road that day," (Bowman Report, Dkt. 334-2). Only Park objects to Dr. Bowman's testimony. (Dkts. 314, 317, 416). In turn, Park designated Dr. Paul Dorothy ("Dr. Dorothy") as a rebuttal expert, (Dkt. 269), to "investigate the interaction between [Park] and her vehicle and the Biden-Harris campaign bus that occurred" during the Incident, (Dorothy Report, Dkt. 313-1). Park states that she designated Dr. Dorothy as an expert to rebut Dr. Bowman's testimony. (Resp. Mot. Exclude, Dkt. 341, at 1). Plaintiffs move to exclude Dr. Dorothy's testimony on multiple grounds. (Dkts. 313, 316).

## II. LEGAL STANDARD

The root of the court's admissibility analysis is Federal Rule of Evidence 702, which

provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Supreme Court has interpreted this rule as imposing a "gatekeeping role" upon district

court judges, tasking them with "ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597

(1993). "The reliability prong mandates that expert opinions be grounded in the methods and

procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v.

Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). "The relevance

prong requires the proponent to demonstrate that the expert's reasoning or methodology can be

properly applied to the facts in issue." *Id.* (internal quotation marks omitted). The burden on the

proponent of the expert testimony is only to prove, by a preponderance of the evidence, that the

testimony is reliable; they need not prove the expert's testimony is correct. *Id.*

The *Daubert* standard requires courts "to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*

*Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The *Daubert* inquiry "'is not intended to serve as a replacement for the adversary system.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Accordingly, "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.* In interpreting *Daubert*, courts in this jurisdiction use a three-factor framework for determining whether expert evidence is admissible. Proponents of expert testimony must demonstrate that "(1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable." *Bonnet-Pritchett v. Washington Cnty.*, 2022 WL 3082522, at *1 (W.D. Tex. June 16, 2022).

### III. DISCUSSION

#### A. Dr. Theron Bowman

##### 1. Dr. Bowman's Background and Testimony

The Court begins with Park's objections to Dr. Theron Bowman's expert testimony. (Dkts. 314, 317, 416). Dr. Bowman has over 39 years of policing experience, including 34 years as a police officer, 14 years as Chief of Police of Arlington, Texas, five years as the Director of Public Safety and Deputy City Manager of the City of Arlington, Texas, and 25 years as a police practices expert. (Bowman Report, Dkt. 334-2, ¶¶ 1, 4–6). In these roles, Dr. Bowman gained significant on-the-ground experience in policing and traffic enforcement, including evaluating and responding to motor vehicle actions and traffic scenarios. He served as a police officer and a patrol officer—roles that required him to respond to calls for service, conduct traffic enforcement activities, and recognize traffic and motor vehicle-related criminal violations. (*See id.* ¶ 17; *see also* Bowman Dep., Dkt. 337, Ex. 1, at 15:25–16:1, 131:15–132:16). Dr. Bowman also was a police supervisor, during which time he supervised patrol officers who conducted traffic enforcement activity and managed events on freeways that involved the movement of traffic. (Bowman Report, Dkt. 334-2, ¶ 17; *see also* Bowman Dep., Dkt. 337, Ex. 1, at 16:1–4). During his long tenure as a police practice expert, Dr.

Bowman has reviewed "several hundreds, if not thousands of police departments and police cases . .

. involving traffic movement [and] traffic enforcement" and assessed "hundreds of in-car camera

videos." (Bowman Dep., Dkt. 337, Ex. 1, at 15:21–24, 51:18–52:1). Further, Dr. Bowman has taught

policing and police administration at five colleges and universities. (Bowman Report, Dkt. 334-2, ¶

3). Dr. Bowman has a Ph.D. in public and urban administration, and has graduated from the FBI

National Academy, the FBI Executive Institute, and the Senior Management Institute for Police. (*Id.*

¶ 2).

