IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WENDY DAVIS, DAVID GINS, and TIMOTHY HOLLLOWAY, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:21-CV-565-RP |
| ELIAZAR CISNEROS, RANDI CEH, STEVE CEH, JOEYLYNN MESAROS, ROBERT MESAROS, and DOLORES PARK, | § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court are three motions for summary judgment from Defendants Eliazar Cisneros ("Cisneros"), Dolores Park ("Park"), and Joeylynn and Robert Mesaros (together, the "Mesaros Defendants") (collectively, "Defendants").[1] (Dkts. 325, 328, 326, 329).[2] Plaintiffs Wendy Davis, David Gins, and Timothy Holloway (collectively, "Plaintiffs") filed a consolidated response in opposition, (Dkts. 364, 366). Only Park filed a reply, (Dkts. 375, 380), and Plaintiffs filed a sur-reply, (Dkt. 383). The United States also filed a notice of intervention and memorandum of law opposing Defendants' interpretation of 42 U.S.C. § 1985(3). (Dkts. 385, 386). Having considered the parties' briefs, the record, and the relevant law, the Court finds that Defendants' motions for summary judgment should be denied.

---

[1] Pro se Defendants Randi Ceh and Steve Ceh did not file motions for summary judgment.
[2] Docket numbers throughout this order refer to both unsealed and sealed versions of each filing.

# I. BACKGROUND

## A. Factual Background

This case arises out of an incident alleged to have occurred during the 2020 U.S. presidential election campaign period (the "Incident"). Plaintiffs Wendy Davis, David Gins, and Timothy Holloway were, respectively, a surrogate, staffer, and contractor for the Biden-Harris Presidential Campaign. (Resp., Dkt. 364, at 1). They state that they intended to spend October 30, 2020 (hereinafter "October 30") campaigning across central Texas in support of the Biden-Harris presidential ticket. Instead, Plaintiffs allege that they were "chased, surrounded, harassed, and assaulted by a caravan of cars and trucks" involving Cisneros, Park, and the Mesaros Defendants. Plaintiffs allege that Defendants worked together, and with other non-parties, to "swarm" the Biden-Harris campaign bus (the "Bus") as it drove on Interstate 35 ("I-35") between San Antonio and Austin, Texas, preventing Plaintiffs from exercising their rights to support and advocate for their candidate and significantly injuring them in the process. (*Id.* at 1). Gins, in particular, has testified that he found the conduct on October 30 to be so intimidating that he decided to cancel campaign stops in San Marcos and Austin out of fear that violence would occur if they held an event. (Gins Dep., Dkt. 366-1, Ex. 26, at 171:17–172:3).

Plaintiffs allege that Park, Cisneros, and the Mesaros Defendants, coordinated with other drivers in the "Trump Train" to "locate and surround the bus, and to harass, intimidate, and threaten it through dangerous driving." (Resp., Dkt. 364, at 3). According to Plaintiffs, the dangerous driving that was on display that day included: "lurching out in front of the many-ton bus from the highway shoulder, coordinating with other drivers to block the bus from exiting the freeway, [and] driving around the bus without hands on the steering wheel while waving flags and filming." (*Id.*). They also allege that Cisneros rammed a campaign staffer's car that was following the

Bus, (*id.*)—an incident that Cisneros later described as "me slamming that f****r" and "welcom[ing] him properly to Texas," (Ex. 12, Dkt. 364–12).

Plaintiffs argue that these acts and outcomes were intentional because Defendants each believed that the 2020 election was a battle between good and evil and believed that extraordinary measures were justified to ensure that Democrats were defeated in 2020. (*Id.* at 1–2). In the months and weeks leading up to the Incident, Defendants allegedly expressed support for aggressive tactics against Democrats, posting messages that supported making liberals "cry" or driving into a crowd of protestors to "instill[] a little bit of fear." (Ex. 7, Dkt. 364-7 (video depicting Park); J. Mesaros Dep., Dkt. 366-1, Ex. 1, at 139:15–140:6; Cisneros Dep., Dkt. 366-1, Ex. 6, at 43:16-22). Plaintiffs also argue that other evidence in the record establishes Defendants' intent: a picture Cisneros posted on social media of a firearm that he called his "Antifa meat tenderizer," (Ex. 8, Dkt. 364-8); a text message exchange showing that Cisneros asked Joeylynn Mesaros to custom-make a t-shirt for him that says, "don't make me Rittenhouse your ass," (Ex. 9, Dkt. 364-9; Cisneros Dep., Dkt. 366-1, Ex. 6, at 26:11–17); and deposition testimony where Cisneros stated that when he went to Washington D.C. on January 6, 2021, he coordinated with others to bring collapsible batons and bear mace to allegedly protect others from Antifa and Black Lives Matter, (Cisneros Dep., Dkt. 366-1, Ex. 6, at 31:5–18).

Plaintiffs also argue that the record demonstrates that Defendants prepared and organized the October 30 "Trump Train." Cisneros stated that before October 30, he was "tr[ying] to come up with a plan to welcome [the Biden-Harris campaign] to Texas so to speak" by organizing a "convoy," and spreading the word to other Trump Train groups, including the New Braunfels Trump Train ("NBTT"). (Ex. 10, Dkt. 366-1). Cisneros was aware that "[m]any people [who] wanted to be involved" "wanted to prevent" a potential Biden administration, and "to let [the Biden-Harris Campaign] know that what they stood for was not welcome here in Texas nor was it

welcome in the United States." (*Id.*). The Mesaros Defendants learned of the event from the NBTT Facebook page and posted online about their attendance. (J. Mesaros Dep., Dkt. 366-1, Ex. 1, at 160:14–25). Park learned of the event from a text message chain with other "Trump Train" participants who were aware of the plan, and Park posted flyers online encouraging others to "greet the Biden bus," depicting an image of the bus with a red circle and line through it, "mean[ing] no." (Park Dep., Dkt. 166-1, Ex. 11, at 195:1).

    After the "Trump Train" Incident, the record demonstrates that Defendants celebrated the fact that they caused Plaintiffs to cancel their campaign events and leave Texas. Cisneros posted about the "Trump Train" noting that "Texas welcomes Biden/Harris. We serve Brisket, Sausage, Leg quarters, Whataburger and 35 in tires . . . What would you like?" (Ex. 12, Dkt. 364-12). He also bragged that he was "[s]mart enough to get the entire Biden Harris campaign canceled in Texas[,]" (Ex. 13, Dkt. 364-13), and testified that he believed that the group's efforts canceled Biden-Harris events in central Texas, (Cisneros Dep., Dkt. 366, Ex. 6, at 108:22–24). Park posted photos of herself in the "Trump Train" captioned "[t]here I go . . . escorting the Biden bus out of town" (Ex. 14, Dkt. 364-14; Ex. 15, Dkt. 364-15). Joeylynn Mesaros stated that "TTNB doesn't mess around y'all," and posted "YASSS! Byeee" in response to comments describing the Incident as "show[ing] Kamala the way out" of Texas. (Ex. 17, Dkt. 364-17). She also posted that they "gave [the Bus] a proper Texas welcome and a friendly escort out of town!" (Ex. 18, Dkt. 264-18). Robert Mesaros posted a comment that he would "just as quick as run [Biden] out of Texas again" than see him visit the state, (Ex. 19, Dkt. 364-19), and admitted that this comment had been referring to the Incident, (R. Mesaros Dep., Dtk. 366-1, Ex. 2, at 228:3–6).

    Due to the events on October 30, Plaintiffs state that they were prevented from engaging in political advocacy in support of their chosen candidates for President and Vice President and from engaging in activities to support voter engagement and get-out-the-vote advocacy during the final

days of the 2020 election. (Resp., Dkt. 364, at 4). In addition, each Plaintiff alleges that they "suffered emotional distress as the result of the incident, causing them to miss work, decline significant professional and political opportunities, and make major changes to their lives and the lives of their families." (*Id.* at 4, 42–45).

Defendants admit that they participated in the "Trump Train" Incident on October 30 but deny that the "Trump Train" was intended to cause intimidation or threatening behavior. Defendants instead argue that they were engaging in a peaceful protest in support of their chosen candidate for President, Donald Trump. (*See* Dkt. 325, at 14–16; Dkt. 329-1, at 4). Cisneros specifically denies that he drove his car into the campaign staffer accompanying the Bus—arguing instead that the staffer hit him—and asserts that it was Holloway, as the Bus's driver, who was driving in a tortious manner. (Dkt. 329-1, at 3, 5).

Park also denies that she had a malicious intent in participating in the "Trump Train" and denies that she knew any of the other Defendants prior to the initiation of this lawsuit. (Dkt. 325, at 2). She admits that on October 29, 2020, she designed a digital flyer for the "Trump Train" and posted it on Facebook. On October 30, she prayed in the morning at a Planned Parenthood and originally did not intend to participate in the "Trump Train" events later that day. After the prayer service concluded, she received a text message from non-party Sarah Hill inviting her to the AT&T Center in San Antonio. Park then decided to attend and follow the Bus on I-35, all the while posting live videos on Facebook. She asserts that for most of the time she was on I-35 she drove behind the Bus. (*Id.*). As she approached Exit 215, she decided to leave I-35 to head home. She states that as she passed the Bus to exit the highway, this was the only time that she was in the "vicinity" of the Bus.  She argues that the record demonstrates that she did not "box[] in the bus" and when she passed the Bus, she did so without incident. (*Id.* at 3–4).

**B. Procedural Background**

Plaintiffs initiated this case on June 24, 2021, (Dkt. 1). They assert that Defendants violated the Support or Advocacy Clause of the Ku Klux Klan Act (the "Klan Act" or the "Act"), 42 U.S.C. § 1985(3), which creates liability for those that "conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner" in favor of a Presidential or Congressional candidate for federal office. Plaintiffs also assert two claims under Texas state tort law: that Defendants engaged in a civil conspiracy; and that Defendants engaged in a civil assault. (Am. Compl., Dkt. 151, at 57–61).

In August 2021, Defendants filed motions to dismiss Plaintiffs' original complaint. (Dkts. 22, 24, 25, 33). The primary focus of their motions to dismiss were disagreements about the proper interpretation of the Support or Advocacy Clause. Defendants argued, *inter alia*, that Plaintiffs' allegations could not support a finding of liability under the Klan Act because the Support or Advocacy Clause (1) requires an allegation of race-based animus; (2) does not create an independent substantive right; and (3) requires an allegation of state action. (*See id.*). On March 23, 2022, the Court issued an order denying Defendants' motions to dismiss. (Order, Dkt. 64). The Court found that the Support or Advocacy Clause does not require a finding of racial or other class-based animus. (*Id.* at 8–11). The Court also found that the Support or Advocacy Clause was created "to allow plaintiffs to recover damages for interference with their election-related rights and is a 'specific remedy for interference by private individuals'"; therefore, it did not have a state action requirement. (*Id.* at 12–13 (quoting *Paynes v. Lee*, 377 F.2d 61, 63–64 (5th Cir. 1967))). The Court also rejected an argument from Cisneros that Texas law does not permit mental and emotional anguish damages in this case. The Court found that Texas law has permitted civil conspiracy and civil assault claims to move forward when plaintiffs seek damages for mental and emotional injuries. (*Id.* at 13–14).

Shortly after, Defendants filed their first motions for certificate of appealability pursuant to 28 U.S.C. § 1292 and reconsideration of the Court's Order denying the motions to dismiss. (Dkts. 66, 69, 70). In their motions, Defendants requested that the Court certify an interlocutory appeal because the Court's Order interpreting the Support or Advocacy Clause included issues that were novel, controlling issues of law; that there was substantial ground for difference of opinion about these questions of law; and that an immediate appeal would have materially advance the ultimate termination of the litigation. (*See id.*) On August 19, 2022, this Court denied these motions. (Order, Dkt. 100). The Court declined to reconsider its previous decision on the motions to dismiss and found that the requirements for interlocutory appeal under 28 U.S.C. § 1292 were not met. (*Id.*).

On January 18, 2023, Plaintiffs filed their amended complaint, (Dkt. 151), and on February 8, 2023, Defendants responded by filing renewed motions to dismiss and requests to authorize an interlocutory appeal, (Dkts. 162, 163, 164). Defendants argued again that the Court should dismiss Plaintiffs' claims under the Support or Advocacy Clause because these claims require racial animus and state action. (*See id.*). Defendants also urged the Court to certify an interlocutory appeal to resolve the question of whether Plaintiffs were required to plead the elements of racial animus or state action for their Support or Advocacy Clause claims. (*See id.*). On August 3, 2023, the Court issued an order denying both the renewed motions to dismiss and motions for interlocutory appeal. (Order, Dkt. 204). The Court found that Defendants' assertions on the requirements of a Support or Advocacy Clause claim were a rehashing of arguments made in previous motions. Accordingly, the Court adhered to its previous application of the Support or Advocacy Clause. (*Id.* at 5–6). The Court also denied the renewed requests to certify an interlocutory appeal for the reasons stated in its August 19, 2022 Order. (*Id.* at 8).

The Mesaros Defendants and Park then filed petitions for writs of mandamus with the Fifth Circuit. (Dkts. 205-1, 208-1). They asked the Fifth Circuit to vacate this Court's denial of

Defendant's motions to dismiss, or in the alternative, direct this Court to certify an appeal under 28 U.S.C. § 1292(b). (*Id.*). On August 28, 2023, the Fifth Circuit issued an unpublished order in which it denied the Mesaros Defendants' petition for writ of mandamus but expressed doubt about the viability of Plaintiffs' § 1985(3) claims. *In re Mesaros*, No. 23-50593 (5th Cir. Aug. 28, 2023), Dkt. 209. The opinion stated that although mandamus relief was not warranted, the case presented "substantial ground[s] for difference[s] of opinion" on "controlling question[s] of law" regarding the application of the Support or Advocacy Clause. *In re Mesaros*, slip op. at 6. The court opined that there was reason to doubt that the clause establishes independent substantive rights. *See id.* at 6–7. The court further expressed doubt about whether the plaintiffs had sufficiently alleged "a conspiracy to exercise 'force, intimidation, or threat'" sufficiently "related to the postbellum violence that necessitated the statute's enactment." *See id.* at 7–8. It further suggested that perhaps the Support or Advocacy Clause should be interpreted as limited to "going to vote" and not encompassing political campaign activity. *Id.* at 8. The court also expressed concern that application of the statute to the case would exceed Congress's authority under the Elections Clause, U.S. Const. art. I, § 4, cl. 1, or would violate the First Amendment. *In re Mesaros*, slip op. at 8–9. However, the Fifth Circuit did not conclusively rule on any of these issues. On September 13, the Fifth Circuit also denied Park's petition for mandamus relief, issuing an opinion that duplicated verbatim the opinion in *In re Mesaros. In re Park*, No. 23-50585 (5th Cir. Sep. 13, 2023), Dkt. No. 221.

Based upon the Fifth Circuit's orders, Defendants again requested that the Court reconsider its earlier denial of certification of an interlocutory appeal. (Dkts. 210, 222, 223, 224). On October 18, 2023, the Court denied the motions for reconsideration and renewed requests to certify an interlocutory appeal. (Order, Dkt. 258). The Court concluded that the Fifth Circuit's mandamus ruling did not compel certification and that certification was not warranted because it would not materially advance the ultimate termination of the litigation. (*Id.* at 8–14). Park then filed a motion

with the Fifth Circuit to renew her request for mandamus. (Dkt. 259-1). The Fifth Circuit again

denied mandamus relief. *In re Park*, No. 23-50585 (5th Cir. Sep. 13, 2023), Dkt. No. 290.

On February 5 and February 7, 2024, Cisneros, Park, and the Mesaros Defendants filed the

present motions for summary judgment. (Dkts. 325, 328, 326, 329). All four of these defendants

raise arguments against application of the Support or Advocacy Clause to the facts of this case—

some of which were previously raised and addressed during the motion to dismiss stage of this

litigation and some of which relate to the questions that the Fifth Circuit panel identified in its

mandamus opinions. Cisneros and Park also contest whether, based on the record, a jury could find

that they committed civil conspiracy or civil assault. Further, Cisneros alone argues that emotional

distress does not constitute an injury for the state-law claims and that Plaintiffs have not shown

sufficient injuries. Plaintiffs filed a consolidated response to the motions for summary judgment.

(Dkts. 364, 366). Only Park filed a reply brief, (Dkts. 375, 380), and Plaintiffs filed a sur-reply, (Dkt.

383).

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure

only "if the movant shows there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine only if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). "A fact issue is 'material' if its resolution could affect the

outcome of the action." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

The party moving for summary judgment bears the initial burden of "informing the district

court of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). "[T]he moving party may [also] meet its burden by simply pointing to an absence of

evidence to support the nonmoving party's case." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 544 (5th Cir. 2005). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 175 (5th Cir. 2000). Courts must view the summary judgment evidence in the light most favorable to the nonmovant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

## III. DISCUSSION

### A. The Section 1985(3) Support or Advocacy Clause Claims

The Court begins its analysis of the motions for summary judgment with Defendants' challenges to Plaintiffs' Ku Klux Klan Act, 42 U.S.C. § 1985(3), claims. Defendants do not argue that they are entitled to summary judgment on these claims based on the factual record in this case. Instead, Defendants argue that they are entitled to summary judgment as a matter of legal interpretation. Defendants urge the Court to adopt their interpretation of the Support or Advocacy Clause and find that under that interpretation, Plaintiffs' allegations do not state a claim for liability or otherwise would render the statute unconstitutional.

Specifically, Defendants make the following arguments: (1) the Support or Advocacy Clause does not create a new substantive cause of action; (2) the Support or Advocacy Clause only creates liability for conspiracies that prevent plaintiffs from exercising their voting rights, not for claims pertaining to election advocacy; (3) the Support or Advocacy Clause does not reach private conspiracies and instead has a state action requirement; (4) the Support or Advocacy Clause is limited to conspiracies involving racial or class-based animus; (5) Plaintiffs' allegations cannot sustain a claim for liability under the Support or Advocacy Clause because the allegations do not

sufficiently mirror nineteenth century Klan violence; (6) Plaintiffs' interpretation of the Support or Advocacy Clause would violate Article I of the Constitution; and (7) Plaintiffs' allegations cannot support a claim without violating the First Amendment because Defendants' actions are protected activity. (*See* Dkts. 325, at 6–14; Dkt. 326; Dkt. 329). The Court addresses each of these arguments in turn.[3]

      1. Background on 42 U.S.C. § 1985(3) and the Support or Advocacy Clause

Section 1985(3) is comprised of multiple clauses. *See Kush v. Rutledge*, 460 U.S. 719, 724–25 (1983) (recognizing the two types of conspiracies prohibited by 1985(3); *see also Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486 (S.D.N.Y. 2020). The italicized portion below, or the first clause of § 1985(3) is commonly referred to as the "Equal Protection Clause" of § 1985(3).[4] The underlined portion below, the second clause, is referred to as "the Support or Advocacy Clause." *See Nat'l Coal.*, 498 F. Supp. 3d at 486; Note, *The Support or Advocacy Clause of 1985(3)*, 133 Harv. L. Rev. 1382, 1390–91 (2020). As currently codified, 42 U.S.C. § 1985(3) reads in its entirety:

> *If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;* <u>or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or</u>

---

[3] The Court is mindful that the Fifth Circuit discussed many of these issues in its mandamus orders in *In re Mesaros* and *In re Park*. Because the Fifth Circuit's discussion of these arguments was in the context of deciding whether this case presented "substantial ground[s] for difference[s] of opinion" on "controlling question[s] of law" under 28 U.S.C. § 1292(b), the Court understands the Fifth Circuit to have not conclusively ruled on these issues. Accordingly, the Court analyzes each of Defendants' arguments based upon its understanding of the applicable precedents.

[4] Throughout this Order, the Court's references to the "Equal Protection Clause" will be to the first clause in § 1985(3)—not to be confused with the Equal Protection Clause of the Fourteenth Amendment.

> to injure any citizen in person or property on account of such support
> or advocacy; in any case of conspiracy set forth in this section, if one
> or more persons engaged therein do, or cause to be done, any act in
> furtherance of the object of such conspiracy, whereby another is
> injured in his person or property, or deprived of having and exercising
> any right or privilege of a citizen of the United States, the party so
> injured or deprived may have an action for the recovery of damages
> occasioned by such injury or deprivation, against any one or more of
> the conspirators.

42 U.S.C. § 1985(3) (emphasis added).

Congress enacted the Support or Advocacy Clause in 1871 as part of the Third

Enforcement Act, 17 Stat. 13 (1871), also known as the Civil Rights Act of 1871 or the Ku Klux

Klan Act. "The main goal of the Act was to override the corrupting influence of the Ku Klux Klan

and its sympathizers on the governments and law enforcement agencies of the Southern States."

*Allen v. McCurry*, 449 U.S. 90, 98 (1980). Section 1 of the Act created a federal right of action for

violation of constitutional rights under color of state law; this right of action exists today at 42

U.S.C. § 1983. Meanwhile, Section 2 of the Act provided for criminal and civil liability where private

actors conspire to deprive people of certain rights; these rights of action exist today as part of 42

U.S.C. § 1985(3). Michael Weingartner, *Remedying Intimidating Voter Disinformation Through § 1985(3)'s*

*Support-or-Advocacy Clauses*, 110 Geo. L.J. Online 83, 95 (2021).

After Congress twice recodified federal statutes, the various civil liability clauses of the

original Section 2 were combined into what is now 42 U.S.C. § 1985 and divided into three

subsections: § 1985(1), which covers conspiracies to interfere with federal officers; § 1985(2), which

has two clauses covering conspiracies to interfere with federal judicial proceedings and state judicial

proceedings; and § 1985(3), which includes the Equal Protection Clause and the Support or

Advocacy Clause. *See Kush*, 460 U.S. at 724–25 (recognizing the five types of conspiracies prohibited

by § 1985); *see also* Weingartner, *supra*, at 99. Though the vast majority of cases interpreting §

1985(3) pertain to the Equal Protection Clause, the Support or Advocacy Clause is the focus of the present case.

2. The Support or Advocacy Clause establishes an independent substantive right to engage in support or advocacy in federal elections that extends beyond the act of voting.

Park and the Mesaros Defendants argue that Plaintiffs can only succeed in this case if Defendants interfered with rights found in the Constitution—namely, the right to vote and the right to speech free from state interference. (*See* Dkt. 325, at 7–8; Dkt. 326, at 3–4). In other words, they argue that the Support or Advocacy Clause does not create substantive rights of its own, and instead merely provides a remedy for violation of rights established by other provisions of law. Park specifically contends that the Support or Advocacy Clause provides a cause of action only when a defendant prevents a plaintiff from exercising her voting rights but does not extend to claims pertaining to "generalized election advocacy." (Dkt. 325, at 13–14). This Court has already rejected a version of this argument earlier in this litigation, (*see* Order, Dkt. 64, at 12–13), and the Court continues to find this argument unpersuasive.

Instead, the Court finds that the Support or Advocacy Clause establishes an independent substantive right to be free from conspiracies that interfere with federal election-related support or advocacy, not merely a purely remedial statute that creates a cause of action for violations of rights established by other provisions of law. This interpretation of the Support or Advocacy Clause is the one that best accords with the statutory text, the Klan Act's legislative history, and applicable precedent, including the Fifth Circuit's holding in *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967).

a. Statutory text and canons of statutory interpretation

As noted above, the Klan Act contained many provisions creating various causes of action for violations of civil rights. Certain provisions of the Act have been clearly interpreted as purely remedial. For example, it is settled law that Section 1 of the Act—now codified at 42 U.S.C. § 1983—"merely provides a method for vindicating federal rights elsewhere conferred." *Graham v.*

*Connor*, 490 U.S. 386, 394 (1989) (cleaned up). Likewise, the Equal Protection Clause of § 1985(3) "provides no substantial rights itself to the class conspired against," and the equal "rights, privileges, and immunities" protected by those clauses "must be found elsewhere." *United Bhd. of Carpenters, Loc. 610 v. Scott*, 463 U.S. 825, 833 (1983). But in *Kush v. Rutledge*, the Supreme Court recognized that not all the provisions of the Klan Act are identical—that is, they have different texts and legislative purposes that must be taken into account when interpreting the statute. *See* 460 U.S. at 724–727 (holding that the first clause of § 1985(2) does not have a requirement of class-based animus simply because the Equal Protection Clause of § 1985(3) does due to the differences in statutory text in the two provisions).

Thus, whether the Support or Advocacy Clause is substantive or purely remedial turns on a question of statutory interpretation. When Congress used the words "support or advocacy" in the Klan Act, did it mean to use those terms in their ordinary, common meaning? Or did Congress instead use the term "support or advocacy" to refer exclusively to other existing constitutional rights, such as the right to vote and the right to engage in First Amendment activities?

"In statutory interpretation, we have three obligations: (1) Read the statute; (2) read the statute; (3) read the statute!" *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020) (cleaned up); *accord Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha. Here, it's also the omega."). Thus, "non-textual limiting constructions" of the Klan Act are "erroneous[]."*Kinney v. Weaver*, 367 F.3d 337, 352 n.14 (5th Cir. 2004) (en banc).

A purely remedial interpretation of the Support or Advocacy Clause is inconsistent with the statute's plain meaning.[5] The Support or Advocacy Clause's "plain language . . . prevents (among

---

[5] Park argues that the text in § 1985(3) providing for damages when a person is "deprived of having and exercising *any right or privilege of a citizen of the United States*" supports her argument. (Dkt. 325, at 10) (quoting 42

other things) conspiracies to prevent someone from advocating for a federal candidate for office or injuring someone for such advocacy." *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1347 (N.D. Ga. Sept. 30, 2023) (emphasis omitted). The use of the elaborate phrase "giving his support or advocacy in a legal manner" instead of the simpler term "voting" shows that Congress intended to extend protection to a broad range of election-related support or advocacy. This conclusion directly stems from the ordinary meaning of "support or advocacy" as those terms were defined at the time of the Klan Act's adoption in 1871. *Cf. Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007) (interpreting the statutory text of the Foreign Sovereign Immunities Act of 1976 based on dictionary definitions from the time of the statute's adoption). Webster's 1864 Unabridged Dictionary defines "advocacy" to mean "[t]he act of pleading for or support; vindication; defense; intercession." New Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English Language 24 (London: Bell and Daldy 1864)). The same dictionary defines "support" as:

> 6. To carry on; to enable to continue; to maintain; as to *support* government; to *support* a war or a contest; to *support* an argument or debate. . . .
>
> 9. To uphold by aid or countenance; as, to *support* a friend or a party; to *support* the administration.
>
> 10. To attend as a honorary assistant; as a chairman *supported* by a vice chairman . . . .

---

U.S.C. § 1985(3)) (emphasis added). But reading that language in its proper context shows that it does not support Park's interpretation. The text provides that a person may bring a claim for damages when he "is injured in his person or property, *or* deprived of having and exercising any right or privilege of a citizen of the United States . . . ." 42 U.S.C. § 1985(3) (emphasis added). The statute again emphasizes that a "party so injured *or* deprived may have an action for the recovery of damages occasioned by such injury *or* deprivation . . . ." *Id.* (emphasis added). This statutory text, with its use of the disjunctive "or," makes clear that damages may be available for "injury" to "person or property" without reference to any "right or privilege of a citizen of the United States."

*Id.* at 1330. Speeches by surrogates in favor of presidential candidates and related presidential campaign activities that provide political assistance, argument, and aid fall under these definitions. Thus, conspiracies that interfere with these activities are prohibited by the plain text of the Support or Advocacy Clause.

Other rules of statutory interpretation support a substantive interpretation of the Support or Advocacy Clause. First, a remedial reading of the clause would violate the consistent usage canon. When interpreting a statute, "A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning." *Landry's, Inc. v. Ins. of the State of Pa.*, 4 F.4th 366, 370 (5th Cir. 2021) (quoting Antonin Scalia & Bryan Garner, Reading Law 170 (2012)). Interpreting the phrase "support or advocacy" to mean only the constitutional right to vote and First Amendment rights would mean that this phrase would have the same definition as other statutory terms (such as "vote" and "constitutional rights") which appear regularly in Reconstruction era statutes. The Reconstruction Congress referred directly to the right to vote when it wanted to; for example, the First Enactment Act (the First Klan Act)—enacted only one year earlier in 1870— included multiple provisions protecting the right to vote and used the term "vote" or "voting" at least six times.[6] Even the Support or Advocacy Clause itself uses the word "vote" as a distinct term from "support or advocacy." 42 U.S.C. § 1985(3) (stating that it is unlawful to "conspire to prevent . . . any citizen who is lawfully entitled to vote, from giving his support or advocacy"). The Reconstruction Congress also referred to the Constitution directly when it wanted to reference constitutional rights. For example, Section 1 of the Klan Act protected against "deprivation[s] of any rights, privileges, or immunities secured by the Constitution." 17 Stat. 13. These provisions demonstrate that "Congress knew how" to refer narrowly to voting when it wanted to. *Cf. United*

---

[6] *See* Act of May 31, 1870, ch. 114, §§ 3-4, 16 Stat. at 140–41, *ruled unconstitutional as a vehicle to enforce 15th Amendment in United States v. Reese*, 92 U.S. (2 Otto) 214 (1875).

*States v. Williams*, 341 U.S. 70, 78 (1951) (opinion of Frankfurter, J.) (reasoning that a provision of the First Enforcement Act applied to private conduct because other provisions showed that "Congress knew how" to refer to "color of State law" if it wanted to). The Reconstruction Congress intentionally differentiated "support or advocacy" from the right to vote or other constitutional rights—to conflate these terms would violate the rule that "a material variation in terms suggests a variation in meaning." *Landry's*, 4 F.4th at 370.

A purely remedial interpretation of the Support or Advocacy Clause would also violate the rule against redundancy. "It is a cardinal rule of statutory interpretation that 'effect shall be given to every clause and part of a statute.'" *In re Glenn*, 900 F.3d 187, 190 (5th Cir. 2018) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). Provisions of the Klan Act should not be interpreted to "deprive" them "of all independent effect" because "it is almost impossible to believe that that Congress intended, in the dissimilar language of the" Act to "simply . . . duplicate the coverage" of other statutory provisions. *Griffin v. Breckenridge*, 403 U.S. 88, 99 (1971). A purely remedial interpretation of the Support or Advocacy Clause would do just that, by making the Support or Advocacy Clause redundant with the Equal Protection Clause of § 1985(3) by according both provisions the same elements. Further, reading the Support or Advocacy Clause as only encompassing the right to vote would be duplicative to a similar provision enacted in the First Enforcement Act only one year earlier. Section 4 of the First Enforcement Act provided for civil and criminal liability:

> [I]f any person, by force, bribery, threats, intimidation, or other unlawful means, shall hinder, delay, prevent, or obstruct, or shall combine and confederate with others to hinder, delay, prevent, or obstruct, any citizen from doing any act required to be done to qualify him to *vote* or from *voting* at any election."

First Enforcement Act, § 4, 16 Stat. 140, 141 (1870) (emphasis added). If the Support or Advocacy Clause were limited to voting, Congress would not have had reason to enact the Support or

Advocacy Clause in the Third Enforcement Act because it would have been duplicative of Section 4 of the First Enforcement Act.

Third, Defendants' interpretation of the Support or Advocacy Clause would violate the presumption against imparting meaning to codification activities. "Under established canons of statutory construction, it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed." *Finley v. United States*, 490 U.S. 545, 554 (1989) (Scalia, J.) (cleaned up). Defendants argue that the Support or Advocacy Clause is remedial because the Supreme Court has held that the Equal Protection Clause—which immediately proceeds the Support or Advocacy Clause in the U.S. Code—is purely remedial. (Dkt. 325, at 7). But the Support or Advocacy Clause was not codified together with the Equal Protection Clause of § 1985(3) until 1874—three years after they were enacted. *Kush*, 460 U.S. at 724 n.6. Thus, codification location should not be a tool to determine the "substantive meaning of the 1871 Act" because the 1874 codification process was "not intended" to change the meaning of the 1871 statutory provision. *Id.* at 724; *see also Logan v. United States*, 144 U.S. 263, 302 (1892) ("The combination and transportation of" the Support or Advocacy Clause and the Equal Protection Clause into "a single section of the Revised Statutes . . . cannot be held to have altered the scope and purpose of these enactments."), *abrogated on other grounds by Witherspoon v. Illinois*, 391 U.S. 510 (1968).

b. Legislative history

Defendants' reading of the Support or Advocacy Clause is also inconsistent with the Act's legislative history. Section § 1985(3)'s Support or Advocacy Clause should not be read the same as the Equal Protection Clause because these clauses were passed separately and under different constitutional authorities. The Equal Protection Clause of § 1985(3) was introduced in the House as part of an amendment designed to narrow an earlier proposal to ensure that the Equal Protection Clause's protection of rights, privileges, and immunities did not exceed Congress's powers under the

Fourteenth Amendment. Cong. Globe, 42d Cong. 1st Sess. 477-78; *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980). By contrast, the Support or Advocacy Clause was introduced and passed without controversy several days later, *see* Cong. Globe, 42d Cong. 1st Sess. 704, 725, and raised none of the federalism concerns raised by the Equal Protection Clause.

The legislative history also demonstrates that in enacting the Klan Act, Congress's concerns were not limited to the narrow act of voting. The Klan and others "terroriz[ed] citizens for their political views" as part of a "pervasive campaign to prevent Republicans from establishing the policies of Reconstruction in . . . the South." *Scott v. Moore*, 680 F.2d 979, 993 (5th Cir. 1982) (en banc), *rev'd on other grounds by Carpenters*, 463 U.S. 825; *see also McDonald v. City of Chicago*, 561 U.S. 742, 856 (2010) (opinion of Thomas, J.) (noting that the politically motivated terror at the time included "breaking up Republican meetings" and "threatening political leaders"). Congressional testimony preceding the Act established that Klan members met to determine whether someone "ought to be killed for being too prominent in politics," or whether "to break up" local Black Republican organizations by killing their leaders. Select Comm. of the Senate to Investigate Alleged Outrages in the Southern States, *Report on the Alleged Outrages in the Southern States*, S. Rep. No. 42-1, at ix, xxi (1871). "The testimony, almost without exception, establishe[d] that the outrages perpetrated by [the Klan] were inflicted upon members of the republican party, both white and colored; in some instances the fact that they were of that party being given as the reason for the punishment." *Id.* at xxii.

c. Caselaw analyzing Section 1985(3)

Defendants' remedial interpretation of the Support or Advocacy Clause relies principally upon Supreme Court caselaw that analyzed the Equal Protection Clause of § 1985(3). *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68, 278 (1993); *Carpenters*, 463 U.S. at 830–33; *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). However, the holdings in

those cases pertained only to the Equal Protection Clause of § 1985(3). In these cases, the Supreme Court relied upon the statutory language in the Equal Protection Clause, which refers to "equal protection of the laws" and "privileges and immunities under the laws," without specifying the content of the pertinent "laws." *See, e.g.*, *Carpenters*, 463 U.S. at 833 ("The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere . . . ."); *Bray*, 506 U.S. at 274 ("A § 1985(3) private conspiracy 'for the purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws,' requires an intent to deprive persons of a right guaranteed against private impairment." (citing *id.*) (omission in original)). Because these cases did not interpret the different statutory language that is contained in the Support or Advocacy Clause, they are distinguishable from the present case.

Defendants also rely upon Eighth Circuit caselaw that concluded that "the support or advocacy" clause does not establish independent substantive rights. *See Gill v. Farm Bureau Life Ins. of Mo.*, 906 F.2d 1265, 1270–71 & n.27 (8th Cir. 1990); *see also Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004) (citing *Gill*). In *Gill*, a former insurance agent brought suit against his former employer, an insurance company, for terminating his contract because the agent supported and fund-raised for a congressional candidate running against an incumbent that his employer favored. *See* 906 F.2d at 1266. The agent alleged that the insurer's termination of his contract under these circumstances violated the § 1985(3) Support or Advocacy Clause. The Eighth Circuit found that the agent's allegations did not amount to a cause of action under the Support or Advocacy Clause for several reasons: the cancellation of the contract did not amount to a "force, intimidation, or threat" that the statute intended to prohibit; § 1985(3) does not provide a remedy for economic injury; and § 1985(3) could not be used to remedy a First Amendment claim without an allegation of state action. *See id.* at 1269–70. The Eighth Circuit then denied another argument the agent made: that the statute itself protected his right to support and fund-raise for his preferred candidate. In a brief analysis, the

Eighth Circuit simply stated the agent's allegations were not actionable unless it invoked the First Amendment, and the First Amendment was not applicable here because *Carpenters* held that a First Amendment claim was not actionable in the absence of state action. *Id.* at 1270–71. The court concluded that that "[i]n the absence of specific constitutional or statutory language sufficient to create such a right, Gill's claim fails to satisfy the requirements of any of the four categories of conspiracy proscribed by" § 1985(3). *Id.* at 1271 n.27.

The Court declines to follow the holding in *Gill*. The *Gill* court's passing citation to *Carpenters* to support its reasoning is unpersuasive because *Carpenters* only pertained to the Equal Protection Clause of § 1985(3). The *Gill* court did not explain why that case should apply to the textually distinct Support or Advocacy Clause. Nor did the *Gill* court identify any reason why the Support or Advocacy Clause should be interpreted as only creating a remedy for violations of other rights. Multiple legal scholars have recognized the flaws in the *Gill* court's reasoning. *See* Eugene Volokh, *Private Employees' Speech and Political Activity: Statutory Protection Against Employer Retaliation*, 16 Tex. Rev. L. & Pol. 295, 324 (2012) (explaining how the Eighth Circuit's decision was a "misreading of § 1985"); Craig R. Senn, *Ending Political Discrimination in the Workplace*, 87 Mo. L. Rev. 365, 396–97 (2022) (explaining that "[l]egal scholars have" rejected Eighth Circuit case law, "persuasively arguing that" it "mistakenly conflates Section 1985(3)'s [Equal Protection Clause] and [Support or Advocacy Clause]").

Rather, a substantive interpretation of the Support or Advocacy Clause better aligns with the Fifth Circuit's opinion in *Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967). In *Paynes*, a Black plaintiff sued three white men who went to the plaintiff's house at night to threaten him and coerce him against trying to register to vote. *Id.* at 63. The Fifth Circuit analyzed whether the plaintiff could bring a Support or Advocacy Clause claim even though the complaint did not allege a violation of the Fourteenth or Fifteenth Amendment, as it did not allege state action. *Id.* at 63–64. The *Paynes* court

concluded that the Support or Advocacy Clause was "something more and something different" than merely a remedy for Fourteenth Amendment violations taken under color of state law, and therefore the Support or Advocacy Clause creates a "remedy for interference by private individuals." *Id.* at 64. The Fifth Circuit held that the Support or Advocacy Clause created "a Federal right . . . to recover damages for interfering with Federal voting rights." *Id.* The court found that the "[f]ederal voting rights" protected by the Support or Advocacy Clause included voter registration: "Registration too is a part of the election process and is within the protection of" 1985(3). Accordingly, the Fifth Circuit allowed the plaintiff's § 1985(3) claim to proceed. *Id.* at 65.

Defendants argue that *Paynes* should be read to only protect the right to vote—and related rights, such as the right to register to vote—free from intimidation, but not interference with broader election advocacy activities. (*See* Dkt. 326, at 3–4).[7] The Court disagrees. Although *Paynes* concerned intimidation related to voter registration, *Paynes* is best read to support the view that the Support or Advocacy Clause creates an independent substantive right to engage in support or advocacy. Defendants offer no reason to limit *Paynes* to its exact facts, and the language of the opinion also does not support such a construction. Indeed, in holding that voter registration was protected by the clause, the court rejected arguments that tried to limit the clause to the act of voting. Instead, the Fifth Circuit found, "The right to be free from threatened harm and the right to

---

[7] Park cites *Graham v. Clusen*, 427 F. Supp 820 (D.D.C. 1977), in support of her argument that the Support or Advocacy Clause is limited to claims related to voting, rather than broader "generalized election advocacy" claims. (Dkt. 325, at 13). But Park misunderstands the holding in the case. In *Graham*, a voter sued the presidents of the major commercial broadcasting networks because they had limited the 1976 presential debate to Gerald Ford and Jimmy Carter. He argued that by excluding all other presidential candidates, the defendants had conspired to forcibly deprive" him of an "informed" vote in violation of the Support or Advocacy Clause of § 1985(3). *Id.* at 820. The district court found that the voter did not properly allege a § 1985(3) claim because the alleged conspiracy did not apply "any more 'force' to him than to any other voter in the country; nor [was] he alleging that the defendants in any way sought to prevent him from obtaining sufficient information about other candidates quite easily from alternative sources." *Id.* at 821. The district court found that the statutory text of the Support or Advocacy Clause required "a more narrowly focused conspiracy and a more nearly total deprivation have existed." *Id.* However, the district court also "assume[d] that an informed vote was an interest that Congress sought to protect in" § 1985(3)." *Id.* Thus, the *Graham* court did not interpret the Support or Advocacy Clause to protect only the act of voting.

be protected from violence for an attempted exercise of *a voting right* are no less protected than the right to cast a ballot on the day of election." *Id.* at 64. This line is a recognition by the *Paynes* court that there is more than one "voting right" that is protected by the Support or Advocacy Clause.

Multiple federal courts and legal commentators have read *Paynes* in this way—to support the view that the Support or Advocacy Clause "gives rise to an independent substantive right — the right to vote and participate in voting-related activities." *Nat'l Coal.*, 498 F. Supp. 3d at 486 n.30 (citing *Paynes*, 377 F.2d at 64; *see also Andrews*, 696 F. Supp. 3d at 1346 (following the Southern District of New York's "lengthy and reasoned analysis" in *National Coalition*); Weingartner, *supra* at 102; Note, *The Support or Advocacy Clause of § 1985(3)*, *supra* at 1399. Under this view, "the support and advocacy clause of Section 1985(3), . . . unlike the equal protection part of Section 1985(3)[,] does not require allegations of a . . . violation of a separate substantive right." *League of United Latin Am. Citizens – Richmond Region Council 4614 v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *6 (E.D. Va. Aug. 13, 2018) ("*LULAC*"). This reading of the Support or Advocacy Clause as not limited to the act of voting or registering to vote also aligns with how Reconstruction era courts viewed the clause. *See, e.g.*, *United States v. Goldman*, 25 F. Cas. 1350, 1352 (C.C.D. La. 1878) (No. 15,225) (recognizing that a conspiracy to "prevent an influential person of the opposite political party from giving his support and advocacy to a particular candidate, to arrest him and restrain him of his liberty until after the election" would be "forbidden" by the Support or Advocacy Clause).

*       *       *

In short, the Court finds that the Support or Advocacy Clause employs specific language to establish protection for an individual right to "giv[e] [one's] support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States." 42 U.S.C. § 1985(3). It is distinct from the Equal Protection Clause of § 1985(3) and as such delineates the right to be protected directly,

independent of any other source of law. Further, this clause is not limited to claims involving the act of voting. This interpretation of the Support or Advocacy Clause derives from the plain meaning of the statute and is consistent with long-established canons of statutory interpretation. The legislative history of the clause and the Fifth Circuit's holding in *Paynes* also support this reading.

The Reconstruction Congress used the expansive phrase "support or advocacy" to protect a broad range of election-related support or advocacy. The political advocacy that Plaintiffs planned to engage in on October 30, 2020, is protected under the Support or Advocacy Clause and can support a finding of liability.

### 3. The Support or Advocacy Clause applies to private conspiracies.

Defendants next argue that a claim under the Support or Advocacy Clause requires state action because the First Amendment only restricts government actors. (Dkt. 325, at 10–13; Dkt. 326, at 3–6). Defendants acknowledge that the clause can apply to private conspiracies under certain circumstances—such as when they interfere with the act of voting—but insist that a claim of interference with election advocacy must be based off the First Amendment and as such must include an allegation of state action. (*See id.*). Park specifically contends, "[T]o allege a private conspiracy under the [Support or Advocacy Clause], plaintiffs must either 1) allege interference or intimidation involving an official government process directly related to 'federal officers, federal courts, or federal elections,' *Kush*, 460 U.S. at 726, or 2) allege interference with advocacy during a campaign when accompanied by the involvement of state action in the conspiracy." (Dkt. 325, at 12).

Defendants' argument fails primarily because it rests on the premise that the Support or Advocacy Clause is a purely remedial statute that draws from and depends on the First Amendment (among other rights). As explained above, the Support or Advocacy Clause does not refer to another source of law, including the First Amendment; it is a substantive provision that provides direct

24

protection for support or advocacy related to federal elections. Defendants' argument is also foreclosed by the Fifth Circuit's decision in *Paynes*. As this Court has already observed, *Paynes* stated that the Support or Advocacy Clause provides "protect[ion] from individual as well as from State interference" and is a "specific remedy for interference by private individuals," unlike a claim based on the Fourteenth Amendment, which requires state action. 377 F.2d at 63–64; *see also* (Order, Dkt. 64, at 12–13).

Another look at the statutory text also demonstrates the flaw in Defendants' argument. Nothing in the language of the Klan Act restricts the Support or Advocacy Clause to conspiracies to violate the First Amendment or that involve state action. In *Griffin v. Breckenridge*, the Supreme Court concluded that the Equal Protection Clause of § 1985(3) did not require state action. 403 U.S. at 98–101. The Court observed that the Equal Protection Clause contained no language suggesting a state action requirement. *See id.* at 96–98. The Court also compared the Equal Protection Clause to neighboring provisions in the Klan Act that did refer to state action—such as 42 U.S.C. § 1983—and differentiated the Equal Protection Clause from those other provisions. *See id.* at 98–99. For example, the Court noted that reading a state action requirement into the Equal Protection Clause of § 1985(3) would "deprive" the statute "of all independent effect." *Id.* at 99. Last, the Court found that the legislative history contained "no suggestion whatever that liability would not be imposed for purely private conspiracies." *Id.* at 100.

A similar analysis applies to the Support or Advocacy Clause. There is no language in the Support or Advocacy Clause suggesting a state action requirement, in contrast to neighboring provisions that do refer to state action. The statute instead speaks only of "two or more persons" who "conspire," without any language that would exclude private actors. 42 U.S.C. § 1985(3). The statute also specifies the required purpose—to "prevent" a person "from giving his support or advocacy in a legal manner" toward a candidate in a federal election—which likewise does not

suggest any state action requirement. *Id.*; *see Griffin*, 403 U.S. at 96–97; *cf. Williams*, 341 U.S. at 78 (opinion of Frankfurter, J.) (reasoning that a provision of the First Enforcement Act applied to private conduct because other provisions showed that "Congress knew how" to refer to "color of State law" if it wanted to). The legislative history of the Support or Advocacy Clause too contains no indication that the clause is limited to state action. *See* Cong. Globe, 42d Cong., 1st Sess. 704, 724 (1871) (adoption of Support or Advocacy Clause). As such, the Support or Advocacy Clause applies to private conspiracies, no matter if the basis of the claim is alleged interference with the act of voting or election advocacy.

4. The Support or Advocacy Clause does not require a showing of racial or class-based animus.

The Mesaros Defendants next reassert an argument that Defendants made earlier in this litigation—that a Support or Advocacy Clause claim requires a showing of racial or class-based animus. (*See* Dkt. 325, at 6). This Court has already rejected this argument, (*see* Order, Dkt. 64, at 8–11), and continues to find it unpersuasive—foreclosed by the applicable caselaw and the historical background that motivated the enactment of the Klan Act.

The Supreme Court has not addressed this issue head-on, but guidance can be drawn from Supreme Court caselaw analyzing other provisions of the Klan Act. In *Griffin v. Breckenridge*, plaintiffs alleged that defendants stopped them on a highway, and assaulted and injured them due to the plaintiffs' race. 403 U.S. at 89–92. As mentioned, the plaintiffs brought suit under the Equal Protection Clause of § 1985(3). *Id.* at 96. The Court held that to allege a violation of § 1985(3), there must be a "class-based, discriminatory animus behind the conspirators' action." *Id.* at 102.

Over ten years later, in *Kush v. Rutledge*, the Supreme Court discussed whether another provision of the Klan Act, § 1985(2), is subjected to the *Griffin* requirement that the pleadings include allegations of racial animus. 460 U.S. at 722–27. The Court concluded that the Klan Act could be divided into five classes of prohibited conspiracies: one proscribed by § 1985(1), two

proscribed by § 1985(2), and two proscribed by § 1985(3). *Id.* at 724. The Court stated that of the five categories, three of them—specifically, § 1985(1), the first clause of § 1985(2), and the Support or Advocacy Clause of § 1985(3) relate to institutions and processes of the federal government and "contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws." *Id.* at 724–25. The other two provisions—the second clause of § 1985(2) and the Equal Protection Clause of § 1985(3)—address "underlying activity that is not institutionally linked to federal interests and that is usually of primary state concern"; as such, these provisions do contain language requiring "an intent to deprive . . . victims of the equal protection of the laws." *Id.* at 725.

In light of these textual distinctions, the Court revisited its holding in *Griffin*, stating that its holding that the pleadings must allege racial animus cannot be applied to every portion of § 1985. *Id.* at 726. The Court noted that the holding in *Griffin* only applied to the Equal Protection Clause of § 1985(3) and concluded that the requirement to plead race-based animus does not apply to the first clause of § 1985(2). *Id.* at 726–27. The Court reasoned that § 1985(2) did not contain the "equal protection" language, which the Court relied heavily on to reach its conclusion in *Griffin*. *Id.* The Court did not directly address whether the Support or Advocacy Clause requires a showing of race-based animus. However, given that the *Kush* court grouped § 1985(2) and the Support or Advocacy Clause together and noted that both clauses lack the critical "equal protection" language, *Kush* heavily supports a finding that the Support or Advocacy Clause also does contain a racial animus requirement.

The Fifth Circuit too has not directly addressed this question, but it has determined that a similar Klan Act provision does not contain a racial animus requirement. In *Bryant v. Military Department of Mississippi*, a former member of the Mississippi Air National Guard ("MSANG") sued MSANG and MSANG officials after he became a whistleblower and they allegedly retaliated against

him. 597 F.3d 678, 683 (5th Cir. 2010). The plaintiff brought claims, *inter alia*, under § 1985(1) and

the second clause of § 1985(2). *Id.* at 684. The court found that the plaintiff's § 1985(2) claim was

properly dismissed by the district court because the second clause of § 1985(2) contains a class-based

animus requirement and the plaintiff had made no such allegation. *Id.* at 687. However, the Court

relied upon *Kush* to hold that "[a] cause of action under § 1985(1) requires no allegation of racial or

class-based discriminatory animus." *Id.* at 688. Given that *Kush* recognized that § 1985(1) and the

Support or Advocacy Clause both "contain no language requiring that the conspirators act with

intent to deprive their victims of the equal protection of the laws," *Kush*, 460 U.S. at 724–25, *Bryant*

also supports a finding that the Support or Advocacy Clause does not require an allegation of racial

or class-based discriminatory animus.

      As this Court has previously noted, the only out-of-circuit case this Court could identify as

addressing this issue head-on is *Gill v. Farm Bureau Life Ins. of Missouri*, 906 F.2d 1265 (8th Cir. 1990).

As discussed, the *Gill* court improperly conflated the Equal Protection Clause with the Support or

Advocacy Clause of § 1985(3) when discussing whether the Support or Advocacy Clause was a

substantive or remedial provision. 906 F.2d at 1269–70. But even though it conflated the two

clauses, the Eighth Circuit still differentiated the clauses on whether they require a showing of racial

animus. The Eighth Circuit found that the Support or Advocacy Clause does not require a pleading

of racial animus:

> The Court in *Kush* went on to note that [*Griffin*] was a case under §
> 1985(3) where the purpose of the alleged conspiracy was to deprive the
> victim of equal protection of the laws. Hence the limitation in *Griffin*
> requiring "some racial, or perhaps otherwise class-based, invidiously
> discriminatory animus behind the conspirators' action" did not apply
> in *Kush,* brought under § 1985(2) and involving conspiracy to
> intimidate witnesses in federal court . . . *Griffin* involved beating blacks
> with clubs, blackjacks, and pipes because one of them was thought to
> be a civil rights worker; it was clearly an equal protection
> claim. *Kush,* on the other hand, was a case relating to "institutions and
> processes of the Federal Government[,]" *where by clear dictum [the Support
> or Advocacy Clause] relating to elections would likewise be classified along with*

*[the first clause of § 1985(2)] and not be subject to the racial or other invidious discrimination requirement applicable to equal protection claims.*

*Id.* at 1269 n.21 (emphasis added). Numerous district courts have also come to the same conclusion. *See Nat'l Coal.*, 498 F. Supp. 3d at 487 ("[P]laintiffs suing under the Support or Advocacy Clause need not demonstrate that defendants acted with discriminatory, class-based animus."); *Andrews*, 696 F. Supp. 3d at 1346 (same); *LULAC*, 2018 WL 3848404, at *4 (same).

The historical record also supports an interpretation of the Support or Advocacy Clause free of a racial animus requirement because the Klan Act was motivated out of concern for political violence as much as racial violence. "Today's Ku Klux Klan proclaims itself to be a racist organization. But in 1871 it was regarded primarily as a political one. . . . Congressmen consistently noted the pervasive regional hostility toward the Republicans as a reason for extending federal protection in section 1985(3)." *Scott*, 680 F.2d at 992–93 (en banc), *rev'd on other grounds by Carpenters*, 463 U.S. 825; *see also McDonald*, 561 U.S. at 856–57 (opinion of Thomas, J.) ("Militias such as the Ku Klux Klan, the Knights of the White Camellia, the White Brotherhood, the Pale Faces, and the '76 Association spread terror among blacks and white Republicans by breaking up Republican meetings, threatening political leaders, and whipping black militiamen."); Select Comm. of the Senate to Investigate Alleged Outrages in the Southern States, *Report on the Alleged Outrages in the Southern States*, S. Rep. No. 42-1, at xxii (1871) (finding that the testimony established that the Ku Klux Klan acted against "members of the republican party, both white and colored"); *id.* at xxxi (finding "[t]hat the Ku-Klux organization does exist, has a political purpose, is composed of members of the democratic or conservative party, has sought to carry out its purpose by murders, whippings, intimidations, and violence, against its opponents").

Thus, once again, there is no basis for imposing "a non-textual limiting construction," *Kinney*, 367 F.3d at 352 n.14, on the Support or Advocacy Clause. In light of the caselaw analyzing the Support or Advocacy Clause's neighboring provisions and the historical context in which the Act

was enacted, the Court reaffirms that the Support or Advocacy Clause is not limited to conspiracies

involving racial or class-based animus. Plaintiffs' claims do not fail for lack of pleading such animus.

5. Plaintiffs' allegations sufficiently mirror the type of "force, intimidation, or threat" that Congress
sought to address when it enacted the Klan Act.

Park next argues that Plaintiffs' claims do not comport with the Support or Advocacy Clause

because the words "force, intimidation, or threat" do not extend to her actions while driving in the

"Trump Train." (Dkt. 325, at 8–9). She cites to *In re Park*, in which the Fifth Circuit panel

questioned whether "§ 1985(3) require[s] something more closely related to the postbellum violence

that necessitated the statute's enactment," as *Gill* held. *In re Park*, 2023 U.S. App. LEXIS 24449, at

*9–10 (citing *Gill*, 906 F.2d at 1269).[8] The Court disagrees. Under the facts of this case, the Court

finds that there is a genuine dispute of material fact as to whether Defendants' actions are analogous

to the type of "force, intimidation, or threat" that Congress sought to prohibit when it enacted the

Klan Act in 1871.

The Fifth Circuit has previously given sufficient guidance on how courts should apply the

statutory text of the Klan to modern times. In *Kinney v. Weaver*, the *en banc* Fifth Circuit held that the

Klan Act should not be limited to the Reconstruction Congress's imagination in 1871:

> [T]he defendants are also incorrect in assuming that the statute's reach
> is restricted to those factual scenarios that the enacting legislature
> could have specifically contemplated. On the contrary, the Supreme
> Court has instructed that Reconstruction-era civil rights statutes are to
> be given a sweep as broad as their language . . . ensuring that their
> protections remain relevant to modern circumstances.

---

[8] In *Gill*, the Eighth Circuit found that the insurance agent had not properly pleaded a Support or Advocacy
Clause claim, *inter alia*, because the cancellation of his employment contract did not amount to a "force,
intimidation, or threat" that the statute intended to prohibit. *See* 906 F.2d at 1269–70. However, the conduct
alleged in the present case far exceeds the severity of the claims in *Gill*. The alleged acts of intimidation and
threatened violence in this case is much more comparable to the types of political violence that played out in
the nineteenth century than to the facts at issue in *Gill*.

367 F.3d at 351 (cleaned up). In other words, according to the court, what matters is the statute's plain language—not the Klan's chosen tactics in 1871. *See id.*

Looking to the plain language of the statute, "the most commonly understood 'dictionary' definition of 'intimidate' is . . . to place a person in fear." *United States v. Hicks*, 980 F.2d 963, 973 (5th Cir. 1992). Further, in interpreting the text, "the 'whole code canon' compels this Court to interpret the same term consistently across similar statutes." *Nat'l Coal. On Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78, 126 (S.D.N.Y. 2023); *see also W.Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88–91 (1991) (Scalia, J.). Thus, this Court interprets the terms "force, intimidation, and threat" in the Support or Advocacy Clause similarly to other electoral intimidation provisions in federal law. For example, the Fifth Circuit has interpreted Section 131(b) of the Civil Rights Act of 1957, a voting rights provision that contains similar terms, to apply to more than just violent, Klan-like electoral intimidation. *See, e.g., United States v. Bruce*, 353 F.2d 474, 477 (5th Cir. 1965) (finding that invoking a state trespass law would constitute threat, intimidation, or coercion under the Civil Rights Act of 1957 if done for the purpose of interfering with his right to register and vote); *United States v. McLeod*, 385 F.2d 734, 740–41 (5th Cir. 1967) (holding that a pattern of baseless arrests of Black individuals attending a voter-registration meeting was intimidating and coercive conduct under the Civil Rights Act of 1957 given its "chilling effect" on voter registration).

Accordingly, federal courts interpreting the Support or Advocacy Clause as well as parallel "force, intimidation, or threat" language in both clauses of § 1985(2) have not limited those terms to Klan-like tactics either. *See, e.g., Nat'l Coal.*, 661 F. Supp. 3d at 125–26 (disinformation robocalls constitute "intimidation and threats" under Support or Advocacy Clause); *LULAC*, 2018 WL 3848404, at *4 (defamation constitutes "force, intimidation, and threat" under Support or Advocacy Clause); *see also McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1034–36 (11th Cir. 2000) (en banc) (threats of employment termination and termination can constitute "force, intimidation, and threat"

under § 1985(2)); *Chahal v. Paine Webber, Inc.*, 725 F.2d 20, 22 (2d Cir. 1984) (a threat against a person's continued employment was "force, intimidation, or threat" under § 1985(2)); *Irizarry v. Quiros*, 722 F.2d 869, 871 (1st Cir. 1983) (denying employment sufficient to "intimidate" under § 1985(2)).

Although the methods of political intimidation may change over time and require adapting the Klan Act to new contexts, the conduct alleged here requires no such adaption; the Defendants' alleged conduct is similar to a type of political violence that the Klan engaged in at the time of the Act's enactment. As discussed above, the Reconstruction era Congress was greatly concerned about the political violence being enacted by the Klan. One such type of political violence was physical intimidation of persons traveling for political rallies. Such conduct was not foreign to the public in 1871. For example, an article published in the *Milwaukee Daily Sentinel* in 1868 decried the "Ku-Klux treachery" of a "dastardly attempt to murder . . . thirty-six young ladies who represented the states at the Republican rally at Bonaparte [Iowa]" by causing the "large wagon in which they were" to crash. *A Democratic Attempt to Kill Thirty-Six Republican Girls, Milwaukee Daily Sentinel*, Oct. 22, 1868, at 2; *see also* (Ex. 1, Dkt. 386). Courts at the time recognized that political intimidation occurring on public roads fell under the breadth of the Support or Advocacy Clause. *See United States v. Butler*, 25 F. Cas. 213, 220 (C.C.D.S.C. 1877) (No. 14,700) (describing testimony, noting that conspirators forced men traveling on the road to "to get down on their knees, and made to swear that they would vote the Democratic ticket").

The record in this case could lead a reasonable jury to conclude that Defendants used "force, intimidation, or threat[s]" to interfere with Plaintiffs' rights to support or advocate for their candidates for President and Vice President. Surrounding a bus with, in Park's words, "about 100 cars," (Ex. 23, Dkt. 364-23, at 0:08–0:22), on the interstate and attempting to control its movements by physically blocking it with their vehicles and driving dangerously, could reasonably constitute

"force."[9] Park notes that the bus was trying "to sneak and get off the freeway but it's not going to work. Everyone is just going to surround it," (Ex. 24, Dkt. 364-24, at 3:04–3:10), and that "it [was] hard to turn off" the freeway due to the presence of so many Trump vehicles, (*id.* at 00:50). Plaintiffs also introduce evidence including videos showing participants in the caravan driving within feet of the bus while yelling, making hand gestures, and filming, (*see, e.g.*, Ex. 25, Dkt. 364-25; Ex. 24, Dkt. 364-24), pulling out in front of the bus from the highway shoulder, (Ex. 25, Dkt. 364-25, at 10:55–11:35), and brake-checking the many-ton bus as it attempts to drive down a major highway with people inside, (*id.* at 08:30–08:46, 11:46, 13:37, 17:58), in addition to the evidence of intimidation tactics used by Cisneros. *See infra* Sections III.B and III.C.

A genuine dispute of fact also exists as to whether a driver or passenger could be intimidated by Defendants' actions. At the time of the Incident, Plaintiffs did not know if Defendants' driving would result in them crashing at highway speeds or when they would be free from the convoy. (*See, e.g.*, Gins Dep., Dkt. 366-1, Ex. 26, at 123:11–15 (stating that the Incident was a "traumatic experience over the course of an hour-and-a-half where [he] believed that [his] life was in danger"); Davis Dep., Dkt. 366-1, Ex. 27, at 190:9–12 (similar)). Gins testified that he found the conduct on October 30 to be so intimidating that he decided to cancel campaign stops in San Marcos and Austin out of fear that violence would occur if they held an event. (Gins Dep., Dkt. 366-1, Ex. 26, at 171:17–172:3). Even Park admitted to feeling unnerved about the driving conditions, noting in one video that "if my husband sees this, he's going to kill me," (Ex. 24, Dkt. 364-24, at 2:30–2:34), and testifying at her deposition that she almost collided with a truck trying to drive around the hazards caused by the "Trump Train," (Park Dep., Dkt. 366-1, Ex. 11, at 328:25– 329:19). And statements by other defendants like Cisneros that Plaintiffs should be served "35 in tires," (Ex. 12, Dkt. 364-

---

[9] *See* New Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English Language, *supra*, at 531 ("force" defined as, among other things, "[p]ower exerted against will or consent; compulsory power; violence; coercion").

12), accompanied by the driving tactics described above, could reasonably be considered threats.[10]

Such evidence, if accepted by a jury, would fall well within the type of forceful, intimidating, or

threatening behavior that Congress sought to prohibit when it enacted the Klan Act.

Moreover, it is important to conclude by recognizing that liability under the Support or

Advocacy Clause does not rely upon a showing of "force, intimidation, or threat." As a reminder,

the Support or Advocacy Clause creates liability where:

> two or more persons conspire to prevent by force, intimidation, or
> threat, any citizen who is lawfully entitled to vote, from giving his
> support or advocacy in a legal manner, toward or in favor of the
> election of any lawfully qualified person as an elector for President or
> Vice President, or as a Member of Congress of the United States; *or to*
> *injure any citizen in person or property on account of such support or advocacy . . .*

42 U.S.C. § 1985(3) (emphasis added). Thus, Defendants can violate the Support or Advocacy

Clause if a jury finds that they conspired to "injure any citizen in person or property on account of

such support or advocacy." *Id.* In *Haddle v. Garrison*, the Supreme Court recognized that the phrase

"injured in his person or property" in § 1985 refers to "principles of tort law." 525 U.S. 121, 127

(1998). Thus, even where conduct does not rise to the level of "force, intimidation, or threat," it can

still nonetheless be actionable under the Support or Advocacy Clause provided that it is part of a

conspiracy to injure on account of a plaintiff's support or advocacy. Again, given the record in this

case, a reasonable jury could determine that the purpose of Defendants' conspiracy in this case was

to injure Plaintiffs on account of their support or advocacy.

6. The Support or Advocacy Clause falls under Congress's constitutional authority to regulate federal
elections.

Next, the Court turns to arguments that Plaintiffs' reading of the Support or Advocacy

Clause would violate the Constitution. Park first argues that Plaintiff's interpretation of the Support

---

[10] *See* New Illustrated Edition of Dr. Webster's Unabridged Dictionary of the English Language, *supra,* at 1378
("threat" defined as a "[d]eclaration of an intention or determination to inflict punishment, loss, or pain on
another; a menace.").

or Advocacy Clause would violate Article I of the Constitution. (Dkt. 325, at 9–10). Her argument rests on the notion that "Congress only has power to regulate 'The Times, Places and Manner of holding Elections'" and thus Congress's Article I powers extend only to "ballot-casting" and not to regulating other federal campaign activities. (*Id.*). However, Park misunderstands both the sources of Congress's authority to regulate elections for President, Vice President, and Congress and the breadth of that authority to shield those offices from corrupting influences.

Congress's authority to regulate federal elections stems from several constitutional provisions. The first provision is the Elections Clause, which states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators." U.S. Const. art. I, § 4, cl. 1. Next, various constitutional provisions establish federal offices, provide for them to be filled by election, and describe Congress's role in the selection processes. *See* Composition Clause, U.S. Const. art. I, § 2, cl. 1 (composition of Congress and election of members of Congress); U.S. Const. art. II, § 1 (establishing office of President and Vice President and setting forth procedures for the selection of both offices); U.S. Const. amend. XII (amending procedure for selecting the President and Vice President). Last, the Supreme Court has recognized that Congress may effectuate and "augment[]" those provisions under the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, to regulate actions that might interfere with federal elections. *See, e.g.*, *Oregon v. Mitchell*, 400 U.S. 112, 120 (1970).

A primary example of how these clauses grant Congress broad authority to regulate federal elections is *Ex Parte Yarbrough*, 110 U.S. 651 (1884). There, petitioners were convicted under the (since repealed) criminal counterpart to the Support or Advocacy Clause[11] for conspiring to assault a

---

[11] *See* Act of Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13, 13-14, *codified at* 70 Rev. Stat. § 5520 (1878), *repealed by* Act of Feb. 8, 1894, ch. 25, § 1, 28 Stat. 36, 37.

voter several months after a federal election. *See id.* at 655–56. The petitioners challenged their convictions, arguing in part that the statute lay beyond the authority of Congress. The Supreme Court rejected the challenge, finding that the provision was a valid exercise of Congress's Article I authority. It reasoned that the Constitution established "a government whose essential character is republican," led by an elected President and Congress, and which "must have the power to protect the elections on which its existence depends, from violence and corruption." *Id.* at 657–58. While the Constitution did not expressly confer such a power on Congress, the Court held that the Necessary and Proper Clause provided sufficient authority. *Id.* at 658. The Court further reasoned that the Elections Clause, at least with respect to congressional elections, encompassed authority to "protect the act of voting, the place where it is done, and the man who votes from personal violence or intimidation, and the election itself from corruption and fraud." *Id.* at 661.[12]

Another example of the Supreme Court's expansive view of Congress's authority to regulate federal elections is *Burroughs v. United States*, 290 U.S. 534 (1934), in which the Court upheld Congress's authority to impose disclosure requirements for political contributions for elections for President and Vice President. *See id.* at 547. The Court found that, given the role of the President in the constitutional system, Congress must have authority to "safeguard" presidential elections "from the improper use of money to influence the result" as a matter of "self protection"—a power "to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption." *Id.* at 545. The Court relied on *Ex parte Yarbrough* and held that the reasoning of that case applied to elections for President and Vice

---

[12] The petitioners in *Ex parte Yarbrough* argued that because the indicted acts took place eight months after the election, they were too attenuated from the election to fall within the scope of Congress's authority under the Elections Clause. *See* Statement and Argument of Counsel for Petitioners 9, *Ex parte Yarbrough*, 110 U.S. 651 (No. 15), https://perma.cc/5YAR-T4TK ("In no instance have the acts of Congress, passed to regulate federal elections, been invoked to punish acts of conspiracy or violence committed after—some months after—the election, and because of the manner in which citizens of the United States have cast their votes at such elections . . . ."). The Supreme Court did not accept that argument.

President. *See id.* at 545–47. Since *Burroughs*, the Court has repeatedly upheld Congress's authority to regulate campaign activities. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 187 (2003), *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Buckley v. Valeo*, 424 U.S. 1, 13 (1976). By contrast, Park's constricted interpretation of Congress's authority to regulate federal taken to its logical conclusion would seem to invite the invalidation of all federal campaign finance law.

The Court once again recognized the multiple sources of Congress's authority in this area in *United States v. Classic*, 313 U.S. 299 (1941), where the Supreme Court held that Congress's authority extends to regulating primary elections. The Court reasoned that, although mo-+dern primary elections did not exist at the time of the Founding, they were "a necessary step in the choice of candidates for election as representatives in Congress" and accordingly implicated the Composition Clause and the Elections Clause. *Id.* at 320. The Court also found that the Necessary and Proper Clause gave Congress the ability to effectuate those provisions in federal election regulation. *Id.*

These cases highlight two important flaws in Park's argument. First, Park is incorrect in asserting that the Elections Clause alone could not provide the basis for an independent, non-remedial Support or Advocacy Clause. The Supreme Court has repeatedly recognized that the "substantive scope" of the Elections Clause is "broad," *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013), such that the Elections Clause confers authority to "provide a complete code for congressional elections," including authority to regulate the "protection of voters" and "prevention of fraud and corrupt practices . . . in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona*, 570 U.S. at 8–9 (reiterating that "Times, Places, and Manner" "are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections'" (quoting U.S. Const. art. I, § 4, cl. 1, and *Smiley*, 285 U.S.

at 366)). Indeed, only a few years after its enactment, the Support or Advocacy Clause was understood by courts to squarely fall under the Elections Clause because it regulates the "manner" of federal elections by protecting the "free interchange and comparison of views" during federal elections. *Goldman*, 25 F. Cas. at 1354.

Second, it is simply not the case that Congress's authority to regulate federal elections only stems from the Elections Clause. Park fails to account for the constitutional provisions providing for the election of the President, Vice President, and Congress, and Congress's authority to regulate those provisions through legislation under the Necessary and Proper Clause. *Ex parte Yarbrough*, *Burroughs*, and *Classic* "point to the principle that a congressional statute protecting against private interference before the voting stage is necessary and proper legislation under [the Elections Clause], whenever it is reasonably related to protection of the integrity of the federal electoral process." *United States ex rel. Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 352 (E.D. La. 1965) (cleaned up). Congress's exercise of those powers as well as the choice between various means and ends are questions "primarily addressed to the judgment of Congress." *Burroughs*, 290 U.S. at 547–48.

Accordingly, the Necessary and Proper Clause also provides an independent and sufficient basis for congressional enactment of the Support or Advocacy Clause. *Cf. United States v. Comstock*, 560 U.S. 126, 134 (2010) ("[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."). Regulating tortious activity taken against political campaigns is necessary and proper to ensure the effectiveness of Congress's power to regulate the time, place, and manner of a federal election by ensuring that tortious activity does not interfere with the fundamental fairness of an election by denying one locally disfavored candidate the same ability to campaign as another candidate. *See Goldman*, 25 F. Cas. at 1354 (discussing how Congress may regulate the "manner" of

federal election because "[a]ny interference with the right of the elector to make up his mind how he shall vote is as much an interference with his right to vote as if he were prevented from depositing his ballot in the ballot-box after he had made up his mind"); *see also Yarbrough*, 110 U.S. 658–60 (noting how the Necessary and Proper Clause can provide a basis for the Support or Advocacy Clause).

The Support or Advocacy Clause aims to protect elections for President, Vice President, and Congress from corruption by "force, intimidation, or threat" against citizens "lawfully entitled to vote." Interpretating the Support or Advocacy Clause to establish a substantive right for plaintiffs to engage in support or advocacy of their chosen candidate for federal election does not run afoul of Article I. The Supreme Court has repeatedly affirmed that Congress's power under the Elections Clause extends to campaign activity, and that the Necessary and Proper Clause augments this power to allow Congress to regulate actions that might interfere with federal elections. A substantive interpretation of the Support or Advocacy Clause falls well within the broad scope of authority granted to Congress to regulate federal elections, as recognized by over one hundred years of Supreme Court caselaw.

7. Plaintiffs' Support or Advocacy Clause claims do not implicate the First Amendment.

Last, Park asserts a First Amendment defense, arguing that her activities on October 30 are protected by the First Amendment because in driving as part of the "Trump Train" on I-35 that day she simply intended to engage in a peaceful protest. (Dkt. 325, at 14–16).[13] She argues that Plaintiffs

---

[13] Park is the only defendant to raise a true First Amendment defense. Cisneros appears to raise a defense based on the Texas Citizens Participation Act ("TCPA"), Texas's anti-SLAPP (Strategic Litigation Against Public Participation) statute, "because it highlights the Constitutionally protected nature of defendants' actions as well as the political nature of the plaintiffs' action in bringing this suit." (Dkt. 329-1 at 7–8). Cisneros's offhand references to the TCPA and applicable caselaw without argument as to how the statute applies to the facts of this case are not enough to raise a First Amendment defense. *See United States v. Reagan*, 596 F.3d 251, 254–55 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver"); *Rost v. United States*, 2021 WL 5190875, at *8 (W.D. Tex. Sept. 22,

have failed to demonstrate that she "conspired with the co-Defendants to engage in an unlawful association." (*Id.* at 16). However, Park's First Amendment defense misses the mark on both factual and legal grounds.

Her argument first raises fact questions about whether Plaintiffs can prove Defendants' conspiracy and prove that she had an unlawful intent in allegedly entering into that conspiracy. But there are disputes of material fact as to whether Park entered into a conspiracy and whether that conspiracy had an unlawful intent. *See infra* Section III.B. Because Park fails to show an absence of disputed fact on whether she conspired with others, she is not entitled to summary judgment on the § 1985(3) claims or her First Amendment defense.

Leaving aside the factual issues that preclude a finding of summary judgment, Park's argument also misunderstands the interplay between the First Amendment and Plaintiffs' Support or Advocacy Clause claims. Plaintiffs' suit does not need to reach Park's conduct that is covered by the First Amendment—her support for a political candidate. Plaintiffs' suit instead arises from Park's allegedly tortious, unlawful behavior in the form of unsafe and assaultive driving. Because Plaintiffs' suit only seeks to hold Park liable for this unlawful conduct, Park cannot escape liability by seeking cover under the First Amendment. Thus, Park's First Amendment defense fails for two reasons: (1) the basis of Plaintiffs' claims is Park's tortious driving, which is not expressive conduct protected by the First Amendment; and (2) to the extent Park's speech or expression is raised or referenced, such speech could reasonably be found to be incidental to tortious conduct or a "true threat"—categories of conduct that are excluded from First Amendment protection.

---

2021) ("Under Fifth Circuit law, when a party does not address an issue in his brief to the district court, that failure constitutes a waiver on appeal, and, by analogy, failure to brief an argument in the district court waives that argument in that court." (cleaned up)). Nor does the TCPA apply to the Klan Act or state-law claims, as the Fifth Circuit has ruled that the TCPA "cannot apply in federal court." *Klocke v. Watson*, 936 F.3d 240, 245 (5th Cir. 2019), *as revised* (Aug. 29, 2019).

First, Park's allegedly tortious conduct in this case cannot be protected by the First Amendment because it is not expressive conduct. The First Amendment only protects conduct that "is inherently expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 65–66 (2006) ("*FAIR*"). Thus, the First Amendment does not extend to "veering cars" at a bus, *United States v. McDermott*, 29 F.3d 404, 407 (8th Cir. 1994); unlawfully obstructing a public highway, *see Doe v. Mckesson*, 71 F.4th 278, 290–94 (5th Cir. 2023); or creating traffic hazards, *see Cox v. Louisiana*, 379 U.S. 536, 554–55 (1965) ("One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest."); *Singleton v. Darby*, 609 F. App'x 190, 193 (5th Cir. 2015) ("The First Amendment does not entitle a citizen to obstruct traffic or create hazards for others."). The First Amendment also does not extend to assaults. *See Wisconsin v. Mitchell*, 508 U.S. 476, 484 (1993) ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment."). Where conduct is made expressive only by the "speech that accompanies it," that is "strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." *FAIR*, 547 U.S. at 66 (holding that a higher education institution's decision on whether to give military recruiters access equal to other recruiters is not inherently expressive conduct subject to First Amendment protection).

Here, the conduct that forms the basis of Plaintiffs' claims is not the fact that Defendants were engaged in a political caravan to indicate support of their preferred candidate for President. What is at issue is the manner in which they drove in that caravan. Plaintiffs allege that Defendants drove in a reckless and dangerous manner that coerced the Bus's movements and threatened the safety of the Bus's passengers. They argue that Defendants' driving injured them and constituted assault. Defendants deny these claims and contend that their driving was peaceful. But either way, driving alone—never mind reckless and dangerous driving—is not an inherently expressive activity in this context. Any expressive component of Defendants' actions would not relate to their driving

but to their speech that accompanies the driving—namely, their words and expressive conduct (like flag waving) that indicate their political beliefs. "If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *FAIR*, 547 U.S. at 66. Just as the First Amendment does not protect a driver waving a political flag from running a red light, it does not protect Defendants from allegedly threatening Plaintiffs with reckless driving. Accordingly, the Court finds that Defendants' driving is not expressive conduct that warrants First Amendment protection.

Second, even if Defendants' conduct had been inherently expressive, the Court finds that Defendants' conduct could reasonably fall into two well-established categorical exceptions to First Amendment protection: conduct incidental to tortious conduct and true threats.

Of course, peaceful protests are the sorts of expressive activities that are protected by the First Amendment. *See, e.g.*, *Thornhill v. State of Alabama*, 310 U.S. 88 (1940) (peaceful picketing); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (peaceful marching). But the First Amendment does not protect the use of violence, even if in connection with protected political activity. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) (noting that "violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection"); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916 (1982) ("The First Amendment does not protect violence."); *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("[W]here demonstrations turn violent, they lose their protected quality as expression under the First Amendment."). And so "if [Defendants] have formed or are engaged in a conspiracy against the public peace and order" and thereby "transcend the bounds of the freedom of speech which the Constitution protects," any law holding them liable for such conspiracy does not violate the First Amendment. *De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937); *Brown v. Hartlage*, 456 U.S. 45, 55 (1982) ("Although agreements to engage in illegal conduct undoubtedly possess some element of

association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment."). Just as those conspiracies can violate the criminal law, the First Amendment does not prohibit "tort liability for . . . losses that are caused by violence and by threats of violence." *Claiborne Hardware*, 458 U.S. at 916.

The primary source of authority in this area stems from the Supreme Court's decision in *NAACP v. Claiborne Hardware Company*, 458 U.S. 886. *See also Mckesson*, 71 F.4th at 289–291 (discussing the Court's holdings in *Claiborne Hardware*). There, the Supreme Court cautioned that where otherwise tortious conduct "occurs in the context of constitutionally protected activity . . . 'precision of regulation' is demanded." *Id.* Such protected activity "imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–17. The "guiding principle" of *Claiborne Hardware* is "to ensure that any liability is molded to prevent wrongful conduct, not stifle legitimate expressive activity." *Mckesson*, 71 F.4th at 290. In other words, "A judgment tailored to the consequences of [a defendant's] unlawful conduct may be sustained." *Claiborne Hardware*, 458 U.S. at 926; *see also id.* at 918 ("Only those losses proximately caused by unlawful conduct may be recovered."); *Mckesson*, 71 F.4th at 292 ("The only other thing required for [a] cause of action to accord with the First Amendment is that it be sufficiently tailored to target the tortious activity without sweeping up legitimate expressive conduct. . . . [T]he question of whether a particular form of liability is consistent with the First Amendment must be assessed "action-by-action" and "defendant-by-defendant.").

The *Claiborne Hardware* court was primarily concerned with imposing tort liability on associates of a protestor merely because of their association with another protestor who engaged in tortious behavior. It made clear that "mere association" with a group whose member commits some unlawful act "is an insufficient predicate on which to impose liability." *Id.* at 924–25. "For liability to

be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920.

But the Court also clearly held that a protestor may be held liable for his or her own wrongful conduct, even if otherwise participating in expressive activity. *Id.* at 918, 926; *see also Mckesson*, 71 F.4th at 290. As the Court recognized, "a finding that [a Defendant] authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity." *Claiborne Hardware*, 458 U.S. at 927; *see also Sines v. Kessler*, 324 F. Supp. 3d 765, 803 (W.D. Va. 2018). "[W]here a defendant creates unreasonably dangerous conditions, and where his creation of those conditions causes a plaintiff to sustain injuries, that defendant has 'directed' his own 'tortious' activity" for purposes of *Claiborne*." *Mckesson*, 71 F.4th at 292–93 (citing *Claiborne Hardware*, 458 U.S. at 927). "In these circumstances, imposing liability goes far more to preventing tortious conduct than it does to suppressing any legitimate expressive activity." *Id.* at 293.

Plaintiffs' Support or Advocacy claims accord with the principles laid out in *Claiborne Hardware* and *Mckesson*. While a Support or Advocacy Clause claim against a driver who peacefully participated in the October 30 "Trump Train," based solely on the driver's association with others who drove unsafely, might raise First Amendment concerns, such is not the case here. Plaintiffs do not seek to hold Park and the other defendants liable solely because they were present on I-35 during the Incident. They seek to hold them liable for their own tortious activity that coincided with their expressive activity. In Park's case, Plaintiffs allege that she coordinated with others to surround and control the Bus's movements and thereby assault the Bus's passengers. They point to evidence in the record—namely videos Park herself recorded while she was on I-35—that demonstrate that she spoke approvingly of the assaultive conduct that was occurring and then acted in such a way to contribute to the unsafe road conditions. (*See* Ex. 23; Dkt. 264-23; Ex. 24, Dt. 364-24). Plaintiffs

argue that this evidence supports a finding that Park entered into a tacit agreement with others to engage in unlawful activity and that Park had specific intent to do so.

Given the evidence in the record, a jury could reasonably conclude that Park engaged in such unlawful conduct and that her unlawful conduct specifically caused Plaintiffs' damages. *See infra* Sections III.B and III.C. Such a finding would satisfy *Claiborne*'s demand for "precision of regulation" because it would be sufficiently tailored to Park's specific actions on October 30. *Mckesson*, 71 F.4th at 292–93 (citing *Claiborne Hardware*, 458 U.S. at 916). Therefore, if Park is found liable under the Support or Advocacy Clause for her own actions, the First Amendment would not protect her conduct. *See Sines*, 324 F. Supp. 3d at 804 (rejecting a generalized First Amendment defense in a case under the Equal Protection Clause of § 1985(3) involving the 2017 Charlottesville "Unite the Right" rally); *see also State v. Dornfeld*, No. A22-0816, 2023 WL 1956532, at *3 (Minn. Ct. App. Feb. 13, 2023) (finding that protestor's conviction of being a pedestrian on a controlled-access highway did not violate the First Amendment because her unlawful conduct did not become lawful merely because it included an expressive component).

The First Amendment also does not protect "true threats" of violence, that is, "'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (alteration in original) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). "True threats of violence . . . lie outside the bounds of the First Amendment's protection" and are a "historically unprotected category of communications," *id.* at 72–73, because "a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur,'" *Black*, 538 U.S. at 360 (alteration in original) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)). Nor do threats of violence gain First Amendment protection merely because they are made in conjunction with protected expressive activity. *See, e.g., Black*, 538 U.S. at

360–63 (holding that a State may validly regulate cross burning with an intent to intimidate even though cross burning is a form of symbolic expression).

Here, a jury could reasonably find that Defendants' conduct was a true threat. As noted above, the evidence supports a jury finding that Defendants' driving was dangerous enough to endanger Plaintiffs. Plaintiffs believed that this conduct was a threat, (*see* Gins Dep. Ex. 26, Dkt. 366-1, at 123:11-15; Holloway Decl., Dkt. 364-30, Ex. 30; Davis Dep., Ex. 27, Dkt. 366-1, at 189:16-190:12 (noting that Plaintiffs feared for their lives and were subjected to an imminent threat of bodily harm)), and a reasonable person could similarly find that this activity was threatening. *See Counterman*, 600 U.S. at 72 (recognizing that a statement can amount to a true threat "based solely on its objective content"). The evidence also supports a finding that Defendants recklessly made these threats, *see id.* at 79–82 (holding that defendants must act recklessly to be held criminally liable for a true threat), given the dangerous nature of their driving and their statements before, during, and after the Incident which demonstrate their support for aggressive tactics, (*see, e.g.*, Cisneros Dep., Dkt. 366-1, Ex. 6, at 43:16-22 (stating that he wanted to "instill a little bit of fear" by driving into a crowd of protestors); (Ex. 7, Dkt. 364-7 (Park stating that she wanted to make liberals "cry"); J. Mesaros Dep., Dkt. 366-1, Ex. 1, at 139:15–140:6 (same); (Ex. 8, Dkt. 364-8) (Cisneros calling his firearm his "Antifa meat tenderizer")).

Park cites *Snyder v. Park*, 562 U.S. 443 (2011), for the proposition that "the First Amendment protects speech any reasonable person would find intimidating." (Dkt. 325, at 14). At issue in *Snyder* was a father of a deceased military service member who brought tort claims against the Westboro Baptist Church for picketing outside his son's funeral with offensive messages. 562 U.S. at 448–450. The Supreme Court held that Westboro's speech was entitled to protection under the First Amendment because it concerned matters of public concern and thus could not be the subject of a claim for intentional infliction of emotional distress. *Id.* at 451–59. In doing so, the Court noted that

"speech cannot be restricted simply because it is upsetting or arouses contempt." *Id.* at 458. However, *Snyder* is immaterial to the present case because *Snyder* involved an indisputably peaceful protest. *See id.* at 449, 456. Indeed, Justice Breyer's concurrence and Justice Alito's dissent both emphasized a counterfactual hypothetical that is much more closely related to the case at hand: "[S]uppose that A were physically to assault B, knowing that the assault (being newsworthy) would provide A with an opportunity to transmit to the public his views on a matter of public concern. The constitutionally protected nature of the end would not shield A's use of unlawful, unprotected means." *Id.* at 461 (Breyer, J., concurring); *see also id.* at 471 (Alito, J., dissenting) (describing the same counterfactual and agreeing that such an assault would not warrant First Amendment protection). This same reasoning applies to Park's First Amendment defense here.

While the First Amendment protects forms of political advocacy, the facts of this case go well beyond protected expressive conduct. A jury could reasonably find that Defendants unlawfully conspired and drove in a dangerous manner such that they threatened or assaulted Plaintiffs. If a jury accepts these allegations, Defendants' First Amendment defense must fail because assaulting, intimidating, or imminently threatening others with force is not protected expression. And to the extent that Defendants' conduct contained any pure speech, such speech would also be excluded from First Amendment protection because it was incidental to tortious behavior or constituted a true threat. Accordingly, Park is not entitled to summary judgment on the basis of her First Amendment defense.

### 8. Support or Advocacy Clause Claims Conclusion

The Reconstruction civil rights acts are to be "accord[ed] a sweep as broad as [their] language." *Jones v. Alfred H. Mayer*, 392 U.S. 409, 437 (1968) (cleaned up); *accord Griffin* 403 U.S. at 97. Courts "are not at liberty to seek ingenious analytical instruments," to "carve" exceptions into these statutes even if application to certain conduct would be "without established precedent." *Jones*, 392

U.S. at 437. "The fact that [the Support or Advocacy Clause] lay partially dormant for many years cannot be held to diminish its force today." *Id.*

In enacting the Support or Advocacy Clause, the Reconstruction Congress used expansive language to combat a range of political violence that was occurring in the nineteenth century. Some of the same tactics that prompted the enactment of the Klan Act have reappeared nearly 150 years later in today's political environment. This Court will not supplant Congress's authority by imposing "non-textual limiting constructions" on the statute. *See Kinney*, 367 at 352 n.14. The plain language of the statute and applicable precedents indicate that the Support or Advocacy Clause establishes a substantive right to engage in support or advocacy in federal elections. This right applies to private conspiracies and is not limited to a showing of racial animus or state action. The statute falls well within Congress's broad constitutional authority to regulate federal elections. And Plaintiffs' application of the Clause does not run afoul of the First Amendment. If accepted by a jury, Plaintiffs' allegations fall within the scope of the type of political violence that Congress intended to protect when it enacted the Klan Act back in 1871. Accordingly, Defendants' motions for summary judgment on Plaintiffs' Support or Advocacy Clause claims are denied.

### B. Civil Conspiracy Claims

The Court next turns to Plaintiffs' state-law claims. Under Texas law, an action for civil conspiracy has five elements:

> (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result.

*MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 196 (Tex. App.—El Paso 2017, no pet.) (citing *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)). Civil conspiracy is a derivative tort, meaning that "a defendant's liability for conspiracy depends on participation in some underlying tort for

which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). Here, the underlying tort alleged is assault.

Park argues that she is entitled to summary judgment because she did not have a "meeting of the minds" with any other co-conspirator. (Dkt. 325, at 18). Both Park and Cisneros additionally argue that they are entitled to summary judgment because they did not intend to accomplish an unlawful purpose. (*Id.*; Dkt. 329-1, at 3–4). The Court addresses each element in turn.

1. Factual Disputes Exist as to Whether Park Entered into an Agreement with the Alleged Co-Conspirators.

Park argues that she is entitled to summary judgment because there is no evidence of a "meeting of the minds" between Park and "any of the co-defendants." (Dkt. 325, at 18). Park repeatedly emphasizes that she "does not know and has never communicated with the other defendants." (*Id.* at 2, 18). However, an agreement to engage in a conspiracy does not require co-conspirators to contact one another via traditional correspondence or know the names of co-conspirators involved. "The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. App.—Austin 1975, writ ref'd n.r.e.). A civil conspiracy can be established by circumstantial evidence, *Int'l Bankers Life Ins. v. Holloway*, 368 S.W.2d 567, 581–82 (Tex. 1963), and "[s]imilar methods of operation together with joint activities and relationships support the finding of a single conspiracy," *Rainey v. State*, 877 S.W.2d 48, 51 (Tex. App.—Tyler 1994, no pet.); *cf. United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982) ("[A] single conspiracy will be inferred" where "there are several parts inherent in a larger common plan, or where the . . . nature of the activity is such that knowledge of the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the participants[.]"). "Statements that the witness did not agree or conspire" do not disprove an agreement on summary judgment because they "are not readily

controvertible statements . . . ." *Am. Petrofina Co. of Tex. v. Crump Bus. Forms, Inc.*, 597 S.W.2d 467, 471 (Tex. App.—Dallas 1980, writ ref'd n.r.e.).

The record demonstrates that Park's affiliation with the "Trump Train" on October 30, 2020, developed over time, beginning with weekly "Trump Train" events at Cornerstone Church in San Antonio, which began at least as early as September 30, 2020, and continued into October 2020. (Park Dep., Dkt. 366-1, Ex. 11, at 123:17–23; Kirby Dep., Dkt. 364-31, at 42:3–10; 92:15–24; *see also* Exs. 34 and 35, Dkts. 364-34 and 364-35 (Instagram post and video, dated October 10, 2020); Exs. 36 and 37, Dkts. 264-36 and 364-37 (Facebook post and video, dated October 17, 2020)). Through her involvement at these events, Park made friends and encouraged others to participate in the "Trump Trains" by sharing promotional flyers for the San Antonio events on her social media. (*See* Ex. 32, Dkt. 364-32; Ex. 33, Dkt. 364-33; Ex. 39, Dkt. 364-39). Park admitted that she learned of the October 30 "Trump Train" through a group text with non-party alleged co-conspirators Sarah Hill ("Hill"), Malorie Lerma ("Lerma"), and Laura Kelly ("Kelly")—all friends she met at other "Trump Train" events. (Park Am. Answers to Pls.' 1st Interrogs., Dkt. 366-2, Ex. 40, Interrog. No. 4; Lerma Dep., Dkt. 366-2, Ex. 41, at 36:22–38:1; Hill Dep., Dkt. 366-2, Ex. 42, at 75:5-9; Kirby Dep., Dkt. 364-31, at 42:3-10).

When she heard about the October 30 "Trump Train," she created a flyer to spread the word about the event and encourage others to participate and "Greet the Biden bus Trump style." (Park Dep., Dkt. 366-1, Ex. 11, at 188:23–189:2; Flyers, Exs. 43, 44, and 45, Dkts. 364-43, 364-44, and 364-45). Her participation in promoting the October 30 "Trump Train" required knowledge that others were organizing and planning the event. For example, she knew that the "Trump Train" was at 12:30 pm on October 30. (Park Dep., Dkt. 366-1, Ex. 11, at 190:3–16). She also used the phrase, "We will greet the Biden bus Trump style," on the flyer, which she heard from someone else. (*Id.* at 191:20–192:14). On the flyer, she also superimposed a red "cancel" or "no" symbol over

the Bus. (*Id.* at 194:21–195:21). Park even implied on a Facebook post that she would be helping to plan the event. (*Id.* at 215:22–216:14 (discussing Facebook post stating "[w]e are putting together a Trump welcoming party" as referring to herself, Hill, Lerma, and Kirby)). Given Park's actual knowledge of the "Trump Train's" plans on October 30 and her distribution of a flyer that promoted the event, a reasonable jury could infer the existence of an agreement between Park and the other "Trump Train" participants.

Perhaps most importantly, Park's contemporaneous statements and driving behavior during the Incident could lead a jury to conclude that she was actively coordinating with other vehicles in the "Trump Train" as part of a concerted effort to assault the Bus and impede its movement. As she drove onto I-35, Park filmed herself on Facebook Live and explained her and other drivers' roles that day, stating, "We're following a bunch of cars. Do you want to know why? Biden's here . . . We're following the Biden Bus, . . . and there's about 50 Trump cars here." (Ex. 46, Dkt. 364-46, at 00:43–01:12). In another video, she explains that "people are lining the freeways, it's hard to turn off," (Ex. 24, Dkt. 364-24, at 0:50-0:55), and that "this Biden bus is surrounded, like seriously surrounded," (*id.* at 1:15-1:22). She then notes that "a lot of people are ahead of the Biden bus. A lot of people. So, wherever [the Bus is] pulling into, they have an escort." (*Id.* at 1:35–1:44). She describes herself as not merely a passive observer, but as part of the broader "Trump Train": She explains there are "Trump people everywhere . . . 100 or more cars, and we're escorting the Biden Bus," (Ex. 23, Dkt. 364-23, at 0:08–0:22); she shouts "Biden, go home!" and says that it's "funny, funny, funny" that so many cars are surrounding the bus, (*id.* at 0:48–0:59); and as she passes the Bus, she says, "I'm gonna show you how many people are Trump people." (Ex. 24, Dkt. 364-24, at 3:50-3:57).[14]

---

[14] The parties dispute what else Park said as she passed the Bus. (*See* Ex. 24, Dkt. 364-24, at 3:50–3:57). In their response, Plaintiffs state that Park is saying that she "scared the driver." (Resp., Dkt. 364, at 30). Park

Park also contemporaneously narrated her awareness that she was driving dangerously as part of the "Trump Train." She exclaims in one video, "If my husband sees this, he's going to kill me." (*Id.* at 2:30–2:34). She additionally testified to almost being involved in a collision with a truck trying to drive around the "Trump Train," and to witnessing the collision between Cisneros and the staffer vehicle when it occurred, but nonetheless continued following the Bus and driving the "Trump Train." (Park Dep., Dkt. 366-1, Ex. 11, at 328:25–329:19, 342:1–343:4).

Last, the record contains ample evidence for a jury to conclude that Park directly collaborated with other "Trump Train vehicles," ensuring their access to the Bus despite the assaultive conduct she was observing. On video, Park says that "there are thirty to forty cars in front of the Biden bus" and that the Bus is "trying to switch lanes to get rid of everyone. Everyone is just switching lanes, look. Hold on *I've got to switch lanes.*" (Ex. 24, Dkt. 364-24, at 2:44–3:03) (emphasis added). Looking at the Bus, she says "they,"—meaning the Bus—"think they're gonna sneak and get off the freeway but it's not gonna work. *Everyone is just going to surround it.*" (*Id.* at 3:04-3:10) (emphasis added). In a separate video, she explains that "they,"—meaning non-"Trump Train" drivers—"try to break us up but it doesn't work. It doesn't work, there's too many of *us*,"—meaning "Trump Train" vehicles—and that "someone just lets everyone in." (Ex. 23, Dkt. 364-23, at 2:30–2:40) (emphasis added). Park then a few moments later demonstrates this tactic of "letting everyone in"

---

instead contends that she said, "skip the driver" as she was passing the Bus in her effort to exit I-35. (Park Reply, Dkt. 375, at 5). She argues that a transcription of the video and her own "reasonable driving" in the video support this finding, as the "video conclusively shows that she does not drive in a manner consistent with an intention to scare anyone." (*Id.*). In a brief sur-reply, Plaintiffs also posit that Park could have said, "Let's get the driver." (Sur-reply, Dkt. 383, at 2). Plaintiffs argue this interpretation makes sense because after she makes the disputed statement, she takes her cell phone, which is mounted on a selfie stick, and places it through her sunroof to film the Bus and the cars behind her. (*Id.* citing Ex. 24, Dkt. 364-24, at 4:00–4:20). Reconciling contested interpretations of a recording is quintessential task for the jury. *See United States v. Wilson*, 578 F.2d 67, 70 (5th Cir. 1978). At the summary judgment stage, the Court views the evidence in the light most favorable to Plaintiffs, *see Rosado*, 5 F.3d at 123, and therefore accepts that Park said either "scared the driver" or "Let's get the driver."

while blocking a semi-truck attempting to pass her, explaining that "you just scoot over and then you let everyone else in like this, watch" at which point there is audible honking. (*Id.* at 3:11–3:22).

Park's driving and videotaped admissions show that she was aware of the coordinated effort to assault the Bus, considered herself to be aligned with that effort, and, as part of her agreement to help surround the Bus, herself engaged in unsafe driving to assist other "Trump Train" drivers. Together with the evidence demonstrating how she had been to multiple other "Trump Train" events before October 30 and encouraged others to attend the October 30 event, there is a genuine dispute of fact about whether Park had a tacit agreement with other "Trump Train" participants to assault the Bus that precludes a finding of summary judgment.

### 2. Factual Disputes Exist as to the Intent of the Conspiracy.

Cisneros and Park next contend that Plaintiffs have not established that Defendants' specific intent was to accomplish an unlawful purpose. (Dkt. 325, at 18; Dkt. 329-1, at 3). A conspiracy to accomplish tortious conduct is an unlawful conspiracy. *Operation Rescue-Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 937 S.W.2d 60, 69–71 (Tex. App.—Houston [14th Dist.] 1996), *aff'd*, 975 S.W.2d 546 (Tex. 1998). In their briefs, Cisneros and Park selectively pick helpful facts to assert that "no one was driving tortiously" during the Incident. (*See* Dkt. 329-1, at 3; *see also* Dkt. 325, at 3–4, 18–19). However, there are also multiple videos in the record that create a factual dispute about whether the "Trump Train" participants were driving in a dangerous, coercive, or assaultive manner. For example, a video captured by Davis from her vantage point at the front of the bus is filled with repeated instances of Defendants and others engaged in intimidating driving tactics. (*See* Ex. 25, Dkt. 364-25). For over forty minutes, the Bus is closely surrounded and boxed in by "Trump Train" vehicles. (*See, e.g.*, *id.* at 4:40–5:10). At moments, the Bus changes lanes to avoid the vehicles around it, some of which drive dangerously close to the Bus in what appears to be an effort to maintain proximity with the Bus. (*See id.* at 7:20–7:34; 10:55–11:35). Throughout the video, the vehicles in

front of the Bus brake-check the Bus or drive so slowly as to bring the Bus to a speed between 15 mph and 30 mph; meanwhile, traffic is seen to move at higher speeds in other lanes. (*See, e.g.*, *id.* at 8:30–9:10; 14:20–14:45; 24:30–26:25). Further, at times, the "Trump Train" vehicles near the bus straddle lanes or weave between other vehicles to remain near the Bus. (*See, e.g.*, *id.* at 16:00–17:06; 18:20–19:00).

The record also contains evidence that could support a finding that Defendants had the specific intent to tortiously interfere with the Bus. Although Defendants and their co-conspirators repeatedly described their plans for October 30 in veiled terms like "welcome" or "greet," (*see, e.g.*, Ex. 10, Dkt. 366-1; Ex. 43, Dkt. 364-43), Defendants also concede that those terms were never meant to be taken at face value, (*see, e.g.*, Cisneros Dep., Dkt. 366-1, Ex. 6, at 97:22–24 ("Q. "[Y]ou're referring to 'welcoming' him with your 35-inch tires. Right? A. Yes."); J. Mesaros Dep., Dkt. 366-1, Ex. 1 at 207:3 ("Yeah, so it's not a literal welcome."")).

Park repeatedly argues that the evidence shows that in the brief period of time when she drove past the Bus, she drove past the Bus "without incident." (Dkt. 325, at 1). She argues that for the other two hours she was on the road, she did not box in the Bus. (*Id.* at 3). But as explained above, Park's own videos demonstrate that she seemed to coordinate with others to control the flow of traffic and the movement of cars around the Bus—even as she remained a few cars behind the Bus.

As for her intent, Park states that she thought she was engaging in an innocent protest and that her lack of intent to participate in an unlawful conspiracy is demonstrated by the fact that in her videos, she states that she has no idea where she is going and is only following others. (*See* Ex. 23, Dkt. 364-23, at 1:12–1:30; Ex. 24, Dkt. 364-24, at 00:13–00:18, 02:13–16). However, there is significant other evidence in the record that could support a finding that she acted intentionally

here.[15] Park expressed a desire to "make the liberals cry" through her participation in previous "Trump Trains." (Ex. 7, Dkt. 364-7). Park testified that she was aware that the driving tactics employed by "Trump Train" drivers were intimidating and created conditions where a collision could occur. (*See* Park Dep., Dkt. 366-1, Ex. 11, at 329:7–19). Indeed, she testified to feeling intimidated and scared herself by conditions on the road and took evasive maneuvers when a truck driver began driving aggressively around the "Trump Train," in what she assumed was an attempt to "break[] [them] up." (*Id.* at 329:7–12). She also stated that she got in front of the truck "because [she] felt safer" and that otherwise the truck was "going to run [her] off the road." (*Id.* at 329:17–19).

The record also shows how a jury could conclude that Cisneros's driving was intimidating. Despite denying that his driving was not tortious, nor threatening, (*see* Dkt. 329-1, at 3–5), Cisneros repeatedly drove in such a way to stay in close range with the Bus, including pulling onto the shoulder and then accelerating back in front of the Bus. (Cisneros Dep., Dkt. 366-1, Ex. 6, at 144:13–146:15). Although the Bus changed lanes several times in an attempt to lose the "Trump Train," it could not, and Cisneros pulled to the shoulder five different times in an approximately 12-minute period to stay close to the bus. (Ex. 25, Dkt. 364-25, at 9:54–23:54).

Video evidence also strongly suggests that Cisneros sped up to prevent a Biden-Harris staffer from remaining with the bus, (Ex. 50, Dkt. 264-50), and used his truck to push the staffer's car out of the lane behind the Bus, causing a collision, (Ex. 51, Dkt. 264-501; Cisneros Dep., Dkt. 366-1, Ex. 6 at 150:23–152:5). Cisneros disputes that he hit the staffer's car and instead argues that the staffer hit him. (*See* Dkt. 329-1, at 3 (referencing Lerma Dep., Dkt. 366-2, Ex. 41); *see also* Cisneros Dep., Dkt. 366-1, Ex. 6 at 151:24). However, other evidence suggests that Cisneros hit the

---

[15] In addition to this other evidence, a reasonable jury could interpret Park merely following others as evidence of a conspiracy. Park merely "following" could show a lack of intent to participate in a planned assault. However, committing to following others could also demonstrate Park's willingness to coordinate with the other alleged co-conspirators no matter what they planned to do that day. Which of these theories to accept is the province of the jury.

staffer. Shortly after the Incident, Cisneros himself described the collision as him "slamming that f****r" and "welcom[ing] him properly to Texas." (Ex. 12, Dkt. 364-12). In an interview about the Incident, Cisneros asserted that the staffer whose vehicle he collided with was "Antifa, I'm more than sure." (Ex. 5. Dkt. 264-5, at 7:30–7:40). Further, Kyle Kruger, a "Trump Train" participant and former defendant in this case, stated that it was Cisneros that "hit a car on the way to Austin." (Kruger Decl., Dkt. 364-49, ¶ 26). Even Cisneros testified at his deposition that he "pushed [the staffer] back" and agreed that he "hit him." (Cisneros Dep., Dkt. 366-1, Ex. 6 at 152:2–5). Cisneros's intent in colliding with the staffer's car is further informed by a similar incident in September 2020, in which Cisneros drove his truck into a crowd of Black Lives Matter protesters who were marching on the streets of San Antonio, drawing screams from the crowd. (Ex. 52, Dkt. 364-52; Ex. 53, Dkt. 364-53). Cisneros testified at his deposition that he drove into that crowd of protestors "just to make a statement," but when asked whether he knew if he put anybody in fear of being hit by his truck, he testified, "I hope so. I hope I instilled a little bit of fear, yeah." (Dkt. 366-1, Ex. 6, at 41:8–9, 43:16-21).

Further, in the immediate aftermath of the Incident, both Cisneros and Park publicly celebrated the fact that they had chased the Biden campaigners out of central Texas. Park shared a video made during the Incident (by someone else) that contained the caption: "THIS IS TEXAS— GTFOH! [Get The F**k Out of Here]." (Ex. 16, Dkt. 364-16).[16] In that video the man filming is laughing, while saying the Trump Train is "chasing them" and "literally escorting the bus out of town." (Ex. 54, Dkt. 364-54).  Park also posted photos of herself in the "Trump Train," captioned "[t]here I go . . . escorting the Biden bus out of town" (Ex. 14, Dkt. 364-14; Ex. 15, Dkt. 364-15).

---

[16] Park emphasizes that she did not write the caption on this video and argues that she did not adopt these sentiments. (Park Reply, Dkt. 380, at 5). Because sharing a video on social media often implies an endorsement of the content shared, there is at least a genuine fact dispute about whether this post is evidence that Park herself believed that Plaintiffs should "Get The F**K Out of" Texas.

Cisneros also posted approvingly about the success of the plan he and non-party Jason Peña-Ahuyon had hatched—a plan which Peña-Ahuyon described as #OperationBlockTheBusRN. (*See* Ex. 10, Dkt. 366-1; Cisneros Dep., Dkt. 366-1, Ex. 6, at 113:7–114:1). In addition to bragging about "slamming that f****r" and "serving 35 in[ch] tires," (Ex. 12, Dkt. 364-12), Cisneros also boasted that he was "[s]mart enough to get the entire Biden-Harris campaign cancelled in Texas[.]" (Ex. 13, Dkt. 364-13). And even during his deposition, Cisneros reflected on the success of his plan: "So was it a success that I kind of saved Texas from people like that, that would quit in the smallest face of adversity? I would— I would want somebody a lot stronger than that. Somebody who won't quit." (Cisneros Dep., Dkt. 366-1, Ex. 6, at 109:17–21).

Although Park and Cisneros now offer post-hoc explanations of their intentions during the Incident, they both witnessed the intimidating driving tactics and how the "Trump Train" vehicles were boxing in the Bus but continued anyway in the caravan. "The law provides a rebuttable presumption that every man intends the natural and probable consequences of his own acts." *United States v. Wilkinson*, 460 F.2d 725, 730 (5th Cir. 1972). Given all the evidence listed above, a reasonable jury could conclude that Park and Cisneros understood and intended the natural consequences of their actions—namely, a conspiracy to assault the Bus and its passengers.[17] Because

---

[17] In addition, United States Magistrate Judge Mark Lane found at an evidentiary hearing that Cisneros and Joeylynn Mesaros had both destroyed evidence "with the intent to deprive [Plaintiffs] of the information's use in the litigation." (R. & R., Dkt. 377 (citing Fed. R. Civ. P. 37(e)(2))). Judge Lane recommended that this Court grant Plaintiffs' motions for sanctions against both defendants and enter permissive inferences at trial. (*Id.* at 27–28). This Court adopted the report and recommendation and granted the motions for sanctions. (Order, Dkt. 389). The Court stated that it would instruct the jury that Cisneros and Joeylynn Mesaros had intentionally deleted certain text message and social media content and that the jury may presume that the defendants did so because the content of the messages would have been unfavorable to their case. (*Id.* at 2–3). Accordingly, a reasonable jury could conclude that Cisneros and Joeylynn Mesaros' destruction of evidence concerning their participation in the Incident is evidence of their unlawful intent that day. As for Park, although Judge Lane found that she had failed to preserve her text messages, the Court declined to order sanctions against her, declining to make the specific finding that her deletion was the result of an intent to deprive Plaintiffs of the evidence. (Ex. 48, Dkt. 364-48, at 234:8–12). Nonetheless, Park has lost text messages from a group text chain with certain non-parties which Plaintiffs argue would have demonstrated her coordinated efforts to promote and participate in the Incident. (*See* Resp., Dkt. 364, at 36–37). The fact

there are disputes of material fact about whether Park entered into an agreement with the other "Trump Train" participants and material fact disputes about the intent of the alleged conspiracy, Park and Cisnero's motions for summary judgment on Plaintiffs' civil conspiracy claims are denied.

### C. Assault Claims

The Court next turns to Plaintiffs' final claims, civil assault. To prove their civil assault claims, Plaintiffs must demonstrate that Defendants (1) intentionally, knowingly, or recklessly caused bodily injury to Plaintiffs; (2) intentionally or knowingly threatened Plaintiffs with imminent bodily injury; or (3) intentionally or knowingly caused physical contact with Plaintiffs when Defendants knew or reasonably believed the contact to be offensive or provocative. *Sanchez v. Striever*, 614 S.W.3d 233, 239 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (the elements of assault are the same in civil and criminal cases) (citing *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012)); *see also* Tex. Penal Code § 22.01(a) (listing the elements of criminal assault). "The focus in an assault by threat case is on the defendant's words and conduct, and the critical inquiry is whether a reasonable person under the circumstances would consider the words and conduct to be an objective threat of imminent bodily injury." *Jones v. Shipley*, 508 S.W.3d 766, 769 (Tex. App.—Houston [1st Dist] 2016, pet. denied).

Alternatively, Plaintiffs may demonstrate that Defendants aided and abetted assault by showing that Defendants (1) provided aid to someone committing a wrongful act that injured Plaintiffs; (2) were aware of their role as part of an illegal or tortious act at the time they provided the assistance; (3) and that Defendants knowingly and substantially assisted in the principal violation. *Halberstam v. Welch*, 705 F.2d 472, 477–78 (D.C. Cir. 1983) (citing, *inter alia*, *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94–95 (5th Cir.1975)); *see also Milliken v. Skepnek*, 1999 WL 496505, at *6 (Tex.

---

that Park, and all the non-parties, have deleted these text messages could be probative evidence of Park's intent.

App.—Houston [14th Dist.] July 15, 1999, no pet.) ("Where one person assists another in making an assault, both are principals and liable in damages."). A defendant's intent or knowledge is a question of fact, determined by the totality of the circumstances. *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998).

Cisneros argues that he is entitled to summary judgment because his conduct during the Incident did not create a threat of imminent bodily injury. (Dkt. 329-1, at 4–5). Park meanwhile argues that she is entitled to summary judgment because she did not aid and abet the others' assault. (Dkt. 325, at 19). Because material disputes of fact exist as to Plaintiffs' claims against both Cisneros and Park, the Court will deny both motions for summary judgment.

1. Factual Disputes Exist as to Whether Cisneros Threatened Plaintiffs with Imminent Bodily Injury.

Cisneros contends that the undisputed evidence shows that he and the other defendants were "driving along the plaintiff bus, waiving [sic] flags, demonstrating support of their preferred presidential candidate, at a speed with the flow of traffic." (Dkt. 329-1, at 4). However, the record contains ample evidence for a jury to reasonably conclude that Cisneros assaulted Plaintiffs.

A reasonable juror could conclude that Cisneros intentionally and knowingly induced in Plaintiffs an apprehension of imminent bodily injury on October 30. Cisneros's own recollection of the Incident suggests that he planned to instill fear in Plaintiffs. In an email, Cisneros describes hatching a plan with non-party Jason Peña-Ahuyon to "welcome [the Bus] to Texas so to speak" by "getting a convoy and welcoming them that way." (Ex. 10, Dkt. 364-10). The email further explains that his "intention" was to let the Biden-Harris campaign know that "what they stood for was not welcome here in Texas nor was it welcome in the United States." (*Id.*) Cisneros testified that he felt his participation in the Incident achieved this goal because the "Trump Train" "let[] [Plaintiffs] know what we stood for here in Texas" and that the passengers on the bus responded with "cowardice." (Cisneros Dep., Dkt. 366-1, Ex. 6, at 108:17-21, 109:9-10).

These statements of intent to instill fear are further informed by Cisneros's history of violent confrontation with political opponents, also done with the "hope" of instilling fear. (*See id.*, at 41:8–9, 43:16-21; Ex. 52, Dkt. 364-52; Ex. 53, Dkt. 364-53). Cisneros's statements after the Incident also support a finding of intentional conduct: His boast that he was "[s]mart enough to get the entire Biden Harris campaign cancelled in Texas," (Ex. 13, Dkt. 364-13)—a belief he reaffirmed at his deposition, Cisneros Dep., Dkt. 366-1, Ex. 6, at 108:22–24—and his statement that he had "welcome[d] Biden/Harris" to Texas with "Brisket, Sausage, Leg quarters, Whataburger and 35 in[ch] tires," (Ex. 12, Dkt. 364–12).

A reasonable juror could also conclude that during the Incident, Cisneros engaged in aggressive, dangerous, and reckless driving, putting Plaintiffs and others at risk of physical danger. He admitted at his deposition to repeatedly pulling onto the shoulder of I-35 and then back out in front of the bus, (Cisneros Dep., Dkt. 366-1, Ex. 6, at 144:13–146:16)—an objectively dangerous driving tactic. At one point, while on the shoulder waiting for the bus, Cisneros filmed and posted a video of himself mocking Vice President Kamala Harris for thinking it was "a good idea to campaign in Texas," and insisted that the Bus needed an "escort" before driving back onto I-35 to catch up with the Bus. (Ex. 56, Dkt. 364-56). While it was surrounded, the Bus and an SUV driven by an accompanying campaign staffer were forced to drive defensively, switching lanes several times and even straddling two lanes at once to ensure sufficient space to maneuver. (*See, e.g.*, Ex. 25, Dkt. 364-12, at 7:20–7:34, 18:20–19:00). Video evidence suggests that Cisneros sped up to block the staffer's vehicle from remaining behind the bus and prevent the staffer from switching lanes. (Ex. 50, Dkt. 364-50). Cisneros testified to driving deliberately in this manner "[b]ecause I can" and "[b]ecause I wanted to." (Cisneros Dep., Dkt. 366-1, Ex. 6, at 148:16—151:11). Cisneros ultimately collided with the staffer's vehicle, (Ex. 50, Dkt. 364-50), and then followed him as the staffer tried to pull over on the interstate shoulder, cutting abruptly in front of the Bus to do so, (Ex. 25, Dkt. 364-

25, at 18:26). He later described the collision as "slamming that f****r" and "welcom[ing] him properly to Texas," (Ex. 12, Dkt. 364-12), called the staffer, "Antifa," (Ex. 5, Dkt. 364-5), and testified that the incident "was [] a success [in] that [he] kind of saved Texas from people like that," meaning the Biden-Harris Campaign. (Cisneros Dep., Dkt. 366-1, Ex. 6, at 109:17–19).

In short, Cisneros's arguments for summary judgment on Plaintiffs' assault claims are without merit. Disputes of material fact clearly exist as to whether Cisneros assaulted Plaintiffs on October 30. Accordingly, Cisneros's motion for summary judgment on Plaintiffs' assault claims is denied.

## 2. Factual Disputes Exist as to Whether Park Aided and Abetted Assault by Other "Trump Train" Participants.

Defendant Park argues that "she did not commit any acts in furtherance of unlawfully aiding and abetting an assault or battery on the bus." (Dkt. 325 at 19). However, as previously explained, the videos Park herself took while driving on I-35 demonstrate that she understood that the Bus was surrounded and could support a finding that she directly assisted and encouraged the caravan in impeding its movement. (*See* Ex. 23 and 24, Dkt. 364-23 and 364-24). In addition, the social media post she shared after the Incident, which stated that Plaintiffs should "GTFOH!" could be understood to be Park celebrating the fact the "Trump Train" had forced Plaintiffs to leave central Texas. (*See* Ex. 16, Dkt. 364-16). This evidence is enough to create a material dispute of fact as to whether Park (1) provided aid to someone committing assault, (2) was aware of her role in the wrongful conduct, and (3) knowingly and substantially assisted. *Creighton*, 2011 WL 743073, at *2. Therefore, Park's motion for summary judgment on Plaintiffs' assault claims is also denied.

### D. Plaintiffs' Claims for Emotional Distress and Mental Anguish Damages

Last, Cisneros alone makes two arguments as to Plaintiffs' claims for emotional distress and mental anguish damages. First, he argues that, as a matter of law, Plaintiffs cannot recover damages

for mental anguish under Texas law for their state-law claims.[18] As this Court has already acknowledged previously in this litigation, "courts have permitted civil conspiracy and civil assault claims to move forward when plaintiffs seek damages for mental and emotional injuries." (Order, Dkt. 64, at 13–14 (citing *Tademy v. Sw.-Tex Leasing Co.*, No. SA-05-CA-0620-RF, 2006 WL 8434113, at *5 (W.D. Tex. Oct. 30, 2006)). In Texas, "mental anguish is recognized as a real and serious harm" that is normally available for "torts involving intentional or malicious conduct" because "such conduct entails a high level of culpability." *Hardin v. Obstetrical & Gynecological Assocs. P.A.*, 527 S.W.3d 424, 436 (Tex. App.—Houston [1st Dist] 2017, pet. denied) (cleaned up). The cases cited by Cisneros agree. (*See* Dkt. 329-1 at 5–6); *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997) ("Mental anguish damages are recoverable for some common law torts that generally involve intentional or malicious conduct . . . ."); *SCI Tex. Funeral Servs., Inc. v. Nelson*, 540 S.W.3d 539, 544 (Tex. 2018) (citing *Likes* and reiterating that mental anguish damages may be available where the plaintiff can show intentional or malicious conduct). Therefore, as a matter of law, Plaintiffs may seek emotional distress and mental anguish damages if Defendants are found liable for the intentional torts here.

Second, Cisneros seems to argue that Plaintiffs' injuries are not sufficient for mental anguish or emotional distress damages as a matter of law. (Dkt. 329-1 at 5–7). He contends that Gins and Holloway did not immediately quit the campaign and their professional fields following the Incident and that Davis had other events in her life which contributed to her feelings of depression in the wake of October 30. (*Id.* at 7). Cisneros asserts without support that Plaintiffs are "invent[ing]" their distress, (*id.* at 6–7), citing to *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 445 (Tex. 1995). But in

---

[18] To the extent that Cisneros also contends that emotional distress does not constitute an injury for Plaintiffs' Support or Advocacy Clause claims, the Supreme Court has recognized that harm that constitutes an injury under traditional common-law principles of tort law constitutes injury under Section 1985. *Haddle*, 525 U.S. at 127; *see also Kinney*, 367 F.3d at 353 (following *Haddle* to conclude that economic injury due to interference with employment is cognizable under § 1985).

contrast to the plaintiffs in *Woodruff* who expressed only "anger, frustration, or vexation" and testified only to being "hot" and "upset," *id.*, each Plaintiff here has testified to "substantial disruption[s] in [their] daily routine[s]—not "mere emotions." *Woodruff*, 901 S.W.2d at 444–45.

For example, Holloway, the Bus driver, states that after the Incident he had trouble sleeping for months and began to take sleep aids for the first time in his life. (Holloway Decl., Dkt. 30, ¶¶ 4–5). Because of the Incident, he no longer felt comfortable driving a bus and decided to start a new business to avoid bus driving. (*Id.* ¶ 6). Gins testified that since the Incident, he has suffered from persistent acute anxiety and its physical manifestations, including nausea, lethargy, and trouble getting out of bed in the morning. (Gins Dep., Dkt. 366-1, Ex. 26, at 124:1-3; 178:15–24). He also testified that the Incident has impacted his career. (*See* Resp., Dkt. 364, at 43). Last, since the Incident, Davis has experienced anxiety and insomnia and was prescribed medication to alleviate her symptoms. (Davis Dep., Dkt. 366-1, Ex. 27, at 164:14–25, 170:16–19). She stated that because of the Incident and the persistent anxiety it caused, she felt the need to hire private security for the first time in her political career, and still experiences anxiety during public speaking engagements today. (*Id.* at 173:13–17).

In short, Plaintiffs have made a sufficient showing that the Incident caused them emotional distress and mental anguish, and these damages may be recoverable if they succeed at trial. At this stage, Cisneros nor the Court need believe Plaintiffs' testimony about these damages because whether their testimony is credible is an issue for a jury to decide. Accordingly, Cisneros's motion for summary judgment as to damages is denied.

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Defendants' motions for summary judgment,

(Dkts. 325, 328, 326, 329), are **DENIED**.

      **SIGNED** on August 13, 2024.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE