IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WENDY DAVIS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 1:21-CV-565-RP |
| | § | |
| ELIAZAR CISNEROS, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Defendants Dolores Park ("Park"), Eliazar Cisneros ("Cisneros"), and Joeylynn and Robert Mesaros's (the "Mesaros Defendants") (collectively, "Defendants") objections to the expert testimony of Dr. Kathleen Blee and Dr. Peter Simi.[1] (Dkts. 297, 299, 300, 303, 307, 309, 310, 418, 420, 429, 430).[2] Plaintiffs Wendy Davis, David Gins, and Timothy Holloway (collectively, "Plaintiffs") filed a consolidated response in opposition to these objections, (Dkts. 331, 331-6), and only Park filed a reply, (Dkts. 351, 355). The Court also allowed counsel to present oral argument on the admissibility of Dr. Blee and Dr. Simi's proposed testimony at the final pretrial conference on August 5, 2024. (Min. Entry, Dkt. 461). Having considered Dr. Blee and Dr. Simi's report, their deposition testimony, the parties' briefs, the parties' oral arguments, and the relevant law, the Court issues the following order.

## I. BACKGROUND

This case arises out of an incident alleged to have occurred during the 2020 U.S. presidential election campaign period (hereinafter, the "Incident"). Plaintiffs assert that on October 30, 2020, they were traveling on I-35 between San Antonio and Austin, Texas, in a Biden-Harris campaign

---

[1] Pro se defendants Randi Ceh and Steve Ceh did not file objections to Plaintiffs' proposed expert testimony.
[2] Docket numbers throughout this order refer to both unsealed and sealed versions of each filing.

tour bus (the "Bus"). (Am. Compl., Dkt. 151, at 2–3). At that time, they allege, "dozens of individuals in at least forty vehicles" participated in a "Trump Train" to show support for presidential candidate Donald Trump by surrounding the Bus on the highway. (*Id.*). Plaintiffs state that for at least ninety minutes, the "Trump Train" forced the Bus to slow down to a crawl on the highway, that vehicles came within inches of the Bus, boxing it in, and that one "Trump Train" vehicle slammed into a Biden campaign staffer's vehicle, causing Plaintiffs to fear for their lives and suffer emotional trauma. (*Id.* at 2–3). Plaintiffs allege that Park, Cisneros, the Mesaros Defendants, Randi Ceh, Steve Ceh, and other participants in the "Trump Train" coordinated to wait for and surround the Bus. (*Id.* at 3).

Based on these allegations, Plaintiffs assert that Defendants violated the Support or Advocacy Clause of the Ku Klux Klan Act ("KKK Act"), 42 U.S.C. § 1985(3), which creates liability for those that engage in a conspiracy "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner" in favor of a Presidential or Congressional candidate for federal office. Plaintiffs also assert two claims under Texas state tort law. They allege that Defendants engaged in a civil conspiracy to commit assault. They also allege that some Defendants engaged in civil assault directly—by intentionally or knowingly threatening Plaintiffs with imminent bodily harm—and other Defendants aided and abetted such assault. (*Id.* at 58–62). This case is currently set for trial beginning on September 9, 2024. (Dkt. 405).

Plaintiffs designated Dr. Kathleen Blee and Dr. Peter Simi—two sociologists—as expert witnesses, (Dkt. 262), to provide an expert opinion on whether Defendants' actions on October 30, 2020 "correspond with tactics and approaches used by political extremists to engage in collective action to deprive people of their civil rights," (Report, Dkt. 297-1, at 1). Park, the Mesaros

Defendants, and Cisneros object to Dr. Blee and Dr. Simi's proposed testimony on multiple

grounds. (Dkts. 297, 299, 300, 303, 307, 309, 310).

## II. LEGAL STANDARD

The root of the court's admissibility analysis is Federal Rule of Evidence 702, which

provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or
> otherwise if the proponent demonstrates to the court that it is more
> likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact
> in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.

The Supreme Court has interpreted this rule as imposing a "gatekeeping role" upon district

court judges, tasking them with "ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597

(1993). "The reliability prong mandates that expert opinions be grounded in the methods and

procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v.*

*Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). "The relevance

prong requires the proponent to demonstrate that the expert's reasoning or methodology can be

properly applied to the facts in issue." *Id.* (internal quotation marks omitted). The burden on the

proponent of the expert testimony is only to prove, by a preponderance of the evidence, that the

testimony is reliable; they need not prove the expert's testimony is correct. *Id.*

The *Daubert* standard requires courts "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The *Daubert* inquiry "'is not intended to serve as a replacement for the adversary system.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Accordingly, "a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.* In interpreting *Daubert*, courts in this jurisdiction use a three-factor framework for determining whether expert evidence is admissible. Proponents of expert testimony must demonstrate that "(1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable." *Bonnet-Pritchett v. Washington Cnty.*, 2022 WL 3082522, at *1 (W.D. Tex. June 16, 2022).

### III. DISCUSSION

#### A. Dr. Blee and Dr. Simi's Background, Research, and Testimony

Dr. Blee and Dr. Simi are both accomplished sociologists. Dr. Blee is a professor of sociology at the University of Pittsburgh in Pennsylvania, who specializes in social movements, "with a particular focus on how people become involved in extremist groups and extremist political action." (Report, Dkt. 297-1, at 1). In her work, she has "conducted interviews and observations with current and former extremists." (*Id.*). Dr. Simi is a professor of sociology at Chapman University in California, where he teaches courses in sociological methodologies. (Resp., Dkt. 331, at 5). Dr. Simi's research specializes in the study of "extremist groups and violence," and in his work, he has "conducted interviews and observations with a range of violent gangs and political extremists across the U.S., Canada, and Europe." (Report, Dkt. 297-1, at 1). Both Dr. Blee and Dr. Simi have written and presented extensively in the areas of political violence and extremism. (*See* Blee CV, Dkt. 331-4; Simi CV, Dkt. 331-5). In addition to their academic contributions, Dr. Blee and Dr. Simi

recently served together as experts in *Sines v. Kessler*, Case No. 3:17-cv-00072 (W.D. Va. judgment entered Jan 9. 2023), which alleged civil rights violations and vehicular assault in connection with the 2017 "Unite the Right" rally in Charlottesville, Virginia. (*See id.*).

Plaintiffs retained Dr. Blee and Dr. Simi "to analyze whether the actions taken by Defendants in planning and implementing the 'Trump Train' incident on October 30, 2020 . . . on I-35 between San Antonio and Austin, Texas, correspond with tactics and approaches used by political extremists to engage in collective action to deprive people of their civil rights." (Report, Dkt. 297-1, at 1). Plaintiffs describe Dr. Blee and Dr. Simi's charge as three-fold. First, they were tasked with analyzing whether Defendants "participated in a collective political action" on October 30, 2020. Second, Dr. Blee and Dr. Simi were to use their expertise "to analyze communications between the individuals who participated" in the Incident "to evaluate the characteristics of any collective political action, including shared understanding of language and objectives." Third, Dr. Blee and Dr. Simi were charged with determining whether Defendants' conduct "bore the hallmarks of political extremism associated with threats and intimidation." (Resp., Dkt. 331, at 5).

Dr. Blee and Dr. Simi state that their expert report (the "Report") is based on their research on extremist collective action, their review of the relevant scholarship on this topic, and their review and analysis of the case materials provided by Plaintiffs. They considered the following materials in forming their expert opinions: messages communicated though social media, cell phone text messages, and other modes of communication; video and other accounts of the Incident; deposition testimony by Defendants and others; other material produced in the litigation; material generated by their own research on political extremism; and relevant scholarship in the area. (Report, Dkt. 297-1, at 1–2). In examining the case materials, Dr. Blee and Dr. Simi used "an analytic procedure that is the standard for rigorous qualitative (non-numerical) social science studies, as indicated in" the 2004 National Science Foundation report. (*Id.* at 2). The Report details six steps that Dr. Blee and Dr.

Simi followed in their analysis. In the first two steps, Dr. Blee and Dr. Simi used and relied upon their knowledge of collective action and extremism based upon their prior research and their studies of prior scholarship. In the third and fourth steps, they reviewed the case materials using "standard content analysis to extract explicit and implicit meanings." Fifth, they "analyzed the relationships between messages and actions" using a retrospective approach—that is, beginning with the final factual outcome of October 30—and "retrac[ing] the trajectory to earlier speech and actions to understand how these helped produce the incident in question." Last, they employed deductive analysis (drawing from prior studies to analyze messaging) and inductive analysis (drawing from the context of a message to analyze it). (*See id.* at 2–4).

In simple terms, their 49-page report provides a sociological framework for analyzing the events leading up to the Incident and the Incident itself. The Report is organized around two key sociological concepts—collective action and political extremism. (*Id.* at 4–8). Dr. Blee and Dr. Simi also outline four characteristics of extremist collective action: (1) participants' immersion in subcultures where extremist ideas circulate; (2) the use of a decentralized but coordinated organization; (3) the use of clandestine communication methods; and (4) processes of escalation. They then describe how those characteristics were present in the weeks leading up to the Incident and on the day of the Incident. (*See id.* §§ 5, 7, 8). Ultimately, in their conclusion, Dr. Blee and Dr. Simi state:

> In our opinion, the events in central Texas orchestrated and implemented by Defendants on October 30, 2020, and, in the weeks leading up to this date, were consistent with characteristics of collective action undertaken for extremist, anti-democratic goals. Our extensive review of their planning materials makes it apparent that Defendants utilized far-right extremist strategies and tactics, principally the reliance on subcultures in which extremist ideas circulated, decentralized but coordinated collective action, a coordinated strategy to disguise their extremist ideas and actions through the use of double-speak and targeted front-stage and back-stage messages and behavior, and escalating extremism over time. Defendants' use of these strategies and tactics was consistent with an intention to intimidate and obstruct the

democratic process by interfering with the progress of the Biden-Harris campaign bus as it traveled through central Texas on October 30, 2020.

*Id.* at 49.

### B. Dr. Blee and Dr. Simi's Testimony is Mostly Admissible.

Park and the Mesaros Defendants raise a number of objections to Dr. Blee and Dr. Simi's testimony.[3] First, Defendants argue that Dr. Blee and Dr. Simi are unqualified to testify on several aspects of their proposed testimony. (*See* Dkt. 297, at 10; Dkt. 300, at 10 n.11; Dkt. 303, at 6–7). Second, Defendants contend that Dr. Blee and Dr. Simi's expert testimony contains improper legal conclusions or is otherwise irrelevant and unhelpful to the factfinder. (*See* Dkt. 297, 7–9; Dkt. 300, at 10; Dkt. 303, at 4–5). Third, Defendants argue that Dr. Blee and Dr. Simi's expert testimony is unreliable and based upon invalid methodology. (*See* Dkt. 297, at 8–9; Dkt. 300, at 8–10; Dkt. 303, at 5–6). Fourth, Defendants contend that Dr. Blee and Dr. Simi's opinion on Defendants' communications and "double-speak" impermissibly judges witness credibility. (*See* Dkt. 297, at 9–10; Dkt. 300, at 10 n.10; Dkt. 303, at 5–6). Finally, Park argues that Dr. Blee and Dr. Simi's testimony should be excluded under Rule 403 as unduly prejudicial. (*See* Dkt. 297, at 10; Dkt. 300, at 10 n.11). The Court addresses each of Defendants' arguments in turn.

#### 1. Dr. Blee and Dr. Simi are qualified to give their expert testimony.

The Court begins its analysis by determining whether Dr. Blee and Dr. Simi are qualified to give their proposed testimony. To be qualified under Rule 702 and *Daubert*, an expert must "possess a higher degree of knowledge, skill, experience, training, or education than an ordinary person." *Lance v. City of San Antonio*, 2023 WL 8696340, at *2 (W.D. Tex. Nov. 1, 2023); *see also* Fed. R. Evid. 702. Dr. Blee and Dr. Simi easily meet this requirement. As sociologists who specialize in the fields

---

[3] Cisneros's objection to the expert testimony of Dr. Blee and Dr. Simi incorporates by reference all the arguments made by Park and the Mesaros Defendants. (*See* Dkt. 307).

of collective action, political extremism, and political violence, they are well suited to give an expert opinion on whether characteristics of collective action and political extremism appear in this case.

Park protests that Dr. Blee and Dr. Simi's expertise is limited to white supremacy and racist organizations, who are not alleged to be involved in the Incident. (Reply, Dkt. 351, at 3–7). She highlights the fact that the federal district court in *Sines v. Kessler* qualified Dr. Blee and Dr. Simi to be experts in that case based on their expertise on "the characteristics of the historical white supremacist movement." *See* No. 3:17-CV-00072, 2021 WL 1431296, at *2 (W.D. Va. Apr. 15, 2021). Further, Park argues that Dr. Blee and Dr. Simi do not have the requisite background to comment on the cultures in central Texas that are relevant to this case because they have not done specific sociological studies in Texas.

The Court disagrees. Dr. Blee and Dr. Simi's resumes are replete with experiences that demonstrate that their knowledge of political extremism is not limited to the subset of white supremacy groups. Both sociologists have published extensively on political extremism and far-right groups. (*See, e.g.*, Blee CV, Dkt. 331-4, at 3, 6–11, 22; Simi CV, Dkt. 331-5, at 2–3, 5–6). Dr. Blee has served as a subject expert on domestic extremism grants funded by the Department of Justice and has given numerous presentations on far-right extremism in particular. (*See* Blee CV, Dkt. 331-4, at 25, 28). Dr. Simi has held positions at two different university centers focused on extremism and radicalization. (*See* Simi CV, Dkt. 331-4, at 1). While it is true that they do not have a specific expertise in central Texas sub-cultures, their broader expertise in collective action, political extremism, and far-right groups is indisputable. In this regard, they clearly have a "higher degree of knowledge, skill, experience, training, [and] education than an ordinary person" when it comes to evaluating whether Defendants' actions bore the characteristics of extremist collective action. *See Lance*, 2023 WL 8696340, at *2.

The only remaining concern as to the qualifications of Dr. Blee and Dr. Simi is whether they reliably applied their general knowledge of extremism to the specific cultures and facts at hand—which, as stated below, the Court finds that they have. Park's questions about the strength of Dr. Blee and Dr. Simi's conclusions due to their specific lack of familiarity with central Texas are better suited for cross-examination, not exclusion. *See Pipitone*, 288 F.3d at 25.0 ("[A]s *Daubert* makes clear, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (cleaned up). Overall, the Court finds that Dr. Blee and Dr. Simi are qualified to give their expert testimony in this case.

### 2. Dr. Blee and Dr. Simi's expert testimony is relevant.

Dr. Blee and Dr. Simi's testimony on whether Defendants' actions correspond with tactics used by political extremists to engage in collective action is also relevant to this case. Relevance is established if the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." *Haas Outdoors, Inc. v. Dryshod Int'l, LLC*, 2020 WL 13157933, at *2 (W.D. Tex. Jan. 28, 2020) (citing Fed. R. Evid. 702). The "main focus" of a trial court's *Daubert* analysis should be whether an expert's opinion will be helpful to the factfinder. *Hix-Hernandez v. Ford Motor Co.*, 2022 WL 2919351, at *2 (W.D. Tex. July 25, 2022) (citing *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019)). "But the helpfulness threshold is low . . . ." *Id.* (quoting *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 459 n.14 (5th Cir. 2013)). In cases involving allegations of conspiracies, courts have regularly allowed expert testimony on how to interpret actions of groups. *See, e.g.*, *United States v. Portillo*, 969 F.3d 144, 169 (5th Cir. 2020) (affirming allowance of expert testimony in a conspiracy case because it helped the jury to understand "evidence regarding the inner-workings of organized crime"); *Sines*, 2021 WL 1431296, at *11 (holding that "expert testimony addressing certain common beliefs, strategies, and violent tactics of various white supremacist groups" is "uniquely helpful

9

evidence to a jury in a conspiracy case"); *United States v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999) (noting that expert "testimony was used to educate the jurors on the general techniques of drug smugglers" and finding that this "information was clearly relevant to establishing the existence of a conspiracy").

In this case, the evidence will involve large amounts of communications and conduct by dozens of individuals that Plaintiffs allege worked together as members of a decentralized but coordinated group. Dr. Blee and Dr. Simi's testimony can assist the jury in understanding and interpreting this evidence. Specifically, Dr. Blee and Dr. Simi's testimony can help the jury determine (a) whether Defendants engaged in a collective action on October 30; (b) how to interpret certain coded messages; and (c) the objectives of the Incident, namely whether the goal of the October 30 "Trump Train" was a peaceful protest or a political extremist action. These issues are contested in this lawsuit because Defendants contend that they did not coordinate or conspire with others on October 30 and that instead they intended to participate in a peaceful protest. Dr. Blee and Dr. Simi's testimony will help the jury analyze this defense and determine whether an unlawful conspiracy existed.

Defendants object that Dr. Blee and Dr. Simi's analysis of whether Defendants engaged in an "extremist collective action" is irrelevant because it "has no bearing on whether Plaintiffs can establish the elements of their claim." (Dkt. 297, at 9; Dkt. 303, at 2). While it is true that extremism itself is not an element of Plaintiffs' KKK Act or state-law claims, an analysis on political extremism is certainly relevant in assessing Defendants' intent. Such intent is relevant to Plaintiffs' KKK Act claims, which require that each Defendant agreed to a conspiracy that aimed to prevent Plaintiffs, by "force, intimidation, or threat," from engaging in support or advocacy of their chosen candidate. Intent is also relevant to Plaintiffs' state-law claims, which require that Defendants specifically agreed to place Plaintiffs in imminent fear of bodily harm and did in fact do so. Defendants claim

that they lacked the requisite intent to harass and intimidate Plaintiffs during the Incident and that they only intended to participate in a peaceful protest. At trial, Defendants will be able to present this defense to a jury, and Plaintiffs will have an equal opportunity to rebut that argument, in part, through Dr. Blee and Dr. Simi's expert testimony.

Defendants also object that Dr. Blee and Dr. Simi's report contains improper legal conclusions. They argue that statements about whether Defendants engaged in a "collective action" or whether they "planned" and "executed" the Incident improperly instruct a jury to find that a conspiracy existed. (*See* Dkt. 297, at 7; Dkt. 303, at 4). The Court disagrees.

Experts are expressly allowed to offer opinions that "embrace[] an ultimate issue," Fed. R. Evid. 704, so long as they do not "purport[] to tell the jury what the law is, or what legal conclusion to reach," *see Deep Ellum Brewing Co., LLC v. Tex. Alcoholic Beverage Comm'n*, 2016 WL 6747293, at *3 (W.D. Tex. Nov. 14, 2016). Testimony that Defendants engaged in a "collective action" or that they "planned" or "executed" the Incident is not the same thing as testimony that purports to tell the jury that Defendants engaged in a conspiracy. Importantly, Dr. Blee and Dr. Simi's definition of "collective action" differs from the legal elements needed to prove conspiracy under Texas law or the KKK Act. Dr. Blee and Dr. Simi define "collective action" as "coordinated behavior aimed at achieving a goal." (Report, Dkt. 297-1, at 4–5). Meanwhile, under Texas law, a claim for civil conspiracy requires a jury to find that (1) two more or persons (2) sought to accomplish an object or course of action; (3) the persons reached a "meeting of the minds" on the object or course of action; (4) the persons committed an unlawful overt act in pursuance of the object of the conspiracy; and (5) plaintiffs sustained damages as a proximate result. *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 196 (Tex. App.—El Paso 2017, no pet.). A KKK Act claim under the Support or Advocacy Clause is even more specific in that it requires the unlawful purpose of a conspiracy to be the use of "force, intimidation, or threat" to prevent a citizen who is lawfully entitled to vote from

expressing her support or advocacy for her chosen candidate for federal office. *See* 42 U.S.C. § 1985(3). In fact, when pressed at her deposition as to whether a "collective action" is the same thing as a conspiracy, Dr. Blee's testimony revealed how the sociological understanding of "collective action" does not correspond with the legal elements of a conspiracy claim. (*See, e.g.*, Blee Dep., Dkt. 331-7, at 97:4–100:4 ("Q: So is collective action the same as . . . the meeting of minds? A: The meeting of the minds doesn't have any definition in sociology . . . .")

Thus far, the Court is not concerned that Plaintiffs will use Dr. Blee and Dr. Simi's testimony to bypass their burden of presenting sufficient evidence of a conspiracy. While Dr. Blee and Dr. Simi opine that Defendants engaged in a "collective action," the Report also emphasizes the decentralized nature of the Incident—an opinion that could cut against a finding of civil conspiracy. (*See* Report, Dkt. 297-1, at 25–27). Defendants will be able to test Dr. Blee and Dr. Simi's conclusions on cross-examination and by introducing counter evidence. Further, when the Court prepares jury instructions, the parties will have a chance to state their positions as to the proper instructions for the jury on the elements of the conspiracy claims and how jurors should assign weight to fact and expert witnesses. Accordingly, the Court does not find that Dr. Blee and Dr. Simi's testimony on whether Defendants engaged in a "collective action" or "planned" or "executed" the Incident to be an impermissible legal conclusion. *See Sines*, 2021 WL 1431296, at \*12 (rejecting objection that Dr. Blee and Dr. Simi's testimony on the "White Supremacist Movement" constituted an improper legal conclusion for similar reasons).

### 3. Dr. Blee and Dr. Simi's expert testimony is reliable.

Defendants next challenge Dr. Blee and Dr. Simi's proposed testimony as unreliable. Defendants argue that their methodology is invalid because it "consists primarily of [Dr. Blee and Dr. Simi's] subject[ive] views and previous research." (Dkt. 297, at 8). Defendants allege that there are no indicia of reliability for Dr. Blee and Dr. Simi's opinions since they have not been peer

reviewed and there are no meaningful standards governing their methodology. (*Id.*; Dkt. 303, at 5). Defendants specifically take issue with the fact that Dr. Blee and Dr. Simi did not base their opinion on ethnographic studies, surveys, or other fieldwork—methodologies that Dr. Blee and Dr. Simi have employed in prior sociological studies. (*See* Dkt. 351, at 8).

In considering reliability, courts may use the four factors described in *Daubert*: "whether the expert's theory or technique: (1) can be or has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error or standards controlling its operation; and (4) is generally accepted in the relevant scientific community." *Bonnet-Pritchett*, 2022 WL 3082522, at *2 (citing *Daubert*, 509 U.S. at 593–94). These factors, however, are not exhaustive. *See Daubert*, 509 U.S. at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate."). The Fifth Circuit has stated that "[i]n the vast majority of cases, the district court first should decide whether the factors mentioned in *Daubert* are appropriate." *Bonnet-Pritchett*, 2022 WL 3082522, at *2 (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 311–12 (5th Cir. 1999)). Application of the *Daubert* factors to particular testimony "is a fact-specific inquiry dependent on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony." *Id.* (citing *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 (5th Cir. 2000)).

Both the Fifth Circuit and the Supreme Court have recognized that social sciences, such as sociology, can be reliable bases for expert testimony, notwithstanding the fact that "social sciences . . . research, theories and opinions cannot have the exactness of hard science methodologies." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (citing *Kumho Tire Co.*, 526 U.S. at 153). As explained above, Dr. Blee and Dr. Simi's report lays out in detail the six-step methodology they used in conducting their analysis. (Report, Dkt. 297-1, at 1–4). This methodology is based on guidelines from the National Science Foundation and is a widely accepted approach for qualitative social

science research.[4] Defendants critique Dr. Blee and Dr. Simi's methodology because they did not employ an ethnographic study or a survey. However, the Court credits Dr. Blee's testimony that such methods are simply one method of data collection in the field of sociology and the use of such methods has no bearing on whether a sociological analysis is reliable or not. (*See* Blee Dep., Dkt. 331-7, at 110:14–111:18; 263:7–10). Dr. Blee testified that in sociology it is common to "match the method to the kind of question you're asking and the availability of data." (*Id.* at 111:11–13). For example, she explained that here, an ethnographic study or interviews with the "Trump Train" participants would have been impossible given that the study needed to take place in the midst of active, adversarial litigation. (*See id.* 261:25–263:6).

Instead, the Court finds that Dr. Blee and Dr. Simi's methodology bears the necessary indicia of reliability. Their analytical process is generally accepted in the field of sociology, and the methodological process was the subject of publication. Both experts testified that they approached the Report with objectivity and based their opinion on the materials presented to them. (Simi Dep., Dkt. 331-8, at 156:25–158:17; Blee Dep., Dkt. 331-7, at 260:15–21). Although their expert report was not the subject of peer review, Dr. Blee testified that she and Dr. Simi laid out the methodology of their study in such a way that they would expect that any other sociologist would come to the same conclusion that they had. (*See* Blee Dep., Dkt. 331-7, at 275:12–25). This testimony, in conjunction with the fact that the Report thoroughly cites to other relevant scholarship as well as materials in the record, persuades the Court that Dr. Blee and Dr. Simi's methodology is capable of being judged by a scientific standard and is not the result of the experts' own subjective views.

Defendants also argue that Dr. Blee and Dr. Simi's methodology is unreliable because it is based upon their insufficient experience with the specific sub-cultures at issue in this case. (*See* Dkt.

---

[4] *See* Michele Lamont & Patricia White, *Workshop on Interdisciplinary Standards for Systematic Qualitative Research*, National Science Foundation, (2005),
https://scholar.harvard.edu/files/lamont/files/issqr_workshop_rpt.pdf.

351, at 9). In essence, Defendants fault Dr. Blee and Dr. Simi for attempting to apply their knowledge of political extremist groups to the specific facts of this case. In support, Defendants cite several cases where district courts excluded sociological evidence because the experts did not reliably apply their area of sociological expertise to the parties at issue in their case. (*Id.* at 9 n.12 (citing *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013 (N.D. Ill. 2011); *United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003)).

A district court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" and may ultimately "conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, however, the Court is satisfied that Dr. Blee and Dr. Simi have reliably applied their expertise and methodology to the facts of this case. The Report thoroughly explains how they came to their conclusions, leaving no analytical gap between their sociological research, the record in this case, and their ultimate opinion. The Report first provides background information on general sociological terms and studies that will inform their analysis. (*See* Report, Dkt. 297-1, §§ 2–6). Then, it applies those general principles in detail to the materials in this case, providing extensive citations throughout. (*See id.* §§ 7–8). Because Dr. Blee and Dr. Simi integrate the facts of this case with their knowledge of political extremism, their testimony is unlike the testimony that was excluded in Defendants' cited cases.[5]

---

[5] For example, in *Obrycka*, 792 F. Supp. 2d 1013, at issue was a police practices expert who was designated to offer an opinion on the Chicago Police Department. The district court excluded the expert not only because he did not have any specific experience studying the Chicago Police Department, but also because his nine-page report did not explain how his generalized findings about police departments at large applied to the Chicago Police Department in particular. *Id.* at 1024–26. The report in *Obrycka* is distinguishable from Dr. Blee and Dr. Simi's 49-page report that thoroughly explains how they applied their knowledge in political extremism to Defendants' actions in this case. Similarly, in *Mamah*, 332 F.3d 475, a criminal defendant of Ghanian descent who had given a confession in police custody sought to admit an anthropologist and a sociologist to testify that Ghanaians were predisposed to giving false impressions because they had lived under a military regime. *Id.* at 476. The Seventh Circuit excluded these opinions because there was no

In sum, the Court finds that in conducting their analysis, Dr. Blee and Dr. Simi employed the "same level of intellectual rigor that characterizes" a typical sociologist. *See Kumho Tire*, 526 U.S. at 152. Because the proposed testimony is based on sufficient facts in the record and is the product of reliable methods that are in turn reliably applied to the facts of the case, the proposed testimony is reliable.

4. Defendants' objections to expert testimony about double-speak and front-stage and back-stage communications are overruled.

Next, Defendants challenge Dr. Blee and Dr. Simi's discussion of double-speak and front-stage and back-stage communications. In the Report, Dr. Blee and Dr. Simi opine that one common characteristic of extremist collective actions is the use of communication strategies designed to shield information from others. (Report, Dkt. 297-1, at 9–10). They explain that one strategy used to disguise extremism from others is double-speak, which Dr. Blee and Dr. Simi define as someone sending "a message that will be understood differently by those well-versed in extremism and those who are not." (*Id.* at 10). Dr. Blee and Dr. Simi opine that double-speak is used by extremists "to create plausible deniability for ideas or actions that would attract legal or social sanctions." (*Id.*). They also note a second contextual communication strategy: the use of front-stage and back-stage behavior, which refers to "the tendency for people to present themselves in different ways depending on the audience." (*Id.*). They state that a front-stage behavior is how someone presents themselves to strangers to make a favorable impression, whereas a back-stage behavior is how someone presents themselves to those in their social circles. Dr. Blee and Dr. Simi state that "[m]essages intended for trusted insiders (a back-stage audience) may indicate support for the use of intimidation and force" whereas "messages intended for outsiders (a front-stage audience) may

---

"empirical link between" the experts' research and the opinion provided given that the defendant was a Ghanian expatriate who had not lived in Ghana for many years. *Id.* at 477–78. Here, the "empirical link between" Dr. Blee and Dr. Simi's prior research and expert opinion is sufficiently apparent given their expertise in political extremism and far-right groups.

advocate lawful actions." (*Id.*). After explaining these general concepts, Dr. Blee and Dr. Simi then describe instances in which Defendants and other "Trump Train" participants engaged in both techniques. (*Id.* at 27–31). They opine that the "Trump Train" participants used these communication techniques to disguise their plans for October 30 as peaceful and humorous rather than actual plans of aggression. In other words, Dr. Blee and Dr. Simi opine that Defendants used these techniques to provide themselves plausible deniability for actions that could subject them to criminal or civil liability. (*Id.* at 31).

Defendants object that Dr. Blee and Dr. Simi's analysis of Defendants' communications impermissibly judges their credibility by discounting Defendants' explanations of their communications. (*See* Dkt. 297, at 9–10; Dkt. 300, at 10 n.10; Dkt. 303, at 5–6). However, where courts have taken issue with expert testimony concerning witness credibility, it is where the expert opines on the witness's character or capacity for truth. *See Joseph v. Signal Int'l L.L.C.*, 2015 WL 12766134, at *14 (E.D. Tex. Feb. 12, 2015); *Meganathan v. Signal Int'l L.L.C.*, 2015 WL 11109846, at *14 (E.D. Tex. June 26, 2015). Here, Dr. Blee and Dr. Simi are not testifying to the character or truthfulness of any defendant or witness. (*See* Simi Dep., Dkt. 331-8, at 139:25–140:4). Instead, their analysis of Defendants' communications used "standard content analysis to extract explicit and implicit meanings," which at times required them to assess whether a communication conveyed its explicit, plain meaning or whether a communication was crafted to obscure a contrary, implicit meaning. (Report, Dkt. 297-1, at 2–3). As sociologists, Dr. Blee and Dr. Simi are well equipped to assess the reliability of a particular communication in this way—to interpret language and determine whether it is "a message that will be understood differently by those well-versed in extremism and those who are not." (*Id.* at 10.). Indeed, their expert testimony was accepted by the district court in *Sines* for this exact purpose. *See* 2021 WL 1431296 at *7 ("Offering an alternative interpretation for

language defendants used is the very point of such expert testimony. The fact that Plaintiffs' experts' interpretation may be different from Defendants' does not render it improper.").

Defendants also argue that Dr. Blee and Dr. Simi's analysis on double-speak and front-stage and back-stage communications is unreliable and inadmissible because it depends upon Dr. Blee and Dr. Simi rejecting "alternative explanations" for Defendants' statements and actions. (*See* Dkt. 297, at 9 n.5 (quoting *Maryland Cas. Co. v. Acceptance Indem. Ins. Co.*, No. A-08-CA-697 RP, 2009 WL 10669798, at *3 (W.D. Tex. Oct. 16, 2009)); Dkt. 303, at 6 (same)). But Defendants' reliance on *Acceptance* is misplaced. There, this Court made clear that the relevant analysis is not whether an expert rejects an alternative explanation, but rather whether the expert appropriately considered the alternative explanation. *See id.* at *4 ("Contrary to Acceptance's characterization, this is not a case in which an expert failed to consider alternative explanations. Rather, Verhuist carefully explained his rejection of those alternative explanations. Acceptance has thus not shown his testimony should be excluded on this basis."). Here, Defendants do not argue that Dr. Blee and Dr. Simi failed to consider Defendants' alternative positions. Indeed, in the Report, where Dr. Blee and Dr. Simi disagree with Defendants' positions as to their statements and arguments, they do so by explaining what Defendants' positions were and why their interpretation differs. (*See, e.g.*, Report, Dkt. 297-1, at 34). Dr. Blee and Dr. Simi's report does not improperly ignore alternative explanations but simply disagrees with those alternative explanations after due consideration. Thus, the Court will not exclude the Report on this basis.

### 5. Defendants' Rule 403 objection is overruled.

Next, Park objects that Dr. Blee and Dr. Simi's proposed testimony should be excluded under Federal Rule of Evidence 403. Under Rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by undue prejudice or its tendency to mislead or confuse the issues. Park argues that the probative value of the testimony is outweighed by the stigma of

linking Park to a "far right extremist collective action," which would lead the jury to unjustly find her liable not for her own actions but for the actions of the entire "collective action." She also argues that testimony about a "collective action" could mislead the jury as to the relevant elements of the claims in this case. (*See* Dkt. 297, at 10; Dkt. 300, at 10 n.11).

The Court does not find that exclusion is warranted under Rule 403. As mentioned above, Dr. Blee and Dr. Simi's testimony has significant probative value. To prevail on their KKK Act claims, Plaintiffs will have to prove that Defendants were part of an unlawful conspiracy that sought to use force, intimidation, or threat to prevent Plaintiffs from engaging in support or advocacy for their preferred candidates for federal office. To do so, Plaintiffs will need to rebut Defendants' argument that they did not conspire with one another and that their purpose of participating in the October 30 "Trump Train" was solely to engage in a peaceful political protest. Dr. Blee and Dr. Simi's opinion that Defendants' actions on October 30 and in the days leading up to it were consistent with "characteristics of collective action undertaken for extremist, anti-democratic goals" would significantly aid the jury in determining whether Defendants violated the KKK Act or engaged in civil conspiracy or assault. Therefore, Dr. Blee and Dr. Simi's testimony is highly relevant to the issues in this case.

Moreover, the probative value of Dr. Blee and Dr. Simi's testimony is not substantially outweighed by its potential for jury confusion or unfair prejudice. As stated above, the Court is confident that the jury, with assistance from the jury instructions, will be able to discern the difference between a "collective action," as Dr. Blee and Dr. Simi define that term, and the elements needed to find liability under the KKK Act, civil conspiracy, and civil assault.

Further, the Court does not find that Dr. Blee and Dr. Simi's testimony would unfairly prejudice Park or any other Defendant by linking them to a collective action undertaken for extremist, anti-democratic goals. Dr. Blee and Dr. Simi stated in both the Report and in their

deposition testimony, "We use extremism to refer to ideas and actions, not people. Indeed, it is misleading to label individuals as 'extremists.'" (Report, Dkt. 297-1, at 5; *see also* Blee Dep., Dkt. 331-7, at 167:4–7). In other words, the proposed testimony does not seek to judge the character of any Defendant individually, but rather offers an opinion on the objectives of the October 30 "Trump Train." Such evidence may be prejudicial in the sense that "all evidence tending to show a defendant's guilt" is "prejudicial." *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (quoting *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006)). But the proposed testimony is not unfairly prejudicial because this case is about whether the Incident constituted political violence. Dr. Blee and Dr. Simi's opinion that Defendants were involved in a collective action undertaken for extremist goals is no more stigmatizing to Defendants than a finding of liability against them for the claims in this case. *See Sines*, 2021 WL 1431296, at *10 ("This evidence is relevant, and the fact that it is relevant and probative of Plaintiffs' claims may cause some prejudice to Defendants, but that is not the same thing as 'unfair prejudice.'" (internal citation omitted)). Testimony that only labels conduct, and not people, as extremist will not unfairly prejudice Defendants. Moreover, any prejudice that does result from this expert testimony would not be unfair and substantially outweigh the probative value of the testimony.

6. Defendants' objections to testimony about whether the "Trump Train" impeded the Bus or acted in an intimidating or threatening manner are sustained in part.

Having concluded that Dr. Blee and Dr. Simi's testimony is largely admissible, the Court ends by discussing two aspects of Dr. Blee and Dr. Simi's proposed testimony that are of particular concern. In Section 8.2 of the Report, Dr. Blee and Dr. Simi describe how the Incident unfolded and discuss how the "Trump Train" vehicles interacted with the Bus, citing to multiple videos in the discovery materials. (*See* Report, Dkt. 297-1, at 39–42). In this section, the experts synthesize information they gathered from video evidence of the Incident, contemporaneous communications during the Incident, and witness statements recounting the Incident. At one point, Dr. Blee and Dr.

Simi state that it is their opinion that the "Trump Train" "jeopardized the safety of the people on the [Bus] and other vehicles driving on what is normally a very busy thoroughfare." (*Id.* at 41). Dr. Blee and Dr. Simi opine that Defendants and others in the "Trump Train" "acted in a manner that was intimidating and that disrupted the democratic process by preventing the Biden-Harris campaign from holding their regularly scheduled events." (*Id.* at 39).

Dr. Blee further discussed these conclusions in her deposition. When asked how she concluded that the "Trump Train" impeded the Bus, she responded that this conclusion was based in part on the fact that the Bus was unable to complete its intended route and rallies that day due to the actions of the "Trump Train." (Blee Dep., Dkt. 331-7, at 218:14–20). But she also testified that her conclusion was based on reviewing the video evidence and determining that the vehicles around the Bus were slowing the Bus down. (*Id.* at 224:24–226:14). When asked what scientific methodology she employed to determine whether the "Trump Train" drivers were driving in a problematic fashion, Dr. Blee could not give an answer other than that she based her conclusions on the evidence in the case. (*Id.* at 226:15–227:19).

Defendants object to this line of testimony. Defendants argue that Dr. Blee and Dr. Simi are not qualified to testify on topics such as traffic safety, the violation of civil rights statutes, or "democratic processes." (*See* Dkt. 297, at 10; Dkt. 300, at 10 n.11; Dkt. 303, at 6–7). They also argue that Dr. Blee and Dr. Simi are not qualified to opine on whether Defendants' actions interfered with the Bus. (*See* Dkt. 300, at 10 n.11). Defendants further contend that testimony about whether the "Trump Train" participants' actions were intimidating or threatening would constitute inadmissible legal conclusions because whether or not Defendants acted with an intent to intimidate or threaten is a matter for the factfinder. (*See* Reply, Dkt. 351, at 9–10).

Defendants are right that Dr. Blee and Dr. Simi are not qualified to opine on traffic safety, individual driving, or legal matters such as intent or violations of civil rights statutes. In fact, Dr.

Blee and Dr. Simi testified at their depositions that they do not have expertise in these areas. (*See, e.g.*, Blee Dep., Dkt. 331-7, at 50:11–21, 123:5–13; Simi Dep., Dkt. 331-8, at 203:13–22). Plaintiffs also concede that Dr. Blee and Dr. Simi will not opine about whether the "Trump Train" participants committed traffic violations or if their actions constitute the legal elements of assault. (Resp., Dkt. 331, at 12). But Plaintiffs argue that Dr. Blee and Dr. Simi can opine on whether the "Trump Train" action "impeded the [Bus] and was intimidating and threatening" because they are experts in political violence and are not opining on any legal conclusions. (*Id.* at 12, 15–16).

The Court finds that Dr. Blee and Dr. Simi are qualified to opine that the "Trump Train" impeded the "democratic process" by impacting the Bus's planned campaign events. Such testimony would fall under their expertise in collective actions and political extremism—especially given that their conclusion is based in part on their analysis of post-Incident communications in which Defendants celebrated the "Trump Train" and the subsequent cancellation of the campaign's events. (*See* Report, Dkt. 297-1, §§ 8.3a, 8.4).

However, given their lack of expertise in traffic safety, Dr. Blee and Dr. Simi are not qualified to testify about how the driving patterns of the "Trump Train" vehicles impacted the Bus's driving or the safety of its passengers. Such testimony would also be unhelpful to the jury. Without expertise in traffic safety, Dr. Blee and Dr. Simi's opinion of the driving on display in the videos of the Incident is no better than that of a jury member who can assess for herself whether the driving on display was safe or reckless. Therefore, Dr. Blee and Dr. Simi may not provide commentary on the quality of driving that occurred during the Incident. They also may not testify that the Incident "jeopardized the safety" of the Bus passengers. (Report, Dkt. 297-1, at 41).

Further, Dr. Blee and Dr. Simi may not testify that Defendants' actions themselves were threatening or intimidating. The Court finds that such testimony would be unhelpful to the jury, which can assess for itself whether Defendants' actions were intimidating based on the entirety of

the evidence presented at trial. Moreover, the Court agrees with Defendants that such testimony would cross into impermissible legal conclusions. Because the KKK Act claim requires a finding that Defendants conspired with the purpose of using "force, intimidation, or threat," testimony stating that Defendants' actions were intimidating tells the jury "what legal conclusion to reach" on that claim. *See Deep Ellum Brewing* 2016 WL 6747293, at *3. That being said, Dr. Blee and Dr. Simi may testify that the "Trump Train" participants used strategies and tactics that were *consistent* with previous extremist collective actions that had an intention to intimidate. (*See* Report, Dkt. 297-1, at 49). But they may not testify that Defendants' actions themselves were intimidating. (*See id.* at 39).

## IV. CONCLUSION

The Court concludes that Dr. Blee and Dr. Simi's proposed expert is largely admissible. The Court limits Dr. Blee and Dr. Simi's proposed testimony in two respects. They may not testify as to how the "Trump Train" participants' driving affected the Bus's driving during the Incident, and they may not testify that Defendants' actions during the Incident were intimidating or threatening. Otherwise, Plaintiffs have carried their burden in proving that more likely than not Dr. Blee and Dr. Simi are qualified to give their proposed testimony and that the testimony is relevant and reliable. *See* Fed. R. Evid. 702.  As for the remainder of Defendants' concerns about the proposed testimony, the Court finds that cross-examination, rather than exclusion, is the appropriate route for Defendants to challenge Dr. Blee and Dr. Simi's opinions. *See Pipitone*, 288 F.3d at 250.

For these reasons, **IT IS ORDERED** that Defendants' objections to the expert testimony of Dr. Kathleen Blee and Peter Simi, (Dkts. 297, 299, 300, 303, 307, 309, 310, 418, 420, 429, 430), are **OVERRULED IN PART AND SUSTAINED IN PART**. Dr. Blee and Dr. Simi's expert testimony may be admitted at trial, with the limitations noted in this order.

**SIGNED** on August 20, 2024.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE