IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WENDY DAVIS, DAVID GINS, and TIMOTHY HOLLOWAY, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:21-CV-565-RP |
| ELIAZAR CISNEROS, RANDI CEH, STEVE CEH, JOEYLYNN MESAROS, ROBERT MESAROS, and DOLORES PARK, | § § § § § | |
| Defendants. | § § | |

## ORDER

Before the Court is Defendant Eliazar Cisneros' ("Cisneros") Motion for Judgment on Partial Jury Findings or for a New Trial, (Dkt. 564), and his Supplement to his Motion, (Dkt. 566). Plaintiffs Wendy Davis, David Gins, and Timothy Holloway (collectively, "Plaintiffs") filed a response in opposition. (Dkt. 568). Cisneros did not file a reply. Having considered the parties' briefs, the record, and the relevant law, the Court finds that Cisneros' motion should be denied.

## I. BACKGROUND

This case arises out of an incident that occurred during the 2020 U.S. presidential election campaign period (hereinafter, the "Incident").[1] Plaintiffs Davis, Gins, and Holloway were, respectively, a surrogate, staffer, and contractor for the Biden-Harris Presidential Campaign. (Order, Dkt. 475, at 2). Plaintiffs alleged that while they were campaigning across central Texas in a Biden-Harris campaign bus (the "Bus") on October 30, 2020, they were chased, surrounded, harassed, and assaulted by a caravan of cars and trucks. Plaintiffs alleged that Defendants Cisneros, Joeylynn

---

[1] The facts of this case are more fully explained in the Court's Order on the parties' motions for summary judgment. (*See* Dkt. 475).

1

Mesaros, Robert Mesaros, Dolores Park, Steve Ceh, and Randi Ceh (collectively, "Defendants") worked together, and with other non-parties, to swarm the Bus as it drove on Interstate 35 ("I-35") between San Antonio and Austin, Texas, preventing Plaintiffs from exercising their rights to support and advocate for their candidates of choice and injuring them in the process. Plaintiffs alleged that for at least ninety minutes, the convoy of cars—otherwise known as the "Trump Train"—forced the Bus to slow down to a crawl on the highway, that vehicles came within inches of the Bus, boxing it in, and that one vehicle—driven by Cisneros—slammed into a Biden campaign staffer's vehicle that was following the Bus. Plaintiffs argued that these acts were intentionally organized to threaten, intimidate, and injure Plaintiffs on account of their support and advocacy for the Biden-Harris campaign. Defendants admitted that they participated in the "Trump Train" Incident on October 30, 2020, but denied that the "Trump Train" was intended to cause intimidation or threatening behavior. Defendants instead argued that they were engaging in a peaceful protest in support of their chosen candidate for President, Donald Trump. (*Id.* at 2–5).

Based on these allegations, Plaintiffs asserted three claims against Defendants. First, Plaintiffs alleged that Defendants violated the Support or Advocacy Clause of the Ku Klux Klan Act, 42 U.S.C. § 1985(3), which creates liability for those who engage in a conspiracy "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner" in favor of a presidential or congressional candidate for federal office. Plaintiffs also asserted two claims under Texas state tort law. They alleged that Defendants engaged in a civil conspiracy to commit assault. They also alleged a civil assault claim under two theories of liability. Plaintiffs alleged that Defendants Cisneros and Robert Mesaros engaged in civil assault directly—by intentionally or knowingly threatening Plaintiffs with imminent bodily harm. Plaintiffs also alleged that all Defendants aided and abetted others' actions during the Incident that threatened imminent bodily injury. (*Id.* at 6; Jury Instr., Dkt. 550, at 8–17).

A jury trial was held in this matter from September 9, 2024, through September 23, 2024. (Min. Entry, Dkt. 535; Min. Entry, Dkt. 561). On September 23, 2024, the jury returned a verdict finding Cisneros liable for engaging in a conspiracy in violation of 42 U.S.C. § 1985(3). The jury awarded Holloway $10,000 in compensatory damages and all Plaintiffs $30,000 in punitive damages. The jury did not find Cisneros liable for any of Plaintiffs' state law claims. They jury also found the other Defendants not liable on all claims. (Dkt. 557). After the jury verdict was received, counsel for Cisneros orally moved for judgment notwithstanding the verdict. The Court took the motion under advisement. (Min. Entry, Dkt. 561).

On September 25, 2024, the Court ordered Cisneros to file a written brief in support of his motion on or before October 6, 2024. (Dkt. 563). Cisneros filed his Motion for Judgment on Partial Jury Findings or for a New Trial on September 30, 2024. (Dkt. 564). He then filed a Supplement to his Motion on October 7, 2024. (Dkt. 566). Plaintiffs filed a response in opposition, (Dkt. 568), and Cisneros did not file a reply.

## II. LEGAL STANDARDS

### A. Rule 50(b) Motion for Judgment as a Matter of Law

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (quoting *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 437 (5th Cir. 2008) (per curiam) (cleaned up)). Under Rule 50(b) "[a] motion for judgment as a matter of law should be granted if there is no legally sufficient evidentiary basis for a reasonable jury to find for a party." *Id.* (cleaned up). At this stage, a court's "review of a jury's verdict is 'especially deferential.'" *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 675 (5th Cir. 2016) (quoting *SMI Owen Steel Co.*, 520 F.3d at 437). The Court "view[s] the entire record in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and 'leaving credibility

3

determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury.'" *Aetna Casualty & Surety Co. v. Pendleton Detectives of Mississippi, Inc.*, 182 F.3d 376, 378 (5th Cir. 1999) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir. 1994)). The Court may grant a motion for JMOL "[o]nly when the facts and reasonable inferences are such that a reasonable juror could not reach a contrary verdict." *Baltazor v. Holmes*, 162 F.3d 368, 373 (5th Cir. 1998). "If reasonable persons could differ in their interpretation of the evidence, the motion should be denied." *Id.*

### B. Rule 59(a) Motion for a New Trial

Courts may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Although Rule 59 does not specifically enumerate the grounds for a new trial, the Fifth Circuit has found that a new trial is appropriate where: (1) the verdict is against the weight of the evidence, (2) the amount of damages awarded is excessive, or (3) the trial was unfair or marred by prejudicial error. *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991). "A trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998). In order to succeed, the movant must show "an absolute absence of evidence to support the jury's verdict." *Seibert v. Jackson Cnty., Mississippi*, 851 F.3d 430, 439 (5th Cir. 2017).

### III. DISCUSSION

To start, the Court addresses a procedural matter: the timing of Cisneros' Supplement. The Court ordered Cisneros to file his written motion for judgment as a matter of law on or before October 6, 2024. (Dkt. 563). While his initial motion was filed by this deadline, his Supplement—filed on October 7, 2024—was not. (Dkt. 566). Cisneros has a history of late filings in this case. (*See*

Dkt. 448, at 1–5).[2] The Court has repeatedly warned counsel for Cisneros that it may disregard his untimely filings in the future.[3] Given that Cisneros has again disregarded a Court deadline, his Supplement is improperly filed, and the Court will strike it from the docket.

In his motion, Cisneros makes three arguments for why he is entitled to relief from the jury's verdict: (1) Plaintiffs failed to carry their evidentiary burden at trial, entitling him to relief under Rules 50 and 59; (2) the jury's findings are internally inconsistent, reflecting an error of law that must be reconciled by the Court; and (3) he is entitled to relief from the judgment under Federal Rules of Civil Procedure 60(a), (b)(4), or (b)(6).[4] The Court will address each argument in turn.

### A. Plaintiffs Presented Sufficient Evidence to Support the Jury's Verdict

Cisneros provides various arguments as to how Plaintiffs failed to present sufficient evidence to prove their claim under 42 U.S.C. § 1985(3).[5] To prove a claim under this statute, Plaintiffs had to prove the following elements: (1) the existence of a conspiracy of two or more persons; (2) the

---

[2] To name a few examples, Cisneros (1) filed his pretrial filings eight days past the deadline, (*see* Dkts. 441, 443); (2) failed to timely respond to Plaintiffs' Motion to Compel Cisneros to Produce His Mobile Phone and Documents Related to Potential Spoliation of Evidence, (Dkt. 109), and only responded after Plaintiffs filed a reply, (*see* Dkt. 115); and (3) failed to timely respond to Plaintiffs' Motion for Rule 37 Sanctions, (Dkt. 267), and asked for an extension to respond after the time for a response had passed and Plaintiffs had already filed a reply, (*see* Dkt. 214).

[3] At a hearing on Plaintiffs' motions for sanctions, United States Magistrate Judge Mark Lane noted that Cisneros failed to timely respond to Plaintiffs' Motion for Rule 37 Sanctions and cautioned: "I should have granted plaintiffs' motion as unopposed. And what I'm telegraphing to you is, I'm going to do that next time if there is a next time." (Hr'g Tr., Dkt. 425-1, at 6:9–16). Further, at the final pretrial conference, the Court had an extensive discussion with counsel about his failure to timely file his pretrial filings and his tendency to minimize the importance of Court deadlines. (Hr'g Tr., Dkt. 570, at 12:15–17:2). The Court warned counsel: "I need you to take seriously—all I'm asking is that you take seriously the deadlines of this court and not minimize, not excuse, and not deflect like you've been doing." (*Id.* at 16:17–20). The Court allowed Cisneros leave to file his untimely pretrial filings, in part, because "Mr. Canseco's clear that we'll need to continue to be diligent in meeting the deadlines" moving forward. (*Id.* at 16:25–17:2).

[4] Cisneros also requests relief under Federal Rule of Civil Procedure 53(b), which governs the appointment of a special master. Given that there is no need for a special master in this case, it is unclear why Cisneros has cited to this rule. Relief is denied under Rule 53(b).

[5] Cisneros also reasserts his previously made argument that the facts of this case cannot sustain a claim under 42 U.S.C. § 1985(3) and renews the arguments made in his Motion for Summary Judgment, (Dkt. 329). (Mot., Dkt. 564, at 2). For the reasons stated in the Court's Order on Defendants' motions for summary judgment, (Dkt. 475), the Court denies relief on these grounds.

conspiracy had an unlawful purpose—namely, preventing Plaintiffs' support or advocacy by force, intimidation, or threat; or injuring Plaintiffs because of their support or advocacy; (3) at least one person involved in the conspiracy took an overt act in furtherance of the conspiracy; and (4) as a result of the conspiracy, Plaintiffs were injured. (*See* Jury Instr., Dkt. 550).

### 1. Existence of, and Membership in, a Conspiracy

Cisneros first argues that there is no evidence that he agreed to commit an unlawful act. The Court disagrees. Plaintiffs provided sufficient evidence at trial by which the jury could conclude that Cisneros joined an unlawful conspiracy with the specific intent to interfere with Plaintiffs' right to support or advocate for their candidates of choice or injure them on account of their support and advocacy. The jury could reasonably infer that specific intent from Cisneros' statements and actions leading up to, on, and after the Incident on October 30, 2020.

At trial, the evidence showed that Cisneros and non-party Jason Peña-Ahuyon ("Peña-Ahuyon") first learned of the Bus' planned tour and campaign stops in Texas at least a few days before October 30, 2020, while Cisneros was at Peña-Ahuyon's home. (Pls.' Ex. 33; Trial Tr., Dkt. 568-1, at 10:7–11:17, 16:11–19). They hatched a plan that night to "welcome [the Bus] to Texas so to speak" by "getting a convoy and welcoming them that way." (Pls.' Ex. 33). To recruit participants, Cisneros and Peña-Ahuyon spread the word about the convoy, and part of their strategy for doing so was to post "Operation Block the Bus" on Facebook. (*Id.*; Trial Tr., Dkt. 568-1, at 19:19–20:4). Cisneros admitted that Peña-Ahuyon ultimately did post "#OperationBlocktheBus RN" on Facebook on October 30, 2020. (Pls.' Ex. 36; Trial Tr., Dkt. 568-2, at 39:13–16).

In his Motion, Cisneros places the blame for the "Block the Bus" plan solely on Peña-Ahuyon and asserts that he never stated that blocking the Bus was the plan. (Mot., Dkt. 564, at 2–3). Instead, he maintains that the only plan he had was to follow the Bus and stop where it stopped to demonstrate his support for President Trump. (*Id.*). However, the evidence above, viewed in the

6

light most favorable to Plaintiffs, shows that Cisneros and Peña-Ahuyon hatched the "Block the Bus" plan together and communicated leading up to and on the day of the Incident regarding their plan. Indeed, Cisneros himself admitted that he was a part of Operation Block the Bus with Peña-Ahuyon. (Trial Tr., Dkt. 568-2, at 38:16–39:4).

The evidence showed that as part of their plan, Cisneros and Peña-Ahuyon agreed that Cisneros would be responsible for recruiting participants from San Antonio and that Peña-Ahuyon would be responsible for recruiting participants from New Braunfels and San Marcos. (Pls.' Ex. 33). Cisneros and Peña-Ahuyon kept in touch regarding their plan in the days leading up to October 30. (Trial Tr., Dkt. 568-1, at 16:24–17:1). Cisneros' recruitment efforts included communicating with Edward Niño ("Niño"), the organizer of the Alamo City Trump Train—a group that had over 5,000 members at the time. (*Id.* at 6:23–25, 17:2–6; Trial Tr., Dkt. 568-3, at 3:20–4:4). Cisneros also communicated with many other "eager" people in the days leading up to October 30. (Pls.' Ex. 33; Trial Tr., Dkt. 568-1, at 16:11–23). Cisneros intentionally destroyed these text message communications with Niño, Peña-Ahuyon, and others from the days leading up to and on October 30, 2020. (*See* Jury Instr. No. 7, Dkt. 550 at 6; *see also* Dkts. 337, 389). The jury was instructed that they "may presume that Eliazar Cisneros deleted those text messages because they were unfavorable to his case and would have been used by Plaintiffs to establish his liability." (Jury Instr. No. 7, Dkt. 550 at 6). Peña-Ahuyon also refused to provide any additional details regarding their plan, invoking the Fifth Amendment at his deposition in response to questions regarding his communications with Cisneros, including whether he discussed with Cisneros how to stop the Biden Bus from campaigning, (Trial Tr., Dkt. 568-4, at 6:25–7:3), whether he agreed with Cisneros that the purpose of the Trump train was to stop the Bus from campaigning as intended, (*id.* at 7:12–15), and whether Cisneros shared the goal of preventing the Bus from campaigning in their community, (*id.* at 10:6–17).

7

On the day of the Incident, the evidence showed that Cisneros first served as the lookout for the Bus, stationing himself south of San Antonio on the northbound side of I-35 for two to three hours. (Pls.' Ex. 33). While on the side of the highway, Cisneros communicated via text message with Peña-Ahuyon and Niño. (Trial Tr., Dkt. 568-1, at 54:21–24, 55:10–15). Cisneros eventually left the side of the highway and continued to communicate via text message with Peña-Ahuyon and Niño regarding the Bus' location, (*id.* at 57:9–58:15), before ultimately receiving a message from Niño that the Bus was at the AT&T Center in San Antonio, (Trial Tr., Dkt. 568-3, at 3:11–19). Cisneros then drove to the AT&T Center, positioned his vehicle to have a clear view of the Bus, and started a Facebook livestream to tell people to get ready because the Bus was coming. (Pls.' Ex. 37; Trial Tr., Dkt. 568-1, at 64:16–65:7). Specifically, he told viewers in New Braunfels, whom he knew were waiting for the Bus from his communications with Peña-Ahuyon that day, to get ready to join the convoy. (Pls.' Ex. 37; Trial Tr., Dkt. 568-1, at 64:24−65:7). Cisneros then waited for the Bus to leave and joined the convoy of twenty to thirty cars that began to surround it. (Trial Tr., Dkt. 568-1, at 67:18–68:7). Approximately 75 additional cars joined Cisneros in the convoy in New Braunfels. (*Id.* at 68:20–69:6).

The jury could reasonably infer from the evidence that during the Incident, Cisneros witnessed the convoy's dangerous driving, drove dangerously himself, and helped the other drivers to surround, forcibly slow, and threaten the Bus' passengers. Cisneros admitted at trial that there were vehicles constantly in front of the Bus. (*Id.* at 21:2–9). Cisneros also acknowledged that when the convoy was braking in front of the Bus, the Bus was braking as well, and that it would not have been hard to stop the Bus. (*Id.* at 19:7–18). Plaintiffs' expert in traffic and highway safety, Dr. Theron Bowman, testified that the vehicles' positioning in front of the Bus created a dangerous situation that could have had "catastrophic consequences." (Trial Tr., Dkt. 568-5, at 3:8–4:16).

8

While it was surrounded, the Bus and a vehicle driven by an accompanying campaign staffer were forced to drive defensively, switching lanes several times and even straddling two lanes at once to ensure sufficient space to maneuver. (*See, e.g.*, Pls.' Ex. 2, at 7:20–7:34, 18:20–19:00). The video evidence showed that at one point on the highway, Cisneros sped up to block the staffer's vehicle from remaining behind the Bus and to prevent the staffer from switching lanes. (Pls.' Ex. 39). Cisneros' truck ultimately collided with the staffer's vehicle. (Pls.' Ex. 394). Cisneros later described the collision as "slamming that fucker" and "welcom[ing] him properly to Texas." (Pls.' Ex. 34).

In his motion, Cisneros claims that "there is no evidence that [he] was driving dangerously or in violation of any traffic laws," (Mot., Dkt. 564 at 4), but Dr. Bowman testified otherwise, stating that in his opinion, Cisneros caused the collision with the white staffer vehicle, (Trial Tr., Dkt. 568-5, at 5:11–20; *see also* Pls.' Ex. 394). Dr. Bowman also testified that Cisneros' actions closely resembled a pit maneuver, which risked spinning the staffer's car out of control, to potentially collide into the Bus or other cars on the highway. (*Id.* at 7:2–16).

Cisneros asserts that his only physical participation in the October 30, 2020 Trump Train was following the Bus. (Mot., Dkt. 564 at 3). But the evidence showed that Cisneros drove in front of the Bus as well. (*See, e.g.*, Pls.' Ex. 52). Cisneros also asserts that "[a]fter the accident [with the staffer], there is no evidence that [he] followed the bus," that "he stayed far from the bus after the accident on the rest of the route into Austin," and that the last time Cisneros is seen in any of the videos is in Plaintiffs' Exhibit 2 from 23:40–23:49. (Mot., Dkt. 564 at 3–4). However, the evidence showed otherwise. For example, Cisneros can later be seen waiting on the side of the highway and accelerating as the Bus passes. (Pls.' Ex. 2, at 36:29–36:31). Additionally, Cisneros testified that he was so close to the Bus that he was unable to react and follow the Bus when it made its abrupt evasive maneuver off I-35 and into Austin. (Trial Tr., Dkt. 568-2, at 21:19–22:4).

9

In summary, Plaintiffs presented evidence demonstrating that Cisneros worked with Peña-Ahuyon to plan the convoy that followed the Bus on October 30, 2020, and worked with Niño and others to promote the event. The evidence showed how on the day of the Incident, Cisneros communicated with others to track the Bus' progress and help others find it. The jury also watched video evidence of the Incident, heard Dr. Bowman's testimony about the dangerousness of the convoy's actions, and heard Cisneros' testimony about how he was aware of how the convoy's actions affected the Bus' movements. Last, the jury repeatedly watched evidence of the collision between the campaign staffer's car and Cisneros' car. Based on their own perceptions of this evidence and Dr. Bowman's testimony about the collision, the jury could reasonably determine that Cisneros drove dangerously during the Incident and caused the accident with the staffer's car. From this record, the jury had sufficient evidence to conclude that Cisneros was a member of a conspiracy that planned and participated in the "Trump Train" and that in joining this conspiracy, he agreed to commit an unlawful act.

2. Unlawful Purpose of the Conspiracy

Cisneros next argues that there is no evidence that he used force, intimidation, or threat, or that he injured any citizen in their person or property on account of Plaintiffs' support or advocacy. (Mot., Dkt. 564, at 3). However, Cisneros misstates the law. Plaintiffs' claim only required that they prove Cisneros *conspired* to accomplish those goals. *See* 42 U.S.C. § 1985(3). In any event, the evidence above, construed in the light most favorable to Plaintiffs, is sufficient to show that Cisneros carried out his plan to forcibly block the Bus, thereby intimidating and emotionally injuring those on board. Further, Plaintiffs presented other evidence of Cisneros' actions before and after the Incident, which sufficiently demonstrate Cisneros' specific intent to commit an unlawful act by planning and participating in the convoy. Though Cisneros now reasserts objections to many of these pieces of evidence, his objections remain unpersuasive.

For example, Cisneros takes issue with the admission of evidence showing that Cisneros "protested BLM [Black Lives Matter] in San Antonio," (Mot., Dkt. 564 at 3), by driving his truck towards a group of marchers to—in his own words—"instill a little bit of fear" in them, and the admission of evidence showing Cisneros patrolling San Antonio with a firearm, purportedly to protect the city from Antifa, (Pls.' Ex. 31; Pls.' Ex. 30; Trial Tr., Dkt. 568-1, at 34:25–35:13). Cisneros argues that this evidence was irrelevant to Plaintiffs' case and was unfairly prejudicial. (Mot., Dkt. 564, at 3). However, the evidence was relevant to show Cisneros' motive, intent, and absence of mistake on October 30, 2020. The evidence contradicted Cisneros' denial that he had any intent to be violent when he planned and participated in the convoy. The fact that these incidents took place months before October 30, 2020, does not negate their relevance—especially because other evidence showed that Cisneros continued to harbor the same hostilities and fears after October 30, 2020, towards BLM and other groups, including Democrats, that he considered anti-American and dangerous. (*See* Pls.' Ex. 28; Trial Tr., Dkt. 568-1, at 48:17–21, 52:8–14; Trial Tr., Dkt. 568-2, at 37:25–38:2).

The jury also heard that Cisneros confessed in a private Facebook message that he was "[s]mart enough to get the entire Biden Harris campaign canceled in Texas." (Pls.' Ex. 35). This statement in addition to evidence of Cisneros' state of mind regarding Democrats and related groups before and after the Incident and evidence of Cisneros planning and executing the "Trump Train" convoy demonstrate sufficient evidence of his specific intent. The jury could reasonably conclude that Cisneros participated in the conspiracy with the purpose of either preventing Plaintiffs by force, intimidation, or threat from giving their support or advocacy in favor of the Biden campaign or injuring them for their support or advocacy.

### 3. Holloway's Injuries as a Result of the Conspiracy

Cisneros finally argues that there is not any evidence that Holloway, the only plaintiff to be awarded compensatory damages, was injured as a result of the conspiracy. His argument appears to rest on his assertion that there is no evidence Cisneros knew who was on the Bus during the Incident, no one on the Bus knew Cisneros or what he looked like before he was named in this lawsuit, and there is no evidence that he was driving dangerously or in violation of any traffic laws. (*See* Mot., Dkt. 564, at 3, 4). However, these assertions are irrelevant to Cisneros' liability or the issue of damages. Plaintiffs were not required to prove that Cisneros knew the identities of the people on the Bus or that Plaintiffs knew Cisneros. Nor were Plaintiffs required to prove that Cisneros' driving was the direct cause of Holloway's injuries, as conspirators are responsible for all injuries that were a foreseeable result of the conspiracy. *United States v. Matias*, 465 F.3d 169, 173 (5th Cir. 2006); *see also Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983) ("As to the extent of liability, once the conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. A conspirator need not participate actively in or benefit from the wrongful action in order to be found liable.").

Instead, all Plaintiffs were required to establish was that Holloway suffered an injury—in this case emotional distress—as a result of the conspiracy. *See Hobson v. Wilson*, 737 F.2d 1, 60–62 (D.C. Cir. 1984) (holding that Section 1985(3) permits a person to recover for injury to "interests protected by common law tort rules," including "emotional distress"), *overruled in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993); *see also Haddle v. Garrison*, 525 U.S. 121, 126 (1998) (recognizing that plaintiff stated a claim for relief under Section 1985 where harm alleged "has long been a compensable injury under tort law"). In this context, courts have recognized compensable emotional distress can take the form of anxiety, stress, fear, depression, headaches, excessive fatigue, and sleeplessness. *See, e.g.*, *Hobson*, 737 F.2d at 60–62

("[T]he court or jury may consider, as elements of compensable injury for emotional distress, humiliation and personal indignity, emotional pain, embarrassment, fear, anxiety, and anguish."); *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996) (testimony regarding "depression, weight loss, intestinal troubles," "marital problems," and "sleeplessness" was sufficient to establish injury in form of "emotional anguish" for purposes of § 1983 claim); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718 (5th Cir. 1998) (explaining that for purposes of establishing injury for recovery of compensatory damages under § 1983, "[e]motional harm may manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self-esteem, excessive fatigue, or a nervous breakdown. Physical manifestations of emotional harm may consist of ulcers, gastrointestinal disorders, hair loss, or headaches." (citation omitted)). Evidence of emotional distress need not be corroborated by doctors, psychologists, or other witnesses, so long as plaintiffs support their claims with competent evidence—which can include a plaintiff's own testimony—showing the nature, extent, and duration of the harm. *See Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 594 (Tex. App.— Houston [14th Dist.] 2015, pet. denied) ("Direct evidence [of mental anguish] can take the form of the claimant's own testimony or that of a third party or expert witness.").

At trial, Holloway gave hours of testimony in which he described in detail the impact the events of October 30, 2020, had on his life. Holloway testified about the anxiety he felt as he was on the road, "surrounded with cars [but] not knowing what they there for," (Trial Tr., Dkt. 568-6, at 27:12–16), and the fear that "if [they are] bold enough to do this in a broad daylight, what else would they do?," (*id.* at 27:22–24). He testified about how this anxiety manifested physically as sweaty palms, headache, and stomach upset. (*Id.* at 29:1–4). He also testified about how he had to stay calm for his passengers, because as "captain of the ship" their safety was his responsibility, even though on the inside he felt "under attack." (*Id.* at 28:2–8, 29:4–5). Holloway testified that in the immediate

13

aftermath of the Incident, he felt "drained" by his experience but "grateful [he] was alive." (*Id.* at 41:23–24, 42:9–12). And for approximately three or four months afterward, he could not shake his anxiety, which caused nausea, loss of appetite, sweaty palms, and headaches. (*Id.* at 42:9–20, 44:7–19). Thinking about the Incident caused Holloway sleepless nights, and although this got better over time, the sleeplessness returned as he got closer to trial. (*Id.* at 42:25–44:6).

Holloway also testified that because of the Incident, he turned down professional opportunities driving entertainment buses. (*Id.* at 46:17–25). Instead, he dedicated himself to his trucking business, which was more work and less pay, but which allowed him anonymity and made him feel safer. (*Id.* at 45:16–25, 46:8–16). And although he has since returned to driving buses, Holloway testified that he would never again take a job for a campaign driving a wrapped bus, for fear of being made a target once again. (*Id.* at 47:19–48:13).

In summary, Holloway testified extensively about the nature, extent, and duration of the harm he suffered as a result of the conspiracy. Overall, Holloway's testimony is sufficient to support the jury's finding of injury in this case. Accordingly, Plaintiffs met their burden in presenting evidence showing that Cisneros conspired to violate 42 U.S.C. § 1985(3). Cisneros' request for relief under Rule 50(b) for judgment as a matter of law and Rule 59(a) for a new trial on sufficiency of the evidence is thus denied.

### B. The Jury's Findings are Not Inconsistent

Cisneros next argues that the jury's findings are "in conflict," reflecting an error of law that the Court must "reconcile" by vacating the jury's verdict as to Cisneros' liability on the 42 U.S.C. 1985(3) claim. (Mot., Dkt. 564, at 6–7). Cisneros argues that there are two inconsistencies that require the Court's intervention. The Court addresses each in turn.

First, Cisneros argues that to find him liable for conspiracy in violation of 42 U.S.C. § 1985(3), the jury needed to also find at least one other Defendant liable. (*See* Mot., Dkt. 564, at 2).

This argument is disproven by the plain language of the statute, which explicitly contemplates liability against a single defendant, stating that injured plaintiffs "have an action for the recovery of damages . . . against *any one* or more of the conspirators." 42 U.S.C. § 1985(3) (emphasis added). As such, Plaintiffs were not required to sue, let alone prove liability for, more than one conspirator. Instead, under the statute, Plaintiffs were required to prove at trial that Cisneros conspired with *someone*. *See id.* (stating that a conspiracy requires "two or more persons"). However, that does not mean Plaintiffs were required to prove Cisneros conspired with the other Defendants. *See, e.g.*, *United States v. Albert*, 675 F.2d 712, 713–14 (5th Cir. 1982) (upholding a criminal conspiracy conviction even "where named coconspirators are acquitted . . . as long as the indictment asserts that such other persons exist and the evidence supports their existence (and complicity)" (cleaned up)). As noted above, Plaintiffs presented sufficient evidence showing Cisneros conspired with Peña-Ahuyon, Niño, and numerous other drivers on the road to carry out Operation Block the Bus. Accordingly, the jury could reasonably find that Cisneros is liable for conspiracy in violation of 42 U.S.C. § 1985(3) even if it did not find the other named Defendants liable.

Second, Cisneros argues that if the jury did not find sufficient evidence to support liability for Plaintiffs' state law claims—civil conspiracy and assault—there could not have been sufficient evidence to support a verdict under 42 U.S.C. §1985(3). (*See* Mot., Dkt. 564 at 4). This argument is flawed because it ignores the different requirements of the two conspiracy laws at issue.

Texas civil conspiracy requires plaintiffs alleging conspiracy to show, among other things, that a member of the conspiracy engaged in "one or more *unlawful*, overt acts." *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141 (Tex. 2019) (emphasis added). In practice, this element requires plaintiffs to prove a statutory violation or underlying intentional tort as a necessary predicate—in this case, assault. (*See* Jury Instr. No. 18, Dkt. 550 at 16); *see also* Texas Civil Pattern Jury Charge 109.1 cmt. ("A defendant's liability for conspiracy is based on participation in the

15

statutory violation or underlying tort (other than negligence) that would have been actionable against at least one of the conspirators individually.") (citing *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). Because of this requirement, the jury could not have found Cisneros liable under Plaintiffs' civil conspiracy claim, unless the jury also found that some member of the conspiracy committed assault—which they did not.

On the other hand, liability under 42 U.S.C. § 1985(3) does not have the same requirement. Under the federal conspiracy law, Plaintiffs were only required to prove a member of the conspiracy took an overt act—even a lawful one—in furtherance of the conspiracy. *See* Jury Instr. No. 16, Dkt. 550 at 13–14); *see also Williams v. United States*, 46 F.2d 731, 732 (5th Cir. 1931) ("An overt act in furtherance of a conspiracy, sufficient to put it in motion, may be an act otherwise entirely innocent."); *United States v. Marquez-Ramos*, No. EP-05-CR-755-DB, 2006 WL 4741911 (W.D. Tex. Sept. 18, 2006) (providing in jury instructions that "[a]n 'overt act' is any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy."); *United States v. Gonzalez*, No. 10-20075-CR-Middlebrooks, 2010 WL 11211262 (E.D. Tex. June 16, 2010) (same).

Plaintiffs still needed to prove—and did prove, as noted above—that the agreement between Cisneros and his fellow conspirators had an unlawful purpose: either preventing Plaintiffs' support or advocacy by force, intimidation, or threat; or injuring Plaintiffs because of their support or advocacy. 42 U.S.C. § 1985(3). But this unlawful purpose need not have taken the form of an assault, defined under Texas state law as "intentionally or knowingly threaten[ing] another with imminent bodily injury." *See* Texas Civil Pattern Jury Charge 6.6; *see also* Tex. Penal Code § 22.01(a)(2) ("A person commits an [assault] offense if the person: . . . intentionally or knowingly threatens another with imminent bodily injury[.]"); *Sanchez v. Striever*, 614 S.W.3d 233, 239 (Tex. App.—Houston [14th Dist.] 2020, no pet.) ("The elements of a civil assault . . . mirror those of a criminal assault."). Based

on the evidence presented, the jury was reasonable in finding that by surrounding the Bus and slowing it to a crawl Cisneros and his fellow conspirators 1) intended to use force to prevent Plaintiffs from engaging in support or advocacy; 2) intended to intimidate Plaintiffs to prevent them from engaging in support or advocacy; and/or 3) intended to cause emotional distress on account of Plaintiffs' support or advocacy; and still find that the conspirators did not intend these actions as a threat of imminent bodily injury. Because the required purpose under 42 U.S.C. 1985(3) encompasses a broader range of actions than is contemplated by Texas' civil assault law, there is no inconsistency in finding liability under the former but not the latter.

The jury's verdict was not inconsistent in finding only Cisneros, and no other Defendant, liable for conspiring in violation of 42 U.S.C. 1985(3). In addition, their decision to only find liability on Plaintiffs' federal conspiracy claim, but not their state law conspiracy claim, was reasonable in light of their verdict that no Defendant was liable for civil assault. As such, there is no reason to disturb the jury's verdict in this case. Cisneros' request for relief under Rule 50(b) for judgment as a matter of law and Rule 59(a) for a new trial on sufficiency of the evidence is also denied on this ground.

### C. Cisneros is Not Entitled to Relief Under Rule 60

Last, in a cursory fashion, Cisneros cites to Rules 60(a), 60(b)(4), and 60(b)(6) in his motion, but he makes no clear arguments as to why he should be entitled to relief from judgment under these rules. (Mot., Dkt. 564, at 1). Indeed, none of these rules can provide the relief Cisneros seeks.

Federal Rule of Civil Procedure 60(a) is a vehicle for courts to address clerical mistakes, oversights and omissions. Fed. R. Civ. P. 60(a). "To be correctable under Rule 60(a), the mistake must not be one of judgment or even of misidentification, but merely of recitation, of the sort that a clerk or amanuensis might commit, mechanical in nature. . . . [E]rrors that affect substantial rights of parties are outside the scope of Rule 60(a)." *In re Galiardi*, 745 F.2d 335, 337 (5th Cir. 1984) (cleaned

17

up). Quintessential examples of "clerical errors" addressable under Rule 60(a) are typographical or computational errors. *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 194 (5th Cir. 2011) ("Clerical mistakes, inaccuracies of transcription, inadvertent omissions, and errors in mathematical calculation are within Rule 60(a)'s scope, missteps involving substantive legal reasoning are not."). In his motion, Cisneros identifies no clerical errors, oversights, or omissions to be corrected. Instead, his issue with the jury's verdict is substantive in nature. Accordingly, he is not entitled to relief under Rule 60(a).

Rule 60(b)(4) allows courts to provide relief from a judgment if "a judgment is void." Fed. R. Civ. P. 60(b)(4). A judgment is void only if it meets one of two criteria: (1) the court that rendered it lacked jurisdiction over the subject matter or the parties, or (2) the court "acted in a manner inconsistent with due process of law." *Carter v. Fenner*, 136 F.3d 1000, 1006 (5th Cir. 1998) (cleaned up). Cisneros makes no argument to establish that this Court lacked jurisdiction over the case or the parties or that it acted in a manner inconsistent with due process. Accordingly, he is not entitled to relief under Rule 60(b)(4).

Last, Rule 60(b)(6) allows for relief for "any other reason." Fed. R. Civ. P. 60(b)(6). Rule 60(b)(6)'s "any other reason" clause is a "grand reservoir of equitable power" to do justice in a case when relief is not warranted by the other five enumerated grounds, but its availability is limited: relief will be granted only if "extraordinary circumstances" are present. *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995). Cisneros has made no argument for how this provision applies to this case, and the Court finds that no such extraordinary circumstances are present here. Accordingly, Cisneros is not entitled to relief under Rule 60(b)(6).

## IV. CONCLUSION

Reasonable jurors could—and did—conclude that Plaintiffs established Cisneros conspired with others to use force, intimidation or threat, to prevent Plaintiffs from engaging in support or

advocacy, or to injure Plaintiffs as a result of their advocacy, and that Holloway was injured as a result of this conspiracy. At trial, there was sufficient evidence to support the verdict, and there was no inconsistency in the jury's findings. Furthermore, Cisneros has identified no other reason that he is entitled to relief from the jury's verdict. Accordingly, the Court must deny Cisneros' motion for judgment as a matter of law or for a new trial and let the jury's verdict stand.

For these reasons, **IT IS ORDERED** that Cisneros' Supplement to His Motion for Judgment on Partial Jury Findings or for a New Trial, (Dkt. 566), is **STRUCK** from the docket.

**IT IS FURTHER ORDERED** that Cisneros' Motion for Judgment on Partial Jury Findings or for a New Trial, (Dkt. 564), is **DENIED**.

**SIGNED** on August 1, 2025.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE