IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| WENDY DAVIS *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> ELIAZAR CISNEROS *et al.*, <br><br> *Defendants.* | Case No. 1:21-CV-565-RP |

## CEH DEFENDANT'S MOTION FOR ATTORNEY'S FEES AND COSTS PURSUANT TO 42 U.S.C. § 1988

Steve and Randi Ceh are ordinary, working-class Americans, who had the temerity to get involved in their community—torn apart and isolated by COVID-era lockdowns—to rally support for President Donald J. Trump in the upcoming 2020 election. Never could they have imagined—nor should they have—that organizing family-friendly and entirely peaceful political rallies would subject their family to a litigation nightmare, unleashed upon them by a millionaire Democrat politician and her army of partisan "public interest" and Big Law attorneys and investigators, bent on portraying Trump supporters as racists and Klansmen. It is impossible to overstate the cynicism and the malice involved in a politician like Wendy Davis bringing this case against the Cehs and pursuing it with such virulence.

Not only does the record amply demonstrate that this case was frivolous, unreasonable, and without foundation—the current, judicially-created standard of review—but also that prevailing defendants like the Cehs—individuals, targeted for

1

expressing their political beliefs as opposed to state actors—should not be held to such a heightened standard which is not contemplated by the text or legislative history of Section 1988.

Nothing can fully repair the damages wrought by Wendy Davis and her compatriots to the Ceh family. Because of this litigation and Plaintiffs' counsel's venomous portrayal of the Defendants in the media, the Cehs and their children have endured accusations of racism, and a constant barrage of online harassment and abuse. They fought for their livelihoods and their reputations, not knowing if or when the madness would end, whether they would lose their jobs, and whether they would be hit with a debilitating judgment. And while an award of attorneys' fees, as authorized by Section 1988, will not repair the damage done, it will at least serve as a deterrent against future abuse of civil rights statutes that were designed to be a shield against racially motivated deprivations of rights, not a weapon to bludgeon political opponents.

## BACKGROUND

A jury trial in this matter was held from September 9, 2024, through September 23, 2024. Dkt. No. 591. On September 23, 2024, the jury returned a verdict of not liable on all claims as to Defendants Randi Ceh and Steve Ceh, as well as fellow Defendants Joeylynn Mesaros, Robert Mesaros, and Dolores Park, entirely vindicating their exercise of free speech in demonstrating support for President Donald J. Trump. *Id.* This case concerned three claims asserted by Plaintiffs Wendy Davis, David Gins, and Timothy Holloway. *Id.* They alleged that Defendants violated

42 U.S.C. § 1985(3)—repeatedly and deliberately referred to by Plaintiffs' counsel using the outdated and inflammatory title, "Ku Klux Klan Act"—and committed civil conspiracy and civil assault under Texas law. *See* Am. Compl. There was zero evidence to support these claims.

The undisputed evidence amounted to the fact that the Cehs organized a weekly, family-friendly, "Trump Train" in their community of New Braunfels, organized through a Facebook page, where they would gather at a parking lot, and then participate in a "flag run" through town, flying Trump flags from their vehicles. It was undisputed that their New Braunfels Trump Train gatherings respected the law, actively discouraged divisive messaging and vulgarity, gave back to the community, and accommodated those with whom it disagreed. There was zero evidence to suggest that these gatherings were violent or had any nefarious purpose. This was entirely protected speech and political activity under the First Amendment.

The undisputed evidence further showed that on October 30, 2020, the Cehs encouraged their group to do just what they had done previously: peacefully demonstrate with a flag run. Randi Ceh posted publicly available information she had heard about a Biden campaign bus passing through New Braunfels on their Trump Train Facebook page. She did so to inform their group in case any of them wanted to show support for President Trump by following the bus on I-35 through New Braunfels with their Trump flags flying. Again, this was protected speech, and there was zero evidence to suggest that Ms. Ceh had any nefarious intention or even any knowledge of the bus's destination or plans. The Cehs did not even participate in

this flag run, with Randi Ceh only able to film it briefly as she passed the bus on her way home from work.

The remaining "evidence" amounted to the Ceh's public expressions of support for the Trump Train, and innuendo about their conservative political and religious views. Once again, all of this is absolutely protected speech under the First Amendment, and none of it suggested any conspiracy or pre-meditated plan to deprive anyone of their civil rights, much less on the grounds of racial animus.

## ARGUMENT

### I.     The Cehs should recover attorney's fees because this action was frivolous and groundless.

The Cehs should recover fees under 42 U.S.C. § 1988 because Plaintiffs lawsuit was vexatious, politically motivated, and could not have possibly established a prima facie case. Plaintiffs failed to plead an essential element of the claim and failed to allege or present facts that provided grounds for relief to be granted. Therefore, the case should have been dismissed at the 12(b)(6) stage. That standard requires dismissal if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court requires this rule to be read in concert with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). It also must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Failure to plead an essential element of a claim violates this rule and mandates dismissal.

4

Section 1988 provides that "[i]n any action or proceeding to enforce [42 U.S.C. § 1985] the court, in its discretion, may allow the prevailing party, *other than the United States*, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b) (emphasis added). When the prevailing party is a defendant, the Supreme Court has ruled that fees are only available when the plaintiff's claim is "frivolous, unreasonable, or groundless," or when "the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422 (1978). The Fifth Circuit analyzes three factors in making this determination: "(1) whether plaintiff established a prima facie case; (2) whether the defendant offered to settle, and (3) whether the district court dismissed the case or held a full-blown trial." *United States v. Mississippi*, 921 F.2d 604, 609 (5th Cir.1991). The purpose of this standard is "to protect defendants from burdensome litigation having no legal or factual basis." *Fox v. Vice*, 563 U.S. 826, 833 (2011) (quoting *Christiansburg Garment Co.*, 434 U.S. at 420).

## II. Plaintiffs failed to allege the Cehs acted with racial animus as required under § 1985(3) in the Fifth Circuit, thereby failing to establish a prima facie case.

The Cehs should have never seen the inside of a courtroom. Plaintiffs failed to establish a prima facie case, and as such the litigation should have never proceeded to discovery, much less trial. Plaintiffs alleged that the Cehs violated the "KKK Act." 42 U.S.C. § 1985(3); Am. Compl. at ¶¶ 146–51. However, they failed to plead an essential element to the claim, namely, that the Cehs' alleged conspiracy was predicated by race-based animus. Nor did they plead any facts that show animus

towards any class at all, much less a racial class. As evidenced by Supreme Court and Fifth Circuit precedent, as well as the Fifth Circuit's interlocutory order, Plaintiffs did not properly plead this action and persisted well after being placed on notice of that inescapable conclusion.

In *Griffin v. Breckenridge*, the Supreme Court ruled that Section 1985(3) provides a remedy for conspiracies to interfere with civil rights when it is motivated by invidious discriminatory animus. *See Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971). To prove a claim under this section, a plaintiff must allege four elements:

> (1) a conspiracy; (2) *for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws*; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Broth. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828–29 (1983) (emphasis added). Therefore, to state a claim, it is a prerequisite that a plaintiff alleges a conspiracy to deprive individuals of their rights *because of* a class-based animus.

Neither the Supreme Court nor the Fifth Circuit have expanded this "class-based" animus to mean anything other than "racial animus." *See Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ("Whatever may be the precise meaning of a "class" for purposes of Griffin's speculative extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors"); *see also Cantu v. Moody*, 933 F.3d 414, 419 (5th Cir. 2019) ("the only conspiracies actionable

under section 1985(3) are those motivated by racial animus."); *see also Bryan v. City of Madison, Miss.*, 213 F.3d 267, 276 (5th Cir. 2000) ("In this circuit, we require an allegation of a race-based conspiracy.") (citing *Newberry v. East Texas State University*, 161 F.3d 276, 281 n.2 (5th Cir. 1998)).

Plaintiffs did not allege any facts connecting the Cehs to any sort of conspiracy, much less one motivated by class-based animus, racial or otherwise. Plaintiffs made only conclusory claims of "conspiracy" to "ambush" and "terrorize" the occupants of a Joe Biden campaign tour bus. *E.g.*, Am. Compl. ¶¶ 6, 20–21, 59, 66, 81, 148–50. The only non-conclusory facts alleged about the Cehs were that they organized weekly "Trump Train" rallies, they operated a community Trump Train facebook page, they posted information on their Trump Train facebook page about a Biden campaign bus passing through their town, and they publicly expressed their support for President Trump and opposition to Biden. Am. Compl. ¶¶ 20–21, 33–35, 37–40, 42, 59, 70, 81, 132–33. None of these allegations has a *thing* to do with racial animus—and yet, Plaintiffs' counsel insisted upon referring to 42 U.S.C. § 1985(3) as the "Ku Klux Klan Act," both inside and outside of court, repeating *ad nauseum* that the Cehs had violated the "KKK Act," and even depicting the Cehs on social media as Klansmen with white hoods. Exhibit 1. This was done to generate headlines, to suggest without evidence that the Cehs and other defendants were racists, and to prejudice the jury against the Cehs.

The only allegations that connected the Cehs to any kind of conspiracy were naked conclusions. None of the facts alleged or uncovered in discovery showed the

Cehs communicating directly with any other Defendants to do anything, much less harass or intimidate based on race. Not a single statement attributed to Steve or Randi Ceh represented a call to violence or to violate the law. There is no allegation that Steve or Randi Ceh drove recklessly, or hit the Biden Bus, or encouraged anyone else to do so. Rather, all the narrative suggests is that the Cehs shared public information for the purposes of protesting and shared their political opinions.

None of this could possibly suffice to meet the pleading standards that are necessary to survive a 12(b)(6) motion, much less sustain a verdict of liability, which is why the Cehs were ultimately vindicated. This type of conspiracy requires an agreement to act unlawfully because of race, and the Plaintiffs could not even properly allege an agreement to act unlawfully, much less an agreement with racial animus in mind. When the lack of a crucial element of the claim is combined with the lack of any facts that support even a single element, it is clear this case fulfills the purpose of the *Christiansburg* test. The separate standard, meant to reflect the "quite different equitable considerations" for prevailing defendants, focuses on protecting them "from burdensome litigation having no legal or factual basis." *Fox*, 563 U.S. at 833 (citing *Christiansburg Garment Co.*, 434 U.S. at 419–20). Without any factual or legal basis for recovery, it is wholly unreasonable to drag defendants of limited means through years of protracted litigation. Put simply, the Cehs are the exact type of defendants that the Christiansburg test is meant to protect.

Furthermore, a panel from the Fifth Circuit has already signaled that it agrees with the Cehs interpretation of this issue in an order denying a Writ of Mandamus.

"As its name suggests, Congress passed the Klan Act to address the *racially motivated*'murders, whippings, and beatings committed by rogues in white sheets in the postbellum South.'" *In re Mesaros*, No. 23-50593, at *4 (5th Cir. 2023) (emphasis added) (order denying Writ of Mandamus) (citing *Gill v. Farm Bureau Life Ins. Co. of Missouri*, 906 F.2d 1265, 1269 (8th Cir. 1990)). It further highlighted the absurdity of the Plaintiffs' application of this statute by stating that "Respondents invocation of the Support-or-Advocacy Clause is unprecedented in the statute's 152-year history." *Id.* at *6. "And what little precedent exists cuts squarely against respondents." *Id.*

That panel expressed further confusion at this case and the use of Section 1985(3) when it concluded that: "it is unclear how respondents' theory comports with the text of the Support-or-Advocacy clause." *Id.* at *7. Pulling no punches, the panel continued with "[t]here are a myriad of reasons for preferring petitioners' reading of the statutory text—not the least of which is that is comports with judicial authorities like *Bray* and *Carpenters*, which interpret the clause immediately preceding the Support-or-Advocacy Clause in §1985(3)." *Id.* at *8.

Finally, the panel did not only address the meaning of 1985(3). It opined on the sufficiency of Plaintiffs' allegations by noting that "respondents offer no allegation that petitioners *conspired* to side-swipe anyone," further highlighting that the Plaintiffs' allegations were just legal conclusions couched as facts. *Id.* at *7 fn. 2. Eventually, the panel ruled that it would not grant a Writ of Mandamus because of the extraordinary nature of that remedy. However, it did conclude that one of the

main reasons for the denial was that it was "confident that the district court will reach the correct certification decision if given another opportunity." *Id.* at *10.

Despite this forceful order from the Fifth Circuit and the overwhelming amount of precedent in the Cehs favor, this Court took a different path. This case was not eventually dismissed, and the Plaintiffs prevailed past subsequent dispositive motions to trial despite Plaintiffs' "invocation of the Support-or-Advocacy Clause [being] unprecedented in the statute's 152-year history." *Id.* at *6. Put plainly, there is not a single case that supported Plaintiffs ability to continue its vexatious lawsuit, and therefore, Plaintiffs failed to establish a prima facie case. As such, there should have been no trial and the usual test of frivolity set forth in *United States v. Mississippi* cuts plainly in the Cehs' favor in this extraordinary circumstance.

Given that it is a prerequisite that a plaintiff alleges a conspiracy to deprive individuals of their rights *because of* a class-based animus, the Plaintiffs could not have possibly established a prima facie case against the Cehs. When a Plaintiff cannot establish a prima facie case, the case should not proceed to trial. These well-connected and well-funded Plaintiffs dragged ordinary Americans through years of unnecessary litigation for daring to demonstrate support for President Trump, chilling theirs and all other Trump supporters' right to free speech. This is quintessentially frivolous and vexatious litigation, and Plaintiffs should be required to reimburse reasonable attorneys' fees.

### III.    The usual test to award prevailing defendants their attorneys' fees should not apply in actions where private parties proceed against one another.

The Cehs should also recover fees because the text of the statute makes no distinction between prevailing plaintiffs and prevailing defendants, and the judicially-imposed test was not intended for cases where a government actor is not a party to the action—indeed, in a case such as this, it is the civil rights of the defendant that were under attack, perverting the very purpose of Section 1985. The Fifth Circuit has interpreted *Christiansburg* as holding that Defendants should receive attorneys' fees under § 1988 "only when a plaintiff's underlying claim is frivolous, unreasonable, or groundless." *U.S. v. Mississippi*, 921 F. 2d. at 609 (citing *Christiansburg*, 434 U.S. at 422). But, when evaluating a statute, "our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024) (citing *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)). Despite the presumption under *Christiansburg*, basic principles of statutory interpretation and the history of the statute prove that the Cehs should be granted attorney's fees.

First, the text of the statute itself does not stand for the idea that has emerged in the wake of *Christiansburg* that Defendants are rarely entitled to attorney's fees. In relevant part, Section 1988 states: "In any action or proceeding to enforce [42 U.S.C. § 1985] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). By following the principle of beginning with the text and ending there if it is unambiguous, one conclusion emerges. The statute makes no distinction between prevailing plaintiffs and prevailing defendants. If Congress had wished to do so, it

11

could have. In fact, the House Report on the bill expressly stated that both were eligible for fees and that "Congress has not always been that generous." H.R. Rep. No. 1558, 94th Cong., 2d Sess. 6 (1976). Beyond that, this deliberate choice to allow both to recover was a departure from the normal congressional path. "In about two-thirds of the existing statutes, such as the Clayton Act and the Packers and Stockyards Act, only prevailing plaintiffs may recover their counsel fees." *Id.* Therefore, from this choice and the text itself, Congress did not intend such a rigid presumption against defendants recovering fees. The only type of party Congress expressly chose to exclude from recovering fees was the United States. A plain reading of this statute does not support a presumption against prevailing defendants recovering attorney's fees.

Second, the Cehs recognize that the plain reading approach is not the only consideration in statutory interpretation. "Of course, statutes cannot be viewed in isolation, and statutory interpretation requires considering the context and structure of the overall statutory scheme." *Kovac*, 109 F.4th at 335 (citing *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)). Therefore, it is important to consider both the purpose and legislative history of this statute. The Supreme Court has stated that the purpose of the different test for prevailing defendants is to protect them "from burdensome litigation having no legal or factual basis." *Fox*, 563 U.S. at 833 (citing *Christiansburg*, 434 U.S. at 419–20). These cases, despite the text, have resulted in an effective presumption against ever awarding prevailing defendants attorney's fees. Plaintiffs have not faced the same barrier, because "the rationale of the rule

12

rests upon the recognition that nearly all plaintiffs in these suits are disadvantaged persons who are the victims of unlawful discrimination or unconstitutional conduct." H.R. Rep. No. 1558, 94th Cong., 2d Sess. 6 (1976) (explaining the holdings of *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968) and *Northcross v. Memphis Board of Education*, 412 U.S. 427 (1973)).

In this case, it is the Cehs, the Defendants, who are the disadvantaged victims. As stated previously, the Cehs are the parties of limited means, who were subjected to years of litigation, despite a lack of factual or legal allegations that could have subjected them to liability. They are the party that is disadvantaged, whose most fundamental civil right—their First Amendment-protected right to free speech—was chilled by Plaintiffs' perverse and unprecedented application of Section 1985. The Cehs were extremely distressed at being dragged through this litigation and the prospect of a potentially debilitating judgment, just for exercising their right to free speech. Declaration of Steve Ceh. They were subjected to a barrage of negative and abusive messages, accusing them of being racists, Nazis, and terrorists, which continues to this day, and their name is now permanently associated with the "Ku Klux Klan Act." *Id.*

In stark contrast to the Cehs, Plaintiffs are extraordinarily powerful, well-connected, well-funded, and backed by an army of lawyers, investigators, and expert witnesses. Among the Plaintiffs is a wealthy Democrat politician and surrogate for the Biden 2020 presidential campaign. In this perverse and abnormal situation, the

13

prevailing defendants should be awarded attorney's fees, as they are precisely the type of party the rules were designed to protect.

Examining the legislative history of the act leads to the same conclusion. The House Report acknowledges the same reality the text does, that under what became § 1988, "either a prevailing plaintiff or a prevailing defendant is eligible to receive an award of fees." H.R. Rep. No. 1558, 94th Cong., 2d Sess. 6 (1976). It further acknowledges that a major reason for the separate standard is that "governmental officials are frequently the defendants in cases brought under the statutes covered." *Id.* at 7 (citing *Brown v. Board of Education*, 347 U.S. 483 (1954); *Hills v. Gautreaux*, 425 U.S. 284 (1976); *O'Connor v. Donaldson*, 422 U.S. 563 (1975)). The pattern identified by the House Report remains true to the present day. The seminal cases on this issue, both at the Supreme Court and Fifth Circuit, have all included government actors as defendants. *See, e.g., Christiansburg*, 434 U.S. 412; *Fox*, 563 U.S. 826; *U.S. v. Miss.*, 921 F.2d 604; *Myers v. City of W. Monroe*, 211 F.3d 289 (5th Cir. 2000); *Vaughan v. Lewisville Indep. Sch. Dist.*, 62 F.4th 199 (5th Cir. 2023). This pattern identifies yet another reason that this case is distinguishable from the usual standard. There is not a single government actor that is a party to this case. If Congress' purpose in enacting the statute was to protect the little guy and not cater to the government, then nothing about the Cehs situation runs afoul of this purpose. The Cehs are the little guy, subjected to oppressive and vexatious litigation. Whether one uses the textual approach or the legislative history approach, the Cehs check all the boxes for the party that the statue intends to protect.

14

Finally, examining the Supreme Court's reasoning in *Christiansburg* is likewise revealing and reflects the same concerns laid out above. In *Christiansburg*, the Supreme Court analyzed the almost identical attorney's fees provision from Title VII, § 706(k). *See Christiansburg*, 434 U.S. at 418–20. The reasoning discussed herein, both the textual analysis and the congressional considerations, was prevalent throughout the Court's opinion. "It seems clear, in short, that in enacting § 706(k) Congress did not intend to permit the award of attorney's fees to a prevailing defendant only in a situation where the plaintiff was motivated by bad faith in bringing the action." *Id.* at 419. "As pointed out in Piggie Park, if that had been the intent of Congress, no statutory provision would have been necessary, for it has long been established that even under the American common-law rule attorney's fees may be awarded against a party who has proceeded in bad faith." *Id.* The Court concluded in its examination of this provision's legislative history that Congress intended to "make it easier for a plaintiff of limited means to bring a meritorious suit." *Id.* at 420. As to prevailing defendants, "several Senators explained that its allowance of awards to defendants would serve 'to deter the bringing of lawsuits without foundation,' 'to discourage frivolous suits,' and 'to diminish the likelihood of unjustified suits being brought.'" *Id.* While the Court ultimately resolved these competing considerations with the test laid out above, the concerns reflected in the Court's opinion militate in favor of making it easier for the Cehs to recover fees in the same way as a prevailing plaintiff, without the added burden of showing frivolity or lack of foundation. The

15

Cehs' status as defendants does not bar them from an award, and they are the party of limited means that the Court is primarily concerned with.

To be sure, this heightened standard makes sense for the government actor, especially considering the text of the statute, as they have "substantial resources available to them through funds in the common treasury, including the taxes paid by the plaintiffs themselves." H.R. Rep. No. 1558, 94th Cong., 2d Sess. 7 (1976). These "greater resources provide an ample base from which fees can be awarded to the prevailing plaintiff in suits against governmental officials or entities." *Id.* The reasoning behind the separate standard was primarily because of the risk that applying the same standard would "widen the gap between citizens and government officials and would exacerbate the inequality of litigating strength." *Id.* However, this same rationale, be it the resources or the litigating strength, does not apply to a private defendant. No private defendant, especially not the Cehs, possesses the type of resources or litigation strength that drove this line of reasoning in the precedential cases. Again, the Cehs are ordinary, working-class Americans. It does not make any sense, nor does it reflect Congress or the Supreme Court's intent, to apply the standard so rigidly in this unique situation.

The *Christiansburg* test is simply inappropriate for a case in which the defendant is not a government actor and the plaintiff is not of "limited means." This case is unique, and potentially one of the first of its kind, as the Fifth Circuit pointed out, calling this application of Section 1985 "unprecedented in the statute's 152-year history." *In re Mesaros*, at *6. There are no government actors in the case, which

16

represents a departure from the normal course in civil rights cases. Given that, it is ill-suited for the usual approach. Regardless of the school of statutory interpretation applied, they all favor the Cehs. The text itself makes no distinction between parties and asserts no bar to the Cehs' recovery. The Congressional intent reflected in the House Report and the Supreme Court's analysis show that the concerns that usually apply to civil rights plaintiffs applies equally to the Cehs. Finally, if one considers the purpose of the statute, to protect parties of limited means, the Cehs likewise fit the bill. Therefore, the Cehs should be awarded their attorney's fees.

## IV.    Calculation of fees.

The Cehs ask this Court to order Plaintiffs to reimburse their reasonable attorneys' fees in the amount of $135,000. This is a reasonable sum, by any calculation, considering the duration, complexity, and outcome of the litigation in this case. Pursuant to Local Civil Rules 7(j) and 54, the Cehs include the attached Declaration of Jason C. Greaves, as well as Exhibits 2 and 3 in support of this motion for fees.

Undersigned counsel was not retained to represent the Cehs until August 29, 2024, only eight days before jury selection began on September 6. To control costs and simplify billing, undersigned counsel agreed to a flat-rate billing arrangement of $13,500 per day of trial. Because the trial lasted 10 days, the total amount billed was $135,000. Exhibit 2. This is a significant discount from the amount that would have been billed if the agreement had been under standard billable rates. Declaration of Jason C. Greaves; Exhibit 3. Based on the calculation of actual time spent on this

matter through trial, the total cost would have been $183,422. That number would of course be even higher if the Cehs had hired an attorney from the beginning. The amount sought in this motion of $135,000 constitutes a modest and reasonable sum.

## CONCLUSION

For the forgoing reasons, the Ceh Defendants respectfully asks for this Court to award them their reasonable attorney's fees of $135,000, and they request an oral hearing on this motion.


Dated: August 29, 2025

Respectfully submitted,

/s/ *Jason C. Greaves*
Jason C. Greaves, TBN 24124953
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com

Martin K. Etwop, TBN 24120215
(*admitted pro hac vice*)
REMNANT LAW
5900 Balcones Drive, Suite 20675
Austin, Texas 78731
Phone: (512) 720-6218
Fax: (512) 200-4616
metwop@ccdfusa-law.com

*Counsel for Steve and Randi Ceh*

## CERTIFICATE PURSUANT TO LOCAL CIVIL RULE 7(j)(1)

I certify that the parties met and conferred over the subject of this motion for fees. No agreement was reached because Plaintiffs' counsel responded by threatening the Cehs and their counsel with a Rule 11 sanctions motion if the Cehs asserted their rights as prevailing parties under 42 U.S.C. § 1988.

/s/ *Jason C. Greaves*
Jason C. Greaves, TBN 24124953

*Counsel for Steve and Randi Ceh*

## CERTIFICATE OF SERVICE

I certify that on August 29, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ *Jason C. Greaves*
Jason C. Greaves, TBN 24124953

*Counsel for Steve and Randi Ceh*