　　Dr. Bowman was retained to review and analyze video recordings and deposition testimony

to evaluate driving behavior and identify traffic violations and criminal infractions potentially

committed by drivers participating in the Incident, as well as how these drivers may have affected

driving conditions on I-35 that day. (*Id.* ¶¶ 20, 21, 25, 28). In completing his analysis, Dr. Bowman

reviewed 53 videos, 13 depositions, as well as other reports, photographs, maps, and articles. (*Id.* ¶¶

23, 24, Ex. B). He states that he created a detailed spreadsheet, which tracked 35 vehicles he

identified in his review, denoted identifying information of those vehicles, and logged the physical

location of those vehicles when they were observable in a video source. (*Id.* ¶ 26, 27, Ex. C). Dr.

Bowman also created a labeling system of the "13 positions relative to the bus's location on the

roadway where Trump Train members tended to position their vehicles"; described the effect of the

particular vehicle configurations on the bus and its movements; and used the identified labeling

scheme throughout his report to identify vehicles' locations throughout the Incident. (*Id.*, Exs. D, E;

*see, e.g.*, ¶¶ 46–48, 54–57)

　　Dr. Bowman assessed the video footage using his experience in police practices to examine

driving behaviors and determine if the videos showed instances of traffic violations or otherwise

dangerous driving conduct. (*Id.* ¶ 25). Dr. Bowman also determined whether specific vehicle

movements were "random" or "coordinated" according to set definitions. (*See id.* ¶¶ 28, 130; *see also*

Bowman Dep., Dkt. 337, Ex. 1, at 170: 21–25). Throughout the report, Dr. Bowman cites to specific

videos and timestamps to substantiate his findings.

      In his report, Bowman concludes, among other things, that:

> (i) former Defendants Hannah Ceh and Kyle Kruger, Defendant Eliazar Cisneros, Defendants Joeylynn and Robert Mesaros, and Defendant Dolores Park engaged in a Trump Train "action" on October 30, 2020 alongside many other participants,

> (ii) they participated in both random and coordinated vehicle movements that violated Texas motor vehicle driving safety and Texas criminal laws,

> (iii) the conduct of Trump Train participants posed a serious danger to the Bus, Biden Campaign Staffer A, who was driving in a separate vehicle, and other members of the motoring public who were exposed to the Trump Train's aggressive driving actions, [and]

> (iv) Trump Train vehicle movements and activities caused other motorists to alter their driving in ways that created additional peril to the Bus and other motorists in the proximity of Trump Train participants[.]

(Bowman Report, Dkt. 334-2, ¶ 130).

2. Dr. Bowman's Testimony is Admissible.

      Park concedes that Dr. Bowman's testimony is relevant but challenges his qualifications and

the reliability of his testimony. Specifically, Park argues that (1) Dr. Bowman is not qualified as an

expert in traffic or highway safety because his qualifications are limited to police practices; (2) Dr.

Bowman's testimony is unreliable because it is not based on the video evidence and deposition

testimony; (3) Dr. Bowman's opinion that Defendants committed violated Texas traffic laws and the

Texas Penal Code is an improper legal conclusion; and (4) Dr. Bowman's testimony should be

excluded under Federal Rule of Evidence 403 because it is misleading and more prejudicial than

probative. (*See* Objs., Dkt. 314, at 1, 6, 9–10). The Court disagrees.

First, Dr. Bowman is qualified to offer an expert opinion on the driving behavior of the "Trump Train" vehicles, its impact on the bus, and traffic safety on the road that day. To be qualified under Rule 702 and *Daubert*, an expert must "possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person." *Lance v. City of San Antonio*, 2023 WL 8696340, at \*2 (W.D. Tex. Nov. 1, 2023); *see also* Fed. R. Evid. 702. Dr. Bowman has extensive experience in highway safety from his time as an on-the-ground police officer, patrol officer, police supervisor, and a police practices expert and professor. He specifically has extensive experience in analyzing traffic enforcement cases and in-car camera videos—experience that is uniquely suited to the issues in this case. Park argues that Dr. Bowman does not have "scientific or technological training in highway or roadway safety." (Objs., Dkt. 314, at 2). But Dr. Bowman does not need scientific or technological training in highway safety to be qualified in this case. He clearly has a "higher degree of knowledge, skill, experience, training, [and] education than an ordinary person" when it comes to evaluating traffic and motor vehicle-related criminal infractions. *See Lance*, 2023 WL 8696340, at \*2 (finding that expert was "certainly qualified to testify about police best practices" where he was a former police officer and a tenured professor on police regulation). The Court finds he is qualified to give his expert opinion.

Second, Park objects that Dr. Bowman's opinion is unreliable because his testimony is not based on sufficient facts or data, nor is his testimony the product of reliable methods. (*See* Objs., Dkt. 314, at 6). Park argues that Dr. Bowman's methodology is faulty because he did not provide "calculations, did not test his opinions, failed to seek peer review, and did not consider alternative explanations." (*Id.* at 8). Park also points to certain pieces of evidence that contradict Dr. Bowman's conclusions that Park engaged in dangerous driving or that her driving impacted the bus's movement. (*See id.* 2–9). She argues that Dr. Bowman "ignore[d] what is captured on video and disregards or ignores relevant deposition testimony." (*Id.* at 7).

The Court disagrees. Dr. Bowman's testimony is the result of a systematic methodology through which he reviewed, tracked, and analyzed 53 videos. His report contains a chart with identifying information on the 35 vehicles he identified as taking part in the Incident. His report also contains specific citations to substantiate his assertions, either citing specific deposition testimony or timestamps in specific videos. Park's argument that Dr. Bowman "shows none of his work" is not supported by the record. Park's protestation that Dr. Bowman has not provided calculations or engaged in peer review on his report is also misguided. The *Daubert* factors' reference to "hard science" methodology is not applicable in every case. *Kumho Tire*, 526 U.S. at 150. The relevant inquiry is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. Courts have expressly acknowledged that law enforcement testimony "is not the type of testimony that is readily subject to peer review." *Carr v. Montgomery Cnty.*, 2015 WL 5838862, at *7 (S.D. Tex. Oct. 7, 2015). In fact, an expert may "draw a conclusion from a set of observations based on extensive and specialized experience." *Pipitone*, 288 F.3d at 247. Here, Dr. Bowman relies on his extensive personal experiences in law enforcement, and there is no indication that he fails to employ the same level of rigor as other law enforcement officers.

As for Park's assertion that Dr. Bowman ignored key evidence in reaching his conclusions, whether an expert sufficiently considered all available evidence "goes to the weight, not admissibility, of his opinion testimony." *See Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 802 (N.D. Tex. 2013) (citing *Daubert*, 509 U.S. at 596). The specific questions that Park raises regarding the strength of Dr. Bowman's conclusions are better suited for cross-examination, not exclusion. *See Pipitone*, 288 F.3d at 250 ("[A]s *Daubert* makes clear, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (cleaned up). The Court finds that Dr.

Bowman's testimony is reliable both because it is the product of reliable methodology and because it is based on sufficient facts and data.

Third, Park objects that Dr. Bowman should not be allowed to testify about Defendants' traffic violations and "reckless driving" on the grounds that this testimony would be an improper legal conclusion. (Objs., Dkt. 314, at 9). In general, while expert testimony may "embrace[] an ultimate issue," Fed. R. Evid. 704, experts may not instruct the jury on the law governing the claims in a case, *see Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997). However, the Fifth Circuit has observed that experts "may testify as to legal matters when those matters involve questions of fact." *Id.* at 672. And an expert "witness may illuminate *ancillary issues of law* not within the province of the jury." *Wal-Mart Stores, Inc. v. Qore, Inc.*, 2009 WL 305687, at *2 (N.D. Miss. Feb. 3, 2009) (emphasis added). Here, Dr. Bowman is not offering any conclusions on the law governing this case. Plaintiffs are not bringing claims against Defendants for violating traffic or criminal laws. Rather, Plaintiffs are bringing claims for conspiracy and civil assault, and Dr. Bowman's testimony does not opine on the ultimate issues of whether Defendants conspired or committed assault. Because his testimony in no way "tell[s] the jury what result to reach," his testimony is within the scope of proper expert opinion. *But see Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 239 (5th Cir. 1983) (holding that trial court acted properly by sustaining objection to expert legal opinion going to the "ultimate issue" of the case).

Last, Park objects that Dr. Bowman's opinion is misleading and more prejudicial than probative and thus should be excluded under Rule 403. Under Federal Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by undue prejudice or its tendency to mislead or confuse the issues. Park argues that she would be prejudiced by Dr. Bowman making his conclusions "using the full weight of his past in law enforcement." (Objs., Dkt. 314, at 10). She also argues that Dr. Bowman's testimony on whether Defendants

committed traffic violations will confuse the jury such that they may conflate a traffic violation with a violation of the KKK Act or liability for civil conspiracy or assault. (Park Reply, Dkt. 353, at 8).

The Court disagrees with both arguments. Dr. Bowman's testimony has significant probative value. To succeed on their KKK Act claim, Plaintiffs will have to prove that Defendants' actions during the Incident were threatening or intimidating. As for their state law claims, Plaintiffs will have to prove that Defendants engaged in an unlawful conspiracy—such as a conspiracy to accomplish tortious conduct—and, for the assault claim, that Defendants caused bodily injury to Plaintiffs or threatened Plaintiffs with imminent bodily injury. *See MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 196 (Tex. App.—El Paso 2017, no pet.) (citing elements of civil conspiracy); *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012) (citing elements of civil assault). Although a violation of the Texas Transportation Code or the Texas Criminal Code does not conclusively demonstrate threatening or intimidating behavior, evidence of such violations could aid the jury in determining whether Defendants' driving threatened or intimidated Plaintiffs. Thus, Dr. Bowman's testimony is highly relevant to the key issues in the case. On the other hand, the fact that this evidence may hurt Defendants' case does not mean that the evidence is prejudicial—never mind *unfairly* prejudicial. *See Graef v. Chem. Leaman Corp.*, 106 F.3d 112, 118 (5th Cir. 1997) ("Evidence is not prejudicial merely because admitting it may sway the jury against a party."). Nor is Dr. Bowman's testimony prejudicial because of his law enforcement background. Indeed, his law enforcement background is what qualifies him to be an expert witness in this case. The fact that Dr. Bowman may be too convincing or compelling to a jury is not a reason to exclude his testimony.

Last, the Court does not find that Dr. Bowman's testimony would confuse the jury into conflating traffic violations with the substantive claims in this case.[2] The Court will provide detailed

---

[2] Park cites *Nat'l Coal. on Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78 (S.D.N.Y. 2023), in support of her argument that the jury will conflate a traffic violation with a violation of the laws at issue in this case. (Park

instructions to the jury about the elements of the three claims in this case and how to consider expert testimony. The parties will have sufficient opportunity to offer argument as to how to draft those instructions, and the Court is confident that after being given those instructions, the jury will be able to find the difference between traffic violations and liability for conspiracy and assault. Therefore, the Court does not find that the probative value of Dr. Bowman's testimony is substantially outweighed by undue prejudice or potential jury confusion.

In sum, the Court finds that Dr. Bowman should be allowed to proffer his expert testimony. He is qualified from his significant experience in law enforcement. His expert report is the result of a reliable methodology based on personal experience and is sufficiently supported by the record. Further, his testimony does not contain improper legal conclusions, nor should it be excluded under Rule 403. Accordingly, the Court overrules Park's objections to Dr. Bowman's expert testimony.

### B. Dr. Paul Dorothy

#### 1. Dr. Dorothy's Background, Research, and Testimony

Next, Plaintiffs move to exclude Dr. Paul Dorothy, Park's rebuttal expert witness on the quality and impact of Park's driving during the Incident. (Dkts. 313, 316). Dr. Paul Dorothy has a Ph.D. in civil engineering and has worked as a civil engineer with a focus on transportation. (Dorothy CV, Dkt. 313-1). He currently serves as a technical consultant on a number of areas including, *inter alia*, "highway design, pavement design/analysis, maintenance of traffic, work zone

---

Reply, Dkt. 353, at 10). At issue in *NCBC* were robocalls containing false information that were made for the purpose of preventing recipients from voting by mail. 661 F. Supp. 3d 78, at 90. Plaintiffs argued that the robocalls were sent through threats and intimidation in violation of the KKK Act, 42 U.S.C. § 1985(3). *Id.* The Court excluded expert testimony that would have stated that the robocalls were not intimidating to voters in part because the proposed expert based his testimony on a New York law that defined intimidation in a way different than the KKK Act. *Id.* at 103–104. The Court found that the expert's application of the New York law definition of intimidation would confuse the jury when called upon to decide intimidation under the KKK Act. *Id.* No similar issue exists in this case. The traffic violations and violations of the Texas Criminal Code that Dr. Bowman would testify about in this case do not contain overlapping definitions of intimidation—or other legal elements—that would confuse a jury.

safety, roadway and roadside safety, [and] traffic engineering . . . ." (*Id.*). Dr. Dorothy worked as a research associate at Michigan State University, focused on "arterial design and operation, freeway interchange design and operation, simulation modeling, crash analysis, truck safety, truck driver training, and speed limits." (*Id.*). He taught courses focused on "engineering economics, roadway design, and simulation modeling." (*Id.*). Dr. Dorothy also has a certification in traffic crash reconstruction, has been published in professional journals and manuals in the areas of traffic analysis and highway safety, and has led hundreds of safety studies focused on the crash experiences of individual roadway elements. (*See* Resp. Mot. Exclude, Dkt. 341, at 2–3).

Dr. Dorothy was retained by Park to rebut the expert testimony of Dr. Bowman. (*Id.* at 6). Dr. Dorothy was designated "to investigate the interaction between Ms. Park and her vehicle and the Biden-Harris campaign bus that occurred on [I-35] as the bus traveled between San Antonio and Austin, Texas, on October 30, 2020." (Dorothy Report, Dkt. 313-1, at 3). In sum, Dr. Dorothy's report consists of eleven pages from executive summary through his analysis: three pages on the executive summary and procedures of the report, four pages summarizing deposition testimony reviewed, one-and-a-half pages stating excerpts from the *Texas Driver's Handbook*, a one-page timeline of the events from his perspective, and two pages of his own analysis. (*See id.*).

Dr. Dorothy states that he utilized two guidelines from the ASTM (formerly known as the American Society for Testing Materials) in his analysis: ASTM E678-07 (13), Standard Practice for Evaluation of Scientific or Technical Data, and ASTM E620-18, Standard Practice for Reporting Opinions of Scientific or Technical Experts. (*Id.* at 3). He reviewed the following materials in preparing his report: Plaintiff's first amended complaint, the Fifth Circuit's order on Park's petition for a writ of mandamus, Dr. Bowman's report, and deposition testimony of Park and third-party Sarah Hill. (*Id.* at 5). Dr. Dorothy also states that he reviewed "multiple videos," though the report only identifies one specific video. (*Id.* at 5, 9). Dr. Dorothy's analysis relies exclusively on the *Texas*

*Driver Handbook* (the "*Handbook*"), which he asserts "establishes the minimum knowledge of the rules of the road that a driver should possess in order to operate a motor vehicle upon the public roadways." (*Id.* at 9–13). Dr. Dorothy states that "the provided evidence, relevant references, and Dr. Dorothy's education, knowledge, and expertise provides the basis for" his opinion. (*Id.* at 3).

Dr. Dorothy concludes, *inter alia*, that: (1) "The vehicle maneuvers that Ms. Park performs in proximity to the bus are performed in a smooth and reasonable manner"; (2) "The maneuvers performed by Ms. Park do not appear to be in coordination with any other vehicles occupying the roadway"; (3) "At no point does Ms. Park's vehicle box in the bus"; (4) "Ms. Park exhibited none of the signs of an aggressive driver identified by the [*Handbook*]"; and (5) "Ms. Park drove her vehicle in a reasonable manner that did not conflict with any of the vehicles traveling in her vicinity." (*Id.* at 11–12).

### 2. Dr. Dorothy's Testimony is Inadmissible.

Plaintiffs move to exclude Dr. Dorothy's testimony on several grounds. First, they argue that Dr. Dorothy's expert report is not a rebuttal report because it was not offered "solely to contradict or rebut evidence on the same subject matter." (Mot. Exclude, Dkt. 313, at 5 (citing Fed. R. Civ. P. 26(a)(2)(D)(ii))). Instead, Plaintiffs argue that Dr. Dorothy's report is an affirmative expert opinion that should be excluded because it is untimely under the scheduling order in this case. (*Id.*). Second, Plaintiffs argue that the report should be excluded because it purports to rebut a theory of the case that Plaintiffs do not assert. (*Id.* at 7–9). Dr. Dorothy's report focuses primarily on the short window of time where Park was driving near the bus because that is the only time period that Dr. Dorothy believed relevant to Plaintiffs' claims. (*See id.*; *see also* Dorothy Report, Dkt. 313-1, at 11–13). Plaintiffs argue that because Dr. Dorothy did not analyze Park's conduct at other times during the Incident, his analysis is not relevant to this case and not helpful to the jury. (*See id.* at 9).

13

Last, Plaintiffs argue that Dr. Dorothy's report should be excluded as unreliable. Specifically, Plaintiffs argue that: (1) Dr. Dorothy, as a civil engineer, is not qualified as an expert on individuals' driving or unsafe driving; (2) Dr. Dorothy's report is not based on sufficient facts and data because it does not disclose the video material he reviewed and fails to consider key evidence; (3) Dr. Dorothy's opinions are not the product of reliable principles and methods because the ASTM standards he cites are too general to provide guidance in this case and he does not provide authority for his proposition that the *Handbook* "establishes the minimum knowledge of the rules of the road"; and (4) Dr. Dorothy has not reliably applied his methodology to the facts of the case because he does not apply the ASTM standards he purports to utilize and his report ignores provisions of the *Handbook* that Park violated. (*Id.* at 10–20). The Court agrees and finds that Dr. Dorothy's testimony is unreliable and should be excluded for several reasons.[3]

First, Dr. Dorothy is not qualified to give an expert opinion on the quality of individual driving. Dr. Dorothy is a civil engineer who has spent his career analyzing how humans interact with infrastructure—specifically, highway infrastructure. In the past, he has given expert opinions on highway structural design issues that may have led to traffic problems or specific traffic incidents. *See, e.g.*, Report of Paul Dorothy, *Wagner v. Fedex Freight Inc.*, No. 513CV01564, 2014 WL 10534390 (W.D. La. Mar. 25, 2014). However, this case does not concern the interaction between drivers and highway infrastructure—it concerns the interactions of various individual drivers, the Biden-Harris campaign bus, and other motorists who were driving on I-35 on October 30, 2020. Although Dr. Dorothy is an accomplished engineer, his knowledge of how highway design affects traffic does not qualify him to opine on individual driving safety. And nowhere in his report does Dr. Dorothy

---

[3] Because the Court finds that Dr. Dorothy's testimony should be excluded as unreliable, the Court does not reach Plaintiffs' arguments concerning whether Dr. Dorothy's report should be excluded as an untimely affirmative expert report or that the report should be excluded because it purports to rebut a theory of the case that Plaintiffs do not assert.

explain how his engineering expertise is relevant to this case. Accordingly, Dr. Dorothy's qualifications—while impressive—are not "sufficiently related to the issues and evidence" in this case such that his proposed testimony will be probative. *See United States v. Wen Chyu Liu*, 716 F.3d 159, 167 (5th Cir. 2013) (internal quotation marks omitted); *see also Macy v. Whirlpool Corp.*, 613 F. App'x 340, 344 (5th Cir. 2015) (striking expert opinion in case relating to alleged exposure to carbon monoxide from defective gas range where, though expert was an "accomplished engineer with significant expertise in vehicular accident reconstruction and fire and explosion analysis," he had "no significant experience or training that relates to carbon monoxide monitoring or defective gas appliances").

Second, Dr. Dorothy's report is not based on sufficient facts and data. Rule 26 requires that expert reports include "(i) a complete statement of all opinions the witness will express and the basis and reasons for them;" and "(ii) the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). Dr. Dorothy's report violates this rule because the report simply states that he reviewed "multiple videos." (Dorothy Report, Dkt. 313-1, at 5). Apart from identifying one specific video he reviewed, (*see id.* at 9), Dr. Dorothy's report makes no effort to identify any other videos that he relied upon. Nor does Dr. Dorothy's report contain any video timestamps to substantiate his conclusions, in stark contrast to Dr. Bowman's report which contains detailed citations to evidence in the record.

In his deposition, Dr. Dorothy estimated that he reviewed somewhere between 12 and 20 videos. (Dorothy Dep., Dkt. 316, Ex. 2, at 159:8–9). However, in her response brief, Park gives inconsistent answers as to how many videos Dr. Dorothy reviewed. She simultaneously argues that Dr. Dorothy reviewed a "*more* comprehensive record" than Dr. Bowman; that he reviewed "*all*" the videos Dr. Bowman did; and that he reviewed *some* of the videos Dr. Bowman did but left out those Park found to be "irrelevant." (*See* Resp. Mot. Exclude, Dkt. 341, at 1, 15, 16) (emphasis added). Her

brief also asserts that Dr. Dorothy "analyzed the same evidence Bowman did in addition to *other video* Plaintiffs produced during discovery." (*Id.* at 1) (emphasis added). Her statements are concerning because they are contradictory and cause more confusion regarding which videos Dr. Dorothy considered in his analysis. For example, what are the "other video[s]" that Dr. Dorothy considered? Did he consider "all" of the videos that Dr. Bowman did, or just some of them? And how could Dr. Dorothy have considered the same evidence as Dr. Bowman when Dr. Bowman reviewed 53 videos for his report, (*see* Bowman Report, Dtk. 334-2, at 53–55), but Dr. Dorothy reviewed between 12 and 20 videos?

Due to the lack of clarity about which videos Dr. Dorothy relied upon in his report, Plaintiffs are prejudiced in their ability to properly address and challenge Dr. Dorothy's analysis. Therefore, his testimony must be excluded as violative of Rule 26 and having an insufficient basis in facts and data. *See Witt v. Chesapeake Exploration, L.L.C.*, No. 2:10-cv-22-TJW, 2011 WL 2790174, at *2-3 (E.D. Tex. July 14, 2011) (granting motion to exclude expert testimony to prevent expert from prejudicing defendant by testifying based on data that was not disclosed in his report).

Third, Dr. Dorothy's testimony is not the result of reliable principles and methods. The report purports to apply two standards promulgated by the ASTM. (*See* Dorothy Report, Dkt. 313-1, at 3). The first standard cited, ASTM E678-07 (2013), a "Standard Practice for Evaluation of Scientific or Technical Data" was withdrawn in 2022.[4] The second, ASTM E620-18, a "Standard Practice for Reporting Opinions of Scientific or Technical Experts," "covers the scope of information to be contained in formal written technical reports which express the opinions of the scientific or technical expert with respect to the study of items that are or may reasonably be expected to be the subject of criminal or civil litigation." ASTM E620-18 § 1.1; (*see also* Ex. 8, Dkt.

---

[4] *See Standard Practice for Evaluation of Scientific or Technical Data (Withdrawn 2022)*, ASTM, https://www.astm.org/e0678-07r13.html (last updated Jan. 17, 2022).

313-8). This document consists of three pages of standards that pertain generally to forensic or technical investigations on any subject. It directs an expert on how to compile a report, not on how to conduct the underlying expert analysis. For the purposes of a *Daubert* analysis, however, this general standard does not provide sufficient methodology because it does not direct Dr. Dorothy—or any expert—on how to conduct an expert analysis in the specific field in which they will be providing an opinion. To accept this standard as sufficient methodology would be to allow any purported expert to be qualified under *Daubert*; a result at odds with the gatekeeping role that *Daubert* intended district courts to embrace. *See Daubert*, 509 U.S. at 597.

Dr. Dorothy's exclusive reliance on *Texas Driver's Handbook* is also an unreliable methodology. Dr. Dorothy asserts that the "*Handbook* establishes the minimum knowledge of the rules of the road that a driver should possess in order to operate a motor vehicle upon the public roadways." (Dorothy Report, Dkt. 313-1, at 12). However, he cites no authority for this proposition. Dr. Dorothy admitted in his deposition that the *Handbook* itself does not make such a claim, nor is the *Handbook* required reading to obtain a Texas driver's license. (Dorothy Dep., Dkt. 316 Ex. 2, at 212:17–20, 214:2–9). It is also not clear based upon Dr. Dorothy's background as a civil engineer what qualifies him to determine that the *Handbook* establishes the minimum knowledge of the rules of the road. Without a sufficient foundation for why he should analyze Park's driving against the provisions in the *Handbook*, his expert opinion is unreliable.

Last, Dr. Dorothy's report does not reliably apply his stated methodology to the facts in this case. A district court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" and may ultimately "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 277 (5th Cir. 1998). Here, aside from the issues raised by the methodologies that Dr. Dorothy purports to apply to his report, Dr. Dorothy does not

follow the standards he states he is applying. ASTM E620-18 requires, among other things, that "[t]he method(s) utilized" in an expert report "shall be identified (including version and date when applicable) in such a manner as to allow critical review or replication by another party." § 4.1; (*see also* Ex. 8). However, Dr. Dorothy's report is not written to allow critical review by another party because his report contains no citations to substantiate his timeline of events or his analysis of Park's driving. For example, in his analysis section, Dr. Dorothy concludes, "The maneuvers performed by Ms. Park do not appear to be in coordination with any other vehicles occupying the roadway, other than that expected by the rules of the road." (Dorothy Report, Dkt. 313-1, at 12). But Dr. Dorothy provides no explanation of how he arrived at this conclusion or what evidence supports it.

Dr. Dorothy also purports to apply various provisions of the *Handbook* to conclude that Park drove her vehicle "in a reasonable manner." (*Id.* at 13). But his report omits instances where the record shows Park violated *Handbook* provisions—including, for example, provisions cautioning against using a cell phone while driving, changing lanes without signaling, veering to one side or another of a lane, and failing to keep both hands on the wheel. (*See Handbook*, Ex. 6, at 41, 51, 57). Dr. Dorothy admitted at his deposition that Park committed these violations. (*See* Dorothy Dep., Dkt. 316 Ex. 2, at 227:25–229:1; 270:18–271:5; 274:22–275:5, 277:5–15, 285:7–20; 306:21–307:2). He testified that he overlooked these violations because they did not result in aggressive or reckless driving or result in an accident. (*See id.* at 227:25–229:1; 285:7–20). But these responses reveal the flawed application of his purported methodology. Dr. Dorothy's report is unreliable because while he claims that the *Handbook* provides the "minimum knowledge of the rules of the road," he ignores instances whereby his own admittance Park's driving fell below that standard. His conclusions thus seem to be the result of his own *ipse dixit*—untethered to the record in this case. *See Joiner*, 522 U.S. at 146.

In short, Dr. Dorothy's expert testimony must be excluded on a few grounds. As a civil engineer, Dr. Dorothy is not qualified to testify on the issue of individual driving. His expert testimony is also unreliable. It is not based on sufficient facts and data as the report violates Rule 26's disclosure requirements by failing to specify the sources of his analysis. Further, Dr. Dorothy did not identify a reliable methodology for his opinion, nor did he reliably apply his purported methodology in his report. Accordingly, the Court grants Plaintiffs' motion to exclude the expert testimony of Dr. Dorothy.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Park's objections to the expert testimony of Dr. Theron Bowman, (Dkts. 314, 317, 416), are **OVERRULED**. Dr. Bowman's expert testimony may be admitted at trial.

**IT IS FURTHER ORDERED** that Plaintiff's motion to exclude the expert testimony of Dr. Paul Dorothy, (Dkts. 313, 316), is **GRANTED**. Dr. Dorothy's expert testimony is excluded from trial.

**SIGNED** on August 12, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